# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID GRANATA, on behalf of himself and all others similarly situated,<br><br>         Plaintiff,<br><br>    v.<br><br>PRATT & WHITNEY, A DIVISION OF RAYTHEON TECHNOLOGIES CORPORATION; QUEST GLOBAL SERVICES-NA, INC.; BELCAN ENGINEERING GROUP, LLC; BELCAN ENGINEERING GROUP LIMITED PARTNERSHIP; CYIENT INC.; PARAMETRIC SOLUTIONS, INC.; AGILIS ENGINEERING, INC.; MAHESH PATEL; ROBERT HARVEY; HARPREET WASAN; THOMAS EDWARDS; GARY PRUS; FRANK O'NEILL; and JOHN DOES 1-3,<br><br>         Defendants. | Case No. _____<br><br><br>**Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

THE PARTIES.................................................................................................................... 4

    A.     Plaintiff ............................................................................................................ 4

    B.     Defendants ....................................................................................................... 4

JURISDICTION AND VENUE ........................................................................................... 6

FACTUAL BACKGROUND ............................................................................................... 7

    A.     Government Investigation into Aerospace Industry ................................................ 9

          1.     The Department of Justice Reinvigorated Investigating No-Poach Agreements ...................................................................................... 9

          2.     The Department of Justice Files First Criminal Complaint Describing Defendants' No-Poach Conspiracy ........................................... 11

    B.     Defendants' Unlawful No-Poach Agreement ...................................................... 12

THE EFFECTS OF DEFENDANTS' ANTICOMPETITIVE CONDUCT ................................ 21

PLAINTIFF'S CLAIMS ARE TIMELY .............................................................................. 22

    A.     The Statute of Limitations is Tolled ................................................................... 22

    B.     Defendants Have Engaged in a Continuing Violation ......................................... 25

CLASS ACTION ALLEGATIONS .................................................................................... 25

CLAIM FOR RELIEF ...................................................................................................... 28

DEMAND FOR JUDGMENT............................................................................................ 28

JURY DEMAND .............................................................................................................. 29

1.      Plaintiff David Granata brings this class action on behalf of himself and all others similarly situated against Pratt & Whitney, a Division of Raytheon Technologies Corporation ("P&W"); QuEST Global Services-NA, Inc.; Belcan Engineering Group, LLC; Belcan Engineering Group Limited Partnership; Cyient Inc.; Parametric Solutions, Inc.; Agilis Engineering, Inc.; Mahesh Patel; Robert Harvey; Harpreet Wasan; Thomas Edwards; Gary Prus; Frank O'Neill; and John Does 1-3 (collectively, "Defendants"), for claims under the Sherman Act to recover damages and other relief for the substantial injuries he and others similarly situated have sustained arising from Defendants' anticompetitive conduct.

2.      Plaintiff's allegations are based on personal knowledge as to Plaintiff and Plaintiff's own actions and upon information and belief as to all other matters, such information and belief having been informed by the extensive investigation conducted by and under the supervision of Plaintiff's counsel.

## NATURE OF THE ACTION

3.      Plaintiff's claims stem from unlawful agreements among Defendants—aerospace engineering firms—to restrain competition in the labor markets in which they compete for employees—principally engineers and other skilled employees in the aerospace industry. Defendants are major competitors for engineering services. They compete with each other to attract, hire, and retain skilled employees, including engineers and other skilled employees.

4.      Beginning, however, at least as early as 2011 and continuing through at least 2019, senior executives and managers at Defendants entered into a conspiracy not to solicit, recruit, hire without prior approval, or otherwise compete for employees, including engineers and other skilled employees (the "no-poach agreement").

5.      The no-poach agreement was not reasonably necessary to any separate, legitimate business transaction or collaboration among the companies. Rather, Defendants' conspiracy was

1

an ideal tool to suppress their employees' compensation that was simple to implement and easy to enforce.

6.      Critically, Defendants agreed to restrict competition for their employees' services with the purpose and effect of fixing, suppressing, and stabilizing wages, salaries, and benefits and restraining competition in the market for their employees' services. The conspiracy disrupted the efficient allocation of labor that would have resulted if Defendants had competed for, rather than colluded against, their current and prospective employees.

7.      Defendants' agreement to fix, suppress, and stabilize wages, salaries and benefits also restricted their employees' mobility to access better job opportunities.

8.      Defendants successfully concealed the conspiracy's existence for years. It was only recently that the conspiracy was first revealed publicly, when on December 9, 2021, the U.S. Department of Justice ("DOJ") unsealed a criminal complaint against a former manager at P&W, Mahesh Patel, for "participating in a long-running conspiracy with managers and executives of several outsource engineering suppliers [] to restrict the hiring and recruiting of engineers and other skilled laborers among their respective companies."[1] The criminal complaint alleges that Defendant Patel "enforced this agreement while serving as an intermediary between conspiring [s]uppliers."[2]

9.      According to the criminal complaint, the conspiracy operated for nearly a decade—beginning at least as early as 2011 and continuing through at least as late as 2019. The DOJ Antitrust Division stated in a press release that "thousands of workers have been victimized

_____

[1] Department of Justice Press Release, Former Aerospace Outsourcing Executive Charged for Key Role in a Long-Running Antitrust Conspiracy (Dec. 9, 2021), https://www.justice.gov/opa/pr/former-aerospace-outsourcing-executive-charged-key-role-long-running-antitrust-conspiracy ("DOJ Press Release").

