UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE and JAMES ROE (pseudonyms), individually and on behalf of all other similarly situated,<br><br>      Plaintiffs,<br><br>            v.<br><br>RAYTHEON TECHNOLOGIES CORPORATION; PRATT & WHITNEY; COLLINS AEROSPACE; QUEST GLOBAL SERVICES, NA; BELCAN LLC; CYIENT, INC.; PARAMETRIC SOLUTIONS, INC.; AGILIS ENGINEERING INC.; MAHESH PATEL; NATALIA KHANDROS; STEVE HOUGHTALING; TOM EDWARDS; GARY PRUS; FRANK O'NEILL; ROBERT HARVEY and HARPREET WASAN<br><br>      Defendants. | Civil Action No. 3:21-cv-01657-SVN<br><br>AMENDED CLASS ACTION COMPLAINT<br><br><u>DEMAND FOR JURY TRIAL</u> |

TABLE OF CONTENTS

I.    SUMMARY OF THE ACTION ...................................................................................... 1

II.   CRIMINAL PROCEEDINGS .......................................................................................... 6

III.  JURISDICTION AND VENUE ....................................................................................... 7

IV.   THE PARTIES ................................................................................................................. 7

V.    AGENTS AND CO-CONSPIRATORS ........................................................................ 13

VI.   FACTUAL ALLEGATIONS ......................................................................................... 14

      A.    Interstate Commerce ........................................................................................... 14

      B.    Market for Aerospace Engineering Services....................................................... 14

      C.    Defendants Have Market Power .......................................................................... 16

      D.    How the Aerospace Market Looks Without a No-Poach Agreements.......................... 18

      E.    Defendants' No-Poach Agreements .................................................................... 19

      F.    Defendants Worked Together to Ensure Compliance with the No-Poach Agreements
            Specifically to Suppress Wages .......................................................................... 21

      G.    Defendants Shared the Same Anticompetitive Goals ......................................... 23

      H.    Defendants Pratt & Whitney, Collins Aerospace, Natalia Khandros and Mahesh Patel
            Policed and Enforced the No-Poach Agreements Amongst Supplier Defendants.................... 24

      I.    Defendants Were Fully Aware Their Conduct Was Unlawful ....................................... 28

      J.    Aerospace Market and Indirect Market Evidence of Collusion .................................... 30

      K.    Defendants Concealed their Unlawful Conduct to the Detriment of the Class.............. 33

VII.  CLASS ACTION ALLEGATIONS ............................................................................... 34

VIII. ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION .......... 35

IX.   EQUITABLE TOLLING AND STATUTE OF LIMITATIONS..................................... 37

X.    CLAIM FOR RELIEF ................................................................................................... 38

XI.   DEMAND FOR JURY TRIAL...................................................................................... 40

XII.  PRAYER FOR RELIEF ................................................................................................ 40

## ANTITRUST CLASS ACTION COMPLAINT

Pursuant to Rule 23 of the Federal Rules of Civil Procedure Plaintiffs John Doe and James Roe ("Plaintiffs"), individually and on behalf of others similarly situated, file this complaint seeking damages and injunctive relief under the antitrust laws of the United States, against Defendants Raytheon Technologies Corporation ("Raytheon"), Pratt & Whitney ("P&W"), Collins Aerospace f/k/a/ UTC Aerospace Systems ("Collins" or "UTAS"), Belcan LLC ("Belcan"), Cyient Inc. ("Cyient"), Parametric Solutions, Inc. ("PSI"), Agilis Engineering Inc. ("Agilis") (collectively, the "Corporate Defendants"); and individual Defendants Mahesh Patel, Steve Houghtaling, Tom Edwards, Gary Prus, Frank O'Neil, Robert Harvey, and Harpreet Wasan (together, the "Individual Defendants") (collectively, "Defendants"). Plaintiffs seeks treble damages and injunctive relief for Defendants' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 & 3.

## I.      SUMMARY OF THE ACTION

1.      This civil antitrust class action alleges a conspiracy among Defendants P&W, Collins, and other Defendant engineering outsource suppliers (Belcan, Cyient, PSI, QuEST and Agilis), to restrict competition for skilled labor, including engineers and other skilled aerospace workers ("Skilled Aerospace Workers") working on aerospace projects. Defendant P&W hired Skilled Aerospace Workers directly, or through the other Defendants. This conspiracy consists of illegal agreements among Defendants to not hire each other's Skilled Aerospace Workers (the "No-Poach Agreements" or "Agreements"). Plaintiffs seek damages and injunctive relief for Defendants' unlawful restraint of competition in the market for Skilled Aerospace Workers.

2.      Corporate Defendants P&W, Collins, Belcan, Cyient, PSI and QuEST perform aerospace engineering work, either as aerospace engineering firms, or as suppliers of aerospace engineering labor that is outsourced to aerospace engineering firms.

1

3.      Defendants entered into their No-Poach Agreements at least as early as 2011 and continued them until at least 2019. Throughout this time, Defendants intentionally concealed their No-Poach Agreements from their employees, independent contractors, and the public at large.

4.      Defendants' unlawful conspiracy was only revealed on December 9, 2021, when the United States Department of Justice ("DOJ") unsealed a criminal matter against Individual Defendant Mahesh Patel. The DOJ alleges that Defendant Patel "served as a leader and primary enforcer" of agreements "to allocate victim-employees in the labor market in the aerospace industry working on projects for [P&W], specifically by agreeing to restrict the hiring and recruiting of engineers and other skilled-labor employees between and among [the Corporate Defendants] in the United States." Affidavit in Support of Criminal Complaint and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-01189-RAR (D. Conn. Dec. 9, 2021), ECF No. 15 ("DOJ Aff."), ¶ 11.

5.      The No-Poach Agreements were broad in their application, covering all aerospace engineers and similar skilled employees and independent contractors who worked for Defendants in the United States and its territories.

6.      The intended and actual effect of the No-Poach Agreements was to fix and suppress Skilled Aerospace Worker compensation, and to impose unlawful restrictions on Skilled Aerospace Workers' mobility.

7.      Defendants established these unlawful horizontal agreements through the work of individuals at the highest levels of their respective organizations. They accomplished their goal through verbal agreements, though their conduct, as well as through emails and in person meetings. Defendants' senior executives frequently reaffirmed, monitored, and enforced their No-Poach Agreements throughout the class period.

8.      The No-Poach Agreements were comprised of multiple overlapping recruiting restrictions, all of which worked together to limit competition among the Defendants for Skilled Aerospace Workers. These Agreements served together as part of a single scheme to restrict the

free movement of Skilled Aerospace Workers and suppress their compensation. The No-Poach Agreements artificially extended the Skilled Aerospace Workers' terms of employment at their employers by preventing them from accessing information about other job opportunities and benefits and compensation structures that they could use to negotiate better terms with their existing employees. By engaging in these illegal No-Poach Agreements, Defendants eliminated outside opportunities and stripped Skilled Aerospace Workers of any bargaining power. As a result of Defendants' illegal No-Poach Agreements, Skilled Aerospace Workers experienced artificially suppressed wages and reduced job mobility for nearly a decade.

9.      Defendants participated in these No-Poach Agreements, at the expense of their employees, for their own financial benefit. By participating in these No-Poach Agreements, Defendants were able to decrease their labor costs by suppressing wages for their skilled, technical, and engineering personnel, who formed the backbone of their aerospace businesses.

10.     Defendants regularly policed their unlawful No-Poach Agreements. By way of example, in a January 2017 email, Defendant Patel of P&W contacted Defendant PSI after they hired a Cyient employee stating "Please do not hire any partners employee, whether they approached, or you approached. That is the only way we can pre[v]ent poaching and price war." DOJ Aff., ¶ 24. This express written agreement, and many others like this, makes the purpose of the No-Poach Agreements clear: to restrict competition and prevent fair compensation of Skilled Aerospace Workers. According to the DOJ, Patel instructed executives from other Defendants not to recruit or hire employees from each other. Patel further served as the intermediary between the other Defendants and was the chief enforcer of the No-Poach Agreements.

11.     Defendants actively monitored and enforced their No-Poach conspiracy. If one Defendant believed that another Defendant was defecting from the conspiracy, they would report these perceived violations to Defendant Patel of P&W—the ringleader—who would direct the defecting party to comply with the No-Poach Agreements. For example, while working at UTAS, Defendant Natalia Khandros, who had worked closely with Patel previously, ensured compliance with the Agreements by reprimanding individuals who hired skilled personnel from

3

Belcan. Due to Patel's status as a customer of the other outsource supplier Defendants, and their own profit in participating in the unlawful No-Poach Agreements, the Defendants would course correct and continue to abide by the Agreements.

12.     The No-Poach Agreements were not reasonably tied to any separate, legitimate business transaction or collaboration among the Defendants. Defendants relied on the No-Poach Agreements for their financial self-interest, as reflected by their communications amongst each other. Defendants' compliance with the No-Poach Agreements was directly tied to the financial benefits they received from suppressing wages. Specifically noting that discipline in "not hir[ing] any partners employee" was essential to "pre[v]ent poaching and price war." DOJ Aff., ¶ 24.

