# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN BALICOCO, M. TOREY MERCURIO, JOHN SOCKWELL, JEFFREY HOWE, and MICHAEL KWOK, on behalf of themselves and all others similarly situated, | No. 3:21-cv-01657-SVN<br>(Lead Consolidated File) |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |
| v. | |
| PRATT & WHITNEY; QUEST GLOBAL SERVICES-NA, INC.; BELCAN, LLC; CYIENT, INC.; PARAMETRIC SOLUTIONS, INC. and AGILIS ENGINEERING, INC., | |
| Defendants. | February 1, 2022 |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................8

III.    PARTIES ..............................................................................................................8

      A.      Plaintiffs ...................................................................................................8

      B.      Defendants ................................................................................................9

IV.     AGENTS AND CO-CONSPIRATORS ...........................................................10

V.      FACTUAL ALLEGATIONS ............................................................................13

      A.      Background .............................................................................................13

            1.      Nature of Engineering and Highly Skilled Work in the
                 Aerospace Industry ......................................................................13

            2.      Hiring and Outsourcing of Aerospace Engineers and
                 Highly Skilled Workers ...............................................................16

      B.      No Hire Conspiracy ...............................................................................18

            1.      Patel Spearheaded Agreements to Restrict Hiring....................19

            2.      Pratt & Whitney Further Restricted Hiring from QuEST.........27

            3.      Pratt & Whitney Reinforced The No Hire Conspiracy
                 Through an Additional Agreement with Belcan. ......................30

            4.      Pratt & Whitney Reinforced The No Hire Conspiracy
                 Through an Additional Agreement with Agilis. ........................32

            5.      Plus Factors that Render the Aerospace Engineering
                 Industry Susceptible to Collusion ..............................................32

      C.      Anticompetitive Effects and Injury Suffered by Class Members .........40

VI.     STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS'
      CLAIMS .............................................................................................................42

      A.      Continuing Violation .............................................................................42

      B.      Fraudulent Concealment ........................................................................43

   1. Plaintiffs Did Not and Could Not Have Discovered
     Defendants' Misconduct ................................................................43

   2. Defendants Actively Concealed the Conspiracy.......................................44

VII. INTERSTATE COMMERCE ......................................................................47

VIII. CLASS ACTION ALLEGATIONS ............................................................47

IX. CAUSES OF ACTION ................................................................................49

  FIRST CLAIM FOR RELIEF: CONSPIRACY TO DEPRESS
  COMPENSATION IN VIOLATION OF SECTION 1 OF SHERMAN
  ANTITRUST ACT (Against All Defendants)..................................................49

X. PRAYER FOR RELIEF ..............................................................................50

XI. JURY TRIAL DEMAND ............................................................................51

Based on the criminal action brought by the Department of Justice and an extensive independent investigation by counsel that provided confirmatory direct evidence of the conspiracy, Plaintiffs John Balicoco, M. Torey Mercurio, John Sockwell, Jeffrey Howe, and Michael Kwok (collectively, "Plaintiffs") bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all engineers and other skilled workers employed by Defendants,[1] their subsidiaries, and related entities in the United States from 2011 until the present (the "Class Period").

## I.   INTRODUCTION

1.      For years, Defendants have conspired to restrain competition in order to suppress the compensation of those that they claim to prize as their greatest assets—their own workers. In *per se* violations of the antitrust laws, Defendants' executives secretly agreed to work together to deprive thousands of their workers of better compensation and deny them opportunities to advance their careers at other companies. These workers included engineers and other skilled workers in the aerospace engineering industry. The conspiracy deprived Plaintiffs and other Class members of millions of dollars in compensation while their work generated billions of dollars in revenue for Defendants with one taking in more than $16 billion in 2017 alone.

2.      Defendants include Pratt & Whitney, a subsidiary of Raytheon Technologies and one of the largest aerospace engine design, manufacture, and service companies in the United States, as well as five outsource engineering supply companies ("Supplier Defendants") whose employees performed work for Pratt & Whitney on a project basis. The co-conspirator Supplier Defendants include QuEST Global Services-NA, Inc. ("QuEST"), Belcan, LLC, Cyient, Inc.

---

[1] The term "Defendants" herein refers to the following companies: Pratt & Whitney, a subsidiary of Raytheon Technologies Corporation; QuEST Global Services-NA, Inc.; Belcan, LLC; Cyient, Inc.; Parametric Solutions, Inc.; and Agilis Engineering, Inc.

(formerly known as Infotech Enterprises Limited), Parametric Solutions, Inc., and Agilis Engineering, Inc. ("Agilis").

3.      Defendants, their subsidiaries, and related entities employ thousands of engineers and skilled workers in the United States. These employees design, manufacture, and service aerospace products. The work performed by these employees is in limited supply, including because it is highly technical, often requiring degrees in aerospace engineering or another field of engineering or science related to aerospace systems. Moreover, because these workers are often employed on projects related to national defense or for other government contractors, they are frequently required to have a security clearance and/or complete their work in the United States. Thus, it is no surprise that military veterans are frequently hired to perform these jobs, with one former Pratt & Whitney senior recruiter for engineers estimating that 80% of the workers he hired were military veterans. With a limited pool of applicants meeting the requirements for work that is in high demand, the leading aerospace industry group, Aerospace Industries Association ("AIA"), and the federal government have both identified a significant shortage of qualified aerospace workers in the United States. Their relative scarcity and the high demand for their services increases their value, and in a competitive labor market, would increase the compensation that employers have to pay to retain them.

4.      Pratt & Whitney relies on these workers, including their own employees and workers from outsource engineering supply companies, to perform their aerospace work. An outsource engineering supply company ("Supplier") like the Supplier Defendants would enter into an agreement with Pratt & Whitney to supply outsourced workers for a particular project, or "Statement of Work." The Supplier would then assign engineers and other skilled workers that it

employed to complete the project for Pratt & Whitney, and they would then receive an agreed-upon payment from Pratt & Whitney for their work.

5.      In a normal competitive labor market, these companies would compete to recruit and hire the most talented employees with better compensation, wages, and benefits. But here, to accomplish their anticompetitive goals, Defendant Pratt & Whitney and the Supplier Defendants agreed to limit hiring and recruiting activities that otherwise would have existed absent Defendants' conspiracy. Since at least 2011, Defendants have conspired to restrict recruiting and hiring of engineers and other skilled workers in the aerospace engineering industry ("No Hire Conspiracy" or "Conspiracy"). They did so by agreeing to not hire each other's employees and by agreeing not to solicit each other's employees. Through these agreements, Defendants restricted their employees' movement between companies and depressed compensation paid to them and other Class Members. The principle underlying Defendants' conspiracy was simple: as one former Belcan recruiter identified during counsel's investigation put it, "You can't steal from your brother." Defendants have engaged in this unlawful conspiracy to maximize their profits by reducing labor costs.

6.      The No Hire Conspiracy was exposed on December 9, 2021, when the Department of Justice ("DOJ") partially unsealed a criminal antitrust action against Mahesh Patel ("Patel"), the former Director of Global Engineering Sourcing at Pratt & Whitney. *See* Aff. in Supp. of Criminal Compl. and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-01189 (D. Conn. Dec. 9, 2021), ECF No. 15 [hereinafter "DOJ Affidavit"].[2] More recently, on December 15, 2021, six of Defendants' executive employees were indicted for their active participation in the alleged No

---

[2] The DOJ Affidavit describes the companies involved in the No Hire Conspiracy as Companies A, B, C, D, E, and F. After investigation, counsel believe that Pratt & Whitney, QuEST, Belcan, Cyient, Parametric Solutions, and Agilis, are Companies A-F, respectively.

Hire Conspiracy, namely Patel, as well as Robert Harvey, Harpreet Wasan, Steve Houghtaling, Tom Edwards, and Gray Prus. *United States v. Patel*, No. 3:21-cr-00220, ECF No. 20 (D. Conn. December 15, 2021) [hereinafter "Indictment"].

7.    As early as 2011, Pratt & Whitney led the Defendants' Conspiracy to restrict the recruiting and hiring of engineers and other skilled workers between and among the Supplier Defendants. These restrictions were spearheaded and enforced by Patel, a senior global sourcing executive at Pratt & Whitney. Evidence gathered by the DOJ as well as counsel's independent investigation demonstrates that the existence and nature of the Defendants' scheme cannot seriously be disputed. According to the DOJ, Patel explicitly and repeatedly instructed executives from the Supplier Defendants not to recruit or hire each other's employees. In one example from September 2016, Patel emailed Gary Prus—the Chief Operating Officer/Executive Vice President and part owner of Parametric Solutions—stating, "Last time we talked you assured me that you will not hire any [Pratt & Whitney] partners['] employee. This must stop . . . ." DOJ Aff. ¶ 29. Patel also served as an intermediary between the Supplier Defendants and admonished Supplier Defendants that were not compliant with the No Hire Conspiracy.

8.    Patel was not even deterred when others warned him that the conspiracy and his actions may be illegal. Belcan's Human Resources Director reported that she and another Belcan manager "spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors." DOJ Aff. ¶ 37. In other words, he knew it was illegal, but Patel continued to enforce the Defendants' scheme anyway.

