**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BOROZNY, *et al.* individually and on behalf of all others similarly situated, | No. 3:21-cv-01657 (SVN) |
| Plaintiffs, | |
| v. | |
| RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION, *et al.*, | July 8, 2022 |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT RAYTHEON TECHNOLOGIES CORPORATION,
PRATT & WHITNEY DIVISION'S MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ......................................................................................................... 1

II.     ALLEGATIONS OF THE COMPLAINT ...................................................................... 3

III.    LEGAL STANDARD ..................................................................................................... 6

IV.     ARGUMENT .................................................................................................................. 7

        A.      The Court Should Dismiss Plaintiffs' *Per Se* Claim Based On The Facts
                Alleged. ............................................................................................................... 7

                1.      Plaintiffs' allegations describe the vertical relationship between
                        P&W and the Outsourcing Defendants, which provides the context
                        for the alleged hiring restrictions. ......................................................... 10

                2.      The alleged hiring restrictions are solely intrabrand, and further
                        P&W's interbrand competition. .............................................................. 13

                        a.      Defendants' alleged hiring restraints could not have
                                allocated the market for aerospace labor to any meaningful
                                extent. .......................................................................................... 15

                3.      Plaintiffs' allegations demonstrate the alleged hiring restrictions
                        were ancillary to P&W's and its Outsourcing Defendants'
                        legitimate business collaboration. .......................................................... 17

                        a.      Plaintiffs' Complaint alleges an ancillary restraint. ...................... 18

                        b.      The alleged restrictions are not "naked." .................................... 22

                4.      Plaintiffs' allegations of *per se* conduct are wholly conclusory. ............... 24

        B.      Plaintiffs' Passing Reference to a "Quick Look" Claim Fails. ............................. 26

        C.      Plaintiffs Do Not Allege A Rule of Reason Claim. ............................................. 27

V.      CONCLUSION .............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...........................................................................6, 7, 22, 25

*AT&T Corp. v. JMC Telecom, LLC,*
  470 F.3d 525 (3d Cir. 2006)...........................................................................10, 27

*ATSI Commc'ns, Inc. v. Shaar Fund,*
  493 F.3d 87 (2d Cir. 2007)....................................................................................7

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
  9 F.4th 97 (9th Cir. 2021) .............................................................17, 19, 20, 21

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
  No. 20-55679 (9th Cir. Nov. 19, 2020), ECF No. 14 ............................................25

*Beck v. Pickert Med. Grp., P.C.,*
  No. CV21-02092 (Nev. 2d Jud. Dist. Feb. 25, 2022) ...........................................25

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................................6

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,*
  35 F. App'x 29 (2d Cir. 2002) .............................................................................10

*Bogan v. Hodgkins,*
  166 F.3d 509 (2d Cir. 1999)........................................................................ *passim*

*Bunker Ramo Corp. v. United Bus. Forms, Inc.,*
  713 F.2d 1272 (7th Cir. 1983) ..............................................................................9

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,*
  485 U.S. 717 (1988)..........................................................................................8, 13

*Cal. Dental Ass'n v. FTC,*
  526 U.S. 756 (1999)...................................................................................8, 26, 27

*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 (2d Cir. 2002)....................................................................................7

*Chapman v. New York State Div. for Youth,*
  546 F.3d 230 (2d Cir. 2008)..................................................................................29

*City of New York v. Grp. Health Inc.*,
   649 F.3d 151 (2d Cir. 2011)....................................................................28

*Cohen v. S.A.C. Trading Corp.*,
   711 F.3d 353 (2d Cir. 2013)......................................................................6

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
   433 U.S. 36 (1977)............................................................................9, 13

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)..............................................................................8

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.*,
   663 F.2d 405 (2d Cir. 1981)..............................................................12, 28

*Deslandes v. McDonald's USA, LLC*,
   No. 17 C 04857, 2022 WL 2316187 (N.D. Ill. June 28, 2022) ...................... *passim*

*Eichorn v. AT&T Corp.*,
   248 F.3d 131 (3d Cir. 2001)...................................................................23

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
   129 F.3d 240 (2d Cir. 1997)..............................................................12, 29

*Gatt Commc'n's, Inc. v. PMC Assocs., LLC*,
   No. 10 Civ.-8, 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) .................................11

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
   386 F.3d 485 (2d Cir. 2004)...................................................................28

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)...................................................................27

*Integrated Sys. & Power, Inc. v. Honeywell Int'l Inc.*,
   713 F. Supp. 2d 286 (S.D.N.Y. 2010)..........................................................15

*In re Jan. 2021 Short Squeeze Litig.*,
   No. 21-2989-MDL, 2022 WL 1522054 (S.D. Fla. May 13, 2022)....................................10

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
   61 F.3d 123 (2d Cir. 1995)....................................................................30

*Kelsey K. v. NFL Enters. LLC*,
   No. C 17-00496, 2017 WL 3115169 (N.D. Cal. July 21, 2017)....................................23

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)...................................................................... *passim*

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986).................................................................................7

*Madison 92nd Street Assocs., LLC v. Courtyard Mgmt. Corp.*,
  624 F. App'x 23 (2d Cir. 2015) .........................................................10, 11, 28, 29

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
  270 F. App'x 56 (2d Cir. 2008) ........................................................................26

*Major League Baseball Props., Inc. v. Salvino*,
  542 F.3d 290 (2d Cir. 2008)..................................................................8, 18, 26

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
  922 F.3d 713 (6th Cir. 2019) ...........................................................................18

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958).............................................................................................1

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021).......................................................................8, 9, 18, 26

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)............................................................................................8

*Nielsen v. AECOM Tech. Corp.*,
  762 F.3d 214 (2d Cir. 2014).............................................................................6

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985)....................................................................................9, 22

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)......................................................................................8

*Paladin Assocs. Inc. v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) .....................................................................21, 22

*Palmer v. BRG of Ga., Inc.*,
  498 U.S. 46 (1990)...........................................................................................22

*Polk Bros., Inc. v. Forest City Enters.*,
  776 F.2d 185 (7th Cir. 1985) ......................................................................17, 20, 22

*Ross v. Am. Express Co.*,
  35 F. Supp. 3d 407 (S.D.N.Y. 2014).................................................................27

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)..............................................................................7

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ........................................................................18

*In re: Ry. Indus. Emp. No-Poach Antitrust Litig.*,
    2:18-mc-00798-JFC (W.D. Pa. Feb. 8, 2019), ECF No. 158 ............................18, 25

*Seaman v. Duke Univ.*,
    No. 1:15-cv-00462-CCF-JLW (M.D.N.C. Mar. 7, 2019), ECF No. 325 .............................25

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ..................................................................................8, 13

*Success Sys., Inc. v. Excentus Corp.*,
    439 F. Supp. 3d 31 (D. Conn. 2020) ................................................................30

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) .............................................................................8, 17, 27

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998) ............................................................................29

*Ulrich v. Moody's Corp.*,
    No. 13 Civ. 0008, 2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014) .............................10

*Union Circulation Co. v. Fed. Trade Comm'n*,
    241 F.2d 652 (2d Cir. 1957) ..........................................................................30

*United States v. Aiyer*,
    33 F.4th 97 (2d Cir. 2022) ..........................................................................8, 9, 17

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ............................................................................9

*United States v. DaVita, Inc.*,
    No. 21-cr-00229, 2022 WL 266759 (D. Colo. Jan. 28, 2022) ...........................22, 25

*United States v. DaVita, Inc.*,
    No. 21-cr-00229-RBJ (D. Colo. Nov. 19, 2021) ................................................25

*United States v. Patel*,
    No. 3:21-cr-00220-VAB (D. Conn.) .......................................................... *passim*

*United States v. Surgical Care Affiliates, LLC*,
    No. 3:21-cr-00011-L (N.D. Tex. Apr. 30, 2021), ECF No. 44 ....................13, 18, 25

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ....................................................................................22

**Statutes**

Sherman Act, 15 U.S.C. § 1 ............................................................................1, 8, 22, 27

**Other Authorities**

Fed. R. Civ. P. 12 .........................................................................................................3, 6, 7

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, § 1909b (2018) ....................................9

## I.     INTRODUCTION

Pratt & Whitney, a division of Raytheon Technologies Corporation ("P&W"),[1]

manufactures engines for civil and military aircraft around the world.  P&W's ability to

successfully compete in the aircraft engine business against competitors like GE Aviation,

Honeywell Aerospace, and Rolls Royce, requires the work of thousands of P&W employees to

support the design, development, production, and sustainment of its products.  P&W also relies

on certain engineering labor supplied from outsourcing firms including Agilis Engineering, Inc.

("Agilis"), Belcan Engineering Group, LLC ("Belcan"), Cyient, Inc. ("Cyient"), Parametric

Solutions, Inc. ("PSI"), and QuEST Global Services-NA, Inc. ("QuEST") (collectively, the

"Outsourcing Defendants").

P&W does not compete with the Outsourcing Defendants in the manufacture and sale of

aircraft engines.  Rather, P&W sub-contracts with the Outsourcing Defendants and other

outsourcing firms to provide engineering services for particular P&W engine contracts, to enable

P&W to compete in the downstream manufacture, sale, and sustainment of aircraft engines for its

customers.  This vertical relationship between P&W and the Outsourcing Defendants,

acknowledged in Plaintiffs' own allegations, provides essential context for analyzing the legality

of the alleged hiring restrictions described in Plaintiffs' Complaint.

Plaintiffs' Complaint pleads a one-count *per se* claim under the Sherman Act, 15 U.S.C.

§ 1.  *See* ECF No. 385 (hereinafter, "Compl.").  Only certain limited categories of conduct, like

price fixing between horizontal competitors, are deemed *per se* illegal under the antitrust laws.

That is because the harm to competition—the concern of the antitrust laws—as a result of these

narrow categories of conduct is so obvious and well known by the courts.  *See N. Pac. Ry. Co. v.*

---

[1]  Pratt & Whitney is an unincorporated division of Raytheon Technologies Corporation.

*United States*, 356 U.S. 1, 5 (1958) (*per se* analysis is reserved for those "agreements or practices" with "pernicious effect on competition and lack of any redeeming virtue").  But all other restraints, like the hiring restrictions alleged in Plaintiffs' Complaint, are presumptively analyzed under the rule of reason, which requires courts to balance whether the companies' alleged conduct, on the whole, harms competition.  Yet Plaintiffs make no attempt to allege a rule-of-reason case.

Notwithstanding this well-established legal framework, Plaintiffs have brought this antitrust case in a single count alleging that the alleged hiring restraints are *per se* illegal.  Contrary to Plaintiffs' conclusory allegations, the alleged hiring restrictions are not subject to *per se* treatment.  Plaintiffs do not allege that there was any agreement between P&W and its horizontal aircraft engine competitors regarding hiring of engineers.  Rather, Plaintiffs allege only that P&W and its upstream suppliers of engineering services agreed on hiring restrictions limited to P&W aircraft engine projects.  Plaintiffs' allegations demonstrate that the alleged hiring restrictions were ancillary to P&W's legitimate outsourcing labor arrangements with the Outsourcing Defendants to support P&W engine programs.  Ancillary restraints that further such legitimate agreements are not subject to *per se* treatment.  In sum, Plaintiffs simply cannot separate the alleged hiring restrictions from the legitimate vertical business relationship between the Defendants here, further demonstrating that Defendants' alleged conduct does not warrant *per se* treatment.

Indeed, there is no legal precedent for treating the type of agreement alleged by Plaintiffs as *per se* illegal.  Plaintiffs' conclusory allegations that this is a *per se* market allocation case ignore their own factual allegations in their Complaint, and do not justify this Court's departure

from the presumptive application of rule-of-reason analysis.  P&W thus moves to dismiss Plaintiffs' Complaint in its entirety.

Plaintiffs rely heavily on, and incorporate into their Complaint, the allegations set forth in the criminal Indictment and Affidavit in *United States v. Patel*, No. 3:21-cr-00220-VAB (D. Conn.) (hereinafter, "*Patel*").  P&W disputes the allegations made by the United States Department of Justice ("DOJ") and rejects the DOJ's position that the conduct at issue should be the subject of criminal prosecution.  As discussed below, such a position squarely conflicts with the DOJ's own pronouncements regarding whether certain employment restrictions should be treated as *per se* illegal or subject to rule-of-reason balancing of procompetitive benefits and adverse competitive effects.  The criminal case will of course be subject to its own scrutiny in the separate proceedings currently before Judge Bolden.  But because Plaintiffs have incorporated into their Complaint these DOJ filings, they are bound by the DOJ's factual assertions about the conduct at issue as if they were Plaintiffs' own allegations.  They are thus properly considered in evaluating whether Plaintiffs' Complaint survives a Rule 12 Motion.

## II.     ALLEGATIONS OF THE COMPLAINT[2]

The aerospace industry is vast and covers space and defense-related sectors, inclusive of commercial and military aviation.  Compl. ¶ 44.  A document incorporated by reference in

---

[2]  Documents Plaintiffs incorporated by reference in their Complaint, which are attached to the Declaration of Chahira Solh (hereinafter, "Solh Decl.") filed herewith, include: (1) the Criminal Indictment in *Patel* (Dec. 15, 2021) (ECF No. 20, hereinafter, "Indictment,"), *see* Compl. ¶ 10; Solh Decl., Ex. A; (2) the Affidavit in Support of Criminal Complaint and Arrest Warrant in *Patel* (Dec. 9, 2021) (ECF. No. 15) (hereinafter, "*Patel* Aff."), *see* Compl. ¶ 9; Solh Decl., Ex. B; (3) PricewaterhouseCoopers, *Global Aerospace and Defense: Annual Industry Performance and Outlook* at 4 (2021), *available at* https://www.pwc.com/us/en/industrial-products/publications/assets/pwc-aerospace-defense-annual-industry-performance-outlook-2021.pdf (hereinafter, "PwC Report"), *see* Compl. ¶ 44 n.3; Solh Decl., Ex. C; (4) United Technologies, *Annual Report 2019* at 10 (2019), *available at* https://investors.rtx.com/static-files/5612ce4a-a018-4f37-adc6-a154069a68f3 (hereinafter, "2019 Annual Report"), *see* Compl. ¶ 49 n.9; Solh Decl., Ex. D; and (5) Statista, *Market share of the leading commercial aircraft engine manufacturers worldwide in 2020*, *available at* https://www.statista.com/statistics/1099835/global-aircraft-engine-manufacturer-market-share/ (hereinafter, "Statista Report"), *see* Compl. ¶ 164 n.26; Solh Decl., Ex. E.

Plaintiffs' Complaint lists *one hundred* potential competitors to P&W in the aerospace and defense industry.  *See* PwC Report (Solh Decl., Ex. C) at 25-27; Compl. ¶ 44 n.3.  P&W made up no more than three percent of the aerospace industry Plaintiffs describe.  *See* Compl. ¶ 44 (U.S. aerospace and defense industry reported nearly $700 billion in revenue in 2020); *id.* ¶ 49 (P&W generated $21 billion in net sales in 2019).  P&W competes with other major aerospace companies with respect to the manufacture, sale, and sustainment of aerospace engines for military and commercial aircraft.  *Id.* ¶¶ 4, 44; *Patel* Aff. ¶ 5 (Solh Decl., Ex. B); PwC Report (Solh Decl., Ex. C) at 5, 25-27; Statista Report (Solh Decl., Ex. E).

Engineers in the aerospace industry are hired to perform a wide variety of services, including "electrical and mechanical engineering, design, testing, software development, supply chain management, and project management" for commercial and military projects.  Indictment ¶ 1.

P&W "relied upon different sources of labor to design, manufacture, and service its aerospace products, including through outsource engineering."  *Patel* Aff. ¶ 5; *see also* Compl. ¶ 4.  P&W entered into arrangements with outsourcing firms to supply P&W with engineering labor for specific P&W engine projects.  These suppliers included, but were not limited to, the Outsourcing Defendants named in this action.  Compl. ¶¶ 31-43; Indictment ¶ 3 (Solh Decl., Ex. A); *Patel* Aff. ¶ 6.  P&W would typically issue a "Statement of Work" ("SOW") for a particular project, and firms like the Outsourcing Defendants would bid on the project.  Compl. ¶ 50.  Once P&W accepted a bid, P&W and the chosen outsource labor supplier would enter into an agreement for the project.  *Id.*; *Patel* Aff. ¶ 5.  The outsourcing supplier would assign its own engineers to the specific P&W project and P&W would pay the supplier an agreed-upon amount

for supplying labor for that project pursuant to the terms of their agreement.  Compl. ¶ 50; *Patel*

Aff. ¶ 5.[3]  Put simply, P&W was the customer and the Outsourcing Defendants its suppliers.

Plaintiffs allege that Defendants agreed with each other since 2011, "not to hire or recruit

each other's" Aerospace Workers, Compl. ¶ 64, which the Complaint defines as "aerospace

engineers and other skilled workers in the jet propulsion systems industry," *id.* ¶ 2.  The Named

Plaintiffs seek to represent a putative class of "[a]ll persons employed by [Defendants] as

Aerospace Workers at any time from January 1, 2011 through the present."  *Id.* ¶ 143.  All of the

Named Plaintiffs are former employees of P&W, or former employees of one of the Outsourcing

Defendants that worked "exclusively" or "primarily" on P&W projects.  *Id.* ¶¶ 22-30.

To try to support their allegations of an "overarching no-poach agreement" between

P&W and the Outsourcing Defendants, Plaintiffs describe (1) a two-year tenure agreement

formed in 2011 and hiring freezes between P&W and QuEST from 2015 to 2017, *id.* ¶¶ 93-105;

and (2) an agreement that P&W would not hire Aerospace Workers in the jet propulsion systems

market from the Outsourcing Defendants, *id.* ¶¶ 106-09. Defendants' alleged hiring restrictions

purportedly restricted employment opportunities available to Aerospace Workers, and allegedly

had the effect of broadly suppressing compensation levels.  Plaintiffs also allege two alternative

relevant markets: the market for labor services of skilled Aerospace Workers in (1) the United

States; or (2) "in local geographic markets in and around Hartford-East Hartford-Middletown,

Connecticut metropolitan area and Palm Beach County, Florida."  *Id.* ¶ 163; *see also id.* ¶¶ 82,

109, 114.

---

[3]  Master contracts between each supplier and P&W provided the maximum pricing suppliers could charge.
Indictment ¶ 10; *Patel* Aff. ¶ 7.

What Plaintiffs do <u>not</u> allege is equally important:

- Plaintiffs do not allege any kind of conspiracy between P&W and any of its horizontal aircraft engine competitors (e.g., GE Aviation, Rolls Royce, and Honeywell Aerospace) not to hire engineers.

- Plaintiffs do not allege any hiring restrictions unrelated to P&W's aircraft engine projects.

## III.   LEGAL STANDARD

To withstand a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The facial plausibility standard requires more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s] devoid of further factual enhancement." *Id.* (internal quotation marks omitted) (alteration in original). The pleading must show, not merely allege, that the pleader is entitled to relief. *Id.* Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Id.* "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555) (alteration in original). When reviewing a motion to dismiss, the Court must accept allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor. *Id.*; *Cohen v. S.A.C. Trading Corp.*,

711 F.3d 353, 359 (2d Cir. 2013) (citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)).

Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In ruling on a motion under Rule 12(b)(6), a court is normally required "to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). But, in certain circumstances, a court "may permissibly consider documents other than the complaint." *Id.* Specifically, "documents that are . . . incorporated in it by reference are deemed part of the pleading and may be considered." *Id.*; *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citation omitted).

## IV.   ARGUMENT

As explained further below: (A) the Court should dismiss Plaintiffs' single *per se* antitrust claim because the facts alleged demonstrate as a matter of law that this is not a *per se* antitrust violation; (B) Plaintiffs' reference to "quick look" analysis fails for largely the same reasons; and (C) Plaintiffs do not allege a rule-of-reason claim.

### A.   The Court Should Dismiss Plaintiffs' *Per Se* Claim Based On The Facts Alleged.

Plaintiffs' allegations do not amount to a *per se* antitrust conspiracy case simply because Plaintiffs say so. Plaintiffs provide no factual support—only threadbare conclusions—that the hiring restrictions they have alleged amount to a *per se* violation. In fact, Plaintiffs' allegations

7

themselves make clear why this case, as a matter of law, cannot be analyzed under a *per se* theory.

Not all restraints constitute antitrust violations under Section 1 of the Sherman Act.  The Supreme Court has held that Section 1 "outlaw[s] only *unreasonable* restraints."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).  "Restraints can be unreasonable in one of two ways":  First, they can be "unreasonable *per se*" if they fall within the "small group of restraints" that are "'always or almost always tend to restrict competition and decrease output.'"  *Id.* (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)).  Such restraints include price fixing, bid rigging, or division of markets by horizontal competitors.  *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984); *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022).  For all other restraints that are not unreasonable *per se*, courts assess the conduct under the "rule of reason"—"a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition."  *Ohio v. Am. Express*, 138 S. Ct. at 2284 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)); *see NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021) ("The whole point of the rule of reason is to furnish 'an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint' to ensure that it unduly harms competition before a court declares it unlawful." (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999))).

Under the Sherman Act, courts "presumptively appl[y] rule of reason analysis."  *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 315 (2d Cir. 2008); *see Alston*, 141 S. Ct. at 2151 ("Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what we have described as a 'rule of reason analysis.'" (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006))); *Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999)

(confirming that the "majority of allegedly anticompetitive conduct continues to be examined

under the rule of reason"); *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59 (1977)

(explaining that the rule of reason is "the standard traditionally applied for the majority of

anticompetitive practices challenged under [Section] 1 of the Act").

Nor do Plaintiffs' allegations warrant that the Court should designate the claimed conduct

as a new category of *per se* conduct.  As the Second Circuit has explained, "[c]ourts have been

reluctant to expand the categories of *per se* illegality."  *Bogan*, 166 F.3d at 514 (citing *Bunker

Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983) ("A particular

course of conduct will not be termed a *per se* violation . . . until the courts have had considerable

experience with that type of conduct and application of the rule of reason has inevitably resulted

in a finding of anticompetitive effects.")); *see also Deslandes v. McDonald's USA, LLC*, No. 17

C 04857, 2022 WL 2316187, at *4 (N.D. Ill. June 28, 2022) ("This Court cannot say that it has

enough experience with no-hire provisions of franchise agreements to predict with confidence

that they must always be condemned, which means . . . that the Court must apply rule-of-reason

analysis to this case." (citing *Alston*, 141 S. Ct. at 2156)). "A plaintiff seeking application of the

*per se* rule must present a threshold case that the challenged activity falls into a category likely to

have predominantly anticompetitive effects."  *Nw. Wholesale Stationers, Inc. v. Pac. Stationery

& Printing Co.*, 472 U.S. 284, 298 (1985).

Determining whether conduct should be analyzed as *per se* versus rule of reason is a

question of law for courts to determine.  *See Aiyer*, 33 F.4th at 113 (citing *United States v. Apple,

Inc.*, 791 F.3d 290, 313, 321-30 (2d Cir. 2015)); Phillip E. Areeda & Herbert Hovenkamp,

*Antitrust Law*, § 1909b (2018) (explaining that "the selection of a mode [of antitrust analysis] is

entirely a question of law" to be decided by the court).  And such determination is entirely

appropriate at the motion-to-dismiss stage. "Courts routinely determine which test"—rule of reason or *per se*—"applies at the motion-to-dismiss stage." *In re Jan. 2021 Short Squeeze Litig.*, No. 21-2989-MDL, 2022 WL 1522054, at *24 n.21 (S.D. Fla. May 13, 2022) (citing cases); *see Madison 92nd Street Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015) (summary order) (affirming district court's dismissal of plaintiff's *per se* claim at the pleading stage); *Ulrich v. Moody's Corp.*, No. 13 Civ. 0008, 2014 WL 12776746, at *26-28 (S.D.N.Y. Mar. 31, 2014), *report and recommendation adopted as modified,* No. 13-CV-00008, 2014 WL 4977562 (S.D.N.Y. Sept. 30, 2014) (applying rule of reason to dismiss plaintiff's antitrust claim at the motion-to-dismiss stage after explaining that that "[d]eciding which of these tests [rule of reason or the *per se* rule] to apply is a question of law"). Plaintiffs' election to plead their case as a *per se* claim renders this case ripe for dismissal now, given that Plaintiffs' own allegations make clear that a *per se* claim cannot be sustained as a matter of law. *See AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006); *Deslandes*, 2022 WL 2316187, at *5 ("This Court previously rejected, at the motion-to-dismiss stage, the idea that [plaintiff] had alleged a restraint that was unlawful *per se*.").

> **1.    Plaintiffs' allegations describe the vertical relationship between P&W and the Outsourcing Defendants, which provides the context for the alleged hiring restrictions.**

The vertical relationship between P&W and the Outsourcing Defendants that provides the basis for the alleged hiring restrictions in Plaintiffs' Complaint is fatal to Plaintiffs' *per se* claim.

Whether an antitrust claim warrants treatment by this Court as *per se* or under the rule of reason depends on the legal determination of whether the alleged relationships at issue are vertical or horizonal, or both vertical and horizontal, in nature. In situations where relationships have both vertical and horizontal elements, the rule of reason—not *per se*—applies. *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 35 F. App'x 29, 29 (2d Cir. 2002) (summary order)

(affirming district court's dismissal of plaintiff's complaint where plaintiff did not allege "a purely horizontal relationship," but rather, "both a vertical and horizontal relationship"); *Gatt Commcn's, Inc. v. PMC Assocs., LLC*, No. 10 Civ.-8, 2011 WL 1044898, at *6 (S.D.N.Y. Mar. 10, 2011) (analyzing and dismissing antitrust claim under rule of reason because "claims alleging a vertical relationship or mixed vertical and horizontal relationships must be evaluated under the rule of reason").  The facts Plaintiffs plead and incorporate into their Complaint illustrate the undeniable vertical nature of the relationship between a customer and its labor suppliers.  *See, e.g.*, Compl. ¶ 50.

The Court must therefore analyze the alleged hiring restrictions in the context of P&W's legitimate vertical relationship with the Outsourcing Defendants.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 894 (2007) (holding that the last previously-recognized instance of a vertical restraint subject to the *per se* rule must instead be analyzed under the rule of reason); *Madison 92nd Street Assocs.*, 624 F. App'x at 28 (summary order) (affirming district court's order rejecting plaintiff's *per se* antitrust claim "because the alleged agreement between the defendants was at most a vertical agreement between buyers and sellers at different levels of the market, rather than a horizontal agreement between competitors" (citing *Bus. Elecs. Corp.*, 485 U.S. at 730)).  "The Supreme Court is slow to . . . extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Bogan*, 166 F.3d at 514 (internal quotation marks and citation omitted); *Leegin*, 551 U.S. at 877-78 (*per se* is only appropriate if the court can "predict with confidence that the restraint would be invalidated in all or almost all instances under the rule of reason").

The "essential nature" of Defendants' "economic relationship" is undeniably vertical. *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 244 n.1 (2d Cir. 1997) ("Mere labels do not alter the essential nature of the economic relationship, however."). P&W manufactures engines that power civil and military aircraft around the world.  Compl. ¶ 49. The Outsourcing Defendants are, as Plaintiffs concede, "a source of labor to design, manufacture, and service [P&W's] aerospace products." *Id.* ¶ 50.  Plaintiffs explain that P&W operates in a different industry than the Outsourcing Defendants.  *Compare id.* ¶ 31, *with id.* ¶¶ 32-36.  P&W is a competitor in the aerospace industry, competing for "national defense projects." *Id.* ¶¶ 4, 6, 44, 46; PwC Report (Solh Decl., Ex. C) at 5, 25-27; 2019 Annual Report (Solh Decl., Ex. D) at 24.  P&W's outsourcing labor providers, which include the Outsourcing Defendants, do not compete in that industry.  Rather, the Outsourcing Defendants compete with each other and other outsourcing firms for contracts from P&W and P&W's competitors in the aerospace industry.  *See* Compl. ¶¶ 4, 50.  Nor is P&W an outsource engineering firm competing to provide labor (which is further apparent given that P&W is not included as an "Outsourcing Defendant").  *See id.* at 1 (introductory paragraph); *see also id.* ¶ 50 (referring to Outsourcing Defendants as "the outsourcing firms whose employees were outsourced to Pratt").  The essential nature of the economic relationship between P&W and the Outsourcing Defendants as alleged in the Complaint is vertical—Outsourcing Defendants supply an input to P&W's aircraft engine production—and not one of horizontal competitors.   In their own terms, Plaintiffs allege a vertical restraint.

Vertical restraints are judged by the rule of reason—not *per se*.  *Leegin*, 551 U.S. at 907; *Elecs. Commc'ns Corp.*, 129 F.3d at 243; *Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 409-11 (2d Cir. 1981) (applying rule-of-reason analysis to restraints imposed on supplier by

manufacturer, where dual distributorship existed); *see Bus. Elecs. Corp.*, 485 U.S. at 730; *see also* United States' Opp'n to Defs.' Mot. to Dismiss at 19, *United States v. Surgical Care Affiliates, LLC*, No. 3:21-cr-00011-L (N.D. Tex. Apr. 30, 2021), ECF No. 44 ("[T]he rule of reason generally applies to vertical restraints—those between participants at different levels of the market structure, such as supplier-customer, manufacturer-distributor, or employer-employee." (citing *Bus. Elecs. Corp.*, 485 U.S. at 730)).  The vertical restraint Plaintiffs allege can only be evaluated under the rule of reason, and Plaintiffs' Complaint, which only contains a single *per se* claim, should be dismissed.

## 2. The alleged hiring restrictions are solely intrabrand, and further P&W's interbrand competition.

The inapplicability of *per se* treatment to the hiring restrictions at issue in this case is established, as a matter of law, by the vertical, procompetitive collaboration between P&W and the Outsourcing Defendants.  Such a conclusion is even more compelling here, where the Plaintiffs' own allegations—which make clear that the alleged restrictions are wholly intrabrand—support application of the rule of reason.

The "primary purpose" of antitrust law "is to protect interbrand competition." *Leegin*, 551 U.S. at 878 (quoting *State Oil Co.*, 522 U.S. at 15) (emphasis added).  Restraints that have "real potential to stimulate interbrand competition," such as the alleged agreements here, are not *per se* unreasonable. *Bus. Elecs. Corp.*, 485 U.S. at 724 (citing *GTE Sylvania*, 433 U.S. at 52 n.19); *see GTE Sylvania*, 433 U.S. at 54 ("Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products. These 'redeeming virtues' are implicit in every decision sustaining vertical restrictions under the rule of reason.").

As Plaintiffs describe in their Complaint, the alleged restraint is designed to support such interbrand competition.  The Complaint alleges that P&W utilizes labor supplied by the Outsourcing Defendants to support the design, manufacture, and sustainment of P&W's brand of aerospace products, i.e., to help P&W compete with other aircraft engine manufacturers in the aerospace market.  Compl. ¶¶ 4, 50; Indictment ¶ 2; *Patel* Aff. ¶ 5.  The Complaint does not allege an agreement among competitors in the aerospace market, which could have an adverse effect on interbrand competition.  Nor does the Complaint allege that the Outsourcing Defendants compete with P&W or P&W's horizontal competitors in the aircraft engine industry (e.g., GE Aviation, Rolls Royce, Honeywell Aerospace, etc.).  *See, e.g.*, PwC Report (Solh Decl., Ex. C) at 25-27; Statista Report (Solh Decl., Ex. E).  Rather, the Outsourcing Defendants supply P&W with the labor it needs to complete P&W's aerospace projects (i.e., intrabrand), so that P&W's brand can increase output and compete in the aircraft engine market (i.e., interbrand).  Compl. ¶¶ 4, 50; 2019 Annual Report (Solh Decl., Ex. D) at 24 ("Pratt & Whitney experiences intense competition for new commercial airframe/engine combinations.").  The alleged hiring restraint—a restraint on intrabrand competition for the input of labor for projects within P&W's brand—*promotes* rather than inhibits interbrand competition for the output of aircraft engines, the aerospace industry in which P&W competes.  It is thus properly analyzed under the rule of reason.

In *Bogan*, the Second Circuit explained the importance of this intrabrand/interbrand distinction in finding that *per se* treatment of hiring restrictions was inappropriate.  166 F.3d at 515-16.  Because the hiring restrictions related only to a single company (the Northwestern Mutual Life Insurance Company) and did not involve any agreements among competing insurance companies, they were "not a classic interfirm horizontal restraint of trade."  *Id.* at 515.

They were instead "akin to an *intra* firm agreement." *Id.* As a result, the Second Circuit found "[t]he agreement here is far from a typical *per se* illegal restraint, consistent with the fact that antitrust law shows more concern to protect interrather [sic] than intrabrand competition." *Id.*

In another case addressing intrabrand allegations, the court applied the rule of reason where the plaintiffs alleged that distributors agreed to allocate customers, not compete for service contracts, and submit non-competitive bids, among other allegations. *Integrated Sys. & Power, Inc. v. Honeywell Int'l Inc.*, 713 F. Supp. 2d 286, 297 (S.D.N.Y. 2010). The court explained:

> A conspiracy to eliminate competition with respect to one component . . . , *within one brand*, within an industry in which Plaintiff has not alleged a lack of substitutes is not the type of restraint that is so "manifestly anticompetitive," or that "would always or almost always tend to restrict competition and decrease output" nor is it a restraint with which "courts have had considerable experience" such that a per se rule would be appropriate.

*Id*. (emphasis added) (quoting *Leegin*, 551 U.S. at 886-87); *see also Deslandes*, 2022 WL 2316187, at *5-6 (rejecting plaintiffs' single-brand market definition for labor as "implausible").

Likewise, the alleged hiring restrictions here were confined to a single aerospace brand—P&W. And, per Plaintiffs' own allegations, the restrictions were tied directly to the performance of P&W's engine contracts. Rule of reason—not *per se* evaluation—is thus the only lens under which the Court should analyze the alleged hiring restraints.

### a.      Defendants' alleged hiring restraints could not have allocated the market for aerospace labor to any meaningful extent.

The Second Circuit's decision in *Bogan* provides yet another reason why Plaintiffs' allegations fail to establish a threshold case for *per se* treatment: there is no obvious anticompetitive effect in the market for aerospace labor where, under the facts Plaintiffs allege, Defendants could not have allocated that market to any meaningful extent. *See Bogan*, 166 F.3d at 515-16. Plaintiffs' intrabrand allegations ignore the degree of competition P&W and the Outsourcing Defendants faced for Aerospace Workers from other aerospace companies and other

outsourcing firms that "operate at the same level of the aerospace market when it comes to hiring skilled Aerospace Workers[,]" none of which are alleged to have had any role in the purported hiring restrictions.  Compl. ¶ 154.  Indeed, the Complaint concedes that "Defendants have some competitors outside of each other."  *Id.* ¶ 62; *see* PwC Report (Solh Decl., Ex. C) at 25-27 (listing the top 100 global aerospace and defense companies).  *See also* Compl. ¶ 46 ("Many aerospace companies participate in projects related to national security or defense . . ."); *id.* ¶ 50; *Patel* Aff. ¶ 6 (describing that the Outsourcing Defendants were "among the Suppliers" whose outsourced employees worked on P&W's projects).  But the Complaint does not—and cannot— plausibly plead any obvious detrimental impact to competition to support a *per se* claim given the breadth of Defendants' competitors in the market for aerospace labor.  *See Deslandes*, 2022 WL 2316187, at *5-6 (explaining that "[p]laintiffs could have sold their labor to other customers" and so "[t]he idea that [plaintiffs] sold their labor in the market that was limited to McDonald's outlets [was] implausible" because "[t]hey could have sold their labor to other buyers").

While the alleged agreement "may [have] constrain[ed]" certain outsourced aerospace engineers working on P&W projects to some degree, the acknowledged existence of many other competitors who are not alleged to have agreed to the purported hiring restrictions means that Defendants could "not [have] allocate[d] the market . . . to any meaningful extent."  *Bogan*, 166 F.3d at 515.  Accordingly, Plaintiffs "fail to establish a threshold case for *per se* treatment for failure to specify the relevant market in which the horizontal agreement they allege could have an obvious anticompetitive effect."  *Id.* at 516.  The Second Circuit has held that specifying a market in which the restraint has some obvious anticompetitive effect is central to any *per se*

analysis.  *Id.*  Defendants' alleged hiring restrictions would not allocate the market for Aerospace Workers to any meaningful extent, and Plaintiffs' *per se* claim fails for this reason as well.

> **3.**     **Plaintiffs' allegations demonstrate the alleged hiring restrictions were ancillary to P&W's and its Outsourcing Defendants' legitimate business collaboration.**

Even if the Court were to determine that Plaintiffs allege a horizontal restraint, *per se* treatment is not warranted for another reason: Plaintiffs' own allegations demonstrate the hiring restraints were intended to further the "design, manufacture, and service [of P&W's] aerospace products" and were thus ancillary to the legitimate collaboration.  Compl. ¶ 50.  The ancillary restraints doctrine "governs the validity of restrictions imposed by a legitimate business collaboration [i.e., ancillary restraints], such as a business association or joint venture, on nonventure activities [and] exempt[s] such agreements from the *per se* rule, such that rule of reason applies."  *Aiyer*, 33 F.4th at 115-16 (internal quotation marks and citations omitted); *see Polk Bros., Inc. v. Forest City Enters.*, 776 F.2d 185, 188-89 (7th Cir. 1985) (defining "ancillary" restraints as "those that are part of a larger endeavor whose success they promote" because "the enterprise (viewed as a whole) expands output and competition" as opposed to "naked" restraints, "those in which the restriction on competition is unaccompanied by new production or products"); *Deslandes*, 2022 WL 2316187, at *5 (holding that the "restraint plaintiffs allege must be judged under the rule of reason" because the alleged restraint "was ancillary to an agreement that was output enhancing in the market for fast food").  Courts distinguish "naked" restraints from ancillary restraints; ancillary restraints are subject to the rule of reason, while only "naked" restraints warrant *per se* treatment.  *See Dagher*, 547 U.S. at 7; *Aiyer*, 33 F.4th at 115-16 (citing *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 97, 1110 (9th Cir. 2021)).

a.      **Plaintiffs' Complaint alleges an ancillary restraint.**

An "ancillary" restraint is one that is (1) "subordinate and collateral to a separate,

legitimate transaction," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224

(D.C. Cir. 1986), and (2) "plausibly relate[d]" to the collaboration's "efficiency-enhancing

purpose," *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 727 (6th Cir.

2019).  *See Major League Baseball Props.*, 542 F.3d at 340 n.11 (Sotomayor, J., concurring)

(explaining that "a challenged restraint" need only be reasonably ancillary, and not "essential"

to, the legitimate business collaboration).

The DOJ agrees.  *United States v. Surgical Care Affiliates, LLC*, No. 3:21-cr-00011-L

(N.D. Tex. Apr. 30, 2021), ECF No. 44 at 17 (United States' Opp'n to Defs.' Mot. to Dismiss)

("Any type of otherwise *per se* unlawful restraint—including market allocation—may be

analyzed under the rule of reason instead, if the factual predicates are established to show that

the agreement is ancillary to a legitimate business collaboration."); *In re: Ry. Indus. Emp. No-*

*Poach Antitrust Litig.*, 2:18-mc-00798-JFC (W.D. Pa. Feb. 8, 2019), ECF No. 158 at 10 (Stmt. of

Interest of the United States) ("If the facts show that no-poach agreements are reasonably

necessary to a separate, legitimate business transaction or collaboration among the employers,

they are not *per se* unlawful, and would instead by judged under the rule of reason."); *see also*

*Alston*, 141 S. Ct. at 2161 ("[A]ntitrust law does not require businesses to use anything like the

least restrictive means of achieving legitimate business purposes."); DOJ/FTC Antitrust

Guidance for Human Resource Professionals at 3 (Oct. 2016) (hereinafter, "DOJ Antitrust

Guidance") ("[I]f the agreement is separate from or not reasonably necessary to a larger

legitimate collaboration between the employers, the agreement is deemed illegal without any

inquiry into its competitive effects [i.e., *per se*].").

18

Both ancillarity factors are established by the facts alleged in Plaintiffs' Complaint. *First*, Plaintiffs' Complaint describes that Defendants' alleged hiring restrictions are subordinate to a separate, legitimate business transaction—namely the vertical outsourcing relationship between P&W and its outsourcing labor suppliers. Compl. ¶¶ 4, 50; Indictment ¶ 10; *see* discussion *supra* Section IV.A.1. Nowhere in the Complaint do Plaintiffs allege—or even suggest—that this legitimate outsourcing relationship between P&W and the Outsourcing Defendants is illegal. Nor can they. Accordingly, the first requirement for ancillarity is met under Plaintiffs' own allegations. *See Aya*, 9 F.4th at 1109.

*Second*, Plaintiffs' Complaint describes why the hiring restrictions were plausibly related to P&W's and the Outsourcing Defendants' legitimate outsourcing relationship: to ensure that the Outsourcing Defendants would not lose their personnel during the collaboration, and as a result reduce productive activity and increase costs associated with the completion of its SOWs for P&W. Compl. ¶ 50; *Patel* Aff. ¶ 51. Despite Plaintiffs' conclusory claim that "Defendants' agreement . . . had no lawful or legitimate procompetitive business purpose," Compl. ¶ 155, Plaintiffs explain that P&W "used outsourcing during the Class Period as a source of labor to design, manufacture, and service its aerospace projects," *id.* ¶ 50, for which P&W competed with companies like GE Aviation, Rolls Royce, and Honeywell Aerospace, *see* PwC Report (Solh Decl., Ex. C) at 5, 25; Statista Report (Solh Decl., Ex. E). The allegations further provide that P&W and at least one Defendant discussed the need to "limit hiring and recruiting between them" in order to "avoid disruption of engineering projects." *Patel* Aff. ¶ 51. Plaintiffs' allegations thus acknowledge P&W's legitimate reason to fear disruption of its engine build projects from losing an experienced team member.

The Ninth Circuit's decision in *Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, is instructive here.  9 F.4th at 1110 (affirming the district court's application of the rule of reason).  AMN was a supplier of nursing services to hospitals.  AMN typically used its own nursing employees to fulfill its hospital contracts, but when it needed additional nurses it sub-contracted with companies like Aya to help AMN fulfill its hospital contracts.  The agreement at issue prohibited Aya from hiring away AMN's nurses.

The court held that the purpose of the restraint—to "ensure[] that AMN will not lose its personnel during the collaboration" with Aya—was "reasonably necessary to the parties' procompetitive collaboration."  *Id.*  The court explained that without the restraint, AMN's employees could be "raid[ed]" or hired away, and AMN "would likely be less willing or unwilling to deal with other agencies to supply travel nurses to hospitals which, as [plaintiff] also recognize[d], already experience a chronic shortage of nurses."  *Id.*  (internal quotation marks and citation omitted).  The court concluded the "provision [was] both ancillary to the parties' broader agreement to collaborate, and a reasonable, pro-competitive restraint."  *Id.* at 1106.  The Ninth Circuit thus held that the district court correctly subjected the restraint to the rule-of-reason standard.  *Id.* at 1111.

Like the restraint in *Aya*, the alleged agreement here allowed P&W to utilize outsourcing engineers as a source of labor to complete its projects, *see* Compl. ¶ 4, and for the Defendants to "collaborate" to promote interbrand competition in the aerospace industry.  *Aya*, 9 F.4th at 1110.  If P&W were to hire aerospace engineers from outsourcing firms where those engineers were already assigned to and working on P&W's projects, P&W would be "cutting [its] own throat."  *See id.* (quoting *Polk Bros.*, 776 F.2d at 189).  Plaintiffs acknowledge that the alleged hiring restrictions were necessary to "avoid disruption of [P&W's] engineering projects."  *Patel* Aff.

¶ 51.  P&W's inability to ensure continuity of engineering services for the duration of an engine build contract would disadvantage P&W vis-à-vis engine manufacturers with whom it competes (e.g., GE Aviation, Honeywell Aerospace, and Rolls Royce).  *See* PwC Report (Solh Decl., Ex. C) at 5, 25.

The alleged restrictions also ensured the viability of the outsourcing relationship. Without the alleged restrictions, it would not make economic sense for the Outsourcing Defendants to provide outsourced labor to a common customer like P&W, where P&W or other outsourcing firms could free-ride on the Outsourcing Defendants' investments in training those employees by hiring them away while they were completing an outsourced contract.  Again, the Outsourcing Defendants would be "cutting [their] own throat[s]."  *Aya*, 9 F.4th at 1110 (internal quotation marks and citation omitted); *see also Leegin*, 551 U.S. at 890-91 (preventing free riding can increase competition).  As in *Aya,* the alleged hiring restraints here were necessary— not just plausibly related—to ensure that the Defendants would "not lose [their] personnel during the collaboration."  *Aya*, 9 F.4th at 1110; *see Paladin Assocs. Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003).  Additionally, the alleged restraints were plausibly related where, as described in the Complaint, they were tailored in scope and duration.  *See* discussion *infra* Section IV.A.3.b.

It is not often the case that a civil antitrust complaint identifies the procompetitive justifications and effects of an alleged improper agreement.  Yet Plaintiffs do so here: providing the context that explains the alleged agreements allowed P&W to hire outsourced labor in order to complete aerospace projects and adequately compete with other aerospace and defense companies in the aerospace industry market.  *See* PwC Report (Solh Decl., Ex. C) at 25-27

(listing the top 100 global aerospace and defense companies, ranked by 2020 revenue).  The

alleged conduct is therefore solidly in rule-of-reason territory and is not a *per se* violation.

### b.    The alleged restrictions are not "naked."

Plaintiffs cannot avoid the Court's application of the ancillary restraint doctrine by

simply declaring Defendants' actions a "naked" restraint.  *See Iqbal*, 556 U.S. at 678.  A "naked"

restraint is one that has "no purpose except stifling competition."  *United States v. Topco*

*Assocs., Inc.*, 405 U.S. 596, 608 (1972) (internal quotation marks and citation omitted).  Where

Defendants' actions are justified by "plausible arguments that they were intended to enhance

overall efficiency and make markets more competitive," *Nw. Wholesale Stationers*, 472 U.S. at

295, courts uniformly find that such agreements are not "naked" restraints and are therefore

subject to rule-of-reason analysis rather than *per se* treatment, *United States v. DaVita, Inc.*, No.

21-cr-00229, 2022 WL 266759, at *2 (D. Colo. Jan. 28, 2022) ("Even an agreement that falls

into a traditional per se category [i.e., a horizontal restraint] will not receive per se treatment

under the Sherman Act unless it is a 'naked' rather than 'ancillary' agreement.").  *See also*

*Paladin Assocs.*, 328 F.3d at 1155 ("When a defendant advances plausible arguments that a

practice enhances overall efficiency and makes markets more competitive, per se treatment is

inappropriate, and the rule of reason applies."); *Polk Bros.*, 776 F.2d at 189 ("A court must ask

whether an agreement promoted enterprise and productivity at the time it was adopted.  *If it*

*arguably did, then the court must apply the Rule of Reason* to make a more discriminating

assessment." (emphasis added)).

Based on their descriptions in the Complaint of the alleged hiring restrictions at issue,

Plaintiffs cannot demonstrate, as a matter of law, that they are "naked restraints of trade with no

purpose except stifling of competition" and, therefore, *per se* illegal.  *Palmer v. BRG of Ga., Inc.*,

498 U.S. 46, 49 (1990) (quoting *Topco Assocs., Inc.*, 405 U.S. at 608); *see, e.g.*, Compl. ¶ 50

(describing that P&W "used outsourcing during the Class Period as a source of labor to design, manufacture, and service [P&W's] aerospace products").

Despite Plaintiffs' conclusory allegations that a broad no-poach conspiracy affected all Aerospace Workers, *see* Compl. ¶ 143, Plaintiffs' actual, factual allegations concern hiring restrictions limited to those engineers "currently" or "actively" working on P&W projects. *See id.* ¶ 103 (September 2017 email stating "direct your HR team not to hire [QuEST] outsource resources currently deployed on [P&W] projects till end of this year . . . ."); Indictment ¶ 22(d) (email stating "[p]lease communicate to [Company C] HR not to interview or hire active employees working on [P&W] work"); *id.* ¶ 19 (describing defendants "allocating employees in the aerospace industry working on projects for [P&W]"); *Patel* Aff. ¶ 11 (describing the "Agreement" as one that allocated "victim-employees in the labor market in the aerospace industry working on projects for [P&W]"). Moreover, Plaintiffs allege further limits on the scope and duration with respect to the conduct between P&W and QuEST: a "two-year tenure restriction and hiring freezes" for "periods of time—from several months to nearly an entire year." Compl. ¶¶ 93, 101.

Hiring restrictions that are limited in time and scope, such as those Plaintiffs describe, are not naked, *per se* violations. *See Kelsey K. v. NFL Enters. LLC*, No. C 17-00496, 2017 WL 3115169, at *4 (N.D. Cal. July 21, 2017), *aff'd*, 757 F. App'x. 524 (9th Cir. 2018) (finding that a "policy that permits poaching on an annual basis but bars it during the NFL season is not a 'naked' no-poaching agreement"); *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144-45 (3d Cir. 2001) (holding that a no-hire agreement was properly analyzed under the rule of reason as an ancillary agreement "executed upon the sale of a corporation" where the company entered into a "no-hire"

agreement with the buyer providing that the seller would not hire the company's employees for eight months).

Plaintiffs thus fail to allege any facts demonstrating the agreements were "naked" restraints on trade.  The Court need not wait for the facts to develop through discovery as to whether the restraint was ancillary; Plaintiffs' own allegations concede that much.  Unlike cases where discovery would be needed to develop the procompetitive benefits of an alleged restraint, Plaintiffs actually allege facts in their Complaint that demonstrate the hiring restrictions are ancillary and therefore necessitates rule-of-reason analysis at this earlier stage.

### 4. Plaintiffs' allegations of *per se* conduct are wholly conclusory.

The law does not support imposing *per se* liability for hiring restrictions that are subordinate to a legitimate vertical relationship and, whether they are categorized as vertical, mixed-vertical and horizontal, or horizontal, that are ancillary to that legitimate business collaboration, as is the case here.  *See* discussion *supra* Sections IV.A.1-3.  The Court's analysis under established legal precedent does not change simply because the DOJ decided in 2016, in the middle of the alleged Class Period, to attempt to prosecute certain no-poach cases under a *per se* standard.  *See* Compl. ¶ 157.  Nor does citing the DOJ's Indictment cure the fundamental defects of Plaintiffs' *per se* claim. The Indictment actually conflicts with the DOJ's own statements regarding whether hiring restrictions, like those at issue here, should or should not be

subject to *per se* treatment.[4]  Even in criminal no-poach cases filed by the DOJ, no court has

suggested that such agreements always fit the definition of a *per se* violation.  In fact, recently, a

U.S. District Court held the opposite.  *See DaVita*, 2022 WL 266759, at *8 ("It does not follow

that every non-solicitation agreement or even every no-hire agreement would allocate the market

and be subject to per se treatment.").

As discussed *supra* in Section III, the facial plausibility standard on a motion to dismiss

requires more than such "labels and conclusions" and "a formulaic recitation of the elements of a

cause of action."  *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted).  Once

the Complaint is stripped of Plaintiffs' conclusory allegations characterizing Defendants' actions

as "*per se*," "naked restraints of trade," "horizontal," and "market allocation," *see* Compl.

¶¶ 156, 162, no factual allegations support or warrant the application of the *per se* standard.

---

[4]  For example, in its opposition to defendants' motion to dismiss in a criminal no-poach matter, the DOJ expressly stated that "[a]ny type of otherwise per se unlawful restraint—including market allocation—may be analyzed under the rule of reason instead, if the factual predicates are established to show that the agreement is ancillary to a legitimate business collaboration."  Opp'n to Defs.' Mot. to Dismiss at 17, *United States v. Surgical Care Affiliates, LLC*, No. 3:21-cr-00011-L (N.D. Tex. Apr. 30, 2021), ECF No. 44; *see also* Statement of Interest of the United States at 5, *Beck v. Pickert Med. Grp., P.C.*, No. CV21-02092 (Nev. 2d Jud. Dist. Feb. 25, 2022) ("A horizontal agreement may be subject to a more fact-specific analysis under the rule of reason, if it is ancillary to a separate, legitimate venture between the competitors."); Br. of Amicus U.S. in Supp. of Neither Party at 12, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 20-55679 (9th Cir. Nov. 19, 2020), ECF No. 14 ("An otherwise per se illegal non-solicitation agreement among competitors nonetheless may be subject to the rule of reason if it qualifies as an ancillary restraint."); Statement of Interest of the U.S. at 10, *In re: Ry. Indus. Emp. No-Poach Antitrust Litig.*, 2:18-mc-00798-JFC (W.D. Pa. Feb. 8, 2019), ECF No. 158 ("If the facts show that no-poach agreements are reasonably necessary to a separate, legitimate business transaction or collaboration among the employers, they are not *per se* unlawful, and would instead by judged under the rule of reason."); Statement of Interest of the U.S. at 24, *Seaman v. Duke Univ.*, No. 1:15-cv-00462-CCF-JLW (M.D.N.C. Mar. 7, 2019), ECF No. 325; Tr. of Hr'g on Mot. to Dismiss at 52:16-20, *United States v. DaVita, Inc.*, No. 21-cr-00229-RBJ (D. Colo. Nov. 19, 2021) ("What we talk about in terms of naked is it's not collateral to a procompetitive business venture. That's what that means, that it's not ancillary to something that actually would be potential for benefits to consumer."); DOJ Antitrust Guidance at 3 (stating that "[n]aked wage-fixing or no-poaching agreements among employers, . . . are per se illegal under the antitrust laws" meaning "if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects").

B.     **Plaintiffs' Passing Reference to a "Quick Look" Claim Fails.**

Plaintiffs' Complaint makes a single reference to "quick look" analysis.  *See* Compl.

¶ 160.  The Supreme Court recently addressed quick look in *NCAA v. Alston*:

> Recognizing the inherent limits on a court's ability to master an entire industry—and aware that there are often hard-to-see efficiencies attendant to complex business arrangements—we take special care not to deploy these condemnatory tools [i.e., *per se* or quick look] until we have amassed "considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances."

*Alston*, 141 S. Ct. at 2156 (quoting *Leegin*, 551 U.S. at 886-87).  Plaintiffs' quick look claim fails

for the same reasons their *per se* claim fails.  As discussed above, there is no obvious

anticompetitive effect given the efficiencies of the legitimate vertical relationship between the

Defendants and the breadth of competition they faced for Aerospace Workers from aerospace

companies and other outsourcing firms.  "If an arrangement 'might plausibly be thought to have

a net procompetitive effect, or possibly no effect at all on competition,' more than a 'quick look'

is required."  *Major League Baseball Props.*, 542 F.3d at 318 (quoting *Cal. Dental*, 526 U.S. at

771).

But Plaintiffs' allegations further fail under the quick look standard given the undeniable

procompetitive justification Plaintiffs allege within their own Complaint.  *See, e.g.*, Compl. ¶ 50;

*Patel* Aff. ¶ 51.  Under the "quick look" doctrine, once a procompetitive justification for the

conduct is advanced (here, via Plaintiffs' own allegations), the court must then apply the rule-of-

reason analysis.  *Bogan*, 166 F.3d at 514 n.6 (briefly applying "quick look" but returning to rule

of reason because the defendant offered "sound allegations of procompetitive benefit"); *Madison*

*Square Garden, L.P. v. Nat'l Hockey League*, 270 F. App'x 56, 58 (2d Cir. 2008) (summary

order) ("A court must abandon 'quick look' and proceed to a full-blown rule of reason analysis,

however, 'once the defendant has shown a procompetitive justification for the conduct.'"

(quoting *Bogan*, 166 F.3d at 514 n.6)); *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 455

(S.D.N.Y. 2014) ("The 'quick look' analysis is appropriate where the restraint, though not

subject to the per se standard, is one that 'an observer with even a rudimentary understanding of

economics could conclude that the arrangements in question would have an anticompetitive

effect on customers and markets.'" (quoting *Cal. Dental*, 526 U.S. at 770)).  Plaintiffs' mere

passing reference to "quick look" does not save their Complaint from dismissal.

> **C.**      **Plaintiffs Do Not Allege A Rule of Reason Claim.**

Plaintiffs make clear in their Complaint that they allege a *per se* claim under the antitrust

laws:

> Defendants' no poach agreement is a *per se* violation of Section 1 of the Sherman
> Act.

Compl. ¶ 156 (under heading "CLAIM FOR RELIEF").  This election by Plaintiffs further makes

their case ripe for dismissal now.

"While pleading exclusively per se violations can lighten a plaintiff's litigation burdens,

it is not a riskless strategy."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir.

2010).  Plaintiffs "could have argued that the restraint at issue ought to be analyzed under the

traditional rule of reason rather than attempt[ing] to squeeze the restraint into the *per se* realm"—

but they did not.  *JMC Telecom*, 470 F.3d at 531 (affirming outright dismissal of *per se* antitrust

counterclaim).  If the Court determines that *per se* treatment is inappropriate, Plaintiffs'

Complaint must be dismissed.  *Id.*; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 362 ("Given

plaintiffs' exclusive reliance on a per se or quick look analysis, the absence of a horizontal

agreement is fatal to their § 1 claims."); *see Dagher*, 547 U.S. at 7 n.2 (ordering dismissal of

plaintiffs' antitrust claim because it was not *per se* unlawful under Section 1 of the Sherman Act

and plaintiffs "ha[d] not put forth a rule of reason claim"); *Copy-Data Sys.*, 663 F.2d at 410-11

(remanding with instructions to dismiss where plaintiff pursued only a *per se* theory).

Plaintiffs make no reference whatsoever to the rule of reason in their Complaint. They

allege:

> Because Defendants' conspiracy is *per se* illegal under the federal antitrust laws, Plaintiffs need not define a relevant product or geographic market.
>
> To the extent a relevant market needs to be defined for any reason, the market restrained by Defendants' conduct is the market for the labor services of skilled Aerospace Workers in the United States, or alternatively, in local geographic markets in and around Hartford-East Hartford-Middletown, Connecticut metropolitan area and Palm Beach County, Florida.

Compl. ¶¶ 162-63.  There are two problems with these assertions.

*First*, Plaintiffs are incorrect in asserting that they have no obligation to adequately plead

a relevant market to support their *per se* claim.  Such allegations are an essential part of a *per se*

claim.  *Bogan*, 166 F.3d at 515.

*Second*, Plaintiffs' vague and conclusory allegations of alternative markets, and of

Defendants' supposed "market power" within those markets, do not come close to satisfying the

pleading standards for such essential elements of either a *per se* or rule of reason claim.

A rule of reason claim must "allege a plausible relevant market in which competition will

be impaired."  *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).  "The

relevant market must be defined 'as all products reasonably interchangeable by consumers for

the same purposes, because the ability of consumers to switch to a substitute restrains a firm's

ability to raise prices above the competitive level.'"  *Id.* (quoting *Geneva Pharms. Tech. Corp. v.*

*Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004)).  Plaintiffs' Complaint is wholly deficient in

this respect.  In the unpublished decision *Madison 92nd Street Assocs., LLC v. Courtyard Mgmt.*

*Corp.*, the Second Circuit affirmed dismissal of both the *per se* and rule of reason claims, finding

that the alleged market, which was limited to labor at Marriott-managed hotels, could not plausibly have "'encompass[ed] all interchangeable substitute products.'" 624 F. App'x at 29 (summary order) (quoting *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008)). The court reasoned that "[i]f other, non-Marriott-managed hotels in New York City suddenly doubled the wages they paid to their employees, it is beyond doubt that Marriott hotels would have to increase their wages to retain any employees." *Id.* The same reasoning applies here. The market for Aerospace Workers is not a proper relevant market, whether viewed in the geographic context of the United States Market or the Local Market that Plaintiffs allege.

A rule of reason claim must also allege that a defendant's conduct "had an *actual* adverse effect on competition as a whole in the relevant market." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (internal quotation marks and citation omitted). Even assuming Plaintiffs had properly pleaded a relevant market, Plaintiffs fail to make any allegation describing injury to competition in that market. "A plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." *Id.* at 97. Plaintiffs have not alleged any facts regarding Defendants' market power in the aerospace labor market, whether in the United States or limited to the alternative local market they allege. In one case, the Second Circuit found that a "single, general allegation" that the restraint "would diminish competition" did not save plaintiff's claim "[w]ithout any allegation as to how market-wide competition [would] be affected." *Elecs. Commc'ns Corp.*, 129 F.3d at 244-46; *see also Bogan*, 66 F.3d at 516.

Plaintiffs do not allege even a single, general allegation that the restraints would diminish competition, let alone how market-wide competition would be affected here—and they cannot. *See K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127-28 (2d Cir. 1995) ("Restrictions on intrabrand competition can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product.  Because the focus of our inquiry is the relevant market as a whole, restriction of intrabrand competition must be balanced against any increases in interbrand competition.") (citations omitted); *Success Sys., Inc. v. Excentus Corp.*, 439 F. Supp. 3d 31, 64 (D. Conn. 2020) (Bolden, J.) (quoting *K.M.B. Warehouse*, 61 F.3d at 128); *see also Union Circulation Co. v. Fed. Trade Comm'n*, 241 F.2d 652, 657 (2d Cir. 1957) (applying rule of reason to antitrust claim challenging "no-switching" agreements "[b]ecause a harmful effect upon competition is not clearly apparent from the terms of these agreements" that "are directed at the regulation of hiring practices and the supervision of employee conduct, not at the control of manufacturing or merchandising practices").

Alleging a proper relevant market here would require Plaintiffs to acknowledge the intense competition P&W faces in the aerospace market, the robust competition the Defendants face in the market for aerospace engineering labor, and the legitimate vertical collaboration between the Defendants.  Doing so would further demonstrate why Plaintiffs *per se* claim fails as a matter of law.

## V.      CONCLUSION

P&W respectfully requests that the Court grant its Motion and dismiss Plaintiffs' *per se* claim with prejudice.

Dated:  July 8, 2022                                Respectfully submitted,


By: */s/ Chahira Solh*
Chahira Solh (phv20470)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone:  (949) 263-8400
Facsimile:   (949) 263-8414
Email:  CSolh@crowell.com

Kent Gardiner (phv ct15260)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:   (202) 628-5116
Email:  KGardiner@crowell.com

John W Cerreta (ct28919)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Telephone:  (860) 275-0665
Facsimile:   (860) 881-2517
Email:  jcerreta@daypitney.com

*Counsel for Raytheon Technologies*
*Corporation, Pratt & Whitney Division*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

*/s/ Chahira Solh*