# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

TARAH KYE BOROZNY, et al.; on behalf
of themselves and all others similarly
situated,

                    Plaintiffs,

    vs.

PRATT & WHITNEY, A DIVISION OF
RAYTHEON TECHNOLOGIES
CORPORATION; et al.,

                    Defendants.

Case No. 3:21-cv-1657-SVN

Date:  September 6, 2022

## PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

FACTS ................................................................................................................................4

    A.    Defendants Compete with Each Other for Aerospace Workers .............................4

    B.    Defendants Conspired to Restrict Hiring and to Suppress Compensation to Aerospace Workers...............................................................................................4

    C.    The DOJ Indicts Defendants' Employees for Their Participation in the Conspiracy ..........................................................................................................6

ARGUMENT ......................................................................................................................7

I.    DEFENDANTS' CONSPIRACY IS SUBJECT TO *PER SE* CONDEMNATION ..........8

    A.    Defendants Are Horizontal Competitors in the Relevant Market...........................9

    B.    Defendants' No-Poach Agreements Allocated the Relevant Market ...................13

        1.    Courts Recognize No-Poach Agreements as Obviously Anticompetitive......................................................................................13

        2.    The DOJ Recognizes No-Poach Agreements as Obviously Anticompetitive......................................................................................18

    C.    Defendants' Attempt to Invoke the "Ancillary Restraints" Doctrine Fails ..........20

        1.    Because the Complaint Pleads a Plausible Per Se Claim, the Ancillary Restraints Doctrine Is Unavailable to Defendants....................20

        2.    The Ancillary Restraints Doctrine Is a Fact-Based Defense that Cannot Lead to Dismissal ...............................................................21

        3.    Defendants Fail to Satisfy the Ancillary Restraints Doctrine...................22

II.    PLAINTIFFS HAVE ADEQUATELY PLEADED AN ANTITRUST VIOLATION UNDER THE QUICK LOOK AND RULE OF REASON STANDARDS................................................................................................................26

    A.    Plaintiffs Have Pleaded an Antitrust Violation Under the Quick Look Standard ..........................................................................................................27

    B.    Plaintiffs Have Pleaded an Antitrust Violation Under the "Rule of Reason"........29

        1.    Plaintiffs Are Not Required to Plead the Words "Rule of Reason" to State a Plausible Antitrust Claim Under That Standard ......................30

2.    Plaintiffs Have Sufficiently Pleaded Defendants' Market Power..............31

III.    PLAINTIFFS HAVE PLEADED BOTH DIRECT AND CIRCUMSTANTIAL
EVIDENCE DEMONSTRATING DEFENDANTS' CONSPIRACY ............................35

A.    The Complaint Alleges Direct Evidence of Defendants' Conspiracy ..................35

B.    The Complaint Alleges Circumstantial Evidence of Defendants'
Conspiracy ............................................................................................................36

C.    Plaintiffs Have Adequately Pleaded Cyient's and PSI's Involvement in the
Conspiracy ............................................................................................................39

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)........................................................................... 8, 36, 39

*Anderson v. Shipowners' Ass'n of Pac. Coast*,
272 U.S. 359 (1926) ...................................................................................... 14

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987)........................................................................... 37, 38, 39

*Apotex, Inc. v. Cephalon, Inc.*,
2017 WL 10963610 (E.D. Pa. May 24, 2017)................................................. 28

*Arizona v. Maricopa Cnty. Med. Soc'y*,
457 U.S. 332 (1982)...................................................................... 8, 20, 21, 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 30

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
2018 WL 3032552 (S.D. Cal. June 19, 2018)................................................. 17

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) ......................................................... 21, 22, 25

*BBAM Aircraft Mgmt., LP v. Babcock & Brown LLC*,
2021 WL 4460258 (D. Conn. Sept. 29, 2021) ................................................ 30

*Bd. of Regents of Univ. of Okla. v. NCAA*,
707 F.2d 1147 (10th Cir. 1983), *aff'd* 468 U.S. 85 (1984) ...................... 22

*Belfiore v. New York Times Co.*,
826 F.2d 177 (2d Cir. 1987)........................................................................... 26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................ 7

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999)..................................................................... 25, 26

*Brennan v. Concord EFS, Inc.*,
369 F. Supp. 2d 1127 (N.D. Cal. 2005) ......................................................... 25

*Broadway Delivery Corp. v. United Parcel Serv. of Am. Inc.*,
651 F.2d 122 (2d Cir. 1981)............................................................................ 32

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1998)........................................................................................ 27

*Calcano v. Swarovski N. Am. Ltd.*,
36 F.4th 68 (2d Cir. 2022) ............................................................................. 30

*Carrigan v. Xerox Corp.*,
 2022 WL 1137230 (D. Conn. Apr. 18, 2022) ................................................ 4, 7, 8

*Cesnik v. Chrysler Corp.*,
 490 F. Supp. 859 (M.D. Tenn. 1980) ................................................................ 17

*City of Phila. v. Bank of Am. Corp.*,
 498 F. Supp. 3d 516 (S.D.N.Y. 2020) .............................................................. 7, 8

*Cohen v. S.A.C. Trading Corp.*,
 711 F.3d 353 (2d Cir. 2013) ............................................................................. 4, 7

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
 370 U.S. 690 (1962) ......................................................................................... 18

*Davitashvili v. Grubhub Inc.*,
 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022) ................................................... 29

*Deslandes v. McDonald's USA, LLC*,
 2018 WL 3105955 (N.D. Ill. June 25, 2018) ....................... 17, 23, 24, 26

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
 732 F.2d 480 (5th Cir. 1984) ........................................................................... 32

*Eiberger v. Sony Corp. of Am.*,
 622 F.2d 1068 (2d Cir. 1980) ........................................................................... 32

*Eichorn v. AT&T Corp.*,
 248 F.3d 131 (3d Cir. 2001) ............................................................................. 17

*Elecs. Commc'ns Corp v. Toshiba Am. Consumer Prods. Corp.*,
 129 F.3d 240 (2d Cir. 1997) ............................................................................. 33

*Erickson v. Pardus*,
 551 U.S. 89 (2007) ............................................................................................. 7

*FTC v. AbbVie Inc.*,
 976 F.3d 327 (3d Cir. 2020) ............................................................................. 28

*FTC v. Ind. Fed. Dentists*,
 476 U.S. 447 (1986) ......................................................................................... 34

*Fuentes v. Royal Dutch Shell PLC*,
 2019 WL 7584654 (E.D. Pa. Nov. 25, 2019) ................................................. 20

*Gelboim v. Bank of Am. Corp.*,
 823 F.3d 759 (2d Cir. 2016) ............................................................................. 38

*Hinds Cnty. v. Wachovia Bank N.A.*,
 620 F. Supp. 2d 499 (S.D.N.Y. 2009) ............................................................. 36

*Hunter v. Booz Allen Hamilton, Inc.*,
 418 F. Supp. 3d 214 (S.D. Ohio 2019) ............................................................ 20

*In re Animation Workers Antitrust Litig.*,
 123 F. Supp. 3d 1175 (N.D. Cal. 2015) ..................................................... 15, 16

*In re Elec. Books Antitrust Litig.*,
  859 F. Supp. 2d 671 (S.D.N.Y. 2012)................................................................ 39

*In re Elevator Antitrust Litig.*
  502 F.3d 47 (2d Cir. 2007).............................................................................. 36

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015)............................................................... 36

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) .......................................................... 20

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)............................................................................ 35

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  338 F. Supp. 3d 187 (S.D.N.Y. 2019).............................................................. 21

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018).............................................................. 36

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
  395 F. Supp. 3d 464 (W.D. Pa. 2019)................................................. 14, 15, 25

*In the Matter of Polygram Holding, Inc.*,
  136 F.T.C. 310 (2003), *review denied*, 416 F.3d 29 (D.C. Cir. 2005)............. 28

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
  791 F.3d 388 (3d Cir. 2015)............................................................................ 28

*Law v. NCAA*,
  902 F. Supp. 1394 (D. Kan. 1995), *aff'd*, 134 F.3d 1010 (10th Cir. 1998)......... 28, 29

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*
  551 U.S. 877 (2007)......................................................................................... 20

*Litovich v. Bank of America Corp.*,
  568 F. Supp. 3d 398 (S.D.N.Y. 2021).............................................................. 37

*LLM Bar Exam, LLC v. Barbri, Inc.*,
  271 F. Supp. 3d 547 (S.D.N.Y. 2017).............................................................. 37

*Madison 92nd Street Assocs., LLC v. Courtyard Mgmt. Corp.*,
  624 F. App'x 23 (2d Cir. 2015) ....................................................................... 33

*Mandeville Island Farms v. Am. Crystal Sugar Co.*,
  334 U.S. 219 (1948) ........................................................................................ 13

*Markson v. CRST Int'l, Inc.*,
  2021 WL 1156863 (C.D. Cal. Feb. 10, 2021)................................................... 15

*Maxon Hyundai Mazda v. Carfax, Inc.*,
  2014 WL 4988268 (S.D.N.Y. Sept. 29, 2014) ..................................... 21, 29, 30

*Meyer v. Kalanick*,
  174 F. Supp. 32d 817 (S.D.N.Y. 2016)............................................... 21, 29

*MLB Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008)............................................................. 21, 23

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958) ........................................................................... 8, 26

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978)............................................................................. 27

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)........................................................................ 10, 27

*Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*,
  614 F.2d 832 (2d Cir. 1980)................................................................. 26

*Northrop Corp. v. McDonnell Douglas Corp.*,
  705 F.2d 1030 (9th Cir. 1983) ............................................................. 25

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985)............................................................................... 8

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)................................................................... 10, 29

*Polk Bros. v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985)................................................................17

*Quinonez v. Nat'l Ass'n of Secs. Dealers, Inc.*,
  540 F.2d 824 (5th Cir. 1976) ............................................................... 14

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
  899 F.2d 951 (10th Cir. 1990) ............................................................. 33

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009) .......................................................... 33

*Roman v. Cessna Aircraft Co.*,
  55 F.3d 542 (10th Cir. 1995) ............................................................... 14

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986)..............................................................17

*Starr v. Sony BMG Music Ent.*,
  592 F.3d 314 (2d Cir. 2010)........................................................... 38, 39

*Sullivan v. Nat'l Football League*,
  34 F.3d 1091 (1st Cir. 1994) ............................................................... 28

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)......................................................31, 32, 33, 34

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998)................................................................... 31

*Tower Air, Inc. v. Fed. Exp. Corp.*,
  956 F. Supp. 270 (E.D.N.Y. 1996) ...................................................... 25

*Toys "R" Us Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ................................................................ 11, 24, 31, 34

*Union Circulation v. FTC*,
  241 F.2d 652 (2d Cir. 1957) ...................................................................................17

*United States v. Aiyer*,
  33 F.4th 97 (2d Cir. 2022) .......................................................................... 8, 9, 21, 22

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) .......................................................................... 2, 11, 12

*United States v. Consol. Laundries Corp.*,
  291 F.2d 563 (2d Cir. 1961) ................................................................................... 16

*United States v. Coop. Theatres of Ohio, Inc.*,
  845 F.2d 1367 (6th Cir. 1988) ............................................................................... 14

*United States v. DaVita Inc.*,
  2022 WL 266759 (D. Colo. Jan. 28, 2022) ...................................................... 14, 16

*United States v. eBay, Inc.*,
  968 F. Supp. 2d 1030 (N.D. Cal. 2013) ............................................................ 16, 20

*United States v. Koppers Co., Inc.*,
  652 F.2d 290 (2d Cir. 1981) ................................................................................... 12

*United States v. Manahe*,
  2022 WL 3161781 (D. Me. Aug. 8, 2022) ............................................. 16, 17, 22, 25

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ................................................................................... 8, 18, 24

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972) ......................................................................... 10, 11, 21, 28

*Valley Liquors Inc. v. Renfield Importers, Ltd.*,
  822 F.2d 656 (7th Cir. 1987) ................................................................................. 32

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ................................................................................. 30

*Wacker v. JP Morgan Chase & Co.*,
  678 F. App'x 27 (2d Cir. 2017) .................................................................... 7, 8, 34

*Weisfeld v. Sun Chem. Corp.*,
  210 F.R.D. 136 (D.N.J. 2002) ...............................................................................17

*Yi v. SK Bakeries, LLC*,
  2018 WL 8918587 (W.D. Wash. Nov. 13, 2018) ................................................... 24

## <u>Rules & Regulations</u>

48 C.F.R. § 9.602 ........................................................................................... 24, 25

48 C.F.R. § 9.604 ................................................................................................. 25

Fed. R. Civ. P. 8(a)(2) ................................................................................................ 7

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 7, 22, 27

### Other Authorities

A. Goolsbee & C. Syverson, *Monopsony Power in Higher Education: A Tale of Two Tracks* (Nat'l Bureau of Econ. Research, Working Paper No. 26070, 2019 ..................... 31, 32

AREEDA & HOVENKAMP, ANTITRUST LAW (3d ed. 2012) ....................................... 15, 31

N. Wilmers, *Wage Stagnation and Buyer Power: How Buyer-Supplier Relations Affect U.S. Workers' Wages, 1978 to 2014*, 83 AM. SOC. REV. 213 (2018) ....................................... 32

S. Naidu et al., *Antitrust Remedies for Labor Market Power*, 132 HARV. L. REV. 536 (2018) ..................................................................................................... 32

T. Ransom, *Labor Market Frictions and Moving Costs of the Employed and Unemployed*, J. HUMAN RES. (Mar. 2021) ............................................... 32

Plaintiffs Tarah Kye Borozny, Anthony DeGennaro, Ryan Glogowski, Ellen McIsaac, Scott Prentiss, Alex Scales, Austin Waid-Jones, Nicholas Wilson, and Steven Zappulla ("Plaintiffs"), by and through their undersigned counsel, respectfully submit this opposition to (1) Defendant Raytheon Technologies Corporation, Pratt & Whitney Division's July 8, 2022 Motion to Dismiss ("Pratt MTD"), Dkt. 465-1, and (2) the Outsourcing Defendants' July 8, 2022 Motion to Dismiss ("OD MTD"), Dkt. 466-1.

## INTRODUCTION

For a decade or more, Defendants conspired to stifle the employment prospects and compensation of aerospace engineers and other skilled workers in the jet propulsion systems industry ("Aerospace Workers").  As part of their unlawful scheme, Defendants secretly agreed not to solicit or hire each other's Aerospace Workers.  As the Complaint alleges in detail, and as the U.S. Department of Justice ("DOJ") has laid out in a criminal indictment of the executives who orchestrated this scheme, Defendants' conspiracy trapped Aerospace Workers in underpaid and unwanted jobs and stalled careers.  Defendants reaped the financial benefits.  As the DOJ has described, because of Defendants' conspiracy, "They no longer had to compete to earn each worker's labor and loyalty; for many, they could simply force it."[1]

The Complaint uses Defendants' own words to identify their anticompetitive motive: fearing that competition for labor would yield a "price war" that would "drive the price structure up," Defendants conspired to keep wages down.  Defendants conspired for one overarching reason:  so they could pay Aerospace Workers *less* than they would be paid in a competitive market.  And because Defendants knew their conspiracy was unlawful, they kept it secret,

---

[1] Mem. of Law of the United States in Opp'n to Defendants' Joint Mot. to Dismiss the Indictment ("DOJ Opp'n"), *United States of America v. Patel et al.*, No. 3:21-cr-22, Dkt. 216, at 1 (D. Conn. Aug. 10, 2022).

leaving Plaintiffs and their co-workers to pursue opportunities in vain and depriving them of a competitive marketplace for their labor.  Time and again Aerospace Workers got their hopes up for a new position, only to have those hopes dashed by a conspiracy hidden from their view.

Despite the Complaint's detailed allegations, and despite the DOJ's ongoing *criminal* prosecution of Defendants' conspiracy, Defendants now ask this Court to dismiss the Complaint at the pleading stage.  The Court should decline this invitation to decide contested questions of fact now.  The Complaint needs only to state a plausible antitrust violation.  It amply does, and thus Defendants' motions must be denied.

*First*, the Complaint plausibly alleges a *per se* unlawful, horizontal agreement among Defendants to allocate employees in a labor market.  Courts have recognized that these types of agreements among competitors are *per se* unlawful under the Sherman Act for over 100 years. Indeed, the DOJ is prosecuting this very same agreement criminally as a *per se* violation.

*Second*, while Defendants strain to avoid *per se* liability by describing the relationship between Pratt & Whitney ("Pratt") and the Outsourcing Defendants ("ODs") as a vertical relationship, Defendants ignore that the agreement at issue is a purely horizontal restraint among competing employers in a labor market.  As the DOJ has already explained in the criminal proceedings, the fact that certain of the Defendants have a vertical business relationship in a separate, non-labor market is irrelevant:

> The existence of a *vertical* business relationship between some of those conspirators in a *services market* is irrelevant to the Court's resolution of this motion.  As the Second Circuit has recently confirmed, the per se rule applies to conspiracies alleging horizontal restraints, even when the conspirator group includes a common customer who helped orchestrate the scheme.[2]

---

[2]  DOJ Opp'n at 1-2 (referencing *United States v. Apple, Inc.*, 791 F.3d 290, 322 (2d Cir. 2015)).

Like the DOJ Indictment, the Complaint here plainly alleges that the restraint in question—an agreement among competing employers to restrict the hiring and solicitation of employees—is purely horizontal.  The fact that Pratt and its employee, Mahesh Patel, served as the ringleader and enforcer does *nothing* to change the purely horizontal nature of that restraint.

*Third*, while Defendants try to invoke the doctrine of ancillary restraints to defend their conduct, that doctrine cannot save them from liability, and certainly not at this stage.  Because Defendants' agreement is unlawful *per se*, Defendants are not entitled to try to defend it on the grounds that it supposedly had some procompetitive benefits.  Moreover, whether Defendants could ever prevail under that defense is an inherently fact-intensive question.  Such a defense cannot be resolved on the face of a Complaint that plausibly alleges an unlawful restraint of trade that is not ancillary to any legitimate venture.

Defendants' effort to invoke this narrow defense also fails (and will fail) on the merits.  Their characterization of their agreement as "ancillary" to a legitimate joint venture is defied by the Complaint's allegations that they kept their agreement secret because they knew it was illegal.  Defendants' arguments boil down to the claim that their agreement helped their businesses be more profitable.  But, the ancillary restraint doctrine is not—as the DOJ observes—"a blanket 'business privilege' to the Sherman Act" that blesses any restraint on competition that is financially beneficial.[3]  Here, Defendants' "ancillary restraint" defense fails because their agreement to restrain the prospects for Aerospace Workers was not reasonably necessary for any procompetitive venture to succeed.

Defendants' remaining arguments—the inapplicability of the "quick look" liability test, the purported failure to plead a rule of reason antitrust violation, and the purported failure to

---

[3]  *Id.* at 2.

plead each Defendants' participation in the conspiracy—are all equally without merit.

Plaintiffs' Complaint is well-pleaded, and their case against Defendants should proceed.

## FACTS

The Complaint alleges the following well-pleaded facts, all of which must be accepted as true at this stage. *Carrigan v. Xerox Corp.*, 2022 WL 1137230, at *3 (D. Conn. Apr. 18, 2022) (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013)).

### A.    Defendants Compete with Each Other for Aerospace Workers.

Aerospace engineering firms, like Pratt and the ODs, compete with each other for Aerospace Workers.  In the aerospace services market, the ODs act as suppliers for Pratt. Consolidated Amended Class Complaint ("Compl."), Dkt. 385 ¶¶ 4, 50 (May 9, 2022).  As *employers*, however, Defendants all operate at the same level, making them horizontal competitors. *Id.* ¶¶ 5, 88, 111-12, 154.  Defendants "draw from, and compete for, the same pool of talent when hiring and staffing their aerospace engineering projects." *Id.* ¶ 5.  Engineering labor is the backbone of the U.S. aerospace industry, but the industry is experiencing a shortage of qualified labor. *Id.* ¶ 47.

In a competitive labor market, a shortage of workers should increase demand for labor and, consequently, compensation. *Id.* ¶ 48.  Defendants would each compete with each other by offering the best possible compensation packages to attract the best talent. *Id.*  Defendants would be forced to offset the possibility of losing talented employees to a competitor by raising compensation for Aerospace Workers. *Id.* ¶¶ 51-59.

### B.    Defendants Conspired to Restrict Hiring and to Suppress Compensation to Aerospace Workers.

Instead of competing with one another for skilled labor, however, Defendants secretly agreed not to recruit or hire each other's Aerospace Workers.  Their goal was to avoid competing

on wages and benefits in order to drive down their labor costs.  *Id.* ¶¶ 61, 64, 66.  At meetings hosted by Pratt, Defendants would discuss their goal of depressing labor costs—*i.e.*, the compensation paid to Aerospace Workers, like Plaintiffs.  *Id.* ¶ 71.  They also made this common goal explicit in written communications, where Defendants sought to "*pre[v]ent poaching and price war*" in order to avoid "*driv[ing] the price structure up*."  *Id.* ¶¶ 72-73 (emphases added).

To carry out the conspiracy, Mahesh Patel, a Manager and Director at Pratt, coordinated with executives from each of the ODs.  *Id.* ¶ 68.  Pratt told the other Defendants via phone, email, and in-person meetings that they should not recruit or hire each other's employees, and each Defendant agreed.  *Id.* ¶¶ 12, 69-73, 78-82, 89-91, 131-32.  Defendants consistently reminded one another of the terms of the conspiracy, and Pratt's Patel threatened to pull business from the ODs if they were caught soliciting and hiring another OD's employees.  *Id.* ¶¶ 77-80, 86-87, 89.

Aerospace Workers who worked for one Defendant rarely succeeded in obtaining jobs with another Defendant and often only subject to highly exceptional circumstances.  *Id.* ¶ 107. For instance, sometimes (albeit rarely) Pratt hired QuEST employees, subject to a "two-year tenure restriction" and "hiring freezes"—mechanisms to further the conspiracy and restrain competition in the market for Aerospace Workers.  *Id.* ¶ 93.  Specifically, Pratt agreed not to hire any QuEST Aerospace Workers until they had worked at QuEST for at least two years.  *Id.* ¶¶ 95-100.  Pratt also agreed to implement "hiring freezes"—periods of time in which Pratt would not hire Aerospace Workers from QuEST.  *Id.* ¶¶ 101-05.  The effect of these arrangements was "to minimize bill rate increases necessary to hire and retain resources needed to provide the desired services" and to "contain labor cost increases."  *Id.* ¶ 105.

Defendants were aware that their conspiracy was illegal.  For example, in January 2016, managers and executives at Defendant Belcan discussed that no-hire agreements with competitors were antitrust violations.  *Id.* ¶ 91.  These concerns were relayed to Pratt's Patel, who stated he "underst[ood] [their] concern" but insisted on maintaining the conspiracy.  *Id.* Another in-person meeting that was scheduled with Patel "included the agenda item: 'Informal poaching agreement between outsource suppliers.  *Recent Apple lawsuit because these agreements are illegal.*'"  *Id.* ¶¶ 16, 91.  Defendants also took concerted action to conceal their conspiracy.  For example, Patel advised Defendants' attendees at a dinner meeting to minimize the written record of their discussion, with one QuEST employee stating:  "Following Ma[h]esh [Patel]'s previous counsel, I am not going into detail in writing on this subject."  *Id.* ¶ 132.

Defendants' conspiracy enabled Defendants to pay their employees less than they would have been paid in a competitive market.  *Id.* ¶ 121.  Plaintiffs are Aerospace Workers who worked for one or more of the Defendants while that Defendant participated in the conspiracy. *Id.* ¶¶ 22-30.  Defendants' conspiracy denied each Plaintiff access to better, higher-paying job opportunities, suppressed their salaries, and restricted their ability to change employment.  *Id.* Plaintiffs and the Class received less compensation than they would have received in a market with free and fair competition.  *Id.* ¶¶ 66-67, 118.

**C.   The DOJ Indicts Defendants' Employees for Their Participation in the Conspiracy.**

In December 2021, a grand jury indicted Patel and five senior executives from the ODs— (1) Robert Harvey, Senior Vice President, then President-Strategic Accounts, then President-Global Business Head at QuEST; (2) Harpreet Wasan, Vice President and Strategic Client Partner at QuEST; (3) Steven Houghtaling, General Manager, Vice President, and Senior Vice President at Belcan; (4) Tom Edwards, President of North America operations at Cyient; and (5)

Gary Prus, Chief Operating Officer/Executive Vice President and part owner at Parametric

Solutions—for entering into an unlawful agreement to restrict competition for employees. *Id.*

¶ 9. *See also United States v. Patel*, No. 3:21-cr-220, Dkt. 20 ¶¶ 10-16 (D. Conn. Dec. 15, 2021)

(the "Indictment"). The DOJ's "investigation revealed a prolonged and widespread scheme to

deprive aerospace workers of the ability to plan their own careers and earn competitive pay."

Compl. ¶ 10 (internal citation omitted). The six individual criminal defendants have been

arraigned and are awaiting trial on their charges.

As the DOJ alleges and as Plaintiffs allege here, Defendants' conspiracy to restrict

competition among horizontal competitors for Aerospace Workers is a *per se* violation of the

federal antitrust laws. *See* Indictment ¶ 19. The DOJ alleges that each defendant "knowingly

entered into and engaged in a combination and conspiracy between and among each other…to

suppress competition by allocating employees in the aerospace industry…specifically by

agreeing to restrict the hiring and recruiting of engineers and other skilled-labor employees

between and among" their respective companies. *Id.*

## ARGUMENT

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "does not

need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule

8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled

to relief." "Specific facts are not necessary; the statement need only 'give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551

U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555). In assessing Plaintiffs' claims, the Court

must "'accept as true the complaint's factual allegations and draw all inferences in the plaintiff's

favor.'" *Carrigan*, 2022 WL 1137230, at *3 (quoting *Cohen*, 711 F.3d at 359). "There is no

heightened pleading standard in antitrust cases, and at the pleading stage, the plaintiffs need only

'raise a reasonable expectation that discovery will reveal evidence of illegality.'" *City of Phila.*

*v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 526 (S.D.N.Y. 2020) (quoting *Wacker v. JP Morgan*

*Chase & Co.*, 678 F. App'x 27, 30 (2d Cir. 2017)).

Facial plausibility exists when a plaintiff "pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 525.

In resolving a motion to dismiss, the Court must "draw all inferences in the Plaintiff's favor."

*Carrigan*, 2022 WL 1137230, at *3. A court should not choose among competing plausible

interpretations of factual allegations. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d

162, 189-90 (2d Cir. 2012).

## I.   DEFENDANTS' CONSPIRACY IS SUBJECT TO *PER SE* CONDEMNATION.

Because of the "anticompetitive potential inherent" in certain types of conduct, the

antitrust laws regard them as categorically forbidden, without any case-specific inquiry into

procompetitive justifications. *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982).

*Per se* illegal restraints, in other words, are "unreasonable and therefore illegal" by their very

nature, "without elaborate inquiry as to the precise harm they have caused or the business excuse

for their use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958); *United States v. Socony-*

*Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("Whatever economic justification particular

price-fixing agreements may be thought to have, the law does not permit an inquiry into their

reasonableness. They are all banned because of their actual or potential threat to the central

nervous system of the economy."). In this way, the "per se approach permits categorical

judgments with respect to certain business practices." *Nw. Wholesale Stationers, Inc. v. Pac.*

*Stationery & Printing Co.*, 472 U.S. 284, 289 (1985).

Market allocations—that is, agreements between competitors to divide up a market—are

one of the traditional *per se* illegal restraints of trade. *United States v. Aiyer*, 33 F.4th 97, 115

(2d Cir. 2022) ("[T]he Supreme Court has held that the practice of allocating markets is subject to the *per se* rule.").  Here, the Complaint squarely pleads that Defendants' secret conspiracy is a classic horizontal agreement to allocate employees in a labor market, and is thus subject to the *per se* rule.  Defendants' arguments to the contrary are foreclosed by binding precedent.

        A.        <u>**Defendants Are Horizontal Competitors in the Relevant Market.**</u>

Defendants try to avoid the application of *per se* rules to their conspiracy by focusing on the *vertical* commercial relationship that Pratt has with the ODs in supplying aerospace products and services.  Pratt argues that *per se* treatment is inappropriate because Pratt and the ODs have a "vertical relationship" in the market for "the manufacture and sale of aircraft engines."  Pratt MTD at 1.  The ODs similarly claim that Plaintiffs' case concerns "restraints among Pratt & Whitney and its vertical outsource partners."  OD MTD at 3.

These arguments miss the point.  The conspiracy at issue does not concern "the manufacture and sale of aircraft engines" to consumers.  Rather, the conspiracy being challenged by Plaintiffs (and the DOJ) restricted competition among employers for the hiring of employees (specifically, Aerospace Workers).  In this case, Defendants are not sellers; they are buyers. Because Defendants compete directly against one another to hire Aerospace Workers, they are horizontal competitors in the labor market at issue.  *See, e.g.*, Compl. ¶ 13 ("Defendants' mutual refusal to recruit or hire each other's employees had the purpose and effect of allocating the market for skilled Aerospace Worker labor."); *id.* ¶ 61 ("Instead of competing vigorously in the labor market for skilled aerospace employees, Defendants entered into an illegal agreement not to compete against each other when it came to recruiting, hiring, and compensating Aerospace Workers"); *id.* ¶ 88 ("Defendants are horizontal competitors, operating at the same level of the market for skilled aerospace labor, and hiring from the same pool of talent").  Defendants simply

ignore that they are horizontal competitors in the market defined by the Complaint—the market that really matters.

The ODs assert that the "essential nature of Defendants' economic relationship is undeniably vertical." OD MTD at 26. But this case does not require a metaphysical inquiry into the "essential nature" of Defendants' relationship. Rather, the question of whether the agreement is vertical or horizontal is contextual: it considers Defendants' relationship in the relevant competitive market. A "horizontal" restraint subject to the *per se* rule is one that concerns resources over which firms actually or potentially compete. *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984). Here, the relevant restraint—the no-poach agreement to allocate employees and suppress wages—is horizontal because it restricts competition among Defendants for the hiring and employment of the common pool of Aerospace Workers. By contrast, "vertical" restraints are those between firms at different levels of distribution concerning goods, services, or other resources for which firms do not compete. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018).

Although Pratt and the ODs may have a "vertical" outsourcing relationship in their provision of aerospace products and services, the Complaint does not challenge any restraint in that market.[4] Rather, the restraint challenged by the Complaint affects the labor market for Aerospace Workers, and Defendants are competitors in that market. The restraint, therefore, is horizontal. *See, e.g.*, *NCAA*, 468 U.S. at 99 (rules regarding football game television broadcast were "horizontal" because among competing schools); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (agreement to allocate marketing territories among grocery store members

---

[4]   Pratt contends that "Plaintiffs explain that P&W operates in a different industry than the Outsourcing Defendants. *Compare [Compl.]* ¶ 31, *with id.* ¶¶ 32-36." (Pratt MTD at 12.) The cited paragraphs say no such thing. Defendants' motions chronically misrepresent Plaintiffs' allegations and should be read with deep skepticism.

of cooperative buying association was horizontal subject to *per se* treatment regardless of arguments that such practices allowed for competition with larger regional and national chains); *Toys "R" Us Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (retailer engaged in horizontal conspiracy when it agreed with competing manufacturers not to sell toys to discount stores).

More basically, Defendants' argument that their "economic relationship is undeniably vertical" (OD MTD at 26) ignores that, even in Defendants' rewriting of reality, the ODs are in no way situated vertically *relative to each other*.[5]  To the contrary, they are horizontal competitors who compete with each other and with Pratt to hire Aerospace Workers.  Their agreement to block competition where they directly compete is a horizontal market-division agreement.  Defendants are wholly separate companies who compete with each other to hire the best possible Aerospace Workers.  Their conspiracy secretly blocked that competition to deprive Aerospace Workers of the benefits of competition, including higher wages.  Defendants try to analogize this to situations where the accused parties were actually part of a single company or were different agencies within a common venture.  This case is simply different—here, the conspiring parties are entirely separate companies who are supposed to be competing.

That Defendants include a common customer (Pratt) who orchestrated the scheme does not take the conspiracy out of the *per se* realm.  The Second Circuit has made clear that the vertical relationship of one defendant to another is immaterial when assessing the "level" at

---

[5]  Pratt makes its misunderstanding clear:  "[t]he alleged hiring restraint . . . promotes rather than inhibits interbrand competition for the output of aircraft engines, the aerospace industry in which P&W competes."  Pratt MTD at 14.  But the relevant market alleged in the Complaint is the market for Aerospace Worker labor, not aircraft engines.  And Pratt may not engage in antitrust violations in a labor market simply because they give it a competitive advantage in another market.  *See Topco Assocs.*, 405 U.S. at 611 ("If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion this too is a decision that must be made by Congress and not by private forces or by the courts.").  *See also* Section I.C, *infra*.  The ODs also fundamentally misunderstand which market is relevant in their discussion of intra- and inter-brand competition.  *See* OD MTD at 26-27.

which the restraint operates. *See Apple, Inc.*, 791 F.3d at 322 (rejecting Apple's argument that it could not be liable for horizontal price fixing due to its vertical relationship with defendant publishers because "[i]t is the type of restraint Apple agreed to impose that determines whether the per se rule or the rule of reason is appropriate."); *see also United States v. Koppers Co., Inc.*, 652 F.2d 290, 296-97 (2d Cir. 1981) (defendants in bid-rigging scheme were properly charged with a horizontal conspiracy despite their partially-vertical buy-sell relationship). Here, regardless of Pratt's business relationship with the ODs, Pratt orchestrated a horizontal agreement with the ODs to block competition in the relevant labor market. Indeed, Pratt contradicts its own argument that it operates in a different market from the ODs when it states that Plaintiffs' allegations "ignore the degree of competition *P&W and the Outsourcing Defendants faced* for Aerospace Workers from other aerospace companies" in the employment of Aerospace Workers. Pratt MTD at 15 (emphasis added). Only if Pratt and the ODs were in the same market for this labor would they each face such competition.

Defendants' claim that "the alleged restrictions are wholly intrabrand" (Pratt MTD at 13) is just another attempt to mis-identify the relevant market. The relevant restrictions apply across employers, *i.e.*, different "brands" to which Aerospace Workers should be free to move. The notion that the alleged restriction has "real potential to stimulate interbrand competition" (Pratt MTD 13) is absurd—the restriction is precisely what destroys inter-brand competition in the market for Aerospace Workers' labor. All Defendants employ these workers. Compl. ¶5. The fact that some Defendants outsource these Aerospace Workers to another Defendant only *confirms* that they are in the same labor pool. *Id.[6]*

---

[6] Likewise, the notion that "hiring coordination among staffing firms and a shared client" is "essentially a vertically-motivated intrabrand restraint" (Brief of *Amicus Curiae* American Staffing Association ("ASA Amicus Br.") Dkt. 498 at 2) entirely misapprehends the crux of Plaintiffs'

Simply put, agreements among buyers in a labor market not to solicit each other's employees are treated no differently than agreements among sellers in a product market not to solicit each other's customers.  Both are horizontal restraints that are *per se* unlawful.  *See, e.g.*, *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) (anticompetitive agreement violated Sherman Act "even though the price-fixing was by purchasers, and the persons specially injured … are sellers, not customers or consumers.").

### B.    **Defendants' No-Poach Agreements Allocated the Relevant Market.**

Defendants try to portray Plaintiffs' Complaint as a departure from established *per se* precedent.  In reality, it is Defendants who are attempting to evade settled authority.  The Complaint explains in detail how and why Defendants' no-poach conspiracy functioned to allocate the market for Aerospace Worker labor.  And Defendants concede that "market allocation among horizontal competitors" is one of the types of conduct that constitutes a *per se* antitrust violation under "long-recognized precedent."  OD MTD at 1.[7]

### 1.    *Courts Recognize No-Poach Agreements as Obviously Anticompetitive.*

Defendants' arguments rely on blatant misstatement of the law.  Pratt argues "there is no legal precedent for treating the type of agreement alleged by Plaintiffs as per se illegal." Pratt MTD at 2. The ODs claim that "no court has ruled []that a no-poach agreement is per se illegal." OD MTD at 21.  In reality, courts have long found no-poach and similar agreements among employers to be unlawful market allocation agreements that are subject to *per se* condemnation.

---

Complaint—a horizontal conspiracy among competitors to restrain competition for labor.  Amicus, like Defendants, cannot rewrite Plaintiffs' Complaint.

[7]    Congress has explicitly recognized courts' longstanding *per se* treatment of such restraints under the Sherman Act, stating that "[c]onspiracies among competitors to fix prices, rig bids, and allocate markets are categorically and irredeemably anticompetitive."  Continuing Appropriations Act, 2021 and Other Extensions Act, Pub. L.  116-159, § 4302(a), 134 Stat 709 (15 U.S.C. § 7a Note).

Nearly 100 years ago, the Supreme Court invalidated an agreement among shipowners to restrict the employment opportunities for seamen. *Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359 (1926). As the Supreme Court observed, "[i]t is not important, [] to inquire whether, as contended by respondents, the object of the combination was merely to regulate the employment of men, and not to restrain commerce." *Id.* at 363. In 1988, the Sixth Circuit held that the *per se* standard applies to an arrangement in which "two competing corporations agreed to refrain from competing for customers who were currently being serviced by the other rival corporation" and "the companies remained free to compete for new customers." *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1368 (6th Cir. 1988). The Court explained that "the so-called 'no-solicitation' agreement" was "undeniably a type of customer allocation scheme which courts have often condemned in the past as a *per se* violation of the Sherman Act." *Id.* at 1373. The Court thus deemed it "unnecessary to engage in the 'incredibly complicated and prolonged economic investigation' under the rule of reason standard." *Id.*

Other Circuit courts long ago arrived at the same conclusion. *See, e.g.*, *Quinonez v. Nat'l Ass'n of Secs. Dealers, Inc.*, 540 F.2d 824, 826, 828-29 (5th Cir. 1976) (*per se* violation where defendants agreed to not hire persons "who had either been rejected or discharged by another member firm"); *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir. 1995) (reversing dismissal in suit alleging that aircraft companies "conspired to restrain trade by agreeing not to hire each other's engineers" and observing that the complaint alleged an "illegal agreement" in which defendants were "horizontally dividing" the labor market).

As these cases illustrate, courts consistently recognize that whether defendants allocate employees' labor rather than customers or geography is irrelevant; both are *per se* unlawful. *See United States v. DaVita Inc.*, 2022 WL 266759, at *3 (D. Colo. Jan. 28, 2022); *In re Ry. Indus.*

*Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 481 (W.D. Pa. 2019).  As the DOJ

observed in the related criminal proceeding, a market "allocation" simply "refers to an agreement

between horizontal competitors to divide between them any aspect of a market, whether by

territory, resources, products, services, customers, or—in this case—labor."  DOJ Opp'n at 7.

    In *Markson v. CRST International, Inc.*, employees of the defendants, which provided

trucking services throughout the country, alleged that the defendants conspired to restrain

competition and suppress plaintiffs' compensation by entering into "a 'no-poaching' conspiracy

whereby they agreed not to hire employees who remain 'under contract' with another trucking

company."  2021 WL 1156863, at *2 (C.D. Cal. Feb. 10, 2021).  The court in *Markson* stated:

> *Courts have concluded that no-poach agreements among competitors are per se
> violations of the Sherman Act.*  Here, Plaintiffs have alleged that Defendants
> agreed among themselves—not, as Defendants argue, with their employees—not
> to poach drivers that are under contract with another competitor.  Accordingly,
> Plaintiffs have adequately alleged a per se violation at the pleadings stage.

*Id.* at *4 (emphasis added, internal citations omitted).

    Likewise, in *In re Railway Industry Employees No-Poach Antitrust Litigation*, the

plaintiffs alleged that railway equipment suppliers and their subsidiaries agreed to not hire or

solicit each other's employees.  In denying the defendants' motion to dismiss, the court held that

horizontal restraints between actual or potential competitors allocating markets or customers are

a "classic" *per se* violation.  395 F. Supp. 3d at 481.  And because antitrust law "does not treat

employment markets differently from other markets," an agreement to not compete for particular

employees "'is, in fact, a service division agreement, analogous to a product division

agreement.'"  *Id.* (quoting AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 2013b (3d ed. 2012)).

    In *In re Animation Workers Antitrust Litigation*, former employees of various studios

contended that the defendants conspired to suppress compensation and restrict mobility.  The

alleged scheme included a prohibition on cold-calling, notifying each other when an employee of the other applied for a position, and refraining from hiring each other's employees without permission.  The court held that plaintiffs had "alleged sufficient facts to support a plausible *per se* claim that Defendants allegedly conspired to suppress the compensation of the putative class." 123 F. Supp. 3d 1175, 1213 (N.D. Cal. 2015); *see also United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013) (holding that no-poach agreement is a "an agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service division agreement, analogous to a product division agreement.") (internal citation omitted).

*Per se* treatment was also deemed proper in the recent *DaVita* prosecution.  There, as here, the defendants allegedly conspired to allocate employees by not soliciting each other's workers.  The court noted that horizontal market allocation agreements are subject to *per se* treatment, and that such agreements can work by dividing geographic territory, customers, or an employment market itself.  *DaVita*, 2022 WL 266759, at *3.[8]  The court rejected defendants' arguments about the novelty of the case, writing that "[e]ven if there were no such history [of cases challenging market allocation in the employment setting], anticompetitive practices in the labor market are equally pernicious—and are treated the same—as anticompetitive practices in markets for goods and services."  *Id.*

Just last month, yet another federal district court denied a motion to dismiss in a case alleging a conspiracy between home health care agencies not to hire each other's workers and fix employee pay.  *United States v. Manahe*, 2022 WL 3161781, at *7, *9 (D. Me. Aug. 8, 2022)

---

[8]  *See also United States v. Consol. Laundries Corp.*, 291 F.2d 563, 574-75 (2d Cir. 1961) ("We fail to see any significant difference between an allocation of customers and an allocation of territory.").

(holding that the allegations identified "a recognized per se illegal form of market allocation among purchasers of labor," and rejecting attempt to argue a procompetitive exemption where the conduct alleged fell into a "category of restraints long condemned as inherently anticompetitive.").

Even *Aya Healthcare Services., Inc. v. AMN Healthcare, Inc.*—a case upon which Defendants heavily rely—contradicts their claim that *per se* treatment would be unprecedented. In *Aya*, both parties provided traveling nurses to understaffed hospitals; plaintiff sued defendant for requiring subcontractor-providers to accept unilateral no-poaching agreements, which forbade defendant's rivals from soliciting the nurses employed by defendant.  2018 WL 3032552, at *2 (S.D. Cal. June 19, 2018).  On defendants' motion to dismiss, the Court viewed the no-poaching agreements as horizontal restraints which eliminated competition between competitors. *Id.* at *12.  *See also Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955, at *6 (N.D. Ill. June 25, 2018) ("A horizontal agreement not to hire competitors' employees is, in essence, a market division. . . . [B]ecause a no-hire agreement is, in essence, an agreement to divide a market, the Court has no trouble concluding that a naked horizontal no-hire agreement would be a per se violation").  That the *Aya* and *Deslandes* plaintiffs' claims later failed *at summary judgment* in light of case-specific evidence developed in discovery does nothing to disturb these legal rulings at the motion to dismiss stage.[9]

---

[9]   Throughout their briefs, Defendants neglect to mention the procedural posture of the rulings they cite when such information undermines their position.  Indeed, like *Aya* and *Deslandes*, many of the decisions Defendants' cite are post-pleading (*e.g., Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001) (summary judgment), *Polk Bros. v. Forest City Enters., Inc.*, 776 F.2d 185 (7th Cir. 1985)  (evidentiary hearing on injunction), *Union Circulation v. FTC*, 241 F.2d 652 (2d Cir. 1957)  (review of FTC trial examiner and FTC decision), *Rothery Storage v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) (summary judgment), *Cesnik v. Chrysler Corp.*, 490 F. Supp. 859 (M.D. Tenn. 1980) (trial), *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136 (D.N.J. 2002) (class certification)).  Moreover, in *Aya*, the Ninth Circuit opinion affirming the *summary judgment* ruling is distinguishable.  There, as ODs concede, the challenged employment restriction "promoted 'competitiveness in the health care staffing industry'" (OD

Finally, to the extent Defendants are arguing that *per se* rules cannot apply to new industries, such as the aerospace industry, that position is obviously wrong as well.  *See Socony-Vacuum*, 310 U.S. at 223 (rejecting attempt to evade *per se* condemnation of price-fixing where defendants stabilized rather than set a firm price because the "machinery employed by a combination" is "immaterial").[10]

        2.    *The DOJ Recognizes No-Poach Agreements as Obviously Anticompetitive.*

Defendants also blatantly misrepresent the DOJ's position on no-poach agreements. According to Defendants, applying *per se* condemnation in this case "squarely conflicts with the DOJ's own pronouncements regarding whether certain employment restrictions should be treated as per se illegal or subject to rule-of-reason balancing."  Pratt MTD at 3.[11]  That argument is baffling, as the DOJ has brought criminal charges under the *per se* rule about this very conspiracy and just last month explained why Defendants' conspiracy merits criminal penalties and *per se* treatment.  *See* DOJ Opp'n at 4-9, 13-25, 39-47.

Elsewhere, the DOJ has explained that a

> no-hire agreement is a type of horizontal market allocation agreement between two or more employers that eliminates or limits competition among them for workers.  These agreements limit the ability of workers to switch employers,

---

MTD at 16), whereas here the challenged restraint stifles competition in Aerospace Worker staffing. Defendants attempt to argue that competitiveness in Pratt's production of engines is promoted by their illegal scheme (OD MTD at 18), but that is no defense to a *per se* violation.

    [10]   Pratt's claim that the two-year hiring freeze between it and QuEST was reasonable given its limited duration (Pratt MTD at 23) ignores that this freeze was part and parcel of Defendants' overarching conspiracy to restrain competition for Aerospace Workers.  As the Supreme Court stated long ago, "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

    [11]   Defendants themselves cannot agree on how to twist the DOJ's position in aid of their motions.  According to Pratt, "the DOJ decided in 2016, in the middle of the alleged Class Period, to attempt to prosecute certain no-poach cases under a per se standard."  (Pratt MTD at 24.)  The ODs make a contradictory contention:  that "[d]uring the time period associated with the alleged conspiracy" (i.e., from 2011 to the present), the DOJ has regarded no-poach agreements as ancillary to legitimate business ventures.  (OD MTD at 21.)  Both positions are false, as detailed herein.

> depriving workers of the benefits of competition for their labor, including better wages, benefits, and other terms of employment.  Limiting labor market competition results in lower wages and worse working conditions because employers are no longer forced to compete against each other for the best workers.

Statement of Interest of the United States, *Markson v. CRST Int'l*, No. 5:17-cv-1261, Dkt. 637 at 6 (C.D. Cal. July 15, 2022) (internal citation omitted).  The DOJ has also explained that "[h]orizontal market allocations—including the no-hire agreements alleged here—are particularly harmful because they eliminate or limit competition among rivals along numerous dimensions, including price and non-price terms." *Id.* at 3.[12]  Whether allocating territory, customers, or workers, such agreements "prevent those unhappy with one company from taking their business to another company, and thus reduce the competitive pressure to lower product prices, raise wages, and improve quality.  The per se rule therefore applies equally in customer-facing and supplier-facing markets, i.e., markets for component parts or labor." *Id.* at 9.  Likewise, the DOJ recently brought criminal antitrust charges under a *per se* theory against a company that provides nurse staffing services for agreeing to not recruit or hire a competitor's nurses, who worked for a shared customer.  *See United States v. Hee*, No. 2:21-cr-98, Dkt. 1 ¶¶ 12-13 (D. Nev. March 30, 2021).  The defendant company pleaded guilty, describing its conduct that satisfied the charged offense as including an agreement to "allocate nurses between the Defendant and the competitor by not recruiting or hiring each other's nurses." *Id.*, Dkt. 96 at 4 (Sept. 1, 2022).

---

[12]  Likewise, in *In re Railway Industry Employees No-Poach Antitrust Litigation*, the DOJ observed in its Statement of Interest that courts have "long held that customer- and market-allocation agreements among competitors are *per se* unlawful," and that "[n]o-poach agreements among competing employers are a type of allocation agreement affecting a labor market." Statement of Interest of the United States, *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, No. 2:18-mc-00798, Dkt. 158 at 1 (W.D. Pa. Feb. 8, 2019).  As noted above, the court agreed.

For all of these reasons, the Court should find at this stage that the Complaint pleads a plausible antitrust violation that is illegal *per se*, and deny the motions on that ground. Nevertheless, as explained in Sections II.A and II.B, *infra*, the Complaint also states a claim under any possible legal standard for evaluating Defendants' conspiracy, including the quick look or the rule of reason.  Moreover, the Court could also choose to deny the motion to dismiss while deferring the resolution of which standard to apply to the alleged conspiracy.  *See Fuentes v. Royal Dutch Shell PLC*, 2019 WL 7584654, at *1 (E.D. Pa. Nov. 25, 2019); *Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214, 222 (S.D. Ohio 2019); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1115 n.9 (N.D. Cal. 2012); *eBay, Inc.*, 968 F. Supp. 2d at 1040 ("the court cannot determine as a matter of law that per se treatment will be inappropriate").

### C.     Defendants' Attempt to Invoke the "Ancillary Restraints" Doctrine Fails.

Defendants' effort to invoke the "ancillary restraints" doctrine to avoid liability fails for multiple reasons.

#### 1.     *Because the Complaint Pleads a Plausible* Per Se *Claim, the Ancillary Restraints Doctrine Is Unavailable to Defendants.*

*First*, because the Complaint pleads a plausible, *per se* unlawful violation, the Court need not—and should not—go further to evaluate Defendants' claims that the agreement had some case-specific benefits.  The foundational premise of the *per se* rule is that it "treat[s] categories of restraints as necessarily illegal" and thereby "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 886 (2007).

Because horizontal no-hire agreements are *per se* illegal, Defendants' argument that the alleged no-hire agreement "might plausibly" have procompetitive benefits or "could be"

procompetitive is foreclosed by precedent.  *See Maricopa Cty. Med. Soc'y*, 457 U.S. at 351

("The anticompetitive potential inherent" in all *per se* agreements "justifies their facial

invalidation even if procompetitive justifications are offered for some."); *Topco Assocs.*, 405

U.S. at 610 ("In applying these rigid [*per se*] rules, the Court has consistently rejected the notion

that naked restraints of trade are to be tolerated because they are well intended or because they

are allegedly developed to increase competition.").

      2.    *The Ancillary Restraints Doctrine Is a Fact-Based Defense that Cannot Lead to Dismissal.*

*Second*, more generally, courts do not entertain efforts by defendants at the pleading

stage to offer procompetitive justifications for allegedly anticompetitive restraints.  As a general

rule in antitrust cases, "any procompetitive justification for such restrictions is not appropriately

weighed on a motion to dismiss."  *In re Keurig Green Mountain Single-Serve Coffee Antitrust

Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019).[13]

Defendants' effort to justify their conspiracy by invoking the ancillary restraints doctrine

is inherently fact intensive and thus inappropriate for resolution at this stage.  A restraint is

ancillary only if it is "reasonably necessary to achieve any of the efficiency-enhancing purposes"

of a qualifying business collaboration.  *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 338 (2d

Cir. 2008) (Sotomayor, J., concurring).  The ancillary restraints doctrine "governs the validity of

restrictions imposed by a legitimate business collaboration, such as a business association or

joint venture, on nonventure activities."  *Aiyer*, 33 F.4th at 115 (internal citation omitted).  The

---

[13]  *See also, e.g.*, *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 828 (S.D.N.Y. 2016) ("Defendant's counter-assertions [concerning the procompetitive benefits of its conduct], while certainly worth a fact-finder's consideration, do not persuade the Court to grant a motion to dismiss."); *Maxon Hyundai Mazda v. Carfax, Inc.*, 2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014) ("[T]o survive a motion to dismiss [plaintiffs] must plead plausible allegations that, if true, would show such an adverse effect; if Plaintiffs then provide evidence of anticompetitive effects, Defendant will later have the opportunity to show the procompetitive effects of the agreements.").

challenged restraint must be "'reasonably necessary' to achieving [the nonventure activity's] pro-competitive purpose." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021) (internal citation omitted).

These are necessarily factual inquiries for which Defendants bear the burden of production; they cannot be resolved on a Rule 12(b)(6) motion. *See Bd. of Regents of Univ. of Okla. v. NCAA*, 707 F.2d 1147, 1154 n.9 (10th Cir. 1983), *aff'd* 468 U.S. 85 (1984); *Manahe*, 2022 WL 3161781, at *6 ("As an affirmative defense, the burden of proof [regarding ancillary restraints] would be on the Defendants . . . ."). *See also* DOJ Opp'n at 27-28 (collecting cases). Indeed, Defendants' repeated reliance on post-pleading decisions demonstrates the inappropriateness of entertaining Defendants' speculative assertions on a Rule 12(b)(6) motion.

3.      *Defendants Fail to Satisfy the Ancillary Restraints Doctrine.*

*Third*, even if the restraint at issue were not "naked" (it is), and even if the ancillary restraints defense were not inherently fact intensive (it is), Defendants would still fail to satisfy the ancillary restraints doctrine on the merits. Contrary to Defendants' misreading of the Complaint, Defendants' conspiracy is not a "legitimate business collaboration" anywhere remotely analogous to the "joint venture-related exception," *Aiyer*, 33 F.4th at 115, 119, recognized under the ancillary restraints doctrine.

Defendants are incorrect that the Complaint on its face contains allegations of "ancillarity." Pratt MTD at 19; OD MTD at 13. Nowhere does the Complaint allege that Defendants' no-poach agreement to restrict labor competition was an essential part of the ODs' business dealings with Pratt, or was necessary for any procompetitive, efficiency-enhancing purpose. Quite the opposite: the Complaint alleges that the restraint was a naked effort to suppress wages that Defendants knew was illegal, was unnecessary, lacked any pro-competitive justifications, was not ancillary, was motivated purely by the anticompetitive goal of suppressing

22

wages by blocking competition, and had many harmful consequences for workers.  *See* Compl.
¶¶ 8, 60, 126, 155, 158.

Pratt argues that the conspiracy's prohibitions on employee mobility were somehow done
"to support P&W engine programs."  Pratt MTD at 2.  But virtually every horizontal conspiracy
"supports" the conspirators' business in some sense.  That is a far cry from demonstrating that
the restraint is reasonably necessary for procompetitive business activities to occur.  Defendants
cannot explain why the alleged no-hire agreements are "necessary" to achieve any
procompetitive end.  *See Salvino*, 542 F.3d at 338.[14]

Vague claims by the American Staffing Association ("ASA") about "preventing
disintermediation," ASA Amicus Br. at 7, likewise do not immunize anticompetitive conduct
from antitrust scrutiny or justify departing from the mandate that well-pleaded allegations are
accepted as true.  The ASA's assertion of "procompetitive virtues" is similarly misguided.
Increasing companies' profits in the market for manufactured goods by eliminating competition
in the market where they hire their employees is hardly a "virtue" in the eyes of the antitrust
laws.  *See Maricopa Cty. Med. Soc'y*, 457 U.S. at 351 ("The anticompetitive potential inherent in
all [*per se* unlawful] agreements justifies their facial invalidation even if procompetitive
justifications are offered for some.").[15]  Businesses cannot conspire to harm their workers even if
it helps them sell their goods for more profit.

---

[14]   To the extent Defendants implicitly advocate (*e.g.*, Pratt MTD at 18) that they need to show a
mere "plausible" relationship between a restraint and an efficiency-enhancing purpose, they misstate the
law of this Circuit.  This "plausible" language is drawn from the Sixth Circuit and is not an accurate
reflection of the ancillary restraints doctrine in this or any other Circuit.

[15]   The ASA analogizes staffing to franchising (ASA Amicus Br. at 12).  But this case does not
involve franchising.  Moreover, courts have shown no tolerance for ASA's procompetitive benefits
arguments when evaluating the sufficiency of allegations challenging franchise agreements' no-poach
provisions.  *See, e.g.*, *Deslandes*, 2018 WL 3105955, at *8 (rejecting defendants' attempt to recast a case
challenging no-poach agreement as promoting competition, and observing that the case "is not about
competition for the sale of hamburgers to consumers.  It is about competition for employees, and, in the

Defendants' attempt to justify the conspiracy by claiming it solved some "free rider problem" also fails.  The ODs claim that the restriction "make[s] economic sense" because without it, "Pratt & Whitney or other Outsourcing Defendants could free-ride on that Outsourcing Defendant's investments in training those employees by hiring them away."  OD MTD at 19.  Pratt parrots this justification:  "Without the alleged restrictions, it would not make economic sense for the Outsourcing Defendants to provide outsourced labor to a common customer like P&W[.]"  Pratt MTD at 21.

Virtually every company could invoke this same flimsy justification for no-poach agreements.  As one court recently observed, "every employer fears losing the employees it has trained.  That fear does not, however, justify, say, law firms agreeing not to hire each other's associates.  Employers have plenty of other means to encourage their employees to stay without resorting to unlawful market division."  *Deslandes*, 2018 WL 3105955, at *8.  As the Supreme Court held long ago, fears of "ruinous competition" are no justification for naked restraints on competition.  *Socony-Vacuum*, 310 U.S. at 221.  *See also Toys "R" Us*, 221 F.3d at 937 ("Taking steps to prevent a price collapse through coordination of action among competitors has been illegal at least since [*Socony-Vacuum*]").

The ODs also claim protection from *per se* liability on the basis that the government authorizes "teaming arrangements" among contractors and subcontractors. OD MTD at 20. This is pure misdirection.  First, while the ODs cite 48 C.F.R. § 9.602 for the proposition that the

---

market for employees, the McDonald's [stores] within a locale are direct, horizontal, competitors…. In the employment market, the various McDonald's stores are competing brands…"); *Yi v. SK Bakeries, LLC*, 2018 WL 8918587, at *4-5 (W.D. Wash. Nov. 13, 2018) (denying motion to dismiss in case challenging provision of franchise agreement prohibiting franchisee from employing, seeking to employ, or recruiting employee from another franchisee and noting that "an arrangement between competing firms to not compete with each other in the market for employees" is an agreement "that someone with a basic understanding of economics would understand would have an anticompetitive effect on the prevailing wage").

government blesses such arrangements, they conveniently ignore 48 C.F.R. § 9.604, which makes clear that "*[n]othing in this subpart authorizes contractor team arrangements in violation of antitrust statutes*." (emphasis added)  Second, the cases the ODs cite only concern alleged restraints on the joint development and sale of products and services; they say nothing about restraints affecting the labor market.  *See Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030 (9th Cir. 1983) (development of F-18 fighter jet variants); *Tower Air, Inc. v. Fed. Exp. Corp.*, 956 F. Supp. 270 (E.D.N.Y. 1996) (supply of airlift services).

None of the cases Defendants cite for the argument that courts apply the rule of reason to no-poach restrictions supports departing from the established *per se* rule here.  As noted, Defendants rely heavily on *Aya*, a *summary judgment* ruling, which held that "the challenged restraint [was] reasonably necessary to the parties' procompetitive collaboration."  *Aya*, 9 F.4th at 1110.  Here, at the *pleading stage*, the Complaint plausibly alleges that Defendants' no-poach conspiracy was not necessary for any procompetitive collaboration.  *See Manahe*, 2022 WL 3161781, at *6  (ancillary restraint defense "is a question of fact that can only be resolved with evidence"); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. at 484 (ancillary restraints defense inappropriate for resolution at pleading stage in no-poach case); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005) (ancillary restraint question "is quintessentially one of fact").

Defendants also incorrectly invoke *Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999). There, the plaintiff challenged as *per se* illegal an insurance company's policy requiring its *own general agents* to promise not to hire away other agents' employees without permission.  The court interpreted the allegations to be "akin to an *intra*firm agreement" and "far from a typical per se illegal restraint."  *Id.* at 515 (emphasis in original).  For all the reasons provided above, the

restraint here is emphatically between several independent entities and thus *inter*firm.  In other words, the Complaint states a claim for the "classic interfirm horizontal restraint of trade" that the *Bogan* court held was absent in that case.  *See id.*[16]

Defendants also cite repeatedly to the summary judgment and class certification rulings in *Deslandes*.  But they conveniently neglect to cite the only relevant ruling in that case at this stage:  the court's order denying defendants' motion to dismiss.  There, the court explicitly *rejected* Defendants' argument that free-rider and investment in training concerns justifies a naked no-hire agreement at the pleading stage.  *See Deslandes*, 2018 WL 3105955, at *8.

In sum, the Court should reject Defendants' attempt to exempt from antitrust scrutiny the alleged conspiracy, and should follow established precedent, which dictates a finding that Plaintiffs have pleaded a plausible antitrust claim under the established *per se* framework.[17]

## II.   PLAINTIFFS HAVE ADEQUATELY PLEADED AN ANTITRUST VIOLATION UNDER THE QUICK LOOK AND RULE OF REASON STANDARDS.

In addition to pleading that the conspiracy is *per se* unlawful, Plaintiffs have also pleaded all necessary facts to support a plausible antitrust claim under either a "quick look" or rule of reason analysis.  Defendants' briefs suggest that the *per se*, quick look, and rule of reason standards are separate types of antitrust violations, which require plaintiffs to plead wholly

---

[16]   The *Bogan* dicta regarding whether *per se* treatment would apply to an interfirm agreement only referred to a no-hire rule pleaded as a group boycott, not market allocation as pleaded here, making that dicta even less informative and less applicable to Plaintiffs' allegations.

[17]   Pratt also argues that even under a *per se* analysis, Plaintiffs must plead a relevant market. Pratt MTD at 28.  That is incorrect.  Under the *per se* rule, no "elaborate inquiry" is required because those types of conduct falling under the *per se* rule "are conclusively presumed to be unreasonable and therefore illegal."  *N. Pac. Ry. Co. v. United States*, 356 U.S. at 5.  *Bogan*'s statement that defining a relevant market is an element of a *per se* claim is incorrect and relies on Second Circuit authority addressing monopolization and attempted monopolization claims, where a relevant market must be defined.  *See Bogan*, 166 F.3d at 515 (citing *Belfiore v. New York Times Co.*, 826 F.2d 177, 180-81 (2d Cir. 1987); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 840 (2d Cir. 1980)).  In any case, Plaintiffs have pleaded a relevant market.  *See* Section II.B.2, *infra*.

separate claims.  They are mistaken.  As the Supreme Court recognized, these standards are analytical tools to evaluate the competitive effect of a particular restraint.  *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779-80 (1999).  Defendants never seriously engage with all the facts pleaded in the Complaint showing that their conduct is plausibly unlawful under *any* standard.

## A.       Plaintiffs Have Pleaded an Antitrust Violation Under the Quick Look Standard.

Even if the Complaint did not state a naked *per se* anticompetitive agreement, Plaintiffs allegations easily satisfy the quick look standard.  Under a quick look analysis, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."  *Id.* at 770.  Here, one needs no specialized understanding of economics to see, based on the Complaint's allegations, that Defendants agreed to restrict employment opportunities and to fix and suppress the compensation they paid to their employees.  This was laid bare by the conspirators themselves in describing their illegal scheme as intended to "pre[v]ent poaching and *price* war" over employee compensation, which would "*drive the price structure up*."  Compl. ¶¶ 72-73 (emphases added); *see also id.* ¶ 72 (Parametric CEO stating that "Mahesh [Patel of Pratt & Whitney] says he does not want the salaries to increase.").  Defendants' attempts to deflect from these damaging admissions fail.

*First*, as noted above, on a Rule 12(b)(6) motion, Plaintiffs are not required to rebut Defendants' purported procompetitive justifications.  Because Defendants bear "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market[,]" judgment as a matter of law on such a defense is inappropriate at the pleading stage.  *NCAA*, 468 U.S. at 113 (citing *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692-96 (1978)).

27

*Second*, Defendants' purported justifications describe efficiencies in the aerospace product and services industry, *not* in the labor market where the Defendants compete for the same talent.  It is well-established that a defendant offering a justification for a challenged restraint must "articulate the specific link between the challenged restraint and the purported justification."  *In the Matter of Polygram Holding, Inc.*, 136 F.T.C. 310, 347 (2003), *review denied*, 416 F.3d 29 (D.C. Cir. 2005).  As a result, a "[p]rocompetitive justification[] . . . must apply to the *same market* in which the restraint is found."  *Law v. NCAA*, 902 F. Supp. 1394, 1406 (D. Kan. 1995), *aff'd*, 134 F.3d 1010 (10th Cir. 1998) (emphasis added).  Accordingly, Defendants cannot "validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market."  *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir. 1994).[18]

The Tenth Circuit's decision in *Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998), is instructive.  There, the NCAA imposed a rule that limited the compensation that colleges could offer assistant coaches.  *Id.* at 1013.  The NCAA attempted to justify the restraint on compensation by claiming that the plan would cut costs for universities.  *Id.* at 1022.  The Court rejected this "cost-cutting" justification because "mere profitability or cost savings have not qualified as a defense under the antitrust laws."  *Id.* at 1022-23 (citing I ABA Section of Antitrust Law, *Antitrust Law Developments*, at 66-67 (4th ed. 1997) (collecting cases)); *see also*

---

[18]  *See also, e.g.*, *Topco Assocs.*, 405 U.S. at 611 ("If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion this too is a decision that must be made by Congress and not by private forces or by the courts."); *Apotex, Inc. v. Cephalon, Inc.*, 2017 WL 10963610, at *2 (E.D. Pa. May 24, 2017) ("increased competition in one market cannot justify anticompetitive conduct in an unrelated market."). *Cf. King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388 (3d Cir. 2015) (a brand manufacturers' grant of a license permitting early entry in one drug market could not offset restraints causing delayed competition and continued higher prices in another drug market); *FTC v. AbbVie Inc.*, 976 F.3d 327, 357 (3d Cir. 2020) (same).

*id.* at 1022 ("Lower prices cannot justify a cartel's control of prices charged by suppliers, because the cartel ultimately robs the suppliers of the normal fruits of their enterprises."). Defendants' "cost efficiency" argument here is nothing more than the NCAA's "cost savings" argument, which the Tenth Circuit rejected on a quick look.

*Third*, as explained in Section I.C.3, *supra*, Defendants have failed to show that there is any legitimate collaboration or that their restraints on employee mobility were a necessary element to that collaboration, or that the same objective could not be achieved by less restrictive means.  Simply put, Defendants can claim no procompetitive justifications accruing to engineers in the aerospace labor market.  And without a legitimate procompetitive justification, there remains only Defendants' naked restraint of competition.[19]

### B.  Plaintiffs Have Pleaded an Antitrust Violation Under the "Rule of Reason."

Plaintiffs have also plausibly pleaded an antitrust violation under the rule of reason. Under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."  *Ohio v. Am. Express Co.*, 138 S. Ct. at 2284.  Although the rule of reason involves a three-step burden shifting analysis, "at the pleading stage, only the first step of this framework is material, as consideration of alleged procompetitive effects of defendants' actions and the ultimate judgment of whether any procompetitive effects 'outweigh' any anticompetitive effects is inappropriate on a motion addressed to the sufficiency of the complaint."  *Davitashvili v. Grubhub Inc.*, 2022 WL 958051, at *6 (S.D.N.Y. Mar. 30, 2022).[20]

---

[19]   None of Defendants' authorities supports the inapplicability of a quick look analysis here. Each is either factually dissimilar insofar as it did not involve price fixing or market allocation among horizontal competitors or was decided on summary judgment or trial, not on the pleadings.

[20]   *See also Meyer*, 174 F. Supp. 3d at 828 ("Defendant's counter-assertions [concerning the many pro-competitive benefits of its conduct], while certainly well worth a fact-finder's consideration, do not persuade the Court to grant a motion to dismiss."); *Maxon Hyundai Mazda*, 2014 WL 4988268 at *9

As demonstrated above, Plaintiffs have sufficiently pleaded anticompetitive harm in the

relevant market by alleging that (1) Defendants' agreement restricted employment opportunities

and suppressed compensation in the market for skilled aerospace workers and (2) there was no

procompetitive justification for these restraints.  *See* Compl. ¶¶ 153-63.  *See also* Section I.A-B,

*supra*.  That ends the inquiry at the pleading stage under the rule of reason.

Nonetheless, Pratt contends that Plaintiffs have failed to satisfy the rule of reason

because:  (1) the Complaint does not separately plead a claim under the rule of reason, and

(2) Plaintiffs fail to plead a properly defined market, Defendants' power in that market, or any

injury to competition in that market.  *See* Pratt MTD at 27-30.  Each of these arguments fails.

> 1.    *Plaintiffs Are Not Required to Plead the Words "Rule of Reason" to State*
>       *a Plausible Antitrust Claim Under That Standard.*

Pratt contends that, because Plaintiffs' Complaint does not use the words "rule of

reason," then Plaintiffs cannot state a claim under that standard.  Pratt is wrong.  The law is clear

that Plaintiffs do not need to use "magic words" to state a plausible claim.  *Calcano v. Swarovski*

*N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) ("[T]he central inquiry is not whether a complaint

pleads the magic words.").  Rather, complaints must plead facts, not labels.  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009); *see also BBAM Aircraft Mgmt., LP v. Babcock & Brown LLC*, 2021

WL 4460258, at *3 (D. Conn. Sept. 29, 2021) ("A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged.") (internal citation omitted).  Plaintiffs have pleaded detailed

---

("[T]o survive a motion to dismiss [plaintiffs] must plead plausible allegations that, if true, would show such an adverse effect; if Plaintiffs then provide evidence of anticompetitive effects, Defendant will later have the opportunity to show the procompetitive effects of the agreements."); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 460 (7th Cir. 2020) ("Thus, balancing anticompetitive effects against hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings . . . .").

facts satisfying each element of a rule of reason analysis, including facts showing that

Defendants' conspiracy harmed competition in a relevant market.

2.   _Plaintiffs Have Sufficiently Pleaded Defendants' Market Power._

Pratt claims that Plaintiffs have failed to plead a relevant market or Defendants' power in

that market.  That is simply incorrect.  The Complaint expressly pleads a relevant antitrust

market as well as Defendants' "substantial" share of that defined market and their ability to harm

competition in that market.  _Todd v. Exxon Corp._, 275 F.3d 191, 206 (2d Cir. 2001) (citing _Tops

Mkts., Inc. v. Quality Mkts., Inc._, 142 F.3d 90, 98 (2d Cir. 1998)); _Toys "R" Us_, 221 F.3d at 937.

Specifically, Plaintiffs allege two alternative market definitions in which Defendants

possess market power:  (1) the market for the labor services of skilled aerospace workers in the

United States, and (2) the market for the labor services of skilled aerospace workers "in and

around the Hartford-East Hartford-Middletown, Connecticut metropolitan area and Palm Beach

County, Florida."  Compl. ¶ 163.  Plaintiffs allege that, in the Connecticut market, Defendants

and their affiliates comprised over 40% of available job postings for aerospace workers in

Connecticut.  _Id._ ¶ 167.  Plaintiffs also allege several structural factors supporting an inference of

market power, including:  (1) that Defendants' aerospace employees are largely unwilling to

relocate (_id._ ¶ 168 (over 70% were unwilling to relocate according to CareerBuilder data));[21]

(2) the existence of substantial search frictions and switching costs in moving to another job (_id._

¶¶ 63, 169); and (3) the specialized training Defendants' employees receive that make them less

suited for employment at an engineering firm outside of Defendants (_id._ ¶¶ 62, 170).

The Complaint also cites voluminous academic and economic literature showing that

employers, such as Defendants, can exercise monopsony power even absent a 50% market share

---

[21]   Lack of employee mobility supports a narrower geographic submarket, which will result in
each Defendant having even greater market power. _See_ AREEDA & HOVENKAMP, _supra_, ¶ 550b.

because of substantial search frictions and switching costs.  *Id.* ¶ 171 (citing A. Goolsbee & C. Syverson, *Monopsony Power in Higher Education: A Tale of Two Tracks* at 15 (Nat'l Bureau of Econ. Research, Working Paper No. 26070, 2019) (finding that academic institutions exert monopsony power regardless of its "local market share"); *id.* ¶ 169 (citing T. Ransom, *Labor Market Frictions and Moving Costs of the Employed and Unemployed*, J. HUMAN RES. (Mar. 2021) (observing that "moving costs are substantial and that labor market are especially burdensome for the employed"); S. Naidu et al., *Antitrust Remedies for Labor Market Power*, 132 HARV. L. REV. 536, 553 (2018) ("Because a worker's existing employer knows that the worker's search cost is high, the employer can reduce compensation . . . or fail to increase compensation despite the worker's contributions")).  Indeed, academic research shows that dominant buyers like Pratt—which, as Plaintiffs allege, is one of a very small number aerospace engineering firms that produce military aircraft and has nearly 50% share in that market (Compl. ¶ 164)—can exert downward pricing pressure on wages paid to their suppliers' employees. *See also* N. Wilmers, *Wage Stagnation and Buyer Power: How Buyer-Supplier Relations Affect U.S. Workers' Wages, 1978 to 2014*, 83 AM. SOC. REV. 213, 216, 221, 223 (2018).[22]

As noted above, Plaintiffs allege structural factors supporting Defendants' ability to control wages, including their employees' unwillingness to relocate, specialized training on Pratt

---

[22]   Case law similarly supports a finding of market power with shares under 50%, particularly where, as here, there is other structural evidence indicating the presence of market power.  *See, e.g.*, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987) (market power can be established with shares of between 17% and 25%) (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984)); *Broadway Delivery Corp. v. United Parcel Serv. of Am. Inc.*, 651 F.2d 122, 128-30 (2d Cir. 1981) (holding that district court erred in instructing the jury that it could not find market power if defendant's market share was less than 50% because "that fact would not automatically preclude a finding of monopoly power by a jury entitled to assess monopoly power on the record as a whole"); *Eiberger v. Sony Corp. of Am.*, 622 F.2d 1068, 1080 (2d Cir. 1980) (upholding Section 1 claim where defendant possessed 12% of market but was the "fastest growing" company with a "strong market position," and was one of four other competitors that combined controlled 96% of the market).

projects, and the substantial search frictions and costs associated with switching jobs.  *See Todd*, 275 F.3d at 203-04 (employee specialization is a relevant factor to consider in determining reasonable employment alternatives).  *Cf. Reed v. Advocate Health Care*, 268 F.R.D. 573, 590 (N.D. Ill. 2009) (recognizing, at the class certification stage, that commuting distance is factor when considering reasonable employment alternatives).  These allegations establish Defendants' market power, separate and apart from the direct evidence of anticompetitive harm.[23]

Pratt argues that, because there are other aerospace engineering firms that compete with Defendants for aerospace labor (*e.g.*, GE Aviation, Rolls Royce, etc.), Defendants are incapable of creating adverse effects in the aerospace labor market.  *See* Pratt MTD at 30.  But as the Complaint explains, "[e]ven though outside options may exist in theory, numerous search frictions limit the geographic scope of the labor market, allowing buyers such as Defendants to place downward pressure on wages in specific locations."  Compl. ¶ 169.  *See also Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 969-72 (10th Cir. 1990) (holding that the existence of multiple other competing insurers did not preclude a finding that defendant possessed market power given other structural evidence indicating market power).  Thus, contrary to Pratt's contentions (Pratt MTD at 28), the Complaint's allegations properly consider all "reasonably interchangeable" employment options faced by Aerospace Workers.[24]

Pratt's disagreement with Plaintiffs' relevant market allegations does not provide a basis for dismissal.  The Second Circuit has observed that, given the "deeply fact-intensive" nature of

---

[23]  Plaintiffs' allegations here of both direct and indirect evidence of market effects stand in contrast to the "single, general allegation" that sank the plaintiff's claim in *Electronics Communications Corp. v. Toshiba America Consumer Products Corp.*, 129 F.3d 240, 245 (2d Cir. 1997), as a dealer termination case involving the dual distribution of a single brand product.

[24]  The market allegations in *Madison 92nd Street Associates, LLC v. Courtyard Management. Corp.*, 624 F. App'x 23 (2d Cir. 2015), which Pratt cites, are completely inapposite because they involved low-skilled labor at a single hotel chain in New York City.

such inquiries, "courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd*, 275 F.3d at 199-200; *Wacker*, 678 F. App'x at 31 (holding district court properly found that plaintiffs sufficiently pleaded defendants' power in the relevant market while vacating on other grounds).

Moreover, the Complaint pleads that Defendants' conspiracy has already produced actual detrimental effects. *See* Compl. ¶¶ 3, 14, 22-30, 61, 68, 104, 119, 121, 173. These allegations on their own are sufficient to plead a rule of reason claim. "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, *proof of actual detrimental effects* . . . can obviate" the need for those inquiries. *FTC v. Ind. Fed. Dentists*, 476 U.S. 447, 460-61 (1986) (emphasis added and internal quotation omitted); *Todd* , 275 F.3d at 206-07 ("If a plaintiff can show an actual adverse effect on competition, such as reduced output . . . we do not require a further showing of market power") (cleaned up).

Defendants' ability to produce anticompetitive harm is also demonstrated by the existence and durability of their conspiracy, which produced its intended anticompetitive effects: suppressed compensation for Defendants' employed skilled aerospace workers and reduced employment opportunities for them (*i.e.*, output). Compl. ¶ 166. *See also Ind. Fed. Dentists*, 476 U.S. at 460-61; *Todd,* 275 F.3d at 207 (holding that if plaintiffs could prove that defendants' arrangement "did in fact have an anticompetitive effect on the market for MPT labor . . . we would not deny relief on the basis of market share figures"); *Toys "R" Us, Inc.*, 221 F.3d at 937 (finding that defendant's market power was evident based on the group boycott's "effect in the market"). Had employers been meaningfully competing in these markets, the conspiracy would have collapsed as workers would have moved to employers that offered greater compensation.

That did not happen.  Defendants' conspiracy collapsed only when the DOJ discovered it and brought criminal charges.  Compl. ¶ 166.  Plaintiffs have thus sufficiently pleaded an antitrust violation under the rule of reason.

### III. PLAINTIFFS HAVE PLEADED BOTH DIRECT AND CIRCUMSTANTIAL EVIDENCE DEMONSTRATING DEFENDANTS' CONSPIRACY.

Finally, Defendants' various arguments that the Complaint does not sufficiently allege that each Defendant participated in the conspiracy fail as well.

### A. The Complaint Alleges Direct Evidence of Defendants' Conspiracy.

The Complaint pleads concrete evidence of an agreement, in the form of dozens of direct communications among the Defendants documenting their conspiracy.  These detailed allegations are direct evidence of an illegal agreement.  As such, they require no inference and are "independently adequate" to state a Section 1 claim.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010) (noting that "[a]llegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" to state a Section 1 claim).

Defendants seek to discount the Complaint by claiming it alleges only that "a few Defendants exchanged emails" and attended "a handful of meetings."  OD MTD at 31.  But this is a gross mischaracterization.  The Complaint quotes repeatedly from emails that show Defendants actually *discussing* the conspiracy (*see, e.g.*, Compl. ¶¶ 17, 70, 72, 73, 79, 80, 86, 90, 91, 98); *participating in* the conspiracy (*e.g.*, *id.*); *enforcing* the conspiracy (*e.g.*, *id.* ¶¶ 70, 86, 87); and discussing the *purpose* of the conspiracy, *i.e.*, to suppress the salaries paid to Defendants' aerospace engineers and other skilled workers (*see id.* ¶ 89).

Defendants also argue these communications do not qualify as "direct evidence" because Plaintiffs do not identify the exact moment the conspiracy was formed.  OD MTD at 31.  But

there is no support for such an assertion.[25]   Courts routinely find that electronic communications

showing co-conspirators discussing and carrying out their conspiracy qualify as direct evidence

for purposes of a Section 1 claim.  *See, e.g.*, *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332

F. Supp. 3d 885, 901 (S.D.N.Y. 2018) ("The chat messages included in the [complaint] are direct

evidence of an anticompetitive agreement"); *In re Foreign Exch. Benchmark Rates Antitrust*

*Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) (finding that electronic chats and instant

messages in which defendants discussed and enacted conspiracy were "direct evidence akin to

the 'recorded phone call in which two competitors agreed to fix prices at a certain level'—the

Second Circuit's paradigmatic example of direct proof of a Section 1 violation") (internal

quotation omitted).

### B.        The Complaint Alleges Circumstantial Evidence of Defendants' Conspiracy.

The Complaint also pleads corroborating circumstantial evidence.  *See Anderson News*,

680 F.3d at 183-84 (noting that "conspiracies are rarely evidenced by explicit agreements, but

nearly always must be proven through inferences that may fairly be drawn from the behavior of

the alleged conspirators") (internal quotation omitted).  As noted above, the Complaint alleges in

detail, using Defendants' own words, how they agreed to act in concert to prevent the hiring and

recruitment of engineers and other skilled workers from each other.  Compl. ¶¶ 17, 70, 72, 73,

---

[25]   Neither of the two cases cited by Defendants stand for the proposition that "direct evidence" of a Section 1 conspiracy must identify the precise moment the conspiracy began. *In re Elevator Antitrust Litigation* did not involve the question of what constitutes "direct evidence." 502 F.3d 47, 50-51 (2d Cir. 2007). Rather, that decision merely found that a complaint's allegations were "conclusory" because they "enumerate[d] basically every type of conspiratorial activity that one could imagine . . . . in entirely general terms without any specification of any particular activities by any particular defendant," amounting to "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatsoever." *Id*.  In *Hinds County v. Wachovia Bank N.A.*, the court found that a complaint "failed to plead facts plausibly suggesting a 'meeting of the minds'" among certain defendants because it made "no specific factual allegations" about those defendants. 620 F. Supp. 2d 499, 512 (S.D.N.Y. 2009) (internal citation omitted). Here, unlike in *Elevator* or *Hinds County*, the Complaint is replete with specific factual allegations regarding every Defendant.

79, 80, 86, 90, 91, 98.  In addition to constituting direct evidence of a conspiracy, these allegations are themselves examples of Defendants' parallel conduct.  *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) ("Parallel conduct can be probative evidence bearing on the issue of whether there is an antitrust conspiracy.").

Defendants argue that Plaintiffs' allegations are insufficient because they are not "consistent in time," citing *Litovich v. Bank of America Corp.*, 568 F. Supp. 3d 398, 417 (S.D.N.Y. 2021), a case alleging a conspiracy among banks to boycott electronic trading platforms for "odd lots" of corporate bonds.  The court there declined to infer a conspiracy where "[a]t various times during the lengthy period of the alleged conspiracy, some of the Defendants invested in particular platforms, while others chose not to invest or to participate."  *Id.*  The complaint in *Litovich* failed not because of mere inconsistencies in the timing of Defendants' parallel actions; it failed because (among other reasons) the complaint acknowledged that not all defendants engaged in parallel conduct.  *Id.* at 434.  Here, however, Defendants' conspiracy can be seen in Defendants' *own words*.  And here, the Complaint alleges that all Defendants consistently agreed not to hire or recruit each other's Aerospace Workers.[26]

The Complaint also alleges numerous "plus factors" that further support the plausibility of the conspiracy.  They include:  (1) a common motive to conspire; (2) a high level of interfirm communications and opportunities to collude; (3) acts against economic self-interest; (4) the

---

[26]   *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 579 (S.D.N.Y. 2017), cited by the ODs (OD MTD at 32), is also distinguishable.  In *LLM Bar Exam*, the plaintiff alleged that the defendant law schools conspired to prevent it from offering its bar review course.  *Id.* at 558.  The court found that decisions by several schools to ban the plaintiff from marketing its materials on campus was not parallel conduct supporting a plausible inference of conspiracy given that the decisions were made "at different times over the span of several years," *id.* at 580, and followed complaints about the quality of the plaintiff's courses, the plaintiff's refusal to give refunds, and misrepresentations to students by the plaintiff's marketing representatives, *id.*  Here, the Complaint alleges all Defendants' continuous participation in the conspiracy throughout the Class Period.

existence of criminal indictments of Defendants' employees; and (5) the existence of high barriers to entry in the labor market for skilled aerospace engineers.  Defendants do not challenge the existence of these plus factors in their briefs.

 **(1)** ***Common motive to conspire***.  The Complaint alleges that each Defendant wanted to keep wages artificially low in order to avoid having to compete for skilled labor in a free market. *See, e.g.*, Compl. ¶¶ 72, 73.  *See Apex*, 822 F.2d at 254 (common motive is a plus factor).

 **(2)** ***Opportunities to collude***.  The Complaint alleges that Defendants had many opportunities to conspire through their numerous interfirm communications and meetings, *see, e.g.*, Compl. ¶¶ 70, 71, 81, 131, a recognized "plus factor."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781-82 (2d Cir. 2016) ("[A]ppellants' complaints contain numerous allegations that clear the bar of plausibility [including] . . . a high number of interfirm communications.").

 **(3)** ***Acts against economic self-interest***.  The Complaint alleges that Defendants acted against their economic self-interest in carrying out the conspiracy.  The Complaint alleges there is a shortage of skilled labor in the aerospace industry, due in part to high educational and skill requirements.  *See* Compl. ¶¶ 46-47.  In such a market, employers would be incentivized to compete vigorously for the best and brightest, including hiring talented aerospace engineers away from their competitors.  But here, because of their agreement, the Defendants refrained from doing so.  Such conduct was plainly against Defendants' economic self-interests, and makes sense only in the context of the conspiracy.  *See Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 327 (2d Cir. 2010) (reversing dismissal of complaint where "plaintiffs have alleged behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals") (internal quotation omitted).

**(4)** *Government investigations*.   Courts regularly hold that a parallel government investigation bolsters the plausibility of civil antitrust conspiracy cases.  *See, e.g.*, *Starr*, 592 F.3d at 324-25 (conspiracy plausibly alleged where the DOJ "launched two new investigations" into the very conduct plaintiffs were suing over).  Here, the DOJ's investigation has gone well beyond the investigatory stage:  high-ranking personnel from each Defendant have been indicted, and the DOJ is moving forward with criminal prosecutions.  *See* Compl. ¶¶ 9-10, 38-43, 166.

Defendants do not challenge the existence of any of these plus factors.

### C.   Plaintiffs Have Adequately Pleaded Cyient's and PSI's Involvement in the Conspiracy.

Defendants Cyient and PSI argue that Plaintiffs have not adequately pleaded their participation in the conspiracy.  These arguments rest on nothing more than self-serving interpretations of damning evidence.  Defendants' requests for the Court to draw inferences in *their* favor at this stage are plainly improper.  *See Anderson News,* 680 F.3d at 189 ("The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible.").

The Complaint alleges ample facts to support the inference that both Cyient and PSI joined and took steps in furtherance of the unlawful agreement not to compete.  *See Apex*, 822 F.2d at 257 ("[O]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it") (internal quotation omitted).[27]  For example, the Complaint quotes correspondence showing that a conspirator employed by QuEST emailed Pratt & Whitney to

---

[27]   *See also In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689-90 (S.D.N.Y. 2012) ("[A] conspirator may join a conspiracy at any time that it is ongoing; there is no requirement that a conspirator join a conspiracy from its inception. . . .  [T]he fact that [a defendant was] involved in only a portion of it[] does not undermine the existence of the conspiracy itself or [the defendant's] role as a participant.").

complain that Cyient had hired a QuEST employee.  Compl. ¶ 73.  The email complained that "[t]his is against *our agreements* with our employees and against our known expectations of Pratt *for the cooperation of the outsource companies*." *Id.* (emphasis added).  The QuEST employee specifically warned that, if the poaching did not stop, it would "drive the price structure up." *Id.*  The communications also show that Cyient executives attended a "private discussion" the following day at Pratt's offices to discuss Cyient's violation of the no-poach agreement.  *Id*.

The Complaint also quotes from correspondence showing Cyient policing and participating in the conspiracy.  For example, in a September 2019 email, a Cyient executive told Agilis in no uncertain terms to stop "actively recruiting" Cyient's employees, and stated that "I flat out ask our teams not to hire people from the other Pratt & Whitney suppliers." *Id.* ¶ 89.

The Complaint also alleges sufficient facts to connect PSI to the conspiracy.  The Complaint quotes emails showing that PSI agreed not to hire employees from other Outsourcing Defendants.  *See id.* ¶ 70 (quoting email in which Pratt & Whitney executive tells PSI executive that the "you assured me that you will not hire any [Pratt & Whitney] partners['] employee[s]").  The Complaint also quotes emails in which PSI reached out to Pratt & Whitney to ask it to enforce the enforce the no-poach agreement—which Pratt then did.  *See id.* ¶ 79 (quoting PSI executive complaining that Belcan was "actively [r]ecruiting [PSI] employees," after which Pratt & Whitney told Belcan "not to interview or hire active employees working on Pratt & Whitney work").  Again, these communications are not circumstantial evidence that require inferences about whether it is plausible PSI was connected to the conspiracy.  These are PSI's *own words*, and they leave no doubt as to its participation.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' motions in their entirety.

DATED:   New Haven, Connecticut
             September 6, 2022

**QUINN EMANUEL URQUHART &**
**  SULLIVAN, LLP**

 */s/ Daniel L. Brockett*
Daniel L. Brockett (phv20450)
Manisha M. Sheth (phv01061)
Steig D. Olson (phv06391)
Thomas Lepri (phv20453)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
danbrockett@quinnemanuel.com
manishasheth@quinnemanuel.com
steigolson@quinnemanuel.com
thomaslepri@quinnemanuel.com

Justin Reinheimer (phv20572)
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:  (415) 875-6600
justinreinheimer@quinnemanuel.com

**DICELLO LEVITT LLC**

 */s/ Gregory S. Asciolla*
Gregory S. Asciolla (phv02599)
Robin A. van der Meulen (phv09139)
Matthew J. Perez (phv06870)
Veronica Bosco (phv20356)
485 Lexington Ave., 10th Floor
New York, New York 10017
Telephone:  (646) 933-1000
gasciolla@dicellolevitt.com
rvandermeulen@dicellolevitt.com
mperez@dicellolevitt.com
vbosco@dicellolevitt.com

*Interim Co-Lead Class Counsel*

**GARRISON, LEVIN-EPSTEIN,**
**  FITZGERALD & PIRROTTI, P.C.**

Joseph D. Garrison (ct04132)
Stephen J. Fitzgerald (ct22939)
Joshua R. Goodbaum (ct28834)
Amanda M. DeMatteis (ct29413)
405 Orange Street
New Haven, Connecticut 06511
Telephone:  (203) 777-4425
jgarrison@garrisonlaw.com
sfitzgerald@garrisonlaw.com
jgoodbaum@garrisonlaw.com
adematteis@garrisonlaw.com

**HURWITZ SAGARIN SLOSSBERG &**
**  KNUFF, LLC**

David A. Slossberg (ct13116)
Erica Oates Nolan (ct31097)
147 North Broad Street
Milford, Connecticut 06460
Telephone:  (203) 877-8000
DSlossberg@hssklaw.com
ENolan@hssklaw.com

*Local Connecticut Counsel*