[2] *Id.*

over a long period of time."[3] Defendant Patel is alleged to have "served as the leader and primary enforcer of the agreement."[4]

10.     In a joint statement issued the same day as the DOJ Press Release, the United States Department of Defense Office of Inspector General Defense Criminal Investigative Services ("DOD") declared that "[p]rotecting the integrity of the Department of Defense (DoD) procurement process is a top priority for the DoD Office of Inspector General's Defense Criminal Investigative Service (DCIS). We are committed to working with the Antitrust Division and the U.S. Attorney's Office for the District of Connecticut to hold companies and individuals accountable for practices that erode public trust and confidence in the DoD industry."[5]

11.     Nonetheless, DOJ's criminal investigation and forthcoming prosecutions will not compensate employees of Defendants who were harmed by Defendants' anticompetitive conduct. Without this class action, Plaintiff and the Class will be unable to obtain compensation for the harm they suffered, and Defendants will retain the benefits of their unlawful conspiracy.

12.     Defendants' no-poach agreement is a *per se* unlawful restraint of trade that violates Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff, on his own behalf and on behalf of the Class (as defined below), seeks to recover the difference between the compensation that Class members were paid and what Class members would have been paid absent Defendants' no-poach agreement. Plaintiff further seeks to enjoin Defendants from repeating or engaging in their unlawful conduct.

---

[3] *Id.*

[4] Alex Wood, Feds: Pratt & Whitney manager tried to depress engineers' pay, Journal Inquirer (Dec. 9, 2021).

[5] DOJ Press Release.

## THE PARTIES

### A.    Plaintiff

13.    Plaintiff David Granata is a skilled employee who worked for QuEST Global Services-NA, Inc. ("QuEST") from 2013 to March 2018. He currently resides in Rhode Island. Mr. Granata worked for QuEST out of its East Hartford, Connecticut offices. As part of his employment at QuEST, Mr. Granata primarily worked on projects for P&W. As a result of Defendants' no-poach agreement, Mr. Granata earned less than he would have absent the alleged agreement. Further, because of Defendants' unlawful agreement, he was also denied access to better, higher-paying job opportunities and his ability to change employment was restricted.

### B.    Defendants

14.    Defendant Pratt & Whitney, a Division of Raytheon Technologies Corporation, is a subsidiary of Raytheon Technologies Corporation and is incorporated in Delaware, with its principal place of business in East Hartford, Connecticut. P&W provides engineering services, including, in the aerospace industry, designing, manufacturing, and servicing of aircraft engines and auxiliary power units. P&W serves clients throughout the United States.

15.    Defendant QuEST Global Services-NA, Inc. is incorporated in Ohio with its principal places of business in East Hartford, Connecticut. QuEST provides engineering services, including designing, modeling, analysis, prototyping, automation, data documentation, instrumentation, embedded systems development, manufacturing support, and vendor management services in the aerospace industry. QuEST serves clients throughout the United States.

16.    Defendant Belcan Engineering Group, LLC is an engineering services supplier and subsidiary of Belcan, LLC. Belcan Engineering Group, LLC is incorporated in Ohio and maintains an office in East Hartford, Connecticut.

17.     Defendant Belcan Engineering Group Limited Partnership is an engineering services supplier and subsidiary of Belcan, LLC. Belcan Engineering Group Limited Partnership is incorporated in Ohio and maintains an office in East Hartford, Connecticut.

18.     Belcan Engineering Group, LLC and Belcan Engineering Group Limited Partnership are collectively referred to as "Belcan."

19.     Defendant Cyient, Inc. (f/k/a Infotech Enterprises Inc.) ("Cyient") is a technology company that provides outsource engineering services, including in the aerospace industry, with its principal place of business in East Hartford, Connecticut. Cyient is a subsidiary of Cyient Limited, an Indian company headquartered in Hyderabad, India.

20.     Defendant Parametric Solutions, Inc. ("Parametric") is an engineering services company that provides services in the aerospace industry that is incorporated in Florida with its principal place of business in Jupiter, Florida.

21.     Defendant Agilis Engineering, Inc. ("Agilis") is an engineering services company that provides services in the aerospace industry is incorporated in Florida with its principal place of business in Palm Beach Gardens, Florida.

22.     Defendant Mahesh Patel is a natural person residing in Glastonbury, Connecticut. Defendant Patel was a manager and later, a director, of a P&W unit in charge of managing the company's relationship with suppliers. Defendant Patel was based in P&W's East Hartford office. Defendant Patel left P&W in March 2020.

23.     Defendant Robert Harvey is a natural person residing in Farmington, Connecticut. Defendant Harvey was a QuEST Senior Vice President, later a President-Strategic Accounts, and currently, a President-Global Business Head, and worked principally from QuEST's office in East Hartford, Connecticut.

5

24.     Defendant Harpreet Wasan is a natural person residing in South Glastonbury, Connecticut. Defendant Wasan was a QuEST Vice President/Strategic Client Partner, and worked principally from QuEST offices in East Hartford, Connecticut and Tokyo, Japan. Defendant Wasan left QuEST in early 2021.

25.     Defendant Thomas Edwards is a natural person residing in New Fairfield, Connecticut. Defendant Edwards works for Cyient as its President for North America Operations. Defendant Edwards worked principally from Cyient's office in East Hartford, Connecticut.

26.     Defendant Gary Prus is a natural person residing in Jupiter, Florida. Defendant Prus works for Parametric as the Chief Operating Officer/Executive Vice President and is a part owner of Parametric, and worked principally from a Parametric office in Jupiter, Florida.

27.     Defendant Frank O'Neill is a natural person residing in Jupiter, Florida. Defendant O'Neill is the founder and a part owner of Agilis, and worked primarily out of Agilis's Palm Beach Garden, Florida office.

28.     John Does 1-3 are natural persons who conspired with Defendants not to solicit, recruit, hire without prior approval, or otherwise compete for employees, as well as to fix, suppress, and stabilize wages, salaries and benefits for employees.

### JURISDICTION AND VENUE

29.     Plaintiff brings this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

30.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

31.    Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district and a substantial portion of the affected interstate trade and commerce was carried out in this district.

32.    Defendants are subject to the jurisdiction of this Court because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in an illegal conspiracy throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## FACTUAL BACKGROUND

### A.    The Nature of the Aerospace Industry Labor Market

33.    Defendants are leaders in the aerospace industry and compete with each other and with other similarly situated companies to attract, hire, and retain skilled employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

34.    Defendants hire engineers and other skilled employees who assist in maintaining products, accelerating product development and innovation cycles, creating alternate revenue streams, enhancing the consumer experience, and making manufacturing processes, operations and supply chains more efficient.

35.    Engineering positions in the aerospace industry typically require a science background—at a minimum, a Bachelor of Science and often advanced science and engineering degrees. Often, engineering positions require specific knowledge of discreet aspects of aerospace engineering (*e.g.*, commercial engines, military engines, aviation engines, etc.). Management and

other skilled positions similarly require college education and extensive business experience in addition to technical skills and knowledge.

36.     There is a high demand for, and limited supply of, skilled employees who have engineering experience and other skilled employees in the aerospace industry.

37.     Companies in the aerospace industry use a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire potential employees. In addition to direct applications, aerospace companies use "outsourced" engineers and other skilled employees, in which one company hires another company's skilled employees to complete a particular project. P&W, for example, used at least five outsource engineering firms during the Class Period—including Defendants QuEST, Belcan, Cyient, Parametric, and Agilis.[6]

38.     Directly soliciting employees from another company is a particularly efficient and effective method of competing for qualified employees. Soliciting involves communicating directly—whether by phone, e-mail, social and electronic networking, or in person—with another business' employee who has not otherwise applied for a job opening. Such direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf.

39.     Aerospace industry companies rely on direct solicitation of employees of other engineering services companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting.

---

[6] Affidavit in Support of Criminal Complaint and Arrest Warrant at ¶ 6, United States v. Patel, No. 3:21-mj-01189, ECF 15 (D. Conn., Dec. 6, 2021).

40.     Aerospace industry companies also rely on receiving unsolicited applications from other companies' employees. For example, P&W maintained an online portal on which it published job openings and accepted applications.

41.     In a competitive labor market, aerospace industry employers compete with one another to attract skilled talent for their employment needs. This competition benefits employees because they learn about additional job opportunities and, with access to that information, can either switch employers or negotiate for a better salary and/or other terms of employment at their current job. In either situation, competitive recruitment practices benefit employees. Defendants' no-poach agreement, however, restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

### A.     Government Investigation into Aerospace Industry

42.     The aerospace industry plays a vital role in the U.S. national security, as aerospace companies are retained by the U.S. government to provide services to support the Department of Defense and U.S. military. It also plays significant role in the U.S. economy, employing thousands of engineers and other skilled professionals. For these reasons, anticompetitive agreements between competitors have in this industry are particularly pernicious because of the implications to both national defense and a competitive economy.

### 1.     The Department of Justice Reinvigorated Investigating No-Poach Agreements

43.     Anti-poaching agreements among competitors have always been unlawful under the antitrust laws. In October 2016, in an effort to reinvigorate enforcement actions against such conduct, DOJ's Antitrust Division and the Federal Trade Commission issued an Antitrust Guidance For Human Resource Professionals (the "Guidance"). DOJ issued the Guidance to help

human resource ("HR") professionals implement safeguards to prevent inappropriate discussions or agreements with other firms seeking to hire similar employees.

44.     In the Guidance, DOJ alerted HR professionals and others involved in hiring and compensation decisions that "[a]n agreement among competing employers to limit or fix the terms of employment for potential hires may violate the antitrust laws if the agreement constrains individual firm decision-making with regard to wages, salaries, or benefits; term of employment; or even job opportunities." The Guidance specifically called out the illegality of no-poach agreements: "An individual likely is breaking the antitrust laws if he or she . . . . Agrees with individual(s) at another company to refuse to solicit or hire that other company's employees (so-called 'no poaching' agreements)."

45.     The following month, on November 17, 2016, acting assistant attorney general of DOJ's Antitrust Division, Renata B. Hesse, stated, "[G]oing forward employers who conspire to hold down wages or restrict hiring of each other's workers will be investigated criminally and, if appropriate, prosecuted criminally. Naked 'no-poaching' agreements or agreements to fix wages stamp out competition just like agreements to allocate customers or to fix product prices, violations of the law that the Division has traditionally investigated criminally and prosecuted as hardcore cartel conduct."

46.     DOJ officials have continued to reiterate that they would carry on with prosecuting naked no-poach agreements. For instance, on September 12, 2017, then Principal Deputy Assistant Attorney General Andrew C. Finch stated that employers "should be on notice that a business across the street from them—or, for that matter, across the country—might not be a competitor in the sale of any product or service, but it might still be a competitor for certain

types of employees such that a naked no-poaching agreement, or wage-fixing agreement, between them would receive per se condemnation."

47.     On January 19, 2018, Makan Delrahim, Assistant Attorney General for DOJ's Antitrust Division, speaking at a conference sponsored by the Antitrust Research Foundation at George Mason University in Virginia, stated that the agency remained "very active" in policing no-poach agreements between employers.

48.     Soon thereafter, on January 23, 2018, Mr. Finch, speaking to the Heritage Foundation, further stated that the "Division will continue to monitor closely . . . the employer-employee relationship and, in particular, what are sometimes called 'employee no-poach' agreements." He also stated that "the Division expects to initiate multiple no-poach enforcement actions in the coming months."

49.     DOJ made good on its promises to vigorously and criminally prosecute illegal no-poach agreements. For example, in 2021, DOJ has criminally charged and secured indictments against healthcare industry organizations and employees for conspiring to restrain competition in healthcare labor markets. *See, e.g., United States v. Surgical Care Affiliates, LLC*, No. 3:21-cr-00011 (N.D. Tex., Jan. 5, 2021); *United States v. Hee*, No. 2:21-cr-00098 (D. Nev. Mar. 30, 2021).

### 2.     The Department of Justice Files Criminal Complaint Describing Defendants' No-Poach Conspiracy

50.     DOJ's Antitrust Division, in conjunction with the Department of Defense, has an ongoing criminal investigating Defendants' no-poach agreement.

51.     On December 9, 2021, DOJ unsealed a criminal complaint against Defendant Patel, a former manager for P&W, alleging his "participating in a long-running conspiracy with managers and executives of several outsource engineering suppliers [] to restrict the hiring and

recruiting of engineers and other skilled laborers among their respective companies."[7] The complaint alleges that Defendant Patel "enforced this agreement while serving as an intermediary between conspiring [s]uppliers."[8]

52.    Defendant Patel is alleged to have been "a leader and primary enforcer of this agreement." According to the complaint, the conspiracy operated for nearly a decade—beginning at least as early as 2011 and continuing through at least as late as 2019.[9]

53.    If found guilty, Defendant Patel faces up to ten years in prison and a fine of $1 million.

**B.    Defendants' Unlawful No-Poach Agreement**

54.    Beginning at least as early as 2011 and continuing until at least September 2019, Defendants entered into a no-poach agreement that they actively managed, monitored, and enforced.

55.    Defendants' no-poach agreement suppressed the compensation (including salaries, wages, and benefits) offered and paid to their employees. Defendants illegal and anticompetitive no-poach agreement spanned multiple business units and jurisdictions.

56.    The no-poach agreement was primarily orchestrated and implemented by senior executives and managers (including Defendant Patel) and involved promises and commitments not to solicit or hire one another's employees. This no-poach agreement affected recruiting for engineers and other skilled employees and restricted each company from soliciting or hiring

---

[7] DOJ Press Release (Dec. 9, 2021).

[8] *Id.*

[9] Alex Wood, Feds: Pratt & Whitney manager tried to depress engineers' pay, Journal Inquirer (Dec. 9, 2021).

current employees from the other's company. At times, this agreement operated as an agreement not to hire current employees from one another without prior approval.

57.     Defendants are competitors in the recruitment and retention of engineers and other skilled employees in the United States.

58.     Specifically, the no-poach agreement involved P&W's arrangements with outsourcing engineering firms—including Defendants QuEST, Belcan, Cyient, Parametric, and Agilis. P&W entered into outsourcing arrangements with these companies to complete a particular project, which were often referred to as a "Statement of Work." Defendants QuEST, Belcan, Cyient, Parametric, and Agilis, then assigned engineers and other skilled workers from among its own employees to complete that project, and then received an agreed-upon payment from P&W for such work.

59.     Although these outsource engineering companies may be considered "suppliers" of labor to P&W, P&W and the outsourcing companies compete with each other for engineers and other skilled employees.

60.     Defendant Patel, on behalf of P&W, coordinated with executives at each of the conspiring outsource engineering companies. These executives included Defendants Harvey, Wasan, Edwards, Prus, O'Neill, and:

> (a)     John Doe 1, the Associate Vice President for QuEST.  John Doe 1 also worked primarily out of QuEST's East Hartford office.
>
> (b)     John Doe 2, the former General Manager and Chief Engineer/Account Manager for QuEST. John Doe 2 also worked primarily out of QuEST's East Hartford office.

> (c)     John Doe 3, the Senior Vice President for Belcan. John Doe 3 worked primarily out of Belcan's Windsor, Connecticut office.

61.     Each Defendant worked together to avoid soliciting or hiring their respective workers. The ultimate purpose of the conspiracy was to avoid competing on wages and benefits. Increases in labor costs, such as increased wages or benefits to engineers and other skilled employees, increased Defendants overall costs associated with a given project. Accordingly, Defendants kept very close tabs on their labor costs and had a strong interest in minimizing or reducing labor costs.

62.     The purpose of the conspiracy was laid bare in communications between Defendants. In a January 2017 email, Defendant Patel reprimanded one of his conspirators after Parametric had hired one of Cyient's employees, stating, "***Please do not hire any partners employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war***" between competitors over their employees' salaries. This intended purpose was conveyed multiple times over the course of the conspiracy and was understood by the conspirators. As one conspirator wrote in a March 2016 email, "Mahesh says ***he does not want the salaries to increase***."

63.     In addition to using phone and email, Defendants coordinated, monitored and enforced their no-poach agreement through in-person meetings. For example, there were weekly meetings between senior managers at QuEST and senior managers at P&W—including Defendant Patel, the manager in charge of engineering outsourcing at P&W. At these meetings, QuEST managers and P&W managers, including Defendant Patel, would discuss engineer applications and which applicants from QuEST were or were not permitted to be hired at P&W.

Out of around fifty applications per week, a majority of applicants were explicitly categorized into a subset of individuals "not permitted to interview at P&W."

64.     In another instance, in December 2015, P&W hosted a dinner that included the other Defendants, where Defendant Patel told his fellow conspirators that they should not be poaching each other's employees.

65.     Defendants, particularly Defendant Patel, kept a watchful eye on each other's hiring practices to ensure that each was complying with the terms of the no-poach agreement. When one Defendant was accused of poaching another Defendant's employee, Defendant Patel often mediated the dispute and directed the Defendant breaching the agreement to take corrective steps and re-affirm their commitment to abide by the no-poach agreement.

    (a)     In May 2016, John Doe 3, Belcan's Senior Vice President, was informed by a colleague that "another employee" had been hired by Parametric to work on an outsourcing project. The Vice President confirmed that he had spoken to Defendant Patel about this hiring and relayed that Defendant Patel replied that "he'd talk to [Parametric] about it." The Vice President emailed Defendant Patel to complain about the breach of the no-poach agreement and identified the employee that was poached.

    (b)     In September 2016, Defendant Patel learned from Belcan that Parametric had poached one of Belcan's employees. After Defendant Patel received the complaint, Defendant Patel emailed Defendant Prus at Parametric, stating: "***You had assured me that [Parametric] will never soliciting [sic] [P&W's] long term partners [sic] employees. … Please send me in writing that proper steps has [sic] taken place to curtail this practice***."

15

Defendant Prus understood that Belcan was the source of the complaint: "Belcan is making a big stink right now over any solicitations." Ultimately, these Defendants reconfirmed their commitment not to solicit each other's employees.

(c)     In November 2016, Defendant Prus emailed Defendant Patel complaining about Belcan's hiring of a Parametric employee: "Belcan actively Recruiting Parametric employees." Defendant Patel forwarded that email to John Doe 3 and other Belcan executives, warning them that "*We must not poach each other [sic] partners employee [sic]. Please communicate to Belcan HR not to interview or hire active employees working on P&W work*."

(d)     In January 2017, Cyient informed Defendant Patel that Parametric had hired a Cyient employee. Defendant Patel forwarded that email to Parametric, stating: "Last time we talked you assured me that you will not hire any [P&W] partners employee [sic]. *This must stop, otherwise others will also start poaching your employees*. Please advise."

(e)     In February 2017, Defendant Wasan sent an email in response to Belcan's offer of employment to a QuEST engineer, stating "Belcan is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." Minutes later, sent an email to Defendant Patel forwarding the news about the hire, and stating "*I am very concerned that Belcan believes they can hire any of our employees*. …. *Could you please stop this person from being hired by Belcan*?"

16

(f)     In an April 2017 email, John Doe 2 emailed Defendant Patel complaining that Cyient had hired an employee of QuEST, telling him, "***This is against our agreements with our employees and against our known expectations of P&W for the cooperation of the outsource companies***." Defendant Patel arranged a "private discussion" the next day in his office with John Doe 2 from QuEST and Defendant Edwards from Cyient.

66.    As part of the overarching no-poach agreement, P&W and QuEST had additional arrangements that reinforced and further restrained competition in the market for engineers and other skilled employees. These included (1) a "two-year tenure restriction" and (2) "hiring freezes."

67.    ***The Two-Year Tenure Restriction***. P&W and QuEST agreed to a restriction whereby, each company would refrain from recruiting or hiring each other's employees. Defendant Harvey and another individual with knowledge of the conspiracy lobbied Defendant Patel to agree that P&W would not hire QuEST's employees until they had worked at QuEST for a certain length of time.

68.    In September 2011, Defendant Harvey and another individual with knowledge of the conspiracy attended a dinner with Defendant Patel and a P&W Vice President to whom Defendant Patel directly reported to discuss that and other issues. Defendant Harvey sent an email to the dinner group the following day, stating: "We truly appreciate and value our strategic relationship. ... I thought I would take the lead in summarizing what we discussed last night and proposed next steps..." First on that list was "Personnel Transfers," which Defendant Harvey described as "the new policy/guidelines" that the P&W Vice President had reviewed at the dinner. The new policy related to a "min. 24 months" for such "Personnel Transfers." Defendant

Harvey further indicated that Defendant Patel had advised to minimize the written record on that issue: "Following Mahesh's previous counsel, I am not going into detail in writing on this subject."

69.     As an example, in October 2012, an individual with knowledge of the conspiracy responded to Defendant Patel by email regarding a QuEST employee after receiving a voicemail from Defendant Patel: "[Employee]'s tenure at QuEST dates to May 2011. Based on our agreement of two-year minimum tenure, we would ask that P&W not pursue employment of [him] at this time."

70.     Defendant Patel continued his communications with others at QuEST. Defendant Patel emailed Defendant Wasan and two other QuEST managers, stating that P&W "is interested in interviewing and hiring" two QuEST employees, "[p]lease provide your concurrence." One of the QuEST managers responded to Defendant Patel that one of the individuals in question had worked at QuEST for four and a half years, and thus "meets requirements," but the other "only has 8 months and does not meet obligation, so QuEST cannot provide concurrence."

71.     As another example, in April 2017, a QuEST manager noted in an internal email to another QuEST manager that he had received a notice from P&W that it wanted to hire a particular QuEST employee, but he "wouldn't meet our requirements for two years." Two days later, the same manager emailed Defendant Patel and stated that the employee "does not meet tenure requirements." Defendant Patel then told a P&W Human Resources employee: "QuEST will not release him...He has not completed 2 [y]ears as our verbal agreements."

72.     ***The Hiring Freezes.*** Between 2015 and 2017, P&W and QuEST discussed and agreed upon periods of time—ranging from several months to nearly an entire year (e.g.,

18

2016)—in which P&W would not recruit or hire any QuEST employees, with only limited exceptions. These periods were referred to as hiring "freezes" or "moratoria."

73.     Each hiring freeze began by QuEST managers and executives lobbying Defendant Patel to restrict or cease hiring from QuEST. As an example, in September 2015, Defendant Patel emailed three QuEST employees, including Defendant Wasan, asking for the company's "concurrence" in P&W's hiring of two named QuEST engineers. Defendant Wasan responded to Defendant Patel at length, complaining about the recent increase in P&W's hiring. While Defendant Wasan agreed that both employees in question "have at least two years [QuEST] experience, so [they] meet the 'handshake agreement' level," he stated that no offer could be extended to them: "[QuEST] will not be able to concur with any more hiring of [QuEST] employees this year. ... All we can do is highlight the problem and ask that [P&W] support us going forward to prevent further hiring of our resources." In a follow-on email, Defendant Harvey added, addressing Defendant Patel directly, "Mahesh, we truly need your help in blocking these two hires and putting a moratorium on [QuEST] hires for the remainder of the year."

74.     As another example, emails show that in January 2016, Defendant Patel and Defendant Wasan were working early in the year to establish a new hiring freeze for 2016. Defendant Wasan reported to John Doe 2 and another colleague that "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. ***Also I am going to tell him that he needs to block***" two QuEST engineers "***from being hired until we come to an agreement on the acceptable limit to hire [from] our team***."

75.     In addition, emails show that Defendant Patel was the one who announced the beginning of hiring freezes to other P&W personnel involved in recruiting and hiring engineers

and directed them to comply with it. As an example, in an early September 2017 email to the Vice President of Human Resources-Engineering, Defendant Patel requested that she "direct your HR team not to hire [QuEST] outsource resources currently deployed on [P&W] projects till end of this year....[QuEST] senior leadership including CEO has repeatedly raised concerns on [P&W] hiring [QuEST] employees."

76.     QuEST and P&W were mutually incentivized to enter the hiring freeze. QuEST could not simultaneously maintain low prices to its customer, P&W, *and* compete with them for engineers and other skilled labor as a result of P&W's higher wages. Thus, by agreeing to curb P&W's recruiting and hiring from QuEST, when many QuEST engineers would otherwise leave for higher wages and other benefits that P&W offered, Defendant Patel helped alleviate upward pressure on costs to both companies. While P&W and QuEST occasionally expressed other reasons for wanting to limit hiring and recruiting between them—*e.g.*, to avoid disruption of engineering projects—the investigation has revealed that the existence and continuation of the conspiracy lessened the pressure on QuEST to better compete with P&W on wages, benefits, and professional opportunities for engineering and other skilled employees.

77.     Consistent with this shared interest, as part of QuEST's lobbying of Defendant Patel to agree to the hiring freezes, QuEST appealed to the financial benefits that would accrue to both QuEST and P&W if P&W ceased recruiting and hiring QuEST engineers, including by containing wage increases.

78.     As an example, in June 2017, QuEST's President, Defendant Harvey, made a business proposal to the parent company of P&W, which was forwarded to Defendant Patel. This proposal, Defendant Harvey noted in his cover email, would be discussed with Defendant Patel and others during upcoming negotiations. The proposal provided a "partnership approach on how

20

we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services to" P&W's parent company. In the attached presentation, Defendant Harvey explicitly requested further hiring restrictions between the two companies, given that "We have found that customer hiring of our resources puts pressure on QuEST's and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time."

*     *     *     *

79.     The overall effect of Defendants' no-poach agreement was to stifle competition for engineering and other skilled labor and suppress compensation to these employees.

### THE EFFECTS OF DEFENDANTS' ANTICOMPETITIVE CONDUCT

80.     Defendants' conspiracy suppressed Plaintiff's and the Class's compensation and restricted competition in the labor market in which Plaintiff and the other Class members sold their services. Defendants accomplished this through their unlawful no-poach agreement.

81.     In a competitive labor market, aerospace industry companies would compete with one another to attract skilled talent for their employment needs. As DOJ's Guidance explains, "competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment."

82.     Defendants' no-poach agreement intended to and did suppress compensation. Direct solicitation from competing employers has a significant beneficial impact for individual employees' compensation. Competing employers may make offers that exceed an employee's current salary, allowing her to receive a higher salary by either changing employers or negotiating increased compensation from her current employer. In addition, recruits often inform other employees of the offers they have received. Such information spreading can lead to movement or negotiation by those other employees.

83.     No-poach agreements similarly affect compensation practices by employers. A firm that directly solicits competitors' employees will learn whether its offered compensation is enough to attract its competitors' employees and may increase an offer to make itself more competitive. Similarly, companies losing, or at risk of losing, employees to competitors may preemptively increase their employees' compensation in order to reduce their competitors' appeal.

84.     Information about higher salaries and benefits provided by recruiters for one firm to employees of another firm naturally would increase employee compensation. Restraining direct recruitment made higher pay opportunities less transparent to workers and thus allowed employers to keep wages and salaries down.

85.     The beneficial effects of free and open solicitation are not limited to the particular individuals solicited or to the particular individuals who would have been solicited but for the no-poach agreement. Rather, the effects of eliminating direct solicitation impacted all members of the Class: those employed by Defendants during the Class Period.

86.     Defendants' conspiracy restricted competition in the labor market in which Plaintiff and the Class sold their services. As a result, Plaintiff and the Class maintained lower salaries, reduced benefits, and restricted job opportunities.

## PLAINTIFF'S CLAIMS ARE TIMELY

### A.     The Statute of Limitations is Tolled

87.     Defendants fraudulently concealed the operation and existence of their conspiracy. Accordingly, the statute of limitations application to Plaintiff's claims have been tolled.

88.     Defendants actively concealed, suppressed, and failed to disclose material facts to Plaintiff and members of the Class concerning Defendants' unlawful no-poach agreement.

Criminal and civil penalties for entering into illegal no-poach agreements are severe. Not surprisingly, Defendants took affirmative measures to conceal this agreement.

89.     Defendants employed the following tactics to actively conceal details of their illegal no-poach agreement:

(a)     Communications between Defendants regarding the no-poach agreement were conducted by senior executives; and

(b)     Senior executives engaged in direct lines of communications to manage and enforce the no-poach agreement.

90.     In combination with their efforts to keep the no-poach agreement secret, Defendants misrepresented to Plaintiff and the Class that they were committed to abiding by antitrust and fair competition laws.

91.     For example, Raytheon Technologies Corporation, which was created in April 2020 via merger between Raytheon Co. and P&W's former parent United Technologies Corporation, states in its Code of Conduct that "anti-competitive activities are always a violation of our values."[10]

92.     And in its Code of Conduct, QuEST states that "anti-competitive activity will not be tolerated."[11]

---

[10] Raytheon Technologies, Code of Conduct (2020), https://www.rtx.com/-/media/project/united-technologies/rtx/home/our-company/ethics-and-compliance/media/rtx-code-of-conduct-english.pdf?rev=1cb38b3fe62c4ca4a8ff92cc24108ac3 . Prior to the 2020 merger, United Technologies had a similar policy in its Code of Conduct: "[A]nti-competitive activities are always a violation of our core values. They can also result in severe civil or criminal penalties for companies and individuals. We compete vigorously and legally, not only because it's good for our business and reputation, but because it's the right thing to do." United Technologies, United by Values, https://www.rtx.com/-/media/project/united-technologies/utc/files/code-of-ethics/coe_us_text_doc_final_english.pdf .

[11] QuEST Global Inc., QuEST Code of Conduct (Sept. 2020), https://3fee7a1sld751eqrjr3a035t-wpengine.netdna-ssl.com/wp-content/uploads/2021/08/Code-of-Conduct-Brochure-v4-Sep-2020.pdf .

93.     Belcan's Code of Conduct "requires and expects everyone to conduct business fairly, impartially, and *in full compliance with all laws and regulations*" (emphasis added).[12]

94.     Cyient has a similar policy outlined in its Code of Conduct. It states that "Directors and Senior Management personnel shall avoid actions that could reasonably be construed as being anti-competitive, monopolistic or otherwise contrary to laws governing competitive practices in the marketplace, including antitrust laws."[13]

95.     These statements impliedly represented to Plaintiff and the Class that Defendants were not violating antitrust laws by entering into an anticompetitive agreement. Unbeknownst to Plaintiff and the Class, Defendants entered into an agreement to restrain competition for employees like Plaintiff and other Class members.

96.     Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff or the Class on inquiry notice that Defendants conspired to restrict competition for Class members' services through anti-solicitation agreements. As discussed above, Defendants' discussions often occurred via private correspondences among top company executives.

97.     The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Class because they related to potential employment opportunities and increases in compensation.

---

[12] Belcan, Code of Conduct (2019), https://www.belcan.com/about/corporate-beliefs/ .

[13] Cyient, Code of Conduct (April 15, 2016), https://www.cyient.com/hubfs/5724847/FY_19_Revamp_Assets_Website/Investors%20/Corporate%20Governance/Code_of_Conduct_150416_edited.pdf .

98.     As a result of Defendants' fraudulent concealment of their conspiracy, the running

of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class

members allege herein.

**B.     Defendants Have Engaged in a Continuing Violation**

99.     Defendants' unlawful conduct and anticompetitive scheme is continuing. Plaintiff

and members of the Class are entitled to recover damages suffered within the applicable

limitations periods**.**

100.    A claim for damages accrued each time Defendants engaged in wrongful

communications regarding the no-poach agreement, restricted an applicant's ability to advance

through the hiring process on account of the no-poach agreement, or otherwise abided by,

attempted to enforce, or reaffirmed the no-poach agreement. Accordingly, Plaintiff and members

of the Class are entitled to recover all damages suffered within the applicable limitation period

for the statutory claims pleaded below.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action on behalf of himself and all others similarly situated as

a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, seeking

equitable and injunctive relief, as well as damages, on behalf of the following class (the "Class"):

> All natural persons employed by P&W, QuEST, Belcan, Cyient,
> Parametric, Agilis, or their wholly-owned subsidiaries as engineers
> or other skilled employees at any time from at least as early as
> 2011 to at least September 2019 (the "Class Period").

102.    The following persons and entities are excluded from each of the above-described

proposed Class:

(a)   Defendants and their counsel, parent companies, franchisees, officers,

directors, management, employees, subsidiaries, or affiliates;

(b)   All governmental entities;

(c)   All Counsel of Record; and

(d)   The Court, Court personnel and any member of their immediate families.

103.   As each Defendant employed hundreds, if not thousands, of Class members each year, members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomical for many plaintiffs to bring individual claims and join them together. The Class is readily identifiable.

104.   Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendants in that they were injured as a result of Defendants' wrongful conduct.

105.   Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.

106.   Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation and with experience in class action antitrust litigation.

107.   Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the Class, making damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

108.   Questions of law and fact common to the Class include:

(a)      Whether Defendants entered into a no-poach agreement to restrict competition in the labor market in which Plaintiff and the other Class members sold their services;

(b)      The scope and duration of the unlawful agreement;

(c)      Whether such an agreement was a *per se* violations of the Sherman Act;

(d)      Whether Defendants' no-poach agreement caused injury to the business or property of Plaintiff and other members of the Class;

(e)      Whether any such injury constitutes antitrust injury;

(f)      The appropriate measure of damages suffered by Plaintiff and other members of the Class; and

(g)      Whether Plaintiff and other members of the Class are entitled to injunctive relief.

109.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practically be pursued individually, substantially outweighs potential difficulties in management of this class action.

110.     Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIM FOR RELIEF

### IN VIOLATION OF 15 U.S.C. § 1
### (ON BEHALF OF PLAINTIFF AND THE CLASS)

111.    Plaintiff incorporates the preceding paragraphs by reference.

112.    Defendants knowingly, intentionally, and cooperatively engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for Class members' services through a no-poach agreement with the purpose and effect of suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

113.    Defendants' conduct injured Plaintiff and other Class members by depriving them of free and fair competition in the market for their services.

114.    Defendants' no-poach agreement is a *per se* violations of Section 1 of the Sherman Act.

115.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have received compensation that is less than they would have received had the market for their services been competitive.

## DEMAND FOR JUDGMENT

116.    WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully demands that this Court:

(a)    Determines that this action may be maintained as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and directs that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declares Plaintiff as representatives of the Class;

(b)   Finds that the unlawful conduct alleged herein be adjudged and decreed to violate the Sherman Act;

(c)   Awards damages, trebled, in an amount to be determined at trial;

(d)   Awards Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

(e)   Awards such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

117.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.

Date: December 14, 2021                    Respectfully submitted,


                                           By:*/s/ David A. Slossberg*

                                           David A. Slossberg
                                           Jeffrey P. Nichols
                                           **HURWITZ SAGARIN SLOSSBERG &
                                           KNUFF, LLC**
                                           147 North Broad Street
                                           Milford, CT  06460
                                           Tel:  203-877-8000
                                           DSlossberg@hssklaw.com
                                           JNichols@hssklaw.com

                                           Gregory S. Asciolla
                                           Robin A. van der Meulen
                                           Matthew J. Perez
                                           Veronica Bosco
                                           **LABATON SUCHAROW LLP**
                                           140 Broadway
                                           New York, NY 10005
                                           Tele: (212) 907-0700
                                           gasciolla@labaton.com
                                           rvandermeulen@labaton.com
                                           mperez@labaton.com
                                           vbosco@labaton.com

                                           *Attorneys for Plaintiff and the Proposed
                                           Class*