13.     The No-Poach Agreements were categorically and intentionally concealed from Plaintiffs and the proposed Class. If not for the DOJ investigation and unsealing of the arrest warrant of Patel, the No-Poach Agreements could have been permanently hidden from the Class.

14.     Defendants were well aware that their No-Poach Agreements were illegal. Knowledge of their illegal actions is evidenced by Defendants' own communications with each other, including discussions where Defendants raised concerns about violating antitrust laws. Defendants took affirmative steps to conceal their No-Poach Agreements and communications about the Agreements. Despite knowing that No-Poach agreements are illegal, Defendants were undeterred from continuing their illicit No-Poach Agreements.

15.     Defendants' No-Poach Agreements are the precise type of agreements that has been established by antitrust enforcers in the United States to be unlawful. In 2016, the DOJ and Federal Trade Commission ("FTC") issued guidance about the unlawful and anticompetitive nature of No-Poach Agreements. The guidance made clear that No-Poach Agreements between and among employers to avoid soliciting or hiring each other's employees "eliminates competition in the same irredeemable way as agreements to fix product prices or allocate customers, which have traditionally been criminally investigated and prosecuted as hardcore cartel conduct." Dep't of Justice Antitrust Div. and Fed. Trade Comm'n, Antitrust Guidance for Human Resource Professionals, at 4 (Oct. 2016).

16.     The DOJ has continued to issue guidance to employers reiterating that no-poach agreements are illegal. In 2019 the DOJ wrote:

> When companies agree not to hire or recruit one another's' employees, they are agreeing not to compete for those employees' labor. Robbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment. Under the antitrust laws, the same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services.

No-Poach Approach, Dep't of Justice Antitrust Div. (Sept. 30, 2019), https://www.justice.gov/atr/division-operations/divisionn-update-spring-2019/no-poach-approach (last visited Dec. 17, 2021).

17.     Defendants worked on a variety of aerospace projects, including military and government work. Government work is generally governed by the Federal Acquisition Regulation ("FAR").

> The FAR is the primary regulation for use by all executive agencies in their acquisition of supplies and services with appropriated funds. It became effective on April 1, 1984, and is issued within applicable laws under the joint authorities of the Administrator of General Services, the Secretary of Defense, and the Administrator for the National Aeronautics and Space Administration, under the broad policy guidelines of the Administrator, Office of Federal Procurement Policy, Office of Management and Budget.

Title 48, Chap. 1. (Federal Acquisition Regulations, (September 21, 2021) https://www.acquisition.gov/far/forwarda).

18.     Among other things, the FAR precludes anticompetitive activity with respect to government contract bids. FAR 3.303. This includes any sort of anticompetitive practice. *Id*. at 3.301. (Examples of anticompetitive practices are collusive bidding, follow-the-leader pricing, rotated low bids, collusive price estimating systems, and sharing of the business.).

19.     Pursuant to the FAR regulations, specifically Section 3.303, Defendants were obligated to report antitrust violations. Despite their knowing participation in the conspiracy, and knowledge of its unlawful nature, no Defendant reported the No-Poach Agreements to the Federal Government.

5

20.     Defendants worked on a variety of government contracting work, including for the United States military. Through working on these projects Defendants were subject to FAR regulations including reporting antitrust violations.

21.     The aerospace industry is specifically vulnerable to the anticompetitive conduct of Defendants. The aerospace industry is characterized in part by high barriers to entry, high barriers to exit, personal relationships between executives at companies such as P&W, and numerous opportunities to collude.

22.     Defendants' No-Poach Agreements for Skilled Aerospace Workers unreasonably restrained trade in violation of the Sherman act, 15 U.S.C. § 1. Plaintiffs Doe and Roe, on their own and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful practices and to recover actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs demand a trial by jury.

## II.      CRIMINAL PROCEEDINGS

23.     On December 9, 2021, the DOJ unsealed a criminal antitrust action against Defendant Mahesh Patel. Defendant Patel was the Director of Global Engineering Sourcing at P&W, a subsidiary of Defendant Raytheon Technologies Corporation. In this role, Patel was responsible for maintaining relationships with suppliers. The DOJ alleged that Patel conspired with the other Defendants to restrict the hiring and recruiting of skilled, technical, and engineering personnel with the goal and effect of suppressing skilled, technical, and engineering personnel wages. *See United States v. Patel*, No. 3:21-mj-1189 (D. Conn. Dec. 9, 2021), ECF No. 15. In addition, six executives of the Defendants have been indicted for participation in the alleged No-Poach Agreements to date. *See* Indictment, *United States v. Patel*, No. 3:21-cr-00220 (D. Conn. December 15, 2021), ECF No. 20 ("Indictment").

24.     As set forth in the DOJ affidavit and Indictment, the Corporate Defendants, through their officers, directors, agents, employees, or representatives—including but not limited to the Individual Defendants—agreed and enforced their agreements to not compete for the services of their employees. Specifically, they agreed to restrict their hiring and recruiting for

aerospace skilled, technical, and engineering personnel amongst each other in the United States and its territories.

### III.   JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

26.     This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of the forum state because each resides in or has its principal place of business in the State of Connecticut, employed individuals in this state during the Class Period, and/or has had substantial contacts within the State of Connecticut in furtherance of the conspiracy.

27.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

### IV.   THE PARTIES

A.     Plaintiffs

28.     Plaintiff John Doe (a pseudonym) was employed by QuEST Global Inc., from November 2018 through April 2019. They performed their duties as a Design Engineer for QuEST Global working on projects for Defendant Pratt & Whitney, including government contract work. John Doe is a citizen of Connecticut.

29.     Plaintiff James Roe (a pseudonym) was employed by Defendant Belcan LLC as an engineer from 2005 to 2013. Plaintiff James Roe performed their duties working on projects for Defendants P&W and Collins. After leaving Belcan, Plaintiff James Roe worked as an engineering manager for Randstad NA, ("Randstad"). James Roe is a citizen of Connecticut.

B.      Defendant Pratt & Whitney

30.      Defendant Raytheon Technologies Corporation ("Raytheon") is the parent of Defendant P&W. Raytheon is a Delaware corporation with its principal place of business located in Waltham, Massachusetts. Raytheon is publicly traded.

31.      P&W is a Delaware corporation with its principal place of business in East Hartford, Connecticut. On information and belief, Defendant P&W is the identity of Company A in the DOJ affidavit. See DOJ Aff., ¶ 5. P&W is a division of Raytheon and is one of the largest aerospace engine design, manufacture, and service companies in the United States.

32.      P&W employs thousands of engineers and other Skilled Aerospace Workers. P&W relies upon these Workers to design, manufacture, and service its aerospace products. They accomplish this by employing their own engineers and Aerospace Skilled Workers, as well as outsourcing Skilled Aerospace Workers from aerospace engineering supply firms. When outsourcing, P&W enters into agreements with engineering supply companies like Defendants Belcan, Cyient, PSI, and Agilis to complete a project for P&W. During the Conspiracy Period, P&W—either directly or through its business units, subsidiaries, agents, or affiliates—outsourced engineering projects to supply companies.

33.      The Supplier Defendant then assigns its own Skilled Aerospace Workers to complete the project for P&W and then receives an agreed upon payment from P&W. Thus, P&W competes with the Supplier Defendants to recruit and hire engineers while also receiving the services of outsourced engineers.

34.      P&W executive Mahesh Patel was indicted by the DOJ for his participation in the No-Poach hiring agreements.

C.      Defendant Collins Aerospace

35.      Collins is a division of Raytheon with its principal place of business in Charlotte, North Carolina. Collins is one of the world's largest suppliers of aerospace and defense products.

36.      Collins operated under the name UTC Aerospace Systems, or UTAS from 2012 to 2018. In 2018 Rockwell Collins merged with UTAS which merged with Raytheon in 2020 and

proceeded to operate as Collins Aerospace. To the extent that the assets and liabilities of UTAS remain, in whole or in part, with Collins (as UTAS's successor in interest), Plaintiffs intend to hold Collins liable for any of UTAS's violations of Sherman Act § 1 that occurred during the Class Period.

37.     Collins employs thousands of engineers and other Skilled Aerospace Workers. Collins relies upon these Workers to design, manufacture, and service its aerospace products. They accomplish this by employing their own engineers and Aerospace Skilled Workers, as well as outsourcing Skilled Aerospace Workers from aerospace engineering supply firms. When outsourcing, Collins enters into agreements with engineering supply companies like Defendants Belcan, Cyient, PSI, and Agilis to complete a project for Collins. During the Conspiracy Period, Collins—either directly or through its business units, subsidiaries, agents, or affiliates— outsourced engineering projects to supply companies.

38.     The Supplier Defendant then assigns its own Skilled Aerospace Workers to complete the project for Collins and then receives an agreed upon payment from Collins. Thus, Collins competes with the Supplier Defendants to recruit and hire engineers while also receiving the services of outsourced engineers.

D.     The Supplier Defendants

39.     Defendant QuEST Global Services, NA ("QuEST"), an Ohio Corporation with its principal place of business in East Hartford Connecticut. QuEST supplied Skilled Aerospace Workers to P&W and Collins who worked on projects for P&W and Collins. On information and belief, QuEST is the identity of Company B in the DOJ affidavit. *Id.*, ¶6(a). QuEST executives Robert Harvey and Harpreet Wasan were indicted by the DOJ for their participation in the No-Poach Agreements.

40.     Defendant Belcan is an Ohio Corporation with a principal place of business located in Windsor, Connecticut. On information and belief, Defendant Belcan is the identity of Company C in the DOJ affidavit. *See id*., ¶ 6(b). Belcan supplied engineers who worked on projects for P&W, Collins, and other firms in the aerospace industry. Belcan competes with

P&W, Collins, and the other Supplier Defendants to recruit and hire Skilled Aerospace Workers. Belcan further competes with the other Supplier Defendants to receive outsourced work from P&W and Collins. The Supplier Defendants compete for these projects in part on price, i.e., compensation for the Skilled Aerospace Workers. Belcan executive Steve Houghtaling was indicted by the DOJ for his participation in the No-Poach Agreements.

41.     Defendant Cyient, formerly known as Infotech Enterprises Limited, is a California Corporation with a principal place of business located in East Hartford, Connecticut. On information and belief, Defendant Cyient is the identity of Company D in the DOJ affidavit. *See id.*, ¶ 6(c). Cyient supplied Skilled Aerospace Workers who worked on projects for P&W, Collins, and other firms in the aerospace industry. Cyient competes with P&W, Collins, and the other Supplier Defendants to recruit and hire Skilled Aerospace Workers. Cyient further competes with the other Supplier Defendants to receive outsourced work from P&W and Collins. The Supplier Defendants compete for these projects in part on price, i.e., compensation for the Aerospace Skilled Workers. Cyient executive Tom Edwards was indicted by the DOJ for his participation in the No-Poach Agreements.

42.     Defendant Parametric Solutions, Inc. ("PSI") is a Florida Corporation with a principal place of business located in Jupiter, Florida. On information and belief, Defendant PSI is the identity of Company E in the DOJ affidavit. *See id.*, ¶ 6(d). PSI supplied engineers who worked on projects for P&W, Collins, and other firms in the aerospace industry. PSI competes with P&W, Collins, and the other Supplier Defendants to recruit and hire Skilled Aerospace Workers. PSI further competes with Supplier Defendants to receive outsourced work from P&W and Collins. The supply company Defendants compete for these projects in part on price, i.e., compensation for the Skilled Aerospace Workers. PSI executive Gary Prus was indicted by the DOJ for his participation in the No-Poach Agreements.

43.     Defendant Agilis is a Florida corporation with a principal place of business located in Palm Beach Gardens, Florida. On information and belief, Defendant Agilis is the identity of Company F in the DOJ affidavit. *See id.*, ¶ 6(e). Agilis supplied engineers who worked

on projects for P&W, Collins, and other firms in the aerospace industry. Agilis competes with P&W, Collins, and the other Supplier Defendants to recruit and hire Skilled Aerospace Workers. Agilis further competes with other Supplier Defendants to receive outsourced work from P&W and Collins. The supply company Defendants compete for these projects in part on price, i.e., compensation for the Skilled Aerospace Workers.

44.     Defendants' actions described herein are part of, and in furtherance of, the unlawful conduct alleged. These actions were authorized, ordered, and/or enacted by the Defendant's various officers, agents, employees, or other representatives while actively engaged in the management of Defendants through the course and scope of their employment with Defendants' actual and/or apparent authority.

E.     Individual Defendants

45.     The individuals/entities named below directly participated as agents and/or co-conspirators with the Defendants as they performed acts and made statements in furtherance of the anticompetitive No-Poach conspiracy alleged herein. The Individual Defendants directly participated in, approved of, and ratified the inherently wrongful anticompetitive conduct described herein.

46.     On information and belief, Defendant Mahesh Patel is a U.S. citizen who resides in Glastonbury, Connecticut. Beginning in 2003, he was the manager and eventual Director of the unit within P&W that managed and maintained the supplier relationships. He was the highest-ranking employee within that unit and managed a team from his office in East Hartford, Connecticut. Patel left P&W in 2020.

47.     Defendant Natalia Khandros was the Global Engineering Center Poland Director for Collins from October 2017 to January 2021. Prior to that, she worked at P&W from 1997 to 2011. After leaving P&W, Khandros worked as the Strategic Sourcing Manager for Collins, then known as UTAS, prior to being acquired by Raytheon, from January 2012 to September 2017. Natalia Khandros was directly involved in enforcing the No-Poach Agreements on behalf of Collins Aerospace.

48.     On information and belief, Defendant Steve Houghtaling is identified in the DOJ Affidavit as "Co-conspirator 5" *See id*., ¶ 8(e). Beginning in 2013, Houghtaling was the General Manager, Vice President, and by 2019 Senior Vice President for Belcan. He worked principally from an office in Windsor, Connecticut.

49.     On information and belief, Defendant Tom Edwards is identified in the DOJ Affidavit as "Co-conspirator 6." *See id*., ¶ 8(f). Beginning in or around 2010, Edwards was employed at the company now known as Cyient, and since 2013 has been President for Cyient's North American operations. He worked principally from an office in East Hartford, Connecticut.

50.     On information and belief, Defendant Gary Prus is identified in the DOJ Affidavit as "Co-conspirator 7." *See id*., ¶ 8(g). Beginning in 2015, Prus was Chief Operating Officer/Executive Vice President and part owner of PSI. He worked principally from an office in Jupiter, Florida. Prior to working for PSI, Prus had worked for 18 years at P&W.

51.     On information and belief, Defendant Frank O'Neill is identified in the DOJ Affidavit as "Co-conspirator 8." *See id*., ¶ 8(h). In 1993, O'Neill founded and was part owner of Agilis and served as its President and Chief Executive Officer. He worked principally from an office in Palm Beach Gardens, Florida.

52.     On information and belief, Defendant Robert Harvey is identified in the DOJ Affidavit as Co-conspirator 1. *See* DOJ Aff., ¶ 8(a). Beginning in 2010, Harvey was the Senior Vice President of Strategic Accounts at QuEST. In 2019, Harvey was the Senior Vice President President-Global Business Head. Harvey worked from an office in East Hartford, Connecticut. From 1998 to 2000, Harvey worked for Defendant P&W as a Senior Vice President. Indictment, ¶ 11.

53.     On information and belief, Defendant Harpreet Wasan is identified as Co-conspirator 3 in the DOJ affidavit. *Id.*, ¶ 8(c). Beginning in early 2015, Wasan was Vice President/Strategic Client Partner of QuEST, and worked principally from offices in East Hartford, Connecticut and Tokyo, Japan. Wasan left QuEST in early 2021. Prior to his roles at QuEST, Wasan worked at Defendant P&W for approximately ten years. Indictment, ¶ 12.

12

## V.      AGENTS AND CO-CONSPIRATORS

54.      Unnamed in this Complaint are additional co-conspirators, principles and agents who have participated with Defendants in the offenses alleged herein this Complaint and have performed acts and made statements in furtherance of the anti-competitive conduct herein alleged.

55.      Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, the identities of which are currently unknown, have participated as co-conspirators with Defendants in the offenses alleged herein this Complaint and have performed acts and made statements in furtherance of the anti-competitive conduct herein alleged.

56.      The anticompetitive and unlawful acts alleged against the Corporate Defendants in this class action complaint were authorized, ordered, or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs. The respective Defendant parent entities identified herein exercise dominance and control over all of their respective Defendant subsidiary entities and those respective subsidiaries have a unity of purpose and interest with their respective parents.

57.      To the extent any respective parent Defendant did not keep a tight rein on its respective subsidiary Defendant, it had the power to assert control over the subsidiary if the latter failed to act in the parent's best interest. The respective parent Defendants and their respective subsidiaries, affiliates and agents thus operated as a single unified entity.

58.      The Defendants' agents operated under the explicit and apparent authority of their principals.

59.      Each Defendant acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

60.      Defendants are jointly and severally liable for the acts of the co-conspirators named below and other co-conspirators whether or not named as defendants in this Complaint.

## VI.        FACTUAL ALLEGATIONS

A.      Interstate Commerce

61.      During the Class Period (defined below), Defendants employed members of the Proposed Class in Connecticut, Vermont, Massachusetts, Illinois, Ohio, Georgia, Florida, Puerto Rico, Kentucky, and throughout the United States, including in this District.

62.      The No-Poach Agreements have substantially affected interstate commerce and has caused antitrust injury to Plaintiffs and members of the Class throughout the United States and its territories.

B.      Market for Aerospace Engineering Services

63.      The No-Poach Agreements are per se illegal under the federal antitrust laws, and thus, there is no requirement to define the relevant product or geographic markets. As the DOJ made clear in guidance it issued in 2016: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws." *See* Dep't of Justice Antitrust Div. and Fed. Trade Comm'n, Antitrust Guidance for Human Resource Professionals, at 4 (Oct. 2016). But, to the extent a relevant market need be defined for any reason, it is for the services of aerospace engineers and similar skilled employees in the United States and its territories.

64.      The United States boasts the largest aerospace industry in the world. This includes military aircraft, missiles, space exploration, commercial airliners, and several other markets. The industry directly employs approximately 500,000 workers in scientific and technical jobs, and aviation continues to be considered a fast-growing industry in the United States.

65.      Each Defendant is a key participant in the aerospace industry in the United States. Defendants compete with one another to recruit and hire engineers and other Skilled Aerospace Workers.

66.      In a competitive market, Defendants would be required to compete with one another to locate, attract, hire, and retain the highly skilled employees that are aerospace engineers and similarly skilled workers. These aerospace engineers and skilled employees are the

heart of the industry, being responsible for directing the design, manufacture, testing of aircraft and similar products, as well as assessing the management concerns of new projects, such as technical feasibility, conforming to engineering principles, satisfying customer requirements, legal requirements, and maintenance. There is no aerospace engineering industry without aerospace engineers and other skilled workers.

67.     The United States aerospace industry employs roughly 2 million people and represents about 1.4% of all employment in the United States.

68.     As of May 2020, there were approximately 60,000 aerospace engineers in the United States with the median annual wage during the same year being about $120,000.

69.     In the United States, aerospace engineers and similarly skilled workers can be employed either directly by the company that designs and manufactures aerospace products, or they can be employed by outsource engineering supply companies who complete projects on other firms' behalf with their own engineers, pursuant to an agreement. The supply company, in return, receives a payment from the original aerospace firm.

70.     The engineers hired by Defendants have specialized skills and qualifications. Aerospace engineers require undergraduate and/or graduate degrees and are often specifically specialized in aerospace engineering.

71.     Advanced aerospace engineering employment normally requires a Professional Engineer license. Licensing is generally provided at the state level and requires an accredited engineering degree, work experience, and passing performance on both the Fundamentals of Engineering Exam and the Professional Engineering Exam. Both exams are required in Connecticut, where a number of the Corporate Defendants hold their chief operations. Upon entering the workforce, engineers further develop specialization based on the specific work tasks they do. For example, engineers can become specialized in mechanical engineering, software/systems engineering, or other specialized fields. Another level of specialization can further occur, focusing on particular functions within the engineering space, such as aerodynamic fluid flow, structural design, propulsion, and similar specialties. These specializations are tied to

aerospace work and are incapable of being directly transferred and utilized in other engineering fields.

72.     Due to this specialization and training requirements, engineers are only able to find acceptable alternatives in similar engineering roles. This means that when undercompensated in their current positions it is extremely difficult for engineers to leave. Other options are simply not available to engineers with their particular skillset. Specialization further increases the value of an aerospace engineer's work due to the scarcity of experienced engineers within specific specializations.

73.     The relevant geographic market is the United States and its territories, and the relevant labor market is all skilled, technical, and engineering workers in the United States.

74.     Engineers in the United States and its territories cannot reasonably substitute their aerospace engineering jobs in the United States and its territories for foreign jobs, even in the same field. Foreign positions are less desirable and valuable, due to language barriers, visa requirements, relocation costs, and distance from family members amongst a host of other difficulties. While foreign engineers have immigrated to the United States to participate in the market, upon information and belief, engineers in the United States do not frequently take positions in the markets outside of the United States and its territories.

75.     There also exists a labor shortage for specialized and qualified engineers. According to the Aerospace Industries Association ("AIA") in 2016, the leading trade association for the aerospace industry, the field was at risk due to looming retirement and the increased work and skill requirements for employment. In a competitive market, the shortage of such skilled employees would allow aerospace engineers and similarly skilled workers to negotiate for higher salaries in order for aerospace companies to retain them as the higher demand for engineers would result in better job offers.

C.      Defendants Have Market Power

76.     Defendants have the ability, collectively, to profitably suppress compensation to Aerospace Skilled Workers. That is, Defendants can impose a small but significant decrease in

16

pay or compensation without losing sufficient numbers of Aerospace Skilled Workers to defeat the effects of the pay decrease. Likewise, Defendants can maintain pay below a competitive level without losing sufficient numbers of Aerospace Skilled Workers to defeat the effects of the pay decrease.

77.     Defendants comprise some of the largest aerospace companies in the United States. Over the years, Raytheon (through Collins) and P&W have garnered substantial market power. In fiscal year 2020, P&W had net sales of approximately $16 billion with Collins having net sales of approximately $19 billion according to Raytheon Technologies Corporation Form 10-K for the period ending December 31, 2020, at p. 4. Raytheon alone is a major player in the United Space aerospace industry, and in conjunction with the Supplier Defendants possess substantial market power throughout the industry.

78.     In competition economics, market power is the ability to profitably charge prices above the competitive level. In the product market, companies that can do this are known as "monopolies." On the labor market side—where employers are buyers of labor and workers are the "sellers"—an employer with market power is known as a "monopsonist." Another way of understanding monopsony power is to imagine a labor market in which any attempt to pay a lower wage does not result in an inability to hire workers, because workers have limited options for switching jobs.

79.     Employers can obtain market power by entering into No-Poach agreements because through them they are agreeing to eliminate competition for workers. This inhibits a worker's ability to negotiate better compensation packages because they stop accessing information about other job offers and the value of their skills.

80.     In the absence of competition, employers do not need to raise compensation to respond to workers' negotiation efforts or ward of offers from competitors simply because the outside offer is non-existent.

81.     By entering into these No-Poach Agreements, Defendants were able to exploit collective market power and successfully suppressed compensation of Plaintiffs and the Class.

Defendants' demonstrated ability to profitably suppress compensation is evidence of Defendants' collective market power in the relevant market described above.

D.    How the Aerospace Market Looks Without a No-Poach Agreements

82.    Skilled Aerospace Workers are indispensable to Defendants who need their services to compete for and complete lucrative projects. In a competitive market, without illegal anticompetitive No-Poach agreements, Defendants would aggressively compete for skilled, technical, and engineering personnel by recruiting and hiring from each other. Defendants would be compelled to offer better compensation packages and opportunities—equipping Skilled Aerospace Workers with bargaining power and information—to retain and develop talent. This information symmetry would have armed Skilled Aerospace Workers with the ability to negotiate raises and more favorable terms with their employers or with competing employers.

83.    Robust lateral recruiting is an important aspect of competitive labor markets, and its forced absence decreases efficiency. Companies value skilled employees who are capable at their job, and will see competitor employees as qualified, skilled, hardworking, and less of a risk than currently unemployed applicants or those seeking employment outside their current jobs. Through lateral hiring, a company gains efficiencies and mitigates the risks and onboarding costs of signing and training a new hire. In the aerospace industry, Skilled Aerospace Workers, and particularly engineers, work on similar projects throughout their careers and come with institutional knowledge of projects and technical skills.

84.    Recruiting amongst competitors is natural in labor markets; companies acknowledge that skilled, technical, and engineering personnel working at competing firms are the most attractive candidates due to their skills and experience. In the absence of their anticompetitive agreements, Defendants would have had to aggressively compete with each other to retain and attract skilled talent. In economic terms, had Defendants not manipulated the labor market, Defendants would have had to offer better compensation packages and benefits.

85.    Competition for labor amongst Defendants ensures a flow of information that grants workers bargaining power and leads to negotiations that result in competitive market

equilibrium. Free markets ensure that workers are employed to roles that fit them best, and result in efficient allocation of resources, higher quality products, and greater innovation.

86.      More importantly, when workers have the potential to switch jobs—often known as job mobility—the benefits of the negotiation process are felt across the company, even if the person did not end up leaving. This is due to internal equity policies, a philosophy that most companies adhere to in order to maintain a sense of cohesiveness and fairness within their workforce. These types of policies, in which people who do similar jobs are paid similarly, lead to a compensation structure that ensures that when one worker accesses a higher salary, there is a shared effect across positions.

87.      These competitive market dynamics impact the entire labor force. By eliminating competition amongst themselves, Defendants deprived workers of outside options thus effectively suppressing wages of all Skilled Aerospace Workers.

88.      Without the No-Poach Agreements Defendants would have been incentivized to pay their employees higher wages to prevent them from seeking or accepting competing opportunities.

E.      Defendants' No-Poach Agreements

89.      Beginning at least in 2011, and continuing until September 2019, the Corporate Defendants, through their officers, directors, agents, employees, or representatives, agreed not to compete for the others' skilled, technical, and engineering personnel in the aerospace industry working on projects for P&W and Collins. Defendants entered, periodically reaffirmed, monitored, and enforced their illegal No-Poach Agreements, the primary purpose of which was to restrict their hiring and recruiting of workers from each other.

90.      Defendant P&W served as the leader and primary enforcer through Individual Defendant Mahesh Patel, who was the manager and later director of P&W's unit that managed its relationship with Supplier Defendants.

91.      The No-Poach Agreements constituted a series of complementary and interlinked hiring and recruiting restrictions designed to limit the competition for Skilled Aerospace Workers

in the aerospace engineering industry. These illegal Agreements were effectuated to depress wages and restrict the free movement of the Workers.

92. The No-Poach Agreements served their purposes of depressing Aerospace Skilled Worker wages through various means. First, the Agreements resulted in artificially extended terms of employment for Aerospace Skilled Workers at a particular employer, resulting in long term benefits for employers who could retain the same talent for extended periods of time at suppressed costs. Second, they resulted in an information asymmetry as Aerospace Skilled Workers who were unaware of the No-Poach Agreements, were unable to leverage their positions and advocate for better terms of employment both with their current and future employers.

93. The No-Poach Agreements were motivated by Defendants shared financial goals and were put in place to increase Defendants' profits at the expense of the Plaintiffs and the Class. The hiring and recruiting restrictions were crafted by Defendants to serve their shared financial motivations and were aimed at depressing wages for Aerospace Skilled Workers. Through the No-Poach Agreements with P&W, Collins and each Supplier Defendant and other co-conspirator supplier agreed to not hire workers from other firms that were engaged by P&W and Collins via outsourcing contracts. P&W enforced the No-Poach Agreements by threatening to withdraw its business if any Supplier Defendants defected from the Agreements and hired or recruited each other's employees. Collins similarly enforced the Agreements with Belcan and UTAS, refusing to approve skilled workers for working on Collins' projects if they were previously employed by a competitor. Collins would also pressure supply firms to terminate employees who attempted to recruit competitors' workers, regardless of if the competitor's worker reached out on their own initiative. At every stage of the conspiracy, P&W and Collins ensured that the labor market for Aerospace Skilled Workers was suppressed and did not operate freely. By entering individual agreements with P&W and Collins, each Supplier Defendant became a member of the overarching No-Poach Agreements orchestrated by P&W and was assured by Defendant Patel that P&W, and others, that Defendants would enforce and monitor the No-Poach Agreements.

20

F.    Defendants Worked Together to Ensure Compliance with the No-Poach Agreements
      Specifically to Suppress Wages

94.    Defendants Patel and Khandros directed managers and executives at the Supplier
Defendants to not hire one another's skilled, technical, and engineering personnel, i.e., Skilled
Aerospace Workers, in furtherance of the No-Poach Agreements. Supplier Defendants knew and
understood that these restrictions applied to all the firms in the conspiracy. Similarly, Defendant
Khandros worked previously with Patel and would enforce the Agreements between UTAS and
Belcan. Patel and Khandros would make these communications directly with the Supplier
Defendants and other co-conspirator and would further enforce the Agreements.

95.    For example, in 2016, Patel emailed Defendant Prus, the Chief Operating Officer,
Executive Vice President and part owner of Defendant PSI. He stated: "Last time we talked you
assured me that you will not hire any [P&W] partners employee [sic]. This must stop, otherwise
others will also start poaching your employees." DOJ Aff., ¶ 29.

96.    Patel further discussed the No-Poach Agreements with multiple suppliers at the
same time, ensuring that each supplier had full knowledge of the shared conspiracy. For example,
in December 2015, P&W hosted a dinner that was attended by Patel and Supplier personnel,
including QuEST, Belcan, and Cyient. These representatives included individuals at the highest
levels of the supplier companies, such as Tom Edwards (the President of the North America
Operations for Cyient), Harpreet Wasan (the Vice President/Strategic Client Partner for QuEST),
and a General Manager for QuEST. An executive of Belcan, who also attended the dinner, sent an
email to Defendant Houghtaling and other Belcan employees to inform them of Patel's
instructions. The email states "Mahesh did take the stage at the end ... no poaching of each others'
[sic] employees." *See* Indictment, ¶ 22(a).

97.    Beyond Patel, the Supplier Defendants also communicated amongst each other to
preserve and enforce the No-Poach Agreements. For example, in December 2017, high level
QuEST employees exchanged emails with Defendant Houghtaling of Belcan discussing attempts
from Belcan to recruit QuEST employees. Specifically, QuEST stated "I would like to understand

if you are planning to address this immediately, or I will be forced to escalate to our mutual customers." Robert Harvey of QuEST responded: "Spot on. This cannot be tolerated! We need to move quickly and forcibly when this is about to happen." To further enforce the Agreements, Harvey later wrote for the conspirators to "Push hard to have it reversed and consequences for [Belcan]." Indictment, ¶ 28(f).

98.     In September 2019, after Agilis had hired four Cyient employees, Defendant Tom Edwards, the President for Cyient's North America Operations, communicated with Defendant Frank O'Neil, the founder, President, and Chief Executive Officer of Agilis, and told him to stop "actively recruiting" Cyient's employees. DOJ Aff., ¶ 34; Indictment ¶ 27(a). Edwards stated, "I wanted to ask if your team could refrain from actively recruiting our employees going forward," and, restated the terms of the No-Poach Agreements by stating "I flat out ask our teams not to hire people from the other suppliers." Indictment ¶ 27(a). O'Neil agreed, stating that their "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get unstable, and our margins all get hurt." *Id*. The Suppliers would explicitly discuss amongst themselves their attempts to shut down solicitation of each other's employees to reduce labor costs and would criticize and force compliance if any attempted to deviate from the terms of the No-Poach Agreements.

99.     Likewise, throughout the class period, Defendant Khandros enforced the Agreements for UTAS projects. When it came to light that skilled personnel were hired from Defendant Belcan to work on projects on behalf of UTAS, Defendant Khandros personally reprimanded the individuals responsible for onboarding those employees. When asked why those individuals were not to recruit skilled personnel from Belcan, Khandros responded that Belcan complained and that hiring skilled personnel from Belcan was prohibited.

100.     Defendants maintained internal policies to further the No-Poach Agreements. Belcan maintained a document entitled "Policy 10." Policy 10 explicitly instructed Belcan hiring personnel to not hire any applicant with prior experience with the other Supplier Defendants. If an

applicant had prior experience, the managers were not to return calls or offer interviews to the applicant.

101.    Collins repeatedly refused to allow former employees of its co-conspirators to work on projects outsourced by Collins. In supplying engineers for projects outsource by Collins, Collins would have to approve the workers prior to the commencement of work. While operating under the name UTAS, Collins through Defendant Khandros, would not approve hires of qualified engineers for UTAS projects due to past employment history with Defendant Belcan. Despite being approached by former Belcan engineers for positions, managers were unable to have those workers approved solely due to their previous status as Belcan employees. Collins would enforce the Agreements by pushing against personnel at supplier firms if they attempted to hire co-conspirator employees to work on outsourced work from Collins. Former employees at Randstad, responsible for bringing on engineers for projects on behalf of Collins, were reprimanded by Defendant Khandros if they suggested otherwise qualified engineers who previously had worked at co-conspirators. After seeking explanations as to why these engineers were not accepted, Khandros would not provide a reason beyond previous work for co-conspirators. If the recruiters continued to suggest engineers who previously worked for co-conspirators, Collins would pressure their employers to terminate the recruiter. This pressure from Collins worked, and the recruiters were terminated. This would include requesting that recruiters not speak with UTAS staff they provided, revoking access to UTAS facilities, and similar tactics to pressure Supplier Defendants to adopting the illegal No-Poach Agreement.

 G.     Defendants Shared the Same Anticompetitive Goals

102.    Defendants have been clear about the purpose and goal of their No-Poach Agreements. In communications with each other, they frequently cited their potential cost savings from suppressing labor costs and how, in the absence of their Agreements, Skilled Aerospace Workers would be able to effectively pursue higher compensation.

103.    For example, in January 2017, Patel contacted PSI after it had hired an employee of Cyient and instructed: "Please do not hire any partners employee, whether they approached, or

you approached. That is the only way we can pre[v]ent poaching and price war." DOJ Aff., ¶ 24; Indictment ¶ 27(b). That email was then shared with Defendant Prus, the Chief Operating Officer, Executive Vice President, and part owner of PSI. In March of 2017, those individuals further discussed the No-Poach Agreements with another Supplier, noting that "MAHESH says he does not want the salaries to increase." DOJ Aff., ¶ 24.

104.    Further, in April of 2017, a General Manager from QuEST sent an email informing that Cyient had hired a previous QuEST Engineer. The General Manager pushed against the hiring, a normal aspect of a competitive market, noting that it was "against our Agreements with our employees and against our known expectations of [P&W] for the cooperation of the outsource companies." The email further stated that allowing firms to recruit each other's employees, again a normal market function, would "drive the price structure up." *Id*., ¶ 25; Indictment ¶ 27(c). Patel then reached out to the General Manager from QuEST and Defendant Edwards, the President of North America Operations from Cyient and marked them as "required" attendees on an invitation for a "private discussion" in his office the next day. DOJ Aff., ¶ 25.

105.    In 2013 Belcan partnered with P&W in an agreement that provided a cap on hourly compensation for workers working on P&W projects. The compensation was limited to $67 an hour for Belcan. In return, Belcan was considered a "Center of Excellence," for P&W and became a main supplier for P&W. This was significantly below the market rate for engineers and other skilled workers.

H.    Defendants Pratt & Whitney, Collins Aerospace, Natalia Khandros and Mahesh Patel Policed and Enforced the No-Poach Agreements Amongst Supplier Defendants

106.    P&W, through Patel, enforced the No-Poach Agreements and did not attempt to hire, solicit, recruit, or otherwise procure the valuable Skilled Aerospace Workers outside the No-Poach Agreements. Collins, through Khandros, also enforced the No-Poach Agreements to

prevent the solicitation or recruitment of valuable Skilled Aerospace Workers from conspirators of the No-Poach Agreements.

107.    Defendant Suppliers would inform Patel about Suppliers who were not abiding by the No-Poach Agreements and rely on Patel to assist in preventing defections from the No-Poach Agreements. Patel was the chief enforcer and was tasked with deterring future violations by Supplier Defendants. Through these Agreements with Patel, each Defendant was privy to and participated in the No-Poach Agreements. Collins, through Khandros, would similarly enforce the No-Poach Agreements by refusing to hire skilled workers for Collins' projects if they worked previously with another of the conspirators. Collectively, these Agreements were designed to and succeeded in harming the Plaintiffs and the proposed Class.

108.    Throughout 2013 to 2014, Collins repeatedly refused to hire previous Belcan engineers seeking employment from Randstad for projects despite working with those same engineers on other projects. When asked by Randstad personnel for why they were unable to hire those Belcan engineers that reached out to them, Collins would blame the decision on Belcan.

109.    In May 2016, Houghtaling was informed that "[a]nother employee" had been hired by PSI to work on an outsourcing project for a company other than P&W. *Id.*, ¶ 27. Houghtaling was asked if he "ever discuss[ed] the last one with Mahesh." *Id.* Houghtaling provided assurances that Patel was handling it and "said he'd talk to [PSI] about it." *Id.*

110.    In November 2016, Prus, Executive Vice President and part owner of PSI, wrote an email to Patel complaining about Belcan "actively recruiting [PSI] employees." DOJ Aff., ¶ 27; Indictment, ¶¶ 22(d), 28(g). In response, Patel stated, "[w]e must not poach each other partners employee. Please communicate to [Belcan] HR not to interview or hire active employees working on [P&W] work." DOJ Aff., ¶ 27; Indictment, ¶ 22(d).

111.    In a February 2017 email, Wasan, the Vice President/Strategic Client Partner for QuEST, upon hearing that Belcan was attempting to hire one of their employees, stated that they were "not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." DOJ Aff., ¶ 28; Indictment, ¶ 22(b). Wasan immediately sent to Patel

25

an email stating "I am very concerned that [Belcan] believes they can hire any of our employees. …. Could you please stop this person from being hired by [Belcan]?" DOJ Aff., ¶ 28; Indictment ¶ 22(b). Managing communications with Patel to enforce the No-Poach Agreements was a responsibility of Wasan's at QuEST. DOJ Aff., ¶ 28.

112.    In January 2017, a representative from Cyient emailed Patel to inform him that PSI had hired a Cyient engineer. Patel wrote to PSI stating: "Last time we talked you assured me that you will not hire any [P&W] partners employee. This must stop, otherwise others will also start poaching your employees. Please advise." DOJ Aff., ¶ 29; Indictment, ¶ 25(b). Throughout all these examples Patel was directly involved in maintaining and enforcing the No-Poach Agreements among Defendants.

113.    Patel's enforcement efforts proved effective in enforcing compliance of the No-Poach Agreements among the Defendants. For example, after a Belcan executive notified Patel that PSI was recruiting and hiring Belcan engineers, Patel sent an email to Prus, the Executive Vice President and part owner of PSI. Patel wrote: "You had assured me that [PSI] will never soliciting [P&W's] long term partners employees . . . Please send me in writing that proper steps has taken place to curtail this practice." DOJ Aff., ¶ 31; Indictment ¶ 28(e). Prus later commented to others that Belcan "is making a big stink right now over any solicitations." DOJ Aff., ¶ 31. However, faced with Patel's enforcement efforts, Prus directed his employees to "[p]lease stop speaking to any [Belcan] or other [P&W] supplier companies about transitioning to [a PSI] Office immediately." DOJ Aff., ¶ 31; Indictment, ¶ 28(e).

114.    Beyond acting as the go between for the Supplier Defendants, Patel and through him, P&W would use its status as a shared customer among the other Defendants to enforce its anticompetitive No-Poach Agreements.

115.    In June 2018, Patel learned of Belcan's plans to hire a QuEST employee. Afterwards, internal Belcan emails including from Defendant Houghtaling stated that QuEST "complained to [P&W] that we are 'stealing' their people, and [P&W] threatened to pull all Pos from [Belcan] if we hire him." DOJ Aff., ¶ 33. A day later, Defendant Houghtaling emailed Patel

and said: "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" the Engineer at issue. *Id*.; Indictment, ¶ 26. Patel was able to use the threat of losing P&W outsourcing business to continue the unlawful No-Poach Agreements. P&W would further agree not to hire from their supplier Defendants. A QuEST employee, upon being solicited heavily by P&W was quickly removed from consideration after QuEST complained to Patel. Patel continued to enforce these Agreements with Defendants and workers remained unable to secure positions at other firms.

116.    On information from anonymous sources, Collins was directly involved in the conspiracy and would not permit the soliciting or hiring of skilled workers amongst all Defendants.

117.    Collins would use their status as the outsourcing company to ensure that all workers on Collins projects were not previous employees of other conspirators. As the outsourcing aerospace firm, Collins maintained oversight of all employees from other firms who would work on projects Collins offered. If an employee were to be hired that had previous experience with another conspirator, Collins would reject them despite being skilled and qualified workers. Collins would pressure employees from other firms to not hire from competitors, and if they attempted to do so, would pressure the firms to terminate those recruiters.

118.    Due to the No-Poach Agreements wages were substantially suppressed. Defendant Belcan entered into an agreement with P&W in 2013 that had Belcan agree to charge a flat rate of $67 an hour for all workers who worked on P&W projects. This substantially reduced potential compensation for workers. As an example, senior engineers could expect at most compensation of $35 an hour, resulting in significantly lower year end salaries. Specifically, the average compensation for a senior engineer in Connecticut is $53 an hour. Due to the No-Poach Agreements, Belcan engineers who wished for higher salaries, consistent with market rates, were unable to find substitute employment.

119.    As a direct result of the No-Poach Agreements, aerospace workers were unable to find substitute employment, and were heavily restricted in their labor mobility. One employee of

P&W was unable to find work at any other Defendant after leaving and was forced to return to P&W. These Agreements suppressed wages, limited mobility, and prevented workers from finding substitute employment.

I.     Defendants Were Fully Aware Their Conduct Was Unlawful

120.    At least as early as January 2016, prior to evidence cited above, managers and executives at Belcan began raising concerns with Patel that the conduct of the Defendants was unlawful. Specifically, they addressed the illegality of their actions in light of the antitrust laws.

121.    In January 2016, a General Manager for Belcan received an email describing a civil lawsuit in which several major companies were accused of "engaging in illegal anti-poaching agreements……the companies involved had promised each other not to actively recruit employees from one another." DOJ Aff., ¶ 35. The General Manager then scheduled a meeting with Patel, including as an item "[i]nformal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal" (an apparent reference to the 2015 settlement in *In re High-Tech Employee Antitrust Litigation*, No. 5:11-cv-2509 (N.D. Cal.)). *Id.*

122.    Concerns about the unlawful nature of the No-Poach Agreements arose again in February 2017. In a series of emails, Belcan's Human Resources Director and the General Manager discussed the No-Poach Agreements and hiring practices of Defendants. The HR Director noted her concern that "there is an anti-trust issue by us turning people away solely based on their previous employer." *Id.*, ¶ 37. The General Manager agreed, noting "[P&W] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors . . . I'm not sure if this is legal, but that is what they are requesting we do." Id. Despite being made aware of Belcan's concerns, Patel continued to enforce the No-Poach Agreements and no Defendant ceased complying with the Agreements.

123.    Belcan internal emails after a call with Patel stated: "spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors." Id. Two weeks later, a Belcan employee sent an email to the Belcan HR Director, the General

Manager, and the Vice President of Human Resources. The sole content of the email was a link to a website that described a class action antitrust lawsuit concerning a "conspiracy" between companies who had agreed to "restrict[ ] recruiting of each other's employees." *Id*., ¶ 38.

124.     Despite knowing that these Agreements violated the antitrust laws, and despite being involved in government contracting, Defendants at no point reported their antitrust violations to the United States Government and continued to conceal their No-Poach Agreements from Plaintiffs, class members, and the public at large.

125.     Defendants worked on a variety of aerospace projects, including military and government work. Government work is generally governed by the Federal Acquisition Regulation ("FAR") which imposes obligations upon those engaged in government work to report antitrust violations.

126.     The FAR is the primary regulation for use by all executive agencies in their acquisition of supplies and services with appropriated funds. It became effective on April 1, 1984, and is issued within applicable laws under the joint authorities of the Administrator of General Services, the Secretary of Defense, and the Administrator for the National Aeronautics and Space Administration, under the broad policy guidelines of the Administrator, Office of Federal Procurement Policy, Office of Management and Budget. Title 48, Chap. 1. (Federal Acquisition Regulations, (September 21, 2021) https://www.acquisition.gov/far/forwarda).

127.     Among other things, the FAR precludes anticompetitive activity with respect to government contract bids. FAR 3.303. This includes any anticompetitive practices. Id. at 3.301. (Examples of anticompetitive practices are collusive bidding, follow-the-leader pricing, rotated low bids, collusive price estimating systems, and sharing of the business.).

128.     Pursuant to the FAR regulations, specifically Section 3.303, Defendants were obligated to report antitrust violations. Despite their knowing participation in the conspiracy, and knowledge of its unlawful nature, no Defendant reported to the No-Poach Agreements to the Federal Government.

129.     Defendants worked on a variety of government contracting work, including for the United States military. Through working on these projects Defendants were subject to FAR regulations including reporting antitrust violations.

130.     Despite these warnings, Defendants did not remove themselves from the No-Poach Agreements nor alerted the Plaintiffs or Class by going public. Defendants did not report their antitrust violations to the proper authorities despite their work as government contractors.

J.     Aerospace Market and Indirect Market Evidence of Collusion

131.     In addition to the direct evidence cited above, circumstantial evidence also supports a finding of an anticompetitive No-Poach Agreements. The market for Skilled Aerospace Workers in the aerospace industry is particularly susceptible to collusion by design. This is true because the market for Skilled Aerospace Workers involves: (1) numerous opportunities for companies to collude; (2) high barriers of entry for both aerospace firms and suppliers; (3) high exit barriers for engineers; and (4) inelastic demand for and a lack of substitutes for Skilled Aerospace Workers.

132.     *Numerous opportunities for collusion*: Defendants had multiple opportunities to conspire throughout their business relationship. As described above, the senior executives of Defendants frequently communicated with Defendant P&W and Defendant Patel for the purpose of furthering and enforcing their No-Poach Agreements. Patel issued threats to non-conforming members of the conspiracy, threating to withdraw business from P&W, if any members defected from the illegal Agreements. Defendant Khandros, on behalf of Collins, then known as UTAS, similarly issued threats to non-conforming members of the conspiracy to attempted defectors from the conspiracy. Beyond interactions with P&W, the Supplier Defendants also directly communicated with each other to enforce the Agreements.

133.     In addition to emails, Defendants regularly communicated and colluded at in person meetings and through phone conversations. Representatives from each Defendant communicated and had opportunity to discuss and enforce the Agreements. For example, P&W would routinely present awards to its most valued suppliers—including the Defendant Suppliers.

30

The awards would be presented at gatherings where Defendants' senior executives, including the Individual Defendants, would have opportunities to communicate with each other in order to further the anticompetitive Agreements.

134.    In 2017, Defendant Belcan received an award from P&W titled the "Supplier Productivity Innovation Award." Belcan itself issued a press release with the award, noting that it was the sixth reward they had received from P&W. Patel himself was present at the award ceremony and spoke on behalf of P&W congratulating Belcan.

135.    Cyient also won the Supplier Innovation Award in 2019 for the seventh consecutive year and the Supplier Highest Productivity Award for the fourth consecutive year. Cyient also issued a press release announcing the awards noting their "multi-million dollars in cost savings that were realized through several supplier saving proposals."

136.    Defendants Mahesh and Khandros worked together for several years at P&W.

137.    These events were prime opportunities for Defendants to discuss their No-Poach Agreements and are indicative of the close relationships between and among the Defendants stretching over years. The frequent meetings and long relationships between Defendants provided ample opportunity for the Defendants to collude with each other to the detriment of the Class and Plaintiffs.

138.    *High barriers to entry*: Aerospace Skilled Workers have remarkable academic qualifications and require technical education as a criterion to obtain employment. At the bare minimum, each Aerospace Skilled Workers has a bachelor's degree and often has additional qualifications such as post graduate degrees in complicated fields such as science, technology, engineering, and mathematics. For example, P&W and QuEST require at least a bachelor's degree for starting positions, and senior positions may require a master's degree, years of experience, additional licensing, or combinations of the above. Further, aerospace engineers and similarly skilled workers may require specialized experience for certain positions, due to the complex nature of the work they undertake. Finally, depending on the project, especially those involving defense or government projects, may require the engineer to be a citizen of the United States, and

potentially, security clearance. All these factors create high barriers of entry to enter the aerospace industry and make it easier for Defendants to work together to suppress wages.

139.    Compounding the high barriers to entry is the shortage of workers in the complex technical fields. The complex and difficult to obtain perquisites for aerospace employment command proper compensation at market determined prices. Coupled with a shortage of skilled qualified workers in aerospace, aerospace engineers and similarly skilled workers would, in a competitive market, be able to demand higher wages.

140.    Defendants have every incentive to poach other firms' highly skilled employees who have demonstrated records of excellence. Defendants' knowing refusal to hire highly skilled and rare employees during the labor shortage makes little sense if they were operating fairly and under competitive market conditions.

141.    *High exit barriers*: Beyond the difficulties in entering the labor market for aerospace engineering, exiting is also difficult. Engineers have invested significant time and resources in developing not only their initial qualifications, but also their specialized skills and experiences. This makes switching careers to a comparable wage immensely difficult, as these specialized engineering skills are not transferable, particularly not after specializing in a specific aspect of aerospace engineering, such as propulsion and combustion. This level of specialization makes it difficult for engineers to fight for higher wages in the face of collusion as they are unable to find alternative means of employment that utilize their skills at market value.

142.    *Inelastic demand and a lack of available substitutes for aerospace engineers*: The final factor that makes aerospace engineering susceptible to this sort of anticompetitive conduct is the relative inelastic demand for aerospace engineers and similarly skilled workers. In the past decade, on average, about 4,000 openings were available for aerospace engineers each year. Due to their highly specialized and difficult to obtain skills, aerospace engineers and similarly skilled workers cannot generally be substituted for other types of engineers. Further, engineers may be limited in their geographic scope for projects if working on defense or government work, and

family concerns can also prevent mobility. Thus, Defendants could artificially deflate wages without workers having an alternative in the face of collusion amongst Defendants.

K.   Defendants Concealed their Unlawful Conduct to the Detriment of the Class

143.   Defendants actively concealed their unlawful conduct to the Class Members, their own employees, to increase their profits. Not only did Defendants not disclose that they were not hiring any employees from other competitor's privy to the No-Poach Agreements, but as alleged above, the Defendants also monitored each other to ensure compliance. At no point did they inform the Plaintiffs or the Class about the existence of their illegal No-Poach Agreements or their enforcement of these illegal agreements.

144.   The No-Poach Agreements were designed to remain undetected by the public and the skilled, technical, and engineering personnel working for Defendants. The No-Poach Agreements were entered into orally, and only referenced in carefully guarded emails and private materials. Thus, Skilled Aerospace Workers and the public had no way of detecting the unlawful activities of Defendants through reasonable inquiry.

145.   Defendants, upon receiving push back from other members of the No-Poach Agreements would not provide any reasoning for stopping negotiations, leaving the Plaintiffs and the Class in the dark about the Agreements.

146.   The DOJ notes that few engineers were aware of the unlawful Agreements, including those who had been denied advancement opportunities or salary increases due to its effect. DOJ Aff., ¶ 54. The market impact of the restrictions would further impact even those Engineers that did not apply for employment with another Defendant, and thus continued to hide the unlawful Agreements. No reasonable inquiry could discover the No-Poach Agreements.

147.   The information made public by the DOJ finally allowed the Plaintiffs and the Class to become aware of the damage done to them. Without the governmental criminal investigation, Plaintiffs would have remained in the dark even now.

148.   The Plaintiffs, and other members of the Class, did not learn of the conspiracy until December 9, 2021, when the DOJ's criminal complaint was partially unsealed and the arrest

warrant for Mahesh Patel was made public. This secrecy made it impossible for Plaintiff and the Class to seek redress prior to that date.

## VII.    CLASS ACTION ALLEGATIONS

149.    Plaintiffs brings this action on behalf of themselves, and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons in the United States and its territories employed by Defendants as Aerospace Engineers or other skilled employment during the Class Period from January 1, 2011, through the present (the "Class Period"). Excluded from the Class are corporate officers, members of the boards of directors, and senior executives of Defendants who entered into the illicit agreements alleged herein; employees of the United States government employed by Defendants during the Class Period; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

150.    Plaintiffs does not, as yet, know the exact size of the Class because such information is in the exclusive control of Defendants. Based upon the nature of the trade and commerce involved, Plaintiffs believes that there are thousands of members in the Class, and that Class members are geographically dispersed throughout this district and the United States and its territories. Joinder of all Class members, therefore, is not practicable.

151.    The questions of law or fact common to the Class include but are not limited to:

a.    whether the conduct of Defendants violated the Sherman Act;

b.    whether Defendants' conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

c.    whether Defendants fraudulently concealed their conduct;

d.    whether Defendants' conspiracy and associated agreements restrained trade, commerce, or competition for skilled labor among Defendants;

e.    whether Plaintiffs and the Class suffered antitrust injury or were threatened with injury;

        f.      the difference between the total compensation Plaintiffs and the Class received from Defendants, and the total compensation Plaintiffs and the Class would have received from Defendants in the absence of the illegal acts, contracts, combinations, and conspiracy alleged herein; and

        g.      the type and measure of damages suffered by Plaintiffs and the Class.

152.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

153.     Plaintiffs' claims are typical of the claims of the Class.

154.     Plaintiffs will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

155.     Plaintiffs has retained competent counsel experienced in antitrust litigation and class action litigation to represent them and the Class.

156.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

157.     This class action is superior to the alternatives for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

## VIII.   ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION

158.     The No-Poach Conspiracy substantially reduced competition for Skilled Aerospace Worker labor. Defendants and their co-conspirators entered into, implemented, and policed these unlawful No-Poach Agreements with knowledge of the overall Conspiracy, and did so with the intent, purpose, and effect of fixing, restraining, and stabilizing the compensation paid to their personnel at artificially low levels.

159.     The Conspiracy did not only harm individuals who sought to change their employment from one Defendant to another, but also extended to those who had no intention of changing from one Defendant to another as they suffered from artificially depressed wages. This injury was caused by the Defendants through their repeated and continuous efforts to maintain internal equity in their compensation structures and reduce transparency.

160.     Plaintiffs and other members of the Class were harmed by the No-Poach Agreements alleged herein. Defendants' unlawful No-Poach Agreements restrained competition in the market for the services of Aerospace Engineering Workers, which had the effect of suppressing compensation and mobility for all members of the Class.

161.     Without this class action, Plaintiffs and the Class will remain unable to receive compensation for the harm they suffered, and Defendants will continue to reap the benefits of their illegal conspiracy.

162.     The unlawful No-Poach Agreements entered into by Defendants and their co-conspirators are per se illegal horizontal restraints on competition.

163.     In the alternative, Defendants are liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on class members and markets.

164.     In the alternative, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the market for skilled labor of aerospace engineers or similarly skilled workers, and are liable under a Rule of Reason inquiry because their unlawful Conspiracy, among other things, reduced compensation and restrained competition in the market for the services of skilled professionals, and any procompetitive effects that may have resulted from the Conspiracy and/or the conduct of Defendants and their agents and co-conspirators in furtherance thereof were and are outweighed by the anticompetitive harm alleged herein, including, but not limited to, restricting employee mobility and suppressing wages, benefits, and other aspects of compensation.

165.     The Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects.

166.     The Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof had substantial anticompetitive effects, including, but not limited to, eliminating competition, preventing Plaintiffs and the Class members from obtaining employment and earning compensation in a competitive market, reducing compensation for Aerospace Skilled Workers, and preventing or limiting employment opportunities and choice with respect to such opportunities.

167.     The anticompetitive effects outweigh any procompetitive benefits of the Conspiracy. The No-Poach Agreements did not provide the Plaintiffs, the proposed Class, or the public at large with a better product, save them money, or create any efficiencies that improved the functioning of the labor market.

168.     Indeed, once Defendants stopped competing with one another for the best aerospace engineers and other similarly skilled labor, the quality of the work likely declined. Nor did the agreements allow Defendants to compete on price better as all Defendants were similarly suppressing wages across the board, making their lower labor costs the same as their competitors.

169.     The only benefit to be derived from suppressing compensation for Plaintiffs and the Class members was increased profits due to lower costs for Defendants. Defendants' ill-gotten gains, achieved through illegal means and at the expense of Plaintiffs and the Class members, are not a benefit the antitrust laws are designed to confer. There are no pro-competitive benefits to be gained through these illegal no-poach agreements.

## IX.     EQUITABLE TOLLING AND STATUTE OF LIMITATIONS

170.     While Plaintiffs had knowledge of aspects of Defendants' and industry recruiting practices, Plaintiffs had neither actual nor constructive knowledge of Defendants' unlawful conspiracy until, at the earliest, December 9, 2021, when the DOJ released unsealed portions of

their indictment of Defendants and arrest warrant for Patel. Nor did Plaintiffs have any reason to suspect that Defendants were illegally acting in concert to suppress wages and the labor market.

171.    At no point did Defendants inform Plaintiffs that their compensation was not competitive but was instead suppressed by Defendants' anticompetitive agreements. Indeed, Defendants' explanations and statements regarding hiring and compensation were pretextual and designed to fraudulently conceal their conspiracy and other illegal anticompetitive conduct. Plaintiffs therefore did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy outlined in the foregoing allegations.

172.    Conspiracies, by their nature, are self-concealing. To keep the conspiracy hidden from those it affected most—their employees and prospective employees—Defendants and their co-conspirators did not publicize their No-Poach Agreements.

173.    Defendants also concealed the fraud by giving false and pretextual explanations for hiring and compensation decisions, including that the decisions were based on merit, the operation of free and open competition, and other considerations, instead of pursuant to an unlawful agreement.

174.    As a result of Defendants' and their co-conspirators' successful efforts to conceal the fact and scope of the Conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiffs' claims concerning Defendants' conspiracy.

**X.     CLAIM FOR RELIEF**
(Violation of Sections 1 and 3 of the Sherman Act § 1 15 U.S.C. §§ 1, 3)
(Alleged against all Defendants)

175.    Plaintiffs, on behalf of themselves and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against each of them the allegations described below.

176.    Defendants entered into and engaged in unlawful No-Poach Agreements in restraint of the trade and commerce described above in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Beginning at a time known only to Defendants, but no later than

January 1, 2011, and continuing through the present, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act.

177.   Defendants' agreements have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

178.   As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, members of the Class have suffered injury to their property in the United States or its territories and have been deprived of the benefits of free and fair competition on the merits.

179.   The unlawful agreements among Defendants have had the following direct, substantial, and reasonably foreseeable effects, among others:

  a.   competition in the United States among Defendants for Skilled Aerospace Workers was and continues to be suppressed, restrained, and eliminated;

  b.   Plaintiffs and Class members have, as a direct and proximate result, received lower compensation from Defendants than they otherwise would have received in the absence of Defendants' unlawful agreements, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

180.   The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

181.   Defendants' contracts, combinations and/or conspiracies are *per se* violations of Sections 1 and 3 of the Sherman Act. Alternatively, Defendants' contracts, combinations and/or conspiracies are illegal and violate Section 1 of the Sherman Act under the quick look or rule of reason approach.

182.    Accordingly, Plaintiffs and members of the Class seek treble damages for Defendants' violations of Section 1 of the Sherman Act. Plaintiffs also seeks to recover the costs of bringing this suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## XI.    DEMAND FOR JURY TRIAL

Plaintiffs and the proposed Class hereby demand a trial by jury on all applicable claims to the maximum number of jurors permitted by law.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

a.    This action may be maintained as a class action, with Plaintiffs serving as the Class Representative for the Class, and with Plaintiffs' counsel as Class Counsel for the Class;

b.    Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 & 3, and Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

c.    The alleged combinations and conspiracy are *per se* violations of the Sherman Act;

d.    Defendants are enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, or other illegal anticompetitive agreement or understanding, as alleged herein;

e.    Judgment be entered for Plaintiffs and the Class members, and against Defendants, for three times the amount of damages sustained by Plaintiffs and the Class, as allowed by law;

f.    Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.       Plaintiffs and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

h.       Plaintiffs and the Class are entitled to such other and further relief as is just and proper under the circumstances.

Dated: January 28, 2022

Respectfully Submitted,

AETON LAW PARTNERS LLP

By:  _/s/ Jonathan M. Shapiro_ _____

Jonathan M. Shapiro (SBN ct24075)
AETON LAW PARTNERS LLP
311 Centerpoint Drive
Middletown, CT 06457
Telephone: (860) 724-2160
Email:  jms@aetonlaw.com

Joseph R. Saveri (SBN 130064)
Steven N. Williams (SBN 175489)
Anupama K. Reddy (SBN 324873)
Christopher K.L. Young (SBN 318371)
Abraham A. Maggard (SBN 339949)
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email:     jsaveri@saverilawfirm.com
            swillliams@saverilawfirm.com
            areddy@saverilawfirm.com
            cyoung@saverilawfirm.com
            amaggard@saverilawfirm.com

Steven N. Williams (SBN 2533826)
JOSEPH SAVERI LAW FIRM LLP
40 Worth Street, Suite 602
New York, NY 10013
Telephone: (646) 527-7310
Facsimile: (212) 202-7678
Email:  swilliams@saverilawfirm.com

*Counsel for Plaintiffs and the Proposed Class*