9.    Counsel's independent investigation revealed facts confirming Defendants' conspiracy in addition to those discovered by the Department of Justice. It encompassed multiple

industry witnesses, including officials with recruiting responsibilities, who provided *direct evidence* that confirmed the existence of the conspiracy. For example, a former Belcan recruiter who worked in the industry for many years described a "Do Not Touch" agreement, under which he was not permitted to hire employees from QuEST while at Belcan. This recruiter was told that if he did so, QuEST would "complain to the customer." In another example, a different former Belcan recruiter put it this way: the message from Pratt & Whitney to Suppliers was, "Look, this is in our sandbox. You all play in our sandbox, so play nice." This former recruiter recalled that Patel "was the one. … He was the contact for upper management at Belcan. He'd call Belcan and tell them they couldn't hire a person." A third former Belcan recruiter with direct knowledge of the industry confirmed that these agreements hurt employees like those working for Defendants because "they can't get hired. Engineers are the ones that get the short end of the stick."

10.     In additional acts in furtherance of the conspiracy, Pratt & Whitney also agreed with QuEST that Pratt & Whitney would not hire QuEST employees unless they had worked for QuEST for a certain period of time. From approximately 2015 through 2017, representatives of Pratt & Whitney and QuEST also agreed to "freezes" or "moratoria"—specific periods of time during which Pratt & Whitney would not recruit or hire QuEST's employees, with limited exceptions. DOJ Aff. ¶ 47.

11.     Counsel's independent investigation revealed that Pratt & Whitney reinforced the conspiracy using similar agreements with Belcan and Agilis.

12.     According to a former Belcan recruiter, Pratt & Whitney agreed not to hire any Belcan contract employees until a contract employee completed a time limited contract, plus an additional six-month "moratorium." If Pratt & Whitney wanted to hire a Belcan contract employee

prior to the end of that moratorium, they had to pay Belcan a fee. These terms were set out in a Master Terms Agreement (MTA) between the two companies.

13.     According to another former Belcan recruiter, a similar monetary penalty applied if Pratt & Whitney wanted to hire a Belcan salaried employee. The fee that Belcan charged a customer for directly hiring a Belcan salaried employee was 30% of the employee's annual salary.

14.     In addition, Pratt & Whitney maintained a similar verbal no hire agreement with Agilis that prohibited both parties from hiring each other's employees. According to a former manager at Agilis, Agilis founder, President and CEO Frank O'Neill had an agreement with Pratt & Whitney executives that Pratt & Whitney "wouldn't come barking up [Agilis's] tree and we wouldn't poach from them."

15.     The conspiracy was intended to suppress compensation throughout the market by limiting hiring and solicitation of engineers and other skilled workers in the aerospace industry. By doing so, Defendants would tamp down bidding wars (i.e., competition) to attract and retain employees. To that end, when any Supplier Defendant engaged in significant competition (in effect, "cheating") in breach of their agreement, Pratt & Whitney's Patel and other conspirators attempted to squelch it. The actual effect of Defendants' conspiracy to restrict hiring and recruiting was achieved; it reduced and suppressed the wages, salaries, and benefits paid to Class Members (defined below) since at least 2011 to levels materially lower than they would have been in a competitive market.

16.     This collusive agreement was not reasonably tied to any separate, legitimate business transaction or collaboration among the Defendants. Rather, it was an easy-to-implement and enforce scheme to restrict their employees' movement between companies and depress compensation. Indeed, Patel was remarkably clear about the shared goals of the conspirators. For

example, in a January 2017 email, Patel contacted Parametric Solutions after it had hired one of Cyient's employees, directing, "Please do not hire any partners employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war." DOJ Aff. ¶ 24. In March 2016, Parametric Solutions' Gary Prus wrote of the hiring restrictions: "[Patel] says he does not want the salaries to increase." *Id.* Poaching and price wars are competition; increased salaries are the result of competition. Competition is what Patel and the Defendants tried to stop.

17.     Defendants took actions to conceal the agreements from their employees. Top executives and human resources and recruiting personnel involved in the conspiracy communicated about the agreements orally in person or by phone or alternatively in emails among themselves. Defendants also repeatedly bragged about the cost savings that the Supplier Defendants and Pratt & Whitney had achieved without ever telling the public, their employees, or other Class Members that much of those savings were achieved at the expense of Class Members through their unlawful scheme. Pratt & Whitney even provided Supplier Awards to Belcan and Cyient for, in part, "cost avoidances" and "cost savings" that allowed Pratt & Whitney "to sustain a competitive advantage in the marketplace." None of the Defendants mentioned the competitive disadvantage that their conspiracy put on their workers who they described as "our forward-thinking engineers who instill innovation into every solution."

18.     Numerous characteristics of the aerospace industry have facilitated the formation and implementation of the Conspiracy, including but not limited to, the following: (a) high barriers to entry; (b) personal relationships between executives at Pratt & Whitney and Suppliers; and (c) numerous opportunities to collude.

19.     The agreement entered into by Defendants to restrict the hiring and recruiting of engineers and other skilled workers has unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1. Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreement and to recover actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs demand a trial by jury.

## II.     JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

21.     This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of the forum state because each resides in or has its principal place of business in the State of Connecticut, employed individuals in this state during the Class Period, and/or has had substantial contacts within the State of Connecticut in furtherance of the conspiracy.

22.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.     PARTIES

### A.     Plaintiffs

23.     John Balicoco was employed as a Mechanical Design Engineer by Agilis from July 2018 to September 2020 in San Diego, California. As part of his employment at Agilis, Mr. Balicoco worked on projects for Pratt & Whitney.

24.     M. Torey Mercurio was employed as a Quality Engineer by Pratt & Whitney from September 2017 to July 2018 in Atlanta, Georgia.

25.     John Sockwell and was employed as an engineer by Cyient from June 2019 to June 2021 in Columbus, Georgia.

26.     Jeffrey Howe was employed as a product development engineering manager by Quest Global from 2010 to 2015 in Connecticut.

27.     Michael Kwok was employed as an engineer by Cyient from September 2011 to April 2018. He was subsequently re-employed by Cyient from June 2019 to August 2020.

**B.      Defendants**

28.     Pratt & Whitney is a subsidiary of Raytheon Technologies Corporation and is incorporated in Delaware with its principal place of business in East Hartford, Connecticut. Pratt & Whitney is one of the largest aerospace engine design, manufacture, and service companies in the United States. During the Class Period, Pratt & Whitney and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States. On information and belief, Pratt & Whitney is identified as "Company A" in the DOJ Affidavit. *See* DOJ Aff. ¶ 5.

29.     QuEST Global Services-NA, Inc. ("QuEST") is incorporated in Ohio with its principal place of business in East Hartford, Connecticut. During the Class Period, QuEST and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States. On information and belief, QuEST is identified as "Company B" in the DOJ Affidavit. *See* DOJ Aff. ¶ 6(a).

30.     Belcan, LLC ("Belcan") is incorporated in Ohio with its principal place of business in Windsor, Connecticut. During the Class Period, Belcan and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to

Class Members in the United States. On information and belief, Belcan is identified as "Company C" in the DOJ Affidavit. *See* DOJ Aff. ¶ 6(b).

31.     Cyient, Inc. ("Cyient") is incorporated in California with its principal place of business in East Hartford, Connecticut. Prior to 2014, Cyient was known under a different corporate name, Infotech Enterprises, Limited. During the Class Period, Cyient and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States. On information and belief, Cyient is identified as "Company D" in the DOJ Affidavit. DOJ Aff. ¶ 6(c).

32.     Parametric Solutions, Inc. ("Parametric Solutions") is incorporated in Florida with its principal place of business in Jupiter, Florida. During the Class Period, Parametric Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States. On information and belief, Parametric Solutions is identified as "Company E" in the DOJ Affidavit. *See* DOJ Aff. ¶ 6(d).

33.     Agilis Engineering, Inc. ("Agilis") is incorporated in Florida with its principal place of business in Palm Beach Gardens, Florida. During the Class Period, Agilis and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States. On information and belief, Agilis is identified as "Company F" in the DOJ Affidavit. *See* DOJ Aff. ¶ 6(e).

## IV.     AGENTS AND CO-CONSPIRATORS

34.     The individuals/entities named below have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy to fix and depress compensation alleged herein.

35.     Defendants are jointly and severally liable for the acts of the co-conspirators named below whether or not named as defendants in this Complaint.

36.     Each Defendant and co-conspirator named below acted as the agent or joint-venturer of, or for, the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

37.     Mahesh Patel ("Patel") is a U.S. citizen who resides in Glastonbury, Connecticut. Beginning in 2003, he was the Manager and (later) Director of the unit within Pratt & Whitney that managed the relationship between Pratt & Whitney and its Suppliers. He was the highest-ranking employee within that unit and managed a team of associates from his office in East Hartford, Connecticut. Patel and his associates controlled the statements of work and payments for Supplier projects, and monitored the quality of Supplier work and progress on their projects for Pratt & Whitney. Patel also was involved in master contract negotiations between Suppliers and Pratt & Whitney's parent company, Raytheon Technologies Corporation. Patel left Pratt & Whitney in March 2020. Pratt & Whitney executive Patel has been indicted for his participation in the alleged No Hire Conspiracy.

38.     The co-conspirators described below were managers or executives at Suppliers that performed work on Pratt & Whitney projects. Each co-conspirator had substantial responsibilities on behalf of his respective corporation to maintain and advance his employer's business relationship with Pratt & Whitney, and substantial responsibilities for hiring and recruiting at his respective company. Each communicated with Patel about those subjects.

39.     On information and belief, Robert (Bob) Harvey is identified in the DOJ Affidavit as "Co-Conspirator 1." DOJ Aff. ¶ 8(a). Beginning in 2010, Harvey was employed by QuEST as Senior Vice President, then President-Strategic Accounts, and, as of 2019, President-Global

Business Head, and worked principally from an office in East Hartford, Connecticut. From 1998-2000, Harvey worked for Pratt & Whitney as a Senior Vice President. QuEST executive Harvey has been indicted for his participation in the alleged No Hire Conspiracy.

40.     Beginning at least as early as 2007, Co-Conspirator 2 was employed by QuEST. He served as Engineering Director, General Manager starting in 2011, and in 2015, Associate Vice President, and worked principally from an office in East Hartford, Connecticut. DOJ Aff. ¶ 8(b).

41.     On information and belief, Harpreet Wasan is identified in the DOJ Affidavit as "Co-Conspirator 3." DOJ Aff. ¶ 8(c). Beginning in early 2015, Wasan was Vice President/ Strategic Client Partner at QuEST, and worked principally from offices in East Hartford, Connecticut and Tokyo, Japan. He left QuEST in early 2021. Prior to his roles at QuEST, Wasan worked at Pratt & Whitney for approximately ten years. QuEST executive Wasan has been indicted for his participation in the alleged No Hire Conspiracy.

42.     Beginning in late 2015, Co-Conspirator 4 was employed by QuEST as a General Manager and, as of 2018, Chief Engineer/Account Manager, and worked principally from offices in East Hartford and Windsor, Connecticut. He left QuEST in 2020. DOJ Aff. ¶ 8(d).

43.     On information and belief, Steve Houghtaling is identified in the DOJ Affidavit as "Co-Conspirator 5." DOJ Aff. ¶ 8(e). Beginning in early 2013, Houghtaling was employed by Belcan as a General Manager, Vice President, and, as of 2019, Senior Vice President, and worked principally from an office in Windsor, Connecticut. Belcan executive Houghtaling has been indicted for his participation in the alleged No Hire Conspiracy.

44.     On information and belief, Tom Edwards is identified in the DOJ Affidavit as "Co-Conspirator 6." DOJ Aff. ¶ 8(f). Beginning in or around 2010, Edwards was employed at the company now known as Cyient, and as of around 2013, has been President for Cyient's North

America operations. He worked principally from an office in East Hartford, Connecticut. Cyient executive Edwards has been indicted for his participation in the alleged No Hire Conspiracy.

45.     On information and belief, Gary Prus is identified in the DOJ Affidavit as "Co-Conspirator 7." DOJ Aff. ¶ 8(g). Beginning at least as early as 2015, Prus was Chief Operating Officer/Executive Vice President and part owner of Parametric Solutions, and worked principally from an office in Jupiter, Florida. Earlier in his career, Prus worked for 18 years at Pratt & Whitney. Parametric Solutions executive Prus has been indicted for his participation in the alleged No Hire Conspiracy.

46.     On information and belief, Frank O'Neill is identified in the DOJ Affidavit as "Co-Conspirator 8." DOJ Aff. ¶ 8(h). Beginning in 1993, O'Neill founded and was part owner of Agilis, and also served as President and Chief Executive Officer. He worked principally from an office in Palm Beach Gardens, Florida.

47.     Florida Turbine Technologies Inc. (FTT) is a corporation located in Jupiter, Florida. It is a division of Kratos Defense & Security Solutions Inc., which is headquartered in San Diego, California. On information and belief, FTT participated in the conspiracy through a no-poach agreement with Agilis.

## V.    FACTUAL ALLEGATIONS

### A.    Background

#### 1.    Nature of Engineering and Highly Skilled Work in the Aerospace Industry

48.     The U.S. aerospace industry is the largest in the world, supplying a variety of markets, including military aircraft, missiles, space, commercial airliners, and general aviation. The industry directly employs approximately 500,000 workers in scientific and technical jobs across the country, with aviation considered one of the fastest growing industries in the United States.

49.     Defendants are key participants in the aerospace industry, and in a competitive market, would compete with one another to attract, hire, and retain highly skilled employees. The engineers and other highly skilled employees in this area hired by Defendants perform a variety of crucial job duties, including directing the design, manufacture, and testing of aircraft and related products, assessing the technical feasibility of projects, evaluating designs to determine if products meet engineering principles, customer requirements, and environmental regulations, and inspecting malfunctioning or damaged products to identify sources of problems and potential solutions.

50.     As of May 2020, there were approximately 60,000 aerospace engineers in the United States. The median annual wage for these engineers in 2020 was nearly $120,000.

51.     Aerospace engineering is a highly technical field, which requires at a minimum a bachelor's degree in aerospace engineering or another field of engineering or science related to aerospace systems. Moreover, the work is often highly specialized, with aerospace engineers developing expertise in fields such as aerodynamics or thermodynamics.

52.     Defendant Pratt & Whitney, for example, requires engineers for the design, manufacture, and service of aircraft and auxiliary power units, with its commercial engines accounting for nearly 30 percent of the world's mainline passenger aircraft fleet. Dozens of countries around the world also use Pratt & Whitney's military engines.

53.     Advanced aerospace engineering employment normally requires a Professional Engineer (PE) license. Licensing is generally done at the state level, and most states require an accredited engineering degree, work experience, and passing performance on both the Fundamentals of Engineering (FE) exam and the Professional Engineering Exam. These are the requirements to be a PE in Connecticut, where several of the Defendants are located, with the state

also requiring four or more years of experience as an engineer and passing a discipline-specific examination.[3]

54.     Because aerospace engineers often work on projects that are related to national defense, engineers often need a security clearance to be able to perform their work. Additionally, because of the substantial security on defense and governmental projects, aerospace engineers frequently need to complete their work in the United States.

55.     Because of the highly specific skills and experience needed to perform aerospace engineering, in addition to the security clearance requirements, military veterans are often predominant in the pool of qualified applicants. Indeed, one former Pratt & Whitney senior recruiter that hired engineers for the company estimated that 80% of the people he hired for Pratt & Whitney were military veterans.

56.     There is a high and growing demand for aerospace engineers, but industry experts have identified a shortage of qualified workers. For example, the AIA, the leading trade association for the industry, explained in 2016 that the aerospace workforce was "at risk" due to a "wave of impending baby boomer retirements along with a shortage of trained technical graduates, while work and skills requirements become more advanced."[4] The AIA explained that "39 percent of aerospace companies predict[ed] an 'extreme' impact on their business growth caused by the [science, technology, engineering, and mathematics (STEM)] labor shortage," and for "U.S. manufacturers," an estimate that "talent shortages cost an estimated $14,000 per unfilled

---

[3] *See* Connecticut Society of Professional Engineers, *Licensure and Ethics*, https://www.ctspe.net/engineering/licensure-and-ethics/ (last visited Dec. 13, 2021).

[4] *See* Aerospace Indus. Assoc., *What Every Candidate Should Know About the Aerospace Workforce and STEM* (June 2016), https://www.aia-aerospace.org/wp-content/uploads/2016/06/AIA_Campaign_Papers_Workforce.pdf.

position."[5] Their relative scarcity and the high demand for their services increases their value, and in a competitive labor market, would increase the compensation that employers have to pay to retain them.

57.     The aerospace industry also relies on the work of highly specialized and experienced tradespeople and craft workers such as assemblers, machinists, tool and die makers, sheet metal workers, patter-makers, and electricians (referred to herein as "Highly Skilled Workers" or "Skilled Workers"). Many of these workers require several years of formal apprenticeship and often have multiple years of plant experience.

58.     As with aerospace engineers, there has been a shortage of aerospace Highly Skilled Workers. According to a 2012 study by Aviation Week, the average age of aerospace employees is 45 and a survey conducted by Advanced Technology Services (ATS) and ACNielsen reported that 41 percent of skilled tradespeople in the United States would retire by 2017.

**2.      Hiring and Outsourcing of Aerospace Engineers and Highly Skilled Workers**

59.     During the Class Period, Pratt & Whitney engaged different sources of labor to design, manufacture, and service its aerospace products.

60.     One of these sources of labor was outsource engineering. In this type of engagement, Pratt & Whitney would issue a "Statement of Work" for a particular project, and an outsource engineering supply company ("Supplier") would bid on that Statement of Work.

61.     Once a bid was accepted, Pratt & Whitney would enter into an agreement with a Supplier for that particular project. The Supplier would then allocate engineers and other skilled workers from among its own employees to complete the project for Pratt & Whitney and would receive an agreed-upon payment from Pratt & Whitney for the project.

---

[5] *Id.*

62.     The Supplier Defendants were among the Suppliers whose employees worked on specific projects for Pratt & Whitney on an outsource basis.

63.     In a normal competitive market, the Supplier Defendants would have competed against one another for outsource work projects from Pratt & Whitney.

64.     In a normal competitive labor market, these companies would compete to recruit and hire the most talented employees with better compensation, wages, and benefits.

65.     One former Cyient recruiter indicated that QuEST Global and Belcan were Cyient's top competitors on these bids. A former Belcan recruiter likewise confirmed that QuEST Global and Cyient were Belcan's largest competitors.

66.     Outsource engineers working on specific projects for Pratt & Whitney would be paid by the Supplier but would often have a Pratt & Whitney badge and email address, and some would work at the Pratt & Whitney office.

67.     Patel and his associates at Pratt & Whitney communicated regularly with representatives of the Suppliers, controlled the Statements of Work and payments for Supplier projects, and monitored the quality and progress of Suppliers' work on projects for Pratt & Whitney.

68.     Patel was also involved in principal contract negotiations between Raytheon—Pratt & Whitney's parent company—and the Defendant Suppliers.

69.     Supplier rates for work on Pratt & Whitney projects are based primarily on per-hour prices for the work to be performed by the engineers and other workers employed by the Supplier.

70.     In a competitive market, Pratt & Whitney and the Supplier Defendants would compete against each other to recruit and hire engineers and other skilled workers.

71.     Any increase in wages or benefits to engineers and other skilled workers affects both the Supplier Defendants and Pratt & Whitney. For example, if one of the Supplier Defendants increased wages or benefits, including as a way to attract or retain employees, the resulting increase in the Supplier Defendant's labor costs may have led it to charge higher prices (or "rates") to Pratt & Whitney for any projects. Each Defendant therefore had an interest in closely monitoring labor costs.

**B.     No Hire Conspiracy**

72.     Beginning as early as 2011 and continuing to the present, Defendants have conspired with each other not to hire or recruit each other's employees, thereby depressing the compensation paid to employees of Defendants, their subsidiaries, and related entities in the United States.

73.     The Supplier Defendants conspired with each other and with Pratt & Whitney to restrict hiring and recruiting of engineers and other skilled workers from, between and among the Defendant companies.

74.     All the Defendants had an interest in restricting the movement of employees between them, including as a strategy to suppress wages and reduce costs.

75.     Patel was the leader and primary enforcer of the No Hire Conspiracy.

76.     Defendants' No Hire Conspiracy was multifaceted, involving overlapping and interrelated restrictions on hiring and recruitment among the Defendant companies.

77.     The conspiracy was intended to suppress compensation throughout the market by limiting hiring and solicitation of engineers and other skilled workers in the aerospace industry. By doing so, Defendants would tamp down bidding wars (i.e., competition) to attract and retain employees. To that end, when any Supplier Defendant engaged in significant competition (in effect, "cheating") in breach of their agreement, Pratt & Whitney's Patel and other conspirators

attempted to squelch it. The actual effect of Defendants' Conspiracy to restrict hiring and recruiting was achieved; it reduced and suppressed the wages, salaries, and benefits paid to Class Members since at least 2011 to levels materially lower than they would have been in a competitive market.

78.     According to the DOJ, the No Hire Conspiracy had the express purpose of limiting competition for, and thus restricting the free movement of, employees within the outsource aerospace engineering industry, thereby artificially prolonging the employees' tenures at their existing employers and eliminating or reducing their ability to negotiate the terms of their current or future employment. The No Hire Conspiracy was motivated by the conspirators' shared financial motivations, in particular to reduce labor costs and suppress wages.

**1.      Patel Spearheaded Agreements to Restrict Hiring.**

79.     A DOJ investigation found that starting as early as 2011, the Supplier Defendants— led by Pratt & Whitney—agreed to restrict the hiring and recruiting of each other's engineers and other skilled employees.

80.     Pratt & Whitney, through Patel, facilitated these agreements and actively monitored and enforced them.

81.     Patel would get involved in recruiting between Pratt & Whitney Suppliers. According to a former Belcan recruiter, a senior employee at Belcan left to work for QuEST, which caused a lot of anger at Belcan. When that happened, "Mahesh (Patel) got involved to break bread."

82.     According to the DOJ, Patel expressly instructed managers for the Supplier Defendants not to recruit or hire each other's employees. Patel held a dinner in December 2015 with QuEST's Wasan and Co-Conspirator 4 (a General Manager for QuEST), as well as Cyient's Edwards (the President of the North America Operations for Cyient), where he directly told attendees that they should not poach each other's employees. An executive of Belcan, who also attended the dinner, sent an email to Houghtaling and other Belcan employees to summarize

statements made by Patel at the dinner. The email states "Mahesh did take the stage at the end… no poaching of each others' [sic] employees." Indictment ¶ 22(a).

83.     As one former Belcan recruiter put it, the message from Pratt & Whitney to Suppliers was, "Look, this is in our sandbox. You all play in our sandbox, so play nice." This former recruiter recalled that Patel "was the one. … He was the contact for upper management at Belcan. He'd call Belcan and tell them they couldn't hire a person."

84.     A former Belcan manager whose responsibilities included recruiting and hiring Belcan TechServices contractors to work on Pratt & Whitney projects explained that in approximately 2010 or 2011, following a quarterly meeting with Pratt & Whitney, Mahesh Patel "cornered [him] out in the hallway" to tell him that he should not hire any employees from QuEST. After the manager told his supervisor at Belcan about Patel's comments, that supervisor said to him, "you can't touch QuEST employees."

85.     After that interaction with Patel and this feedback from his supervisor, the Belcan manager did not hire any employees from QuEST. "I'm sure I came across QuEST candidates. I'd tell [the QuEST candidates], 'I'm under orders. You have to quit (your job at QuEST), get another job somewhere else, and then come back'" and apply for a position at Belcan. He believes he told the QuEST candidates that he could not consider hiring them until at least six months after they left QuEST. Of Patel, this Belcan manager recalled, "He called the shots."

86.     A second former Belcan recruiter recalled that in or around 2012, at QuEST's urging, Patel ordered that Belcan and Pratt & Whitney could not hire QuEST employees.

87.     This recruiter attended a dinner in 2013 at which Patel and Belcan's Houghtaling were present, along with the then-Presidents of Belcan and Belcan Tech Services. At the dinner, the Belcan executives complained to Patel that they felt that Patel had a stronger allegiance to

QuEST than he had to Belcan. Everyone at the dinner expressed that they were "adamant that they did not want to see transitions" of personnel to Pratt & Whitney or to QuEST.

88.     According to this former recruiter, similar dinners between Patel and Belcan executives occurred approximately every four years. At these dinners, which were related to the negotiation of MTAs between Belcan and Pratt & Whitney, Patel also discussed what he called "border patrol," which was his way of referring to limiting personnel transfers between Belcan, QuEST, and Pratt & Whitney. The former Belcan recruiter recalled that Patel "wanted it to not be a rivalry and wanted to calm the waters."

89.     Patel was the "ringleader" of these agreements, and would enforce them even when employees wanted to move from one company to another. This former recruiter specified that if a Belcan employee wanted to work at QuEST, "QuEST will tell you via Mahesh (Patel), 'No.' Mahesh would tell you [that] you can't do it."

90.     According to this former recruiter, employees were "held hostage by these agreements," which "were ruining livelihoods."

91.     A third former Belcan recruiter explained that Pratt & Whitney was such a huge customer for Belcan that Belcan tried to keep Pratt & Whitney happy at all times. This former recruiter recalled, "I wasn't into stealing employees. I was very careful. It gets dirty." Hiring contractors from a competing supplier pitted two companies against each other and "doesn't make Pratt & Whitney happy."

92.     A former corporate recruiter at Cyient in East Hartford, Connecticut confirmed that when she worked for Cyient from 2018-2019, she was not allowed to hire employees from Cyient competitor QuEST Global "because they (QuEST Global) were working for Pratt & Whitney."

93.     A former Agilis manager similarly recalled verbal no-poach agreements between Agilis and its competitors, including Belcan, PSI, and Florida Turbine Technologies (FTT). This former manager described the industry as having a "good ol' boys" network.

94.     A fourth former Belcan recruiter who worked at Belcan from 2015 to 2018 recalled similar restrictions. According to this former recruiter, at the direction of Belcan's corporate office, recruiters were not permitted to recruit candidates that worked for a competitor if that competitor also worked on Pratt & Whitney projects. If a candidate worked on the same Pratt & Whitney program, Belcan recruiters were not permitted to hire that candidate at all.

95.     A fifth former Belcan recruiter who worked in the industry for many years described a "Do Not Touch" agreement, under which he was not permitted to hire employees from QuEST while at Belcan. This recruiter was told that if he did so, QuEST would "complain to the customer."

96.     A sixth former Belcan recruiter with knowledge of the industry likewise explained that "Everyone has partner agreements and you can't recruit from partners." According to this former recruiter, "Typically, the client will tell the contractors, 'You cannot steal from your brother.'" As a result, "Engineers are the ones that get the short end of the stick. If another company is hiring for $0.50 more per hour, the engineer can't move" to receive a pay increase.

97.     Another former recruiter at QuEST said that "barely anyone" was hired from QuEST to work for a competitor. "Belcan refused to hire our employees."

98.     A former employee of a company that recruited engineers for Pratt & Whitney beginning in approximately 2018 explained that there was a directive from Pratt & Whitney's human resources division not to recruit employees from Pratt & Whitney's suppliers. The message from Pratt & Whitney was, "We need our suppliers to be successful," so current employees of

suppliers should not be hired. The directive was that if a candidate worked for a current Pratt & Whitney supplier, then the recruiter had to inform the Pratt & Whitney hiring manager and human resources about the candidate's current employer.  This led to the position that candidates currently working for a Pratt & Whitney supplier should not be put forward because "they can't go up to Mahesh [Patel's] team."

99.     In an email from September 2016, Patel wrote to Prus—the Chief Operating Officer/Executive Vice President and part owner of Parametric Solutions—stating, "Last time we talked you assured me that you will not hire any [Pratt & Whitney] partners['] employee. This must stop, otherwise others will also start poaching your employees." DOJ Aff. ¶ 29.

100.     In or around December 2017, a Vice President from QuEST emailed Houghtaling complaining about Belcan's reported employment offers to two QuEST employees in Illinois and stated, "I would like to understand if you are planning to address this immediately, or I will be forced to escalate to our mutual customers." Harvey responded: "Spot on. This cannot be tolerated! We need to move quickly and forcibly when this is about to happen." Later, he added, speaking to QuEST's management and executive team: "Push hard to have it reversed and consequences for [Belcan]." Indictment ¶ 28(f).

101.     DOJ's allegations also expose that Patel served as an intermediary and enforcer for agreements between Suppliers not to hire each other's employees. If a Supplier breached the agreement, another Supplier would inform Patel of the violation and request Patel's assistance in enforcing the agreement.

102.     A former Vice President at Belcan Engineering recalled, for example, that if Belcan hired a certain number of employees from QuEST, Belcan would approach Pratt & Whitney and explain that these hirings were a "disruption" and "we'd need to find a resolution." He further

explained that Belcan had a "gentleman's agreement" with Pratt & Whitney that Belcan would not make large and strategic hires from competing suppliers because Pratt & Whitney "frowned upon it."

103.    In May 2016, Belcan Vice President Steve Houghtaling learned from a colleague that Parametric Solutions had hired a Belcan employee for a project not involving Pratt & Whitney. In discussing the incident with his colleague, Houghtaling stated that he had spoken to Patel about the breach and that Patel "said he'd talk to [Parametric Solutions] about it." Houghtaling later emailed Patel, complaining that his company was "losing another employee to [Parametric Solutions]." DOJ Aff. ¶ 27; Indictment ¶ 22(c).

104.    Shortly thereafter, in November 2016, Parametric Solutions' Prus contacted Patel via email to complain about "[Belcan] actively Recruiting [Parametric Solutions] employees." Patel forwarded the email to Houghtaling and another Belcan manager, admonishing, "[w]e must not poach each other partners employee. Please communicate to [Belcan] HR not to interview or hire active employees working on [Pratt & Whitney] work." DOJ Aff. ¶ 27; Indictment ¶¶ 22(d), 28(g).

105.    A few months later, in January 2017, after Cyient notified Patel that Parametric Solutions had hired a Cyient employee, Patel forwarded the email from Cyient to Prus (Parametric Solutions), stating: "Last time we talked you assured me that you will not hire any [Pratt & Whitney] partners employee. This must stop, otherwise others will also start poaching your employees. Please advise." DOJ Aff. ¶ 29.

106.    In another example, in February 2017, after learning that Belcan had made an offer to hire a QuEST engineer, Wasan, the Vice President/Strategic Client Partner at QuEST, stated in an email, "[Belcan] is not allowed to poach any of our employees and I will plan to block this

immediately. I will send this to Mahesh today." DOJ Aff. ¶ 27. A few minutes later, Wasan reported the information about Belcan's attempted hire directly to Patel via email, writing, "I am very concerned that [Belcan] believes they can hire any of our employees. … Could you please stop this person from being hired by [Belcan]?" *Id.*; Indictment ¶ 22(b). Part of Wasan's responsibilities at QuEST was to inform Patel when other Suppliers violated the No Hire Agreement.

107.    A former Belcan recruiter confirmed Pratt & Whitney's policing of the No Hire Agreement. In one instance that he recalled, Belcan was told by Pratt & Whitney that it could not hire a specific employee because a competitor had "lodged a complaint" about Belcan stealing one of its employees.

108.    Patel's policing and enforcement of the No Hire Agreement between suppliers was effective. As one former Belcan recruiter described, Pratt & Whitney had the "entire authority" when it came to Belcan's hiring, even though the employee would be a Belcan employee.

109.    In a September 2016 email, after a Belcan executive notified Patel that Parametric Solutions had violated the agreement by poaching an employee, Patel admonished Parametric Solutions, stating in an email to Prus, "You had assured me that [Parametric Solutions] will never soliciting [sic] [Pratt & Whitney]'s long term partners [sic] employees. … Please send me in writing that proper steps has [sic] taken place to curtail this practice." DOJ Aff. ¶ 31; Indictment ¶ 28(e). A subsequent email from Prus instructed, "[p]lease stop speaking to any [Belcan] or other [Pratt & Whitney] supplier companies about transitioning to a [Parametric Solutions] Office immediately." The email's recipient responded, "[c]onsider it done." *Id.*

110.    Patel also threatened to cut-off Suppliers from Pratt & Whitney's business if they violated the No Hire Agreement. In June 2018, QuEST complained to Patel that Belcan had offered

employment to one of QuEST's engineers. In an internal email, a Belcan recruiter wrote, "[Pratt & Whitney] threatened to pull all POs from [Belcan] if" Belcan proceeded with hiring QuEST's engineer. DOJ Aff. ¶ 33. The next day, a Belcan employee, in an email that included Houghtaling, assured Patel, "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" QuEST's engineer. *Id.*; Indictment ¶ 26.

111.    The Supplier Defendants also discussed the No Hire Agreement directly. In September 2019, after Agilis had hired four Cyient employees, Cyient's President for North America Operations Tom Edwards asked Agilis President and CEO Frank O'Neill in an email to stop "actively recruiting" Cyient employees. DOJ Aff. ¶ 34; Indictment ¶ 27(a). Edwards stated, "I wanted to ask if your team could refrain from actively recruiting our [Cyient] employees going forward." Indictment ¶ 27(a). O'Neill agreed, stating that, Agilis' "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get unstable, and our margins all get hurt." *Id.* Edwards then thanked O'Neill, and added, "I flat out ask our teams not to hire people from the other [Pratt & Whitney] suppliers." *Id.*; DOJ Aff. ¶ 34.

112.    Patel and other Defendants and co-conspirators were made aware of the illegality of their conduct but continued engaging in their No Hire Conspiracy. As early as January 2016, managers and executives at Belcan began to discuss the fact that no-hire agreements between competitors violate antitrust laws. A later email showed that Belcan's Houghtaling planned a meeting with Patel that included as an agenda item, "Informal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal." In a separate email thread Houghtaling expressed concern about the agreements, stating, "[Pratt & Whitney] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors … I'm not sure if this is legal, but that is what they are requesting we do." The next

day, Belcan's Human Resources Director conveyed that she and another Belcan manager "spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors." DOJ Aff. ¶ 37.

113.    The DOJ's investigation uncovered "no evidence" that Patel or the Supplier Defendants ended the No Hire Agreement after the incidents described. DOJ Aff. ¶ 39.

### 2.    Pratt & Whitney Further Restricted Hiring from QuEST.

114.    In addition to leading and enforcing the No Hire Agreement among the Supplier Defendants, Patel also reinforced and effectuated the No Hire Conspiracy by agreeing with QuEST to restrict Pratt & Whitney's hiring of engineers and skilled workers from QuEST.

115.    Pratt & Whitney agreed not to hire engineers or other skilled workers from QuEST until the employees had worked for QuEST for at least two years. In September 2011, Harvey, a senior QuEST executive, attended a dinner with Patel and another Pratt & Whitney Vice President. Following the dinner, Harvey memorialized the group's conversation in an email, writing, "We truly appreciate and value our strategic relationship … . I thought I would take the lead in summarizing what we discussed last night and proposed next steps… ." DOJ Aff. ¶ 42. The first "next step" in the email was "Personnel Transfers," which Harvey described as "the new policy/guidelines," which provided a "min. 24 months" for such "Personnel Transfers." *Id.* Harvey further stated that Patel had advised minimizing the written record of their agreement, stating, "Following Mahesh's previous counsel, I am not going into detail in writing on this subject." *Id.*; Indictment ¶ 24(a).

116.    Patel was the principal decision-maker and routinely communicated with managers and executives at QuEST about this agreement. A QuEST employee wrote in an October 2012 email to Patel, "[Employee]'s tenure at [QuEST] dates to May 2011. Based on our agreement of

two year minimum tenure, we would ask that [Pratt & Whitney] not pursue employment of [him] at this time." DOJ Aff. ¶ 44.

117.    The DOJ's investigation revealed that Pratt & Whitney adhered to the agreement. In June 2015, Patel emailed Wasan and two other QuEST managers, asking for their "concurrence" for Pratt & Whitney to proceed with interviewing and potentially hiring two QuEST employees. QuEST withheld concurrence for one of the employees because he had only worked for QuEST for 8 months. In April 2017, QuEST again withheld its consent for Pratt & Whitney to hire a QuEST employee with less than two years of employment, leading Patel to inform a Pratt & Whitney Human Resources employee: "[QuEST] will not release him … He has not completed 2 [y]ears … ." DOJ Aff. ¶ 46.

118.    In furtherance of the No Hire Conspiracy, from approximately 2015 through 2017, Patel and QuEST representatives also agreed to periods of time—from several months to nearly an entire year (2016)—during which Pratt & Whitney would not recruit or hire *any* QuEST employees, with only limited exceptions. The companies referred to these periods as "freezes" or "moratoria." For example, emails show that in January 2016, Wasan reported to Co-Conspirator 4 and another colleague that "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I am going to tell him that he needs to block" two QuEST engineers "from being hired until we come to an agreement on the acceptable limit to hire [from] our team." DOJ Aff. ¶ 49. Patel enforced this part of the agreement within Pratt & Whitney, in one instance requesting that Pratt & Whitney's Vice President of Human Resources-Engineering:

> direct [her] HR team not to hire [QuEST] outsource resources currently deployed on [Pratt & Whitney] projects till end of this year … . [QuEST] senior leadership including CEO has repeatedly

raised concerns on [Pratt & Whitney] hiring [QuEST] employees.
We will lift [QuEST] hiring restriction from Jan 1, 2018.

DOJ Aff. ¶ 50.

119.    As a specific example of how the hiring freeze was enforced, in or around July 2016, Wasan sent an email to Patel regarding a QuEST employee that Pratt & Whitney was interested in hiring, writing "we cannot lose him" and complaining to Patel that "[Pratt & Whitney] keeps poaching this team." Patel then emailed a Pratt & Whitney hiring contact and explained: "I checked with [QuEST], they absolutely <u>do not want to release</u> [the employee]. Please <u>do not extend offer</u> to him. [Pratt & Whitney] has committed to [QuEST] that we will not hire any more of their employees this year in 2016." Patel sent the correspondence to Wasan, and Wasan thanked Patel. Indictment ¶ 23(b).

120.    In or around September 2017, an email directive from Patel to a Pratt & Whitney Vice President of Human Resources advised, "direct your HR team not to hire [QuEST] outsource resources currently deployed on [Pratt & Whitney] projects till end of this year." Indictment ¶ 25(a).

121.    One former QuEST recruiter recalled that many of the employees expressed that they were unhappy working at QuEST and wanted to work directly for Pratt & Whitney, but they were unable to do so.

122.    Pratt & Whitney's agreement with QuEST helped alleviate cost pressures on both companies. By agreeing to restrict hiring of QuEST's employees, Pratt & Whitney helped keep QuEST's wages—and therefore its own costs—lower than they would have been in a competitive market. The DOJ's investigation revealed that QuEST expressly appealed to this shared interest in keeping labor costs artificially low. In June 2017, Harvey, QuEST's President-Strategic Accounts, made a proposal to Pratt & Whitney's parent company suggesting a "partnership approach on how

we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services[.]" DOJ Aff. ¶ 52. In the attached presentation, Harvey expressly requested further hiring restrictions between the two companies, given that "We have found that customer hiring of our resources puts pressure on [QuEST]'s and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time." *Id.*

### 3. Pratt & Whitney Reinforced The No Hire Conspiracy Through an Additional Agreement with Belcan.

123.    Counsel's independent investigation revealed that Pratt & Whitney further effectuated and reinforced the No Hire Conspiracy by likewise restricting recruiting between Pratt & Whitney and Belcan. This agreement has not yet been publicly disclosed or challenged by the DOJ.

124.    According to a former recruiter at Belcan Tech Services—a division of Belcan that hired contractor employees to work on Pratt & Whitey projects—Belcan had an agreement with Pratt & Whitney that was quite similar to the QuEST agreement described in ¶¶ 114-22.

125.    Belcan contract employees on Pratt & Whitney projects worked on-site at Pratt & Whitney facilities, and had a time-limited contract. (2,080 hours at the time this former recruiter worked there.) Once a contract employee completed those hours, Belcan could decide whether or not to re-hire them.

126.    Pratt & Whitney agreed not to hire any Belcan contract employees until they had worked for Belcan for 2,080 hours. Even once a contract employee's 2,080 hours were complete, the employee had to wait an additional "moratorium" of six months before being hired directly by Pratt & Whitney. In the interim six months, the contract employee would remain unemployed with no guarantee that the Pratt & Whitney position would be available at the end of the moratorium.

127.    As part of this agreement, Pratt & Whitney could hire a Belcan contract employee prior to the end of the moratorium period and prior to the completion of 2,080 hours as a Belcan employee *only if* Pratt & Whitney paid Belcan a buy-out fee that was equal to the amount of money that Belcan would have paid the contract employee to reach 2,080 hours and an additional fee for the moratorium period. For example, a buy-out from Pratt & Whitney to Belcan for a contract employee could total $12,000 if the contract employee's rate was $30/hour and the contract employee had 12 months remaining in their 2,080-hour contract.

128.    The terms for Belcan contract employees accepting direct employment at Pratt & Whitney were included in a Master Terms Agreement (MTA) between Belcan and Pratt & Whitney.

129.    Other companies had similar terms and moratoria in their MTAs with Pratt & Whitney, including QuEST and Cyient. According to a former Belcan recruiter, "[a]ll of their MTA's had the moratorium." The former Belcan recruiter also recalled that QuEST was the first company to impose a buy-out fee of the type described in ¶ 127, but Belcan followed suit.

130.    According to a former VP of Engineering at Belcan, an MTA with Pratt & Whitney similarly provided for "penalties" if Pratt & Whitney hired Belcan salaried employees.

131.    Another former Belcan recruiter recalled that "Customers [like Pratt & Whitney] were never allowed to hire a Belcan employee while the employee worked at Belcan . . . or else [Belcan would] charge [the customer] a fee." The fee that Belcan charged a customer for directly hiring a Belcan salaried employee was 30% of the employee's annual salary. For example, if the employee made $120,000, then the fee was equal to $120,000 multiplied by 30% or $36,000. Belcan set the fee high to deter customers from hiring its employees directly.

132.    This No Hire and Moratorium Agreement between Belcan and Pratt & Whitney prevented many employees from moving from Belcan to Pratt & Whitney.

**4.      Pratt & Whitney Reinforced The No Hire Conspiracy Through an Additional Agreement with Agilis.**

133.    As further reinforcement of the No Hire Conspiracy, Pratt & Whitney also had a verbal no hire agreement with Agilis that prohibited both parties from hiring each other's employees.

134.    According to a former manager at Agilis, Agilis founder, President and CEO "Frank [O'Neill] knew everyone at Pratt." O'Neill had an agreement with Pratt & Whitney executives that Pratt & Whitney "wouldn't come barking up our tree and we wouldn't poach from them." The former manager noted that Mahesh Patel was aware of the agreement.

135.    This former manager also recalled that if Agilis employees were "sniffing around" to move to a competitor or to Pratt & Whitney, O'Neill would comment, "I gotta make a call," meaning that he was going to make a call to someone that could block the poaching of the employee.

136.    This former manager believes that Belcan and PSI had similar no hire agreements with Pratt & Whitney.

**5.      Plus Factors that Render the Aerospace Engineering Industry Susceptible to Collusion**

137.    The extensive communications among the defendants described above constitutes direct evidence of a conspiracy. Nevertheless, additional facts, or plus factors, further show that the aerospace engineering industry is particularly susceptible to collusion and bolsters the plausibility of the conspiracy alleged herein. These include: (1) high barriers to entry; (2) Defendants' actions against their self-interest; (3) numerous opportunities to collude; (4) the Defendants' motive to conspire to suppress employee compensation; and (5) the existence of a government investigation.

138.    *High Barriers to Entry*. Aerospace engineers and related skilled workers typically require at least a bachelor's degree in an engineering or related field, requiring at least four years of education beyond high school in complex science, technology, engineering, and mathematics fields ("STEM"). For example, Pratt & Whitney offer entry-level positions in mechanical, aerospace, and systems engineering through the company's "Engineering Development Program (EDP)." These positions require an applicant to obtain a bachelor's or master's degree. Similarly, entry-level engineering positions at QuEST Global require a bachelor's degree. Senior positions may require a master's degree, years of experience, licensure as a Professional Engineer, or some combination of the three. At a minimum, the years of education and training required in highly technical fields of study to enter these professions constitute a significant barrier to entry. In addition, significant portions of the aerospace industry—because they involve defense or other governmental projects—require work to be done in the United States by U.S. citizens.

139.    There are also high barriers to entry for aerospace manufacturers and Suppliers to enter the market to provide such services. There are only a few aerospace manufacturers as large and powerful as Pratt &Whitney. Moreover, selling these services to the federal government and others requires significant initial investment and is highly complex, requiring companies to marshal technical resources, and to wade through a thicket of laws, procurement policies, and security clearances. Similarly, the high barriers to entry for outsource Suppliers include required technical expertise, an understanding of the skills and qualifications required to meet manufacturers' outsourcing needs, the ability and resources to identify, vet, recruit and retain qualified candidates, and development and maintenance of relationships with the manufacturers.

140.    *Actions Against Self Interest*. Compounding these high barriers to entry is a significant shortage of qualified workers in these complex technical fields. A 2016 report from the

AIA, for example, noted that there "is a nationwide shortage of workers for jobs requiring skills in science, technology, engineering, and mathematics (STEM)."[6] The same report noted that this shortage was an issue concerning AIA members "for decades" and that "[aerospace and defense] companies must compete for scarce manufacturing talent."[7] A similar report from 2015 similarly notes that "[s]imply too few qualified candidates are in the market. As a result, many of the 4 million job openings in the U.S. go unfilled every year."[8] Similar reports from the federal government also highlight this shortage of qualified workers in the aerospace industry.[9] Moreover, these talent shortages are costly to employers like the defendants. According to the AIA in 2016, "39 percent of aerospace companies predict an 'extreme' impact on their business growth caused by the STEM labor shortage" and "[a]mong U.S. manufacturers, talent shortages cost an estimated $14,000 per unfilled position."[10] Given the shortage of skilled labor in the aerospace industry, employers like Defendants have every incentive to poach engineers and other skilled labor from their competitors. Their refusals to hire qualified employees in the midst of a labor shortage makes little sense absent an agreement with their competitors.

141.     *Opportunity to Conspire.* Defendants have had multiple opportunities to conspire. In addition, defendants have communicated with each other to carry out and enforce their

---

[6] Aerospace Indus. Assoc., *2016 National Aerospace & Defense Workforce Summit: Proceedings Report & Recommendations* 3 (2016), https://www.aia-aerospace.org/report/2016-national-aerospace-defense-summit-proceedings-report-and-recommendations/.

[7] *Id.* at 4.

[8] Aerospace Indus. Assoc., *The Defining Workforce Challenge in U.S. Aerospace & Defense: STEM Education, Training, Recruitment & Retention* 5 (2015), https://www.aia-aerospace.org/wp-content/uploads/2016/09/STEM_Report_lowres_V11.pdf.

[9] *See, e.g.*, U.S. Dep't of Def., Rep. to Congress: Fiscal Year 2017 Annual Indus. Capabilities 8 (Mar. 2018) ("A&D companies are being faced with a shortage of qualified workers to meet current demands . ….").

[10] Aerospace Indus. Assoc., What Every Candidate Should Know About the Aerospace Workforce and STEM 2 (2016).

agreement. As described in more detail above, the Supplier Defendants regularly communicated with Patel to monitor and police their agreement, including threats to cut off work from Pratt & Whitney if they did not comply with the No Hire Agreement. In addition, personnel at the Supplier Defendants communicated directly with each other to police the agreement.

142.    In addition to their extensive email communications regarding the No Hire Agreement, defendants also met in person to discuss the agreement. For example, Patel held a dinner in December 2015 with representatives of QuEST, Belcan, and Cyient where he directly told attendees that they should not poach each other's employees. Patel held another dinner with representatives from QuEST in 2011 to discuss the No Hire Agreement. Emails also indicate that Belcan's Houghtaling planned to hold a meeting with Patel to discuss the No Hire Agreement with the following agenda item: "Informal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal." DOJ Aff. ¶ 36.

143.    A former recruiter who worked at CDI when it was acquired by Belcan similarly recalled a verbal "gentleman's agreement" between CDI, Belcan, and QuEST, noting that the three were located in the same building. Referring to Belcan and QuEST, this former recruiter stated, "They wouldn't poach from us; we wouldn't poach from them." He reiterated that they "were . . . a small, tight knit community, in the same building."

144.    The below map shows the location of the co-conspirators' offices in Hartford, Connecticut.



145.     Indeed, three of the Defendants have offices in the same building in Windsor, CT,

as shown below.



146. A former Agilis manager described close relationships between Agilis founder Frank O'Neill and the other co-conspirators. O'Neill had started his career at Pratt & Whitney and "knew everyone at Pratt." This former manager also recalled close relationships between O'Neill and high-level management at PSI and Belcan.

147. Other opportunities to conspire include the defendants' participation in trade associations and trade conferences. For example, Patel and Belcan Senior Vice President Steven Houghtaling are Co-Chairs of the International Association of Outsourcing Professionals' (IAOP) Engineering and Technology Services chapter. The chapter has existed since at least January 2012 and meets quarterly. Raytheon (parent company of Pratt & Whitney) and Belcan are also both members of the Aerospace Industries Association (AIA).

148. Defendants likewise had opportunities to collude at events. A former Belcan recruiter recalled that he would run into recruiters from Belcan's competitors—including Cyient—at industry events.

149. The photograph below shows Belcan executives, including Houghtaling, alongside Patel and others, accepting the 2017 Pratt & Whitney Supplier Productivity Innovation Award. The award is a based on, among other things, "cost avoidances." Belcan won the award the following year as well, in addition to other awards it received from Pratt & Whitney over the years. Patel was directly involved in the presentation of these awards to Suppliers.



150.    Cyient likewise won several awards from Pratt & Whitney over the Class Period. These awards recognized Cyient's efforts that "led to engineering cost savings for Pratt & Whitney …"[11]

151.    In 2019, Cyient won two awards from Pratt & Whitney. The awards were announced at an annual Pratt & Whitney Supplier Summit, and "recognized Cyient's continued commitment in delivering unparalleled productivity and cost savings."[12] The photograph below shows Cyient's Tom Edwards accepting one of the awards, with Patel also in the photo.

---

[11]  *Cyient Bags 3 awards from Pratt & Whitney*, The Hans India, (Mar. 26, 2019), https://www.thehansindia.com/business/cyient-bags-3-awards-from-pratt-whitney-515518.

[12]  Press Release, Cyient, Cyient Wins Pratt & Whitney Supplier Awards in Two Key Categories (Mar. 11, 2020, 3:12 PM), https://www.cyient.com/prlisting/cyient-wins-pratt-whitney-2019-supplier-awards-in-two-key-categories.



152.    *Motive to Conspire*. By agreeing to refrain from competing for each other's engineers and other skilled labor, defendants were able to restrain those employees from moving from one Defendant to another. Restrictions on employee mobility reduce competition for labor and, as a result, enable employers to suppress compensation and thereby reduce their labor costs. Relatedly, restricting employee mobility reduces employee turnover and its attendant costs. In addition, higher compensation for employees may have led each Supplier Defendant to quote or seek to charge higher prices to Pratt & Whitney for any projects, which may have resulted in an unsuccessful bid. For its part, Pratt & Whitney was able to outsource projects at lower cost because of the reduced bids from the other Defendants. As a result, Defendants had sufficient motive to reach an agreement not to hire or poach employees from each other. The other plus factors described above are each conducive to transforming that motive into action.

153.    *Government Investigation*. Courts regularly hold that a parallel government investigation bolsters the plausibility of antitrust conspiracy cases. Here, a DOJ investigation found that starting as early as 2011, the Defendants agreed to restrict the hiring and recruiting of each other's engineers and other skilled employees. The DOJ's investigation has gone beyond just

an investigation, though: Patel and other executives have been criminally charged for their role in Defendants' conspiracy.

## C.     Anticompetitive Effects and Injury Suffered by Class Members

154.    Defendants' conspiracy suppressed Plaintiffs' and the Class's compensation and restricted competition in the labor market in which Plaintiffs and the other Class Members sold their services. It did so through schemes to restrict hiring and recruiting of Defendants' employees.

155.    As a result of Defendants' anticompetitive conduct alleged herein, the compensation of engineers and other skilled employees in aerospace engineering in the United States were fixed, stabilized, or maintained at artificially depressed levels during the Class Period.

156.    The purpose of the conspiratorial conduct of the Defendants was to depress, fix, or maintain the compensation of engineers and other skilled employees in the aerospace engineering industry in the United States and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Class received compensation at artificially depressed rates during the Class Period.

157.    This purpose was confirmed by the DOJ's investigation, which revealed that the No Hire Conspiracy was shaped by the Defendants' shared financial motivations, namely, to reduce labor costs and suppress wages. For example, in a January 2017 email, Patel contacted Parametric Solutions after it had hired one of Cyient's employees, directing, "Please do not hire any partners employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war." DOJ Aff. ¶ 24; Indictment ¶ 27(b). In March 2016, Parametric Solutions' Prus wrote of the hiring restrictions: "[Patel] says he does not want the salaries to increase." *Id.* In April 2017, Co-Conspirator 4 likewise complained of a violation of the agreement, that if such hiring does not stop, it will "drive the price structure up." DOJ Aff. ¶ 25; Indictment ¶ 27(c).

158.     As a result of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury, having received lower compensation during the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Class have suffered damages.

159.     This is an injury of the type that the antitrust laws were meant to punish and prevent.

160.     In a competitive market, Defendants would have competed to recruit, hire, and retain workers during the Class Period by offering higher wages, higher salaries, and superior benefits, and many Class Members would have switched employment to different Suppliers or employers as a result of that competition for labor. Yet, by entering into the alleged conspiracy, Defendants were able to reduce and stabilize turnover rates. Defendants' scheme harmonized compensation to Class Members across the aerospace engineering industry and thus reduced the incentive for Class Members to switch employment between Defendants.

161.     Indeed, because of their anticompetitive effects, these types of no-hire and no-poaching agreements among competitors have always been illegal under the antitrust laws. In October 2016, the DOJ's Antitrust Division and the Federal Trade Commission issued Antitrust Guidance for Human Resource Professional ("Antitrust Guidance"). As part of the announcement, the DOJ stated its intention to ramp up criminal investigation of no poaching agreements, with the Antitrust Division's Acting Assistant Attorney General explaining that "[a]ntitrust violations in the employment arena can greatly harm employees and impact earnings over the course of their entire careers." The Antitrust Guidance was issued to aid human resource professionals in implementing safeguards and preventing unlawful agreements among firms seeking to hire or

retain similar employees, because these "HR professionals need to understand that these violations can lead to severe consequences, including criminal prosecution."[13]

162.    The Antitrust Guidelines themselves explain that an "agreement among competing employers to limit or fix the terms of employment for potential hires may violate the antitrust laws if the agreement constrains individual firm decisionmaking with regard to wages, salaries, or benefits; terms of employment; or even job opportunities."[14] The Antitrust Guidance then specifically identifies the types of agreements at issue in this case as "likely … breaking the antitrust laws" if an individual "agrees with individual(s) at another company to refuse to solicit or hire that other company's employees (so-called 'no poaching' agreements)."[15] The Guidance specifically states that "naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a  third party intermediary, are per se illegal under the antitrust laws."[16]

## VI.    STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS

### A.    Continuing Violation

163.    During the Class Period, Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein. Defendants' unlawful

---

[13] *See* Press Release, FTC, FTC and DOJ Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation (Oct. 20, 2016) https://www.ftc.gov/news-events/press-releases/2016/10/ftc-doj-release-guidance-human-resource-professionals-how.

[14] FTC & DOJ, Antitrust Guidance for Human Resources Pros. 1 (Oct. 2016) https://www.ftc.gov/system/files/documents/public_statements/992623/ftc-doj_hr_guidance_final_10-20-16.pdf.

[15] *Id.* at 3.

[16] *Id.*

and anticompetitive scheme is continuing. Via their unlawful agreement, Defendants have continued to restrict recruiting and hiring of engineers and other skilled workers in the aerospace engineering industry through the present.

**B.      Fraudulent Concealment**

**1.      Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct**

164.    Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix and depress compensation paid to engineers and other skilled workers in the aerospace engineering industry.

165.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Defendant companies are not exempt from antitrust regulation, and thus, Plaintiffs reasonably considered the aerospace engineering industry to be competitive until the DOJ's complaint was made public in December 2021. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages, salaries, or benefits paid by Defendants to engineers and other skilled workers in the United States.

166.    Plaintiffs exercised reasonable diligence. Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and co-conspirators to conceal their combination.

### 2. Defendants Actively Concealed the Conspiracy

167. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members. The combination and conspiracy alleged herein was fraudulently concealed by Defendants via various means and methods, including, but not limited to, conducting in-person meetings among the conspirators, and attempting to minimize the written record of their agreements. In these ways and others, Defendants formed and implemented the combination and conspiracy in a manner specifically designed to avoid detection.

168. For example, Belcan has repeatedly publicly touted awards given to them year after year by Pratt & Whitney that were based in part on their ability to produce "cost avoidances" and reduce "overall cost" for Pratt & Whitney. Neither Belcan nor Pratt & Whitney ever disclosed to the public, their employees, Plaintiffs, or other Class Members that their ability to achieve those cost avoidances and reduce costs was based on their conspiracy not to hire or recruit Class Members and thereby suppress their compensation.

169. Defendants conducted in-person meetings, often behind closed doors, to discuss the rules of the agreement among the conspirators. For example, as explained previously, in December 2015, Mr. Patel and Pratt & Whitney held a dinner with representatives from other Defendants, including Wasan and Co-Conspirator 4 (employees of QuEST Global) and Edwards (an executive at Cyient). At this dinner, Mr. Patel told attendees that they should not poach each other's employees.

170. In another in-person meeting, Mr. Patel used his office as a location for "private discussion" between Defendants to resolve alleged breaches of the agreement. DOJ Aff. ¶ 25. In April 2017, after Co-Conspirator 4 emailed Mr. Patel to complain that Defendant Cyient had hired

an employee of QuEST, Mr. Patel then sent an invitation for a "private discussion" the next day in his office with executive employees of Cyient and QuEST. *Id.*

171.    Following another dinner meeting attended by Defendants, and which included Mr. Patel, QuEST's Harvey stated that Patel had advised minimizing the written record of their agreement, communicating: "Following Mahesh's previous counsel, I am not going into detail in writing on this subject." DOJ Aff. ¶ 42.

172.    As another example, in a January 2015 statement by a QuEST manager to Harvey and two other QuEST executives regarding his recent discussion with Houghtaling about ceasing poaching between QuEST and Belcan, the QuEST manager stated, "While I want you to be informed, I would rather not have any other folks know where this info came from.  I request that this email not be forwarded." Indictment ¶ 29(f).

173.    Defendants also agreed that the No Hire Agreement would remain an unwritten understanding and not reflected in master terms agreements or other formal, written agreements between Pratt & Whitney and the other Defendants. Indictment ¶ 29(b).

174.    Another way that Defendants actively concealed the conspiracy was by using Mr. Patel as the primary intermediary between the Defendants, limiting the recipients on communications in furtherance of the conspiracy. He served as the leader and chief enforcer of the agreement. As one example, the DOJ explained that Mr. Patel told Pratt & Whitney's Suppliers that they should not be recruiting and hiring in each's employees, such that these Suppliers would understand that these restrictions applied mutually among the Suppliers themselves.

175.    In addition to these means of concealing their unlawful agreement, the Defendants publicly proclaimed to the Plaintiffs and Class Members that they were upholding competition and antitrust laws. Raytheon Technologies Corporation, Pratt & Whitney's parent company, states in

its Code of Conduct that "anti-competitive activities are always a violation of our values. They can also result in severe civil or criminal penalties for companies and individuals. We compete fairly and legally, not only because it is good for our business and reputation but because it is the right thing to do."[17]

176.    QuEST similarly states in its Code of Conduct that "anti-competitive activity will not be tolerated."[18]

177.    Cyient in its Code of Conduct proclaims that "Directors and Senior Management personnel shall avoid actions that could reasonably be construed as being anti-competitive, monopolistic or otherwise contrary to laws governing competitive practices in the marketplace, including antitrust laws."[19]

178.    Belcan's Code of Conduct "requires and expects everyone to conduct business fairly, impartially, and in full compliance with all laws and regulations."[20]

179.    It was reasonable for Plaintiffs and Class Members to believe that the Defendants were enforcing and abiding by these codes and conduct and the policies recited therein.

180.    As a result of Defendants' fraudulent concealment of their Conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiffs and the Class Members allege herein.

---

[17] Raytheon Tech. Corp., *Code of Conduct* 22 (2020), https://www.rtx.com/-/media/project/united-technologies/rtx/home/our-company/ethics-and-compliance/media/rtx-code-of-conduct-english.pdf?rev=1cb38b3fe62c4ca4a8ff92cc24108ac3.

[18] QuEST, *Code of Conduct* 58 (Sep. 2020), https://3fee7a1sld751eqrjr3a035t-wpengine.net dna-ssl.com/wp-content/uploads/2021/08/Code-of-Conduct-Brochure-v4-Sep-2020.pdf.

[19] Cyient, *Code of Conduct* 7 (Apr. 15, 2016), https://www.cyient.com/hubfs/5724847/FY_19_Revamp_Assets_Website/Investors%20/Corporate%20Governance/Code_of_Conduct_150416_edited.pdf.

[20] Belcan, *Code of Conduct*, https://www.belcan.com/about/corporate-beliefs/, (last visited Dec. 14, 2021).

## VII.    INTERSTATE COMMERCE

181.    During the Class Period, Defendants employed Plaintiffs and other Class Members in various states across the United States, including Connecticut, Vermont, Massachusetts, Illinois, Ohio, Georgia, Florida, and California.

182.    Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

## VIII.    CLASS ACTION ALLEGATIONS

183.    Plaintiffs bring this action on behalf of themselves, and on behalf of the members of the following class ("Class Members"), under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3):

> All engineers and other skilled workers employed by Defendants, their subsidiaries and/or related entities in the United States from 2011 until the present.

184.    The following persons and entities are excluded from the proposed Class: Defendants' executives, human resources managers, human resources staff; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state, or local governmental entities.

185.    The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

186.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

187.    The Class is so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains thousands of similarly situated workers.

188.    The Class is readily identifiable and is one for which records should exist.

189.    Plaintiffs' claims are typical of those of the Class. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

190.    Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in aerospace engineering than they would have in a competitive market.

191.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are aligned with, and not antagonistic, to the Class.

192.    Questions of law and fact common to the Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the Class Members.

193.    Questions of law and fact common to the Class include:

a.   Whether Defendants engaged in an agreement, combination, or conspiracy to restrict hiring and recruiting of engineers and other skilled workers in the aerospace engineering industry;

b.   Whether such agreements constituted violations of the Sherman Antitrust Act;

c.   The identity of the participants of the alleged conspiracy;

d.   The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e.   Whether Defendants fraudulently concealed their misconduct;

f.   Whether and to what extent Defendants' anticompetitive scheme suppressed compensation paid to Class Members below competitive levels;

g.   The nature and scope of injunctive relief necessary to restore competition; and

h.   The measure of damages suffered by Plaintiffs and the Class.

194.   Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

195.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

196.   Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

### IX.   CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF:**
**CONSPIRACY TO DEPRESS COMPENSATION IN VIOLATION OF**
**SECTION 1 OF SHERMAN ANTITRUST ACT**
**(Against All Defendants)**

197.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

198.   Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint

of trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for Class Members' services through restrictions on hiring and recruiting aerospace engineers and other skilled workers from, between, and among them.

199. Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by receiving less compensation from Defendants, their subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy and by depriving them of free and fair competition in the market for their services.

200. Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a);

D.    Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

F.      Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

G.      Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper to this Court.

## XI.    JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

DATED: February 1, 2022

SUSMAN GODFREY LLP

By ___/s/ *Kalpana Srinivasan* _____

Kalpana Srinivasan*
Marc M. Seltzer*
Krysta Kauble Pachman*
Steven G. Sklaver*
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com
mseltzer@susmangodfrey.com
kpachman@susmangodfrey.com
ssklaver@susmangodfrey.com

Matthew R. Berry*
Ian M. Gore*
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
mberry@susmangodfrey.com
igore@susmangodfrey.com

*Counsel were admitted *pro hac vice* in *Balicoco v. Pratt & Whitney*, No. 21-cv-01673, and per an order of the Court, are also counsel in the consolidated case, *Granata v. Pratt & Whitney*, No. 3:21-cv-01657, ECF No. 52.

**Pro hac vice* forthcoming

Respectfully Submitted,

COHEN MILSTEIN SELLERS & TOLL PLLC

By ___/s/ *Brent W. Johnson* _____

Brent W. Johnson*
Daniel A. Small*
Emmy L. Levens*
Jessica Weiner*
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dsmall@cohenmilstein.com
bjohnson@cohenmilstein.com
elevens@cohenmilstein.com
jweiner@cohenmilstein.com

HAGENS BERMAN SOBOL SHAPIRO LLP

By ___/s/ *Shana E. Scarlett* _____

Shana E. Scarlett*
Benjamin Siegel*
Abigail Pershing (ct442063)**
715 Hearst Avenue, Suite 202
Berkeley, CA 9471
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com
abigailp@hbsslaw.com

Steve W. Berman*
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

***Proposed Co-lead Counsel for the Class and Plaintiffs John Balicoco, John Sockwell, M. Torey Mercurio, Jeffrey Howe and Michael Kwok***

BRENNER, SALTZMAN & WALLMAN LLP

By ____/s/ *Brian P. Daniels*_____

Brian P. Daniels (ct11863)
Michael T. Cretella (ct29512)
271 Whitney Avenue
New Haven, CT 06511
Telephone: (203) 772-2600
Facsimile: (203) 562-2098
bpdaniels@bswlaw.com
mcretella@bswlaw.com

***Local Counsel for the Named Plaintiffs
and the Class***