## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TARAH KYE BOROZNY, ANTHONY DeGENNARO, RYAN GLOGOWSKI, ELLEN McISAAC, SCOTT PRENTISS, ALEX SCALES, AUSTIN WAID-JONES, NICHOLAS WILSON, and STEVEN ZAPPULLA, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) | 3:21-cv-1657-SVN |
| *Plaintiffs*, | ) ) | January 20, 2023 |
| v. | ) ) | |
| RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION; AGILIS ENGINEERING, INC.; BELCAN ENGINEERING GROUP, LLC; CYIENT, INC.; PARAMETRIC SOLUTIONS, INC.; and QUEST GLOBAL SERVICES-NA, INC., | ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) | |

## RULING AND ORDER ON DEFENDANTS' MOTION TO DISMISS

Sarala V. Nagala, United States District Judge.

In this antitrust putative class action, eight named Plaintiffs have alleged, on behalf of themselves and others similarly situated, that six corporate Defendants[1] engaged in a conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by secretly agreeing to restrict their competition in the recruitment and hiring of aerospace engineers and other skilled workers in the jet propulsion systems industry.

The Outsourcing Defendants and Pratt & Whitney have separately moved to dismiss the operative complaint. Both motions to dismiss argue that Plaintiffs have failed to adequately allege

---

[1] The Court will refer to Defendants Agilis Engineering, Inc. ("Agilis"); Belcan Engineering Group, LLC ("Belcan"); Cyient, Inc. ("Cyient"); Parametric Solutions, Inc. ("Parametric Solutions"); and QuEST Global Services-NA, Inc. ("QuEST") as the "Outsourcing Defendants." The remaining Defendant is Raytheon Technologies Corporation, Pratt & Whitney Division ("Pratt & Whitney").

conduct that is appropriately deemed a *per se* antitrust violation; having failed to plead an alternative "rule of reason" claim, Defendants argue, the complaint must be dismissed. The Outsourcing Defendants' motion to dismiss also contends that the complaint fails to adequately allege a conspiracy under the Sherman Act, and that it fails to include allegations sufficient to implicate Cyient and Parametric Solutions in any such conspiracy. Plaintiffs contend that the conduct alleged in the complaint appropriately states both a *per se* violation of the antitrust laws and a violation of those laws under the rule of reason.

For the reasons described below, the Court agrees with Plaintiffs and DENIES both motions to dismiss.

## I.    PROCEDURAL HISTORY

This action has already had a somewhat lengthy procedural history. The initial complaint, filed on December 14, 2021, was the first of what would ultimately become thirty-one separate lawsuits filed against substantially the same Defendants. These actions followed the unsealing of criminal antitrust charges against several executives who worked for various Defendants during the relevant time period. *See United States v. Patel et al.*, D. Conn. Case No. 3:21-cr-220 (VAB). Each of the civil suits was consolidated into the present action. ECF Nos. 44, 52, 62, 192, 232. Following consolidation, the Court appointed interim class counsel to lead the putative class and gave counsel the opportunity to file a consolidated amended complaint (the "CAC"). The CAC was filed on May 5, 2022.[2] The present motions to dismiss were filed in response to the CAC.

## II.    FACTUAL BACKGROUND

The facts discussed below are taken from the CAC and presumed to be true for the purposes of the present motions to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[2] In July 2022, Plaintiffs voluntarily dismissed various individual defendants from the case, leaving only the six corporate defendants.

A. <u>The Aerospace Industry</u>

The United States' aerospace industry is the largest in the world, reporting nearly $700 billion in revenue in 2020.  CAC, ECF No. 385, ¶ 44.  That same year, there were approximately 60,000 aerospace engineers in the United States earning a mean wage of more than $120,000 per year.  *Id.* ¶ 45.  A large part of this market is made up of projects related to national security or defense.  *Id.* ¶ 46.  Such projects often require engineers to obtain national security clearances; candidates who are unable to obtain and maintain secret-level security clearance may not be qualified.  *Id.*  In addition to aerospace engineers, companies such as Pratt & Whitney require specific aerospace skilled workers, such as assemblers, machinists, and tool and die makers.  *Id.* ¶ 47.  Collectively, all of these employees are referred to as Aerospace Workers.  Barriers to entry keep the supply of qualified candidates for positions in the aerospace industry low, despite increasing demand.  *Id.*  This problem is only expected to worsen in the coming years.  *Id.*  This scarcity, combined with the increasing demand for employees in the aerospace industry, would ordinarily result in an increase in compensation to employees because, in a competitive labor market, numerous employers would be forced to compete for a limited number of candidates, likely resulting in an increase in the compensation paid to hire and retain such employees.  *Id.* ¶ 48.

In the aerospace industry, Pratt & Whitney is a "major player" with "significant sway over the market."  *Id.* ¶ 49.  In 2019, Pratt & Whitney employed more than 42,000 people and generated almost $21 billion in net sales, with a profit of $1.8 billion.  *Id.*  In addition to hiring its own Aerospace Workers, Pratt & Whitney used outsourcing to supplement its labor force.  *Id.* ¶ 50.  In an outsourcing relationship, Pratt & Whitney would issue a "Statement of Work" detailing the requirements of a particular project, and other outsourcing firms would bid on the project.  *Id.*

Pratt & Whitney would then accept one of the bids and that outsourcing firm would enter an agreement with Pratt & Whitney to allocate some of the outsourcing firm's own employees to work on the project, often alongside Pratt & Whitney's direct employees. *Id.* Each of the Outsourcing Defendants were among the firms that would bid on such jobs. *Id.*

In a truly competitive market, each of the Defendants would have been competing against each other to hire qualified Aerospace Workers. *Id.* ¶ 51. Such competition would have required Defendants to offer Aerospace Workers better compensation, wages, and benefits. *Id.* This competition also would have resulted in lateral hiring, which occurs when an Aerospace Worker looks to switch employers, often for the opportunity to obtain better compensation or other benefits. *Id.* ¶¶ 51–52. When an employer learns that its employee is being lured to competitors based on the possibility of increased benefits or compensation, the current employer is incentivized to improve the employee's current compensation and benefits to avoid the possibility of losing the employee to a competitor. *Id.* ¶ 52.

While such an example may appear to affect only one specific Aerospace Worker, increasing that person's compensation and benefits is likely to have broader effects. *Id.* ¶ 53. News of such an increase will likely spread throughout a given company, resulting in other Aerospace Workers who perform similar functions requesting a commensurate raise. *Id.* Then, a phenomenon of "internal equity" will result in employers striving to keep wages among similarly situated employees consistent, because employees value the idea that similarly situated individuals

4

are compensated similarly. *Id.* ¶¶ 54–55. Defendants' pay structures were governed by the idea of internal equity. *Id.* ¶ 57.[3]

Thus, in a free market, Defendants would have been incentivized to minimize lateral departures by increasing compensation. *Id.* ¶ 59. The resulting wage increases would benefit not only employees looking for a new position with a competitor, but all similarly situated employees. *Id.* In order to prevent such a situation, according to Plaintiffs, Defendants entered into an agreement not to hire Aerospace Workers from other Defendants.

B. <u>Defendants' Alleged Conspiracy</u>

According to Plaintiffs, Defendants' alleged conspiracy not to hire or recruit each other's employees began at least as early as 2011, but was kept secret from Defendants' employees due to its illegality and negative impact on Defendants' employees' compensation and career options. *Id.* ¶¶ 64–65. The goal of this conspiracy was for Defendants to enrich themselves by colluding to suppress the compensation of their Aerospace Workers. *Id.* ¶ 66. This goal was accomplished by severely limiting, if not entirely eliminating, competition for employees between Defendants. *Id.* Essentially, once any Defendant hired any Aerospace Worker, no other Defendant could recruit or hire that same employee. *Id.* ¶¶ 66, 69. This agreement allowed Defendants to artificially suppress the market rate for Aerospace Workers, as there was little risk that such employees would be able to find employment elsewhere. *Id.* ¶ 66.

In order to implement the conspiracy, Pratt & Whitney informed the Outsourcing Defendants that they should not hire or recruit each other's employees. *Id.* ¶ 69. The Outsourcing

---

[3] Plaintiffs claim that the increase in wages resulting from the practice of internal equity at a specific company would then ripple through the market. For instance, one Defendant's employee handbook expressly noted that its wage structure was "based on the market value of each position compared to similar organizations in the industry and the local business community. Wage ranges will be reviewed, periodically, to ensure the appropriateness of the structure." CAC ¶ 58.

Defendants agreed to this instruction. *Id.* Throughout the conspiracy, Defendants were in frequent contact and continually assured each other of their commitment to continuing the conspiracy. *Id.* ¶ 71. For instance, Pratt & Whitney would hold meetings for all its outside suppliers of labor. *Id.* These frequent meetings were led by Mahesh Patel, the manager and director of the Pratt & Whitney unit charged with managing Pratt & Whitney's relationships with the Outsourcing Defendants. *Id.* At these meetings, Patel would often raise the idea of depressing labor costs. *Id.*

Such communications were not limited to these in person meetings, however. By and large, the task of making sure all Defendants continued the conspiracy fell largely on Patel. *Id.* ¶ 68. If any Defendant attempted to hire an employee of another Defendant, Patel would be informed. *Id.* Patel would then attempt to stop whichever Defendant was failing to obey the rules of the conspiracy. *Id.* For example, in one instance in 2017, Patel wrote an email to Parametric Solutions stating, "please do not hire any partners['] employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war." *Id.* ¶ 72. As another example, in April 2017, an employee at QuEST emailed Patel complaining about Cyient's hiring of a QuEST employee, stating that "[t]his is against our agreements with our employees and against our known expectations of Pratt & Whitney for the cooperation of the outsource companies," and concluding with the statement that such actions would "drive the price structure up." *Id.* ¶ 73. Patel responded to this email by inviting executives of both QuEST and Cyient to a private discussion in his office the next day. *Id.* These examples are not meant to be exhaustive, but merely illustrative of the peacekeeping and leadership role Plaintiffs claim Patel assumed in the conspiracy.

What the conspiracy did not do, however, was restrict all hiring of an employee who had ever worked for a co-conspirator. Rather, it pertained only to Aerospace Workers currently employed by a co-conspirator. *Id.* ¶ 75. The co-conspirators needed no agreement with respect to

former employees because when an Aerospace Worker was unemployed, there was no need to offer that person higher wages to lure them away from an existing job. *Id.* In order to determine whether an employee was presently or formerly employed by a co-conspirator, Defendants would communicate about applications they received. *Id.* ¶ 75. For example, when Agilis received an application in October 2019 that listed Belcan as a prior employer, that candidate's application was allowed to proceed only after Agilis employees confirmed that he was no longer employed by Belcan. *Id.* ¶ 76.

Finally, as Pratt & Whitney was the company ultimately determining whether to engage any of the Outsourcing Defendants, Pratt & Whitney could, and did, refuse to outsource work to any Defendant not abiding by the agreement. *Id.* ¶ 84. Patel and another Pratt & Whitney employee exercised complete control over the process of deciding who was given a certain contract and requested lists of employees an Outsourcing Defendant was planning to staff on a particular Pratt & Whitney project; when an Outsourcing Defendant was failing to comply with the conspiracy, Patel could simply withhold approval for any jobs for which that Defendant applied. *Id.* Plaintiffs allege concrete instances of this happening. For example, emails from June 2018 show that QuEST complained to Pratt & Whitney after Belcan made an employment offer to a QuEST engineer. *Id.* ¶ 86. After receiving this complaint, Pratt & Whitney threatened to pull all project orders from Belcan if it hired the employee. *Id.* The day after this threat from Pratt & Whitney, Belcan emailed to confirm that it rescinded the offer letter to the engineer. *Id.*

Despite Patel often acting as an intermediary for disputes among the co-conspirators, sometimes the Outsourcing Defendants would communicate directly amongst themselves regarding disagreements. *Id.* ¶ 89. For instance, in September 2019, Cyient requested that Agilis stop "actively recruiting" Cyient employees. *Id.* Agilis responded that the aim was not to recruit

other Defendants' employees because that would lead to salaries rising, the workforce becoming unstable, and all Defendants' margins being hurt.  *Id.*  Cyient thanked Agilis and reminded it that Cyient "flat out ask[s] our teams not to hire people from the other Pratt & Whitney suppliers."  *Id.*

It was not only the Outsourcing Defendants that were concerned about who could and could not be hired, however.  Pratt & Whitney would also run its hiring decisions by the Outsourcing Defendants where necessary.  *Id.* ¶ 90.  Specifically, in March 2016, Pratt & Whitney asked Agilis whether it would be acceptable for Pratt & Whitney to hire a particular Aerospace Worker from Agilis.  *Id.*  Pratt & Whitney was told such a hire would "undermine the trust" between the two companies, and ultimately did not hire the candidate.  *Id.*

In sum, by having the ability to refuse to outsource work to the Outsourcing Defendants if they broke the rules of the conspiracy, Pratt & Whitney was able to wield a certain degree of leverage over the Outsourcing Defendants in effectuating this conspiracy.  Plaintiffs allege that Pratt & Whitney also, however, was an equal competitor for aerospace labor vis-à-vis the Outsourcing Defendants.  For that reason, Plaintiffs contend that the conspiracy was an anticompetitive agreement among horizontal competitors.  *See id.* ¶¶ 72, 74, 88, 118, 154.

C.  Effects of the Conspiracy

Plaintiffs generally allege that this conspiracy impacted the market for Aerospace Workers by suppressing labor competition and, in turn, compensation.  During the time the above actions were taking place, Defendants were competing for a limited number of qualified Aerospace Workers.  *Id.* ¶ 111.  Were it not for the alleged conspiracy, Defendants would have been required to compete against each other in order to "recruit, hire, and retain top aerospace engineers and other skilled workers, including by directly soliciting competitors' employees with better offers."  *Id.* ¶ 112.  Instead, Defendants, as horizontal competitors in the market for Aerospace Workers,

were able to keep wages artificially low by refusing to break ranks and compete with one another over employees.  *Id.* ¶ 118.  If Defendants were instead free to hire employees from each other at will, this would have led to upward pressure on compensation as Defendants competed to hire top talent away from their competitors, while also making efforts to retain their own employees.  *Id.* ¶ 120.  Unfortunately, according to Plaintiffs, Defendants chose not to engage in the free market. Instead, they entered into the alleged conspiracy, which successfully stifled competition, suppressed compensation for Aerospace Workers, and eliminated new employment opportunities for those employees.  *Id.* ¶ 125.  This, Plaintiffs believe, constitutes a violation of the Sherman Act and entitles Plaintiffs to recover damages.

### III.    LEGAL STANDARD

When determining whether a complaint states a claim upon which relief can be granted, highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully."  *Id.*  In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).

The Court is not, however, "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause

of action will not do," *Iqbal*, 556 U.S. at 678. Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## IV.    DISCUSSION

### A.    *Per Se* and Rule of Reason Claims

Read literally, the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. As a result of the breadth of this language, the Supreme Court "has not taken a literal approach to" it. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Instead, the Supreme Court "has long recognized that Congress intended to outlaw only unreasonable restraints" on trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Thus, most antitrust claims are analyzed under the "rule of reason," which requires the fact finder to determine whether a questioned practice is an unreasonable restraint on trade. *Id.* Under a rule of reason analysis, "an agreement will not violate the antitrust laws unless it can be shown that it will have an adverse effect on competition in the relevant market." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997). Whether a restraint has an adverse effect on competition is determined by examining a number of factors, including "specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil*, 522 U.S. at 10.

Despite this general rule, there are some "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to

be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). These are the *per se* violations of the Sherman Act. Some of the practices that have been recognized as *per se* unlawful are price fixing, division of markets, group boycotts, and tying arrangements. *Id.*

While *per se* illegality is a powerful tool for courts that can prevent much unnecessary work, "*per se* rules are appropriate only for conduct that is manifestly anticompetitive, that is, conduct that would always or almost always tend to restrict competition and decrease output." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (cleaned up). Thus, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007) (internal citations and quotations omitted).

Determining whether conduct should be analyzed under the *per se* or rule of reason framework is a question of law for the Court to decide. *United States v. Aiyer*, 33 F.4th 97, 113–14 (2d Cir. 2022); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 1909b (2018) ("the selection of a mode [of antitrust analysis] is entirely a question of law" to be decided by a court).

### B. Defendants' Arguments

The CAC contains only a single count accusing Defendants of conspiring to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. CAC ¶¶ 152–173. The motions to dismiss argue that the conduct alleged does not constitute a *per se* violation of antitrust laws and, therefore, Plaintiffs were required to plead a claim under the rule of reason. Defendants further claim Plaintiffs have failed to plead a rule of reason claim and, thus, the complaint is subject to

dismissal as a whole. The Outsourcing Defendants make the additional argument that Plaintiffs have not sufficiently alleged a conspiracy under the law. Finally, the Outsourcing Defendants claim that even if the conspiracy allegations are enough to state a claim, there are insufficient allegations against Cyient and Parametric Solutions specifically, and those two Defendants must be dismissed. The Court addresses each contention below.

### C.  Plaintiffs' *Per Se* Claim

The main dispute in Defendants' motions is whether the actions alleged in the CAC state a *per se* violation of the Sherman Act. Defendants mount numerous attacks on the CAC, discussing why the allegations therein are not appropriate for *per se* treatment under the Sherman Act. The Court will address each argument in turn.

#### 1.  *Vertical or Horizontal Relationship*

Defendants first argue that they had a vertical, rather than a horizontal, relationship with each other, such that any agreements amongst them cannot be *per se* violations of the Sherman Act. The difference between a horizontal restraint on trade and a vertical restraint on trade is theoretically quite simple. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp.*, 485 U.S. at 730; *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) ("Agreements within the scope of § 1 may be either 'horizontal,' *i.e.*, 'agreement[s] between competitors at the same level of the market structure,' or 'vertical,' *i.e.*, 'combinations of persons at different levels of the market structure, *e.g.*, manufacturers and distributors.'" (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972))). As simple as this distinction may theoretically be, its implication here is crucial because, "[a]bsent price-fixing between a supplier and distributor,

vertical restraints are generally subject to 'rule of reason' analysis." *Elecs. Commc'ns Corp.*, 129 F.3d at 243.  Thus, if Defendants are correct and the relationship between them is a vertical one, it is unlikely that Plaintiffs' *per se* theory of liability will prevail.

Defendants' main argument why they have a vertical, rather than horizontal, relationship is that the CAC alleges Pratt & Whitney manufactures engines and uses the Outsourcing Defendants as upstream suppliers that provide "labor to design, manufacture, and service [Pratt & Whitney's] aerospace products."  ECF No. 466-1 at 35 (citing CAC ¶ 50).  Defendants elaborate that such a relationship means that Defendants do not compete with each other, but, rather, all work together to support the overall success or failure of Pratt & Whitney.  *Id.  See also* ECF No. 465-1 at 21–22.  This, in turn, leads Defendants to conclude the restraint at issue is not a horizontal restraint between competitors at all but is, instead, a vertical agreement.  Defendants alternatively argue that, at a minimum, the restraint alleged has both vertical and horizontal elements.  *Id.* at 17. Regardless of whether the restraint is purely vertical or a mix of vertical and horizontal, the argument proceeds, Plaintiffs' claims cannot constitute *per se* anticompetitive behavior and must be analyzed under the rule of reason.

Plaintiffs argue in response that Defendants have ignored the allegations of their complaint and are focusing on the wrong market.  Specifically, Plaintiffs argue the market actually at issue here is the labor market for Aerospace Workers, not the market for aircraft engines or the greater aerospace industry at large.  ECF No. 524 at 18.  Plaintiffs do not claim the alleged conspiracy had any impact on either the market for aircraft engines or the greater aerospace industry at large. Instead, their contention is that Defendants unlawfully divided the market for the labor of Aerospace Workers, in which they were all horizontal participants competing for the same employees.  *Id.*

Plaintiffs are correct:  the conspiracy alleged to have restricted competition is a horizontal, rather than vertical, restraint on trade.  While the CAC does provide background about the relationship between Defendants, including some potentially vertical elements of their relationship, the Court must evaluate "the nature of the restraint, rather than the identity of each party who joins in to impose it, in determining whether the *per se* rule is properly invoked." *United States v. Apple, Inc.*, 791 F.3d 290, 297 (2d Cir. 2015).  Plaintiffs make clear that the conspiracy alleged in the CAC is one among competitors for the labor of Aerospace Workers.  The CAC states that "Defendants' conspiracy suppressed the compensation (including salaries, wages, and benefits) offered and paid to their Aerospace Workers while restricting the employment opportunities available to these employees."  CAC ¶ 110.  Plaintiffs have alleged that the restraint suppressed competition in the *labor* market for Aerospace Workers, in which Defendants, including Pratt & Whitney, were positioned as competitors.

The alleged conspiracy is one of market allocation, in which Defendants supposedly divided the labor of Aerospace Workers amongst themselves, in a horizontal fashion.  Importantly, "[a]ntitrust law does not treat employment markets differently from other markets," and "an agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service division agreement, analogous to a product division agreement." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013) (holding that a no-poach agreement between two technology companies sufficed to state a horizontal market allocation agreement) (quoting Areeda & Hovenkamp, *Antitrust Law* § 2013b).  Further, in the currently pending criminal action based on the same operative facts as the instant case, Judge Bolden recently held that the restraint in issue "operate[d] only horizontally." *See United States v. Patel, et al.*, No. 3:21-CR-220 (VAB), 2022 WL 17404509, at *17 (D. Conn.

Dec. 2, 2022).  This conclusion is in line with numerous courts throughout the country that have found allegations of no-poach agreements similar to the one at issue here sufficient to state a horizontal restraint on trade.  *See id.*; *see also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021) ("It is undisputed that the parties' non-solicitation agreement constitutes a horizontal restraint."); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, No. 21-CV-00305, 2022 WL 4465929, at *10 (N.D. Ill. Sept. 26, 2022) ("The Court finds that Plaintiffs have plausibly alleged that the non-solicitation agreements are *per se* unreasonable naked horizontal market allocation agreements."); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 481 (W.D. Pa. 2019) ("Thus, plaintiffs plausibly alleged that defendants' agreements constituted horizontal restraints of competition with respect to defendants' employees.").

While Defendants contend this case is different than past no-poach agreement cases given that the Outsourcing Defendants supplied labor to Pratt & Whitney, the Court is unpersuaded by this argument.  On this point, *Apple* is instructive.  In *Apple*, the defendant was accused of orchestrating a conspiracy in which all publishing companies that used Apple's digital bookselling marketplace agreed to a price fixing arrangement to provide an advantage to Apple over Amazon, a competitor.  791 F.3d at 308.  As in the instant case, Apple argued that, because it merely had several vertical agreements with the publishing companies, its actions should not be subject to a *per se* analysis.  *Id.* at 314.  The Second Circuit recognized that Apple was a "vertical market participant," in the sense that the publishing companies sought to sell their books in Apple's virtual marketplace.  *Id.* at 323.  But the court explained that Apple's vertical relationship to the publishing companies was not the basis of the alleged conspiracy; rather, Apple facilitated the horizontal price fixing conspiracy among the publishing companies and itself participated in that conspiracy, which

rendered its conduct a *per se* unreasonable restraint on trade.  *Id.* at 324–25.  Similarly, here, Pratt & Whitney's relationship with the Outsourcing Defendants may have been vertical in nature with respect to the manufacture and distribution of aerospace products, but that does not require the Court to apply the rule of reason analysis rather than the *per se* analysis.  Rather, the present action pertains to an alleged conspiracy to restrain competition in the aerospace labor market; all Defendants, including Pratt & Whitney, participate in that market horizontally, and they are all alleged to have participated in the market division conspiracy horizontally.  *See* CAC ¶ 72, 74, 88, 118, 154; *see also Patel*, 2022 WL 17404509, at *16.  Therefore, *per se* treatment could be appropriate.

Defendants' heavy reliance on *Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999), does not change this outcome.  In *Bogan*, the Second Circuit held that an agreement among the general agents within a particular insurance company not to allow subordinate insurance agents to move between the general agents was an intrafirm agreement not subject to a *per se* analysis.  *Id.* at 515.  *Bogan* is distinguishable from this case in several respects.  Initially, *Bogan* was decided on appeal from a summary judgment motion.  *Id.* at 511.  Thus, unlike here, the *Bogan* court had a fully developed factual record before it.  Further, in *Bogan*, the agreement was between general agents of only one insurance company, rendering the conspiracy necessarily intrafirm.  The Second Circuit noted that "the agreement is far from a typical *per se* illegal restraint" as "no-switching restriction cases typically involve multiple companies."  *Id.* at 515.  Here, Plaintiffs have alleged the involvement of several different companies, all conspiring to refuse to hire any employees from each other in order to ensure salaries did not increase.  *See, e.g.*, CAC ¶ 121.  Finally, the *Bogan* court went on to note that there were "other insurance companies" that competed "for the services of experienced [insurance] agents, as is clearly evidenced by the [plaintiffs] having found

other work after being terminated." *Id.* at 516.  In this case, Plaintiffs allege that, as a result of the conspiracy among Defendants, it would have been very difficult, if not impossible, for Plaintiffs to find other employment in their industry without relocating.  CAC ¶ 169.  For all of these reasons, *Bogan*'s holding is inapplicable here.

In sum, contrary to Defendants' arguments, the complaint in the instant action alleges a horizontal conspiracy to restrain trade, such that it is plausible the conduct at issue could constitute a *per se* violation of the Sherman Act.

### 2.   Ancillary Restraint Doctrine

The Court's holding that the conspiracy among Defendants was horizontal and not vertical does not end the inquiry into whether the CAC alleges a *per se* violation of the Sherman Act.  The next step is determining whether the alleged conduct "is a naked restraint on trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes" of a legitimate business collaboration.  *Texaco*, 547 U.S. at 7.  "[A] market allocation agreement or any other restraint traditionally subject to *per se* treatment will only be found to be *per se* illegal if it facially appears to be one that would almost always tend to restrict competition and decrease output, *i.e.* if it is a naked restraint on trade."  *eBay, Inc.*, 968 F. Supp. 2d at 1039.  A restraint is naked where it has "no purpose except stifling of competition."  *Major League Baseball Props, Inc. v. Salvino, Inc.*, 542 F.3d 290, 307 (2d Cir. 2008).  By contrast, conduct can be deemed an ancillary restraint, and thus exempt from the *per se* rule, if it is not a naked restraint on trade and is "reasonably necessary to achieve any of the efficiency-enhancing benefits of a joint venture."  *Id.* at 337 (Sotomayor, J., concurring); *see also Aya Healthcare Servs., Inc.*, 9 F.4th at 1109 (in order to qualify as an ancillary restraint, a horizontal agreement must be (1) subordinate and collateral to a separate legitimate transaction and (2) reasonably necessary to achieving that transaction's pro-competitive purpose).

17

While the parties spend many pages of their respective briefing arguing about whether the agreement in the instant case constitutes a naked or an ancillary restraint on trade, the Court need spend far less ink.  The motion presently pending before the Court is one to dismiss the CAC.  At this stage in the proceedings, there has been no discovery conducted, and the Court assumes the facts pleaded in the complaint are true.  The CAC alleges that, absent the conspiracy at issue, the Outsourcing Defendants "would have competed against one another, and against Pratt & Whitney, to recruit and hire the most talented Aerospace Workers by offering them better compensation, wages, and benefits."  CAC ¶ 51.  In order to prevent this competition against one another, Defendants allegedly "entered into an illegal agreement not to compete against each other when it came to recruiting, hiring, and compensating Aerospace Workers."  *Id.* ¶ 61.  This allowed Defendants to pay "their Aerospace Workers less money than they would otherwise have to in a free market."  *Id.*  Further, the CAC alleges that Defendants could have operated in the aerospace industry without this agreement but were able to get a substantial benefit, to the detriment of the Aerospace Workers, by entering the conspiracy.  *Id.* ¶ 126.  Plaintiffs therefore conclude that "Defendants' agreements are naked restraints of trade that serve no purpose except for stifling competition."  *Id.* ¶ 158.

Defendants make extensive arguments that the CAC itself alleges an ancillary restraint such that the Court can, and should, determine that Plaintiffs' *per se* claims fail as a matter of law. As described above, however, Plaintiffs' complaint adequately alleges that the no-poach agreements at issue had no legitimate business purpose and thus did not satisfy the ancillary restraint doctrine.  Further, numerous courts examining similar alleged no-poach agreements have found it premature to determine whether the agreement is an ancillary restraint at the pleading stage.  *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2022 WL 4465929, at *12 ("Rather,

because Plaintiffs have a plausible *per se* claim, the question becomes whether the evidence will establish that the non-solicitation agreements do, in fact, nakedly allocate the market for outpatient medical care employees. . . . Such questions, however, must await development of the record."); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d at 484 ("Here, at this stage of the proceedings, the court cannot discern that the alleged no-poach agreements would be legitimate ancillary restraints on trade executed with some other proper business purpose."); *eBay, Inc.*, 968 F. Supp. 2d at 1040 ("At this stage in this action, the court simply cannot determine with certainty the nature of the restraint, and by extension, the level of analysis to apply.").  This idea is not limited to no-poach agreements.  Courts examining other alleged antitrust violations have also found that "whether a restriction such as fixing the interchange fee is a 'naked' restraint or an 'ancillary' restraint" is "quintessentially one of fact, and one that plaintiffs have pled in their favor in the complaint."  *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005).

Finally, Defendants rely heavily on *Aya Healthcare Services, Inc.* in making their argument that the restraint alleged is ancillary.  The decision in that case, however, came after discovery and a motion for summary judgment.  In fact, more than three years prior to the Ninth Circuit decision relied on by Defendants, the district court denied a motion to dismiss, holding that the parties did not "have the benefit of discovery or factual evidence to support their contentions" that the no-poach agreement was an ancillary restraint.  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,

No. 17CV205-MMA (MDD), 2018 WL 3032552, at *15 (S.D. Cal. June 19, 2018).[4]  Contrary to Defendants' assertions, Plaintiffs have adequately pleaded that the no-poach agreement at issue was a naked restraint on trade.  Whether Plaintiffs will eventually be able to produce evidence to substantiate this claim at summary judgment or trial is a question for another day.

In sum, the CAC adequately alleges a potential claim for a *per se* violation of the Sherman Act.  A final determination of whether the instant case in fact presents a *per se* violation, or whether it must be analyzed under the rule of reason, "is more appropriate on a motion for summary judgment."  *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012).  Thus, Defendants' request that the Court dismiss Plaintiffs' claim alleging a *per se* violation of the Sherman Act is DENIED.

### D. Sufficiency of Rule of Reason Pleading

Pratt & Whitney further contends that Plaintiffs have failed to adequately allege an antitrust violation under the rule of reason framework.  Plaintiffs disagree, admitting that, while the phrase "rule of reason" does not appear in their complaint, the complaint does contain allegations sufficient to put Defendants on notice that Plaintiffs are alternatively pursuing a claim under the rule of reason analysis.[5]

---

[4] Nor does Defendants' reliance on *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2018 WL 3105955 (N.D. Ill. June 25, 2018), aid them.  *Deslandes* involved a McDonald's franchise agreement providing that franchisees could not hire or seek to hire any person who was employed by McDonald's or any of its subsidiaries, including restaurants operated directly by McDonald's.  The court granted a motion to dismiss the plaintiff's *per se* claim under the ancillary restraint doctrine.  *Id.* at *7.  There, however, the complaint had cited specifically to the franchise agreement and alleged that "McDonald's model is *designed to encourage competition* with regard to sales between and among franchisees and McOpCo stores."  Amended Complaint at 18, *Deslandes v. McDonald's USA, LLC*, No. 17-cv-4857 (N.D. Ill. Sept. 17, 2017) (emphasis added).  Based on these allegations, the court held that Plaintiffs had alleged the franchise agreement was procompetitive.  *Deslandes*, 2018 WL 3105955 at *7.  The court further held that, because the no-hire restraint alleged in the complaint was ancillary to the alleged procompetitive franchise agreement, the restraint could not be unlawful *per se*.  *Id.*  Here, the CAC alleges no procompetitive benefits to the no-poach agreement between Defendants.  To the extent Defendants argue that the restraint Plaintiffs allege was ancillary to the agreements Pratt & Whitney makes with the Outsourcing Defendants to supply labor for Pratt & Whitney projects, that argument presents a factual question inappropriate for resolution on a motion to dismiss.
[5] That Plaintiffs did not use the words "rule of reason" in the CAC is not dispositive.  A complaint need not plead "magic words."  *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022).

The rule of reason analysis "seeks to determine if the alleged restraint is unreasonable because its anticompetitive effects outweigh its procompetitive effects." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006).  In rule of reason cases, the legality of a challenged restraint is ultimately evaluated under a three-step burden-shifting framework.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018).  At the pleading stage, however, only the first step—whether the plaintiff has demonstrated that a defendant's challenged behavior "had an actual adverse effect on competition as a whole in the relevant market"—is material.  *Davitashvili v. Grubhub Inc.*, No. 20-cv-3000 (LAK), 2022 WL 958051, at *6 (S.D.N.Y. Mar. 30, 2022) (quoting *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993)).  Therefore, at the motion to dismiss stage, the rule of reason inquiry requires only that the plaintiff "identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." *Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*, No. 21-CV-10876 (ALC), 2022 WL 14963876, at *6 (S.D.N.Y. Oct. 26, 2022).

### 1.   Identifying the Relevant Market

The first step in evaluating a rule of reason claim it to determine whether the complaint "allege[s] a plausible relevant market in which competition will be impaired." *Madison 92nd St.*

*Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015) (summary order).[6]  A

market has two relevant components:  a product market and a geographic market.  *Concord*

*Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 52 (2d Cir. 2016).  "Because market definition

is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a

relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001).  Dismissal

is appropriate "[w]here the plaintiff fails to define its proposed relevant market with reference to

the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed

relevant market that clearly does not encompass all interchangeable substitute products even when

all factual inferences are granted in plaintiff's favor," as that renders the relevant market "legally

insufficient." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).  When

determining whether a plaintiff has met this pleading requirement, "[i]nterchangeability means

roughly equivalent products exist," and that even if a consumer might have a preference between

products, the consumer "could use either product and it would work effectively," *Success Sys.,*

*Inc. v. Excentus Corp.*, 439 F. Supp. 3d 31, 61 (D. Conn. 2020), while "cross-elasticity of demand

exists if consumers would respond to a light increase in the price of one product by switching to

---

[6] Pratt & Whitney argues, in passing, that Plaintiffs are required to plead a relevant market regardless of whether the complaint states a claim for a *per se* or rule of reason violation.  Plaintiffs dispute this assertion.  ECF No. 524 at 26 n.17.  Defendants are correct, as "it is an element of a *per se* case to describe the relevant market in which we may presume the anticompetitive effect would occur." *Bogan*, 166 F.3d at 515; *see also PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 347 (S.D.N.Y. 2021) ("The Court is not aware of any basis to distinguish a market definition inquiry for purposes of the rule of reason from a market definition inquiry for purposes of evaluating an alleged *per se* violation. Thus, the Court applies the standard from the rule of reason case law to evaluate whether Plaintiff has alleged a group boycott that merits *per se* treatment."); *Singh v. Am. Racing-Tioga Downs Inc.*, No. 3:21-CV-0947-LEK-ML, 2021 WL 6125432, at *9 (N.D.N.Y. Dec. 28, 2021) ("Regardless of what standard applies (*per se* or rule of reason), Plaintiffs must articulate a relevant market."); *Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 766 (S.D.N.Y. 2020) ("Peloton argues that there is no need to address the relevant market given the '*per se*' nature of the Counter-Defendants' violation of Section 1. But, 'it is an element of a *per se* case to describe the relevant market in which [courts] may presume the anticompetitive effect would occur.'").  Thus, the Court's analysis in this section relates not only to the rule of reason claim, but to the *per se* allegations, as well.

another product," *Todd*, 275 F.3d at 201–02 (quoting *AD/SAT v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999)).

Crucially for the present matter, where the alleged market is a labor market, the Second Circuit has noted that the conspiracy itself is actually a "buyer-side" conspiracy rather than the more traditional seller-side conspiracy. *Id.* at 201–02. When addressing the market for a buyer-side conspiracy, the Court is required to reverse its analysis of interchangeability and cross-elasticity. *Id.* at 202. Thus, "the market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Id.* In this case, for purposes of analyzing the relevant market, the buyers, or purchasers of labor, are Defendants, while Plaintiffs are the sellers.

With these principles in mind, the Court turns to the question of whether an appropriate market has been alleged here. In the CAC, Plaintiffs name three potential geographic markets: "the market for the labor services of skilled Aerospace Workers in the United States, or alternatively, in local geographic markets in and around Hartford-East Hartford-Middletown, Connecticut metropolitan area and Palm Beach County, Florida." CAC ¶ 163. Initially, the CAC contains no allegations regarding Palm Beach County, Florida, other than to say that it is a potential market and that two Defendants are incorporated and have their principal places of business there. Without more information, Plaintiffs fail to allege that the Aerospace Workers market in Palm Beach County, Florida is a plausible market in which competition could be impaired.

Further, with respect to the national market, although Plaintiffs allege that Pratt & Whitney has "nearly 50% of the domestic market for military aircraft engines," *id.* ¶ 164, they have been exceedingly clear that the market at issue here is not the military aircraft engine market, or the aircraft engine market more generally. Rather, Plaintiffs' theory is that the relevant market is the market for Aerospace Workers. ECF No. 524 at 19 ("Although Pratt and the [Outsourcing

Defendants] may have a 'vertical' outsourcing relationship in their provision of aerospace products and services, the Complaint does not challenge any restraint in that market. Rather, the restraint challenged by the Complaint affects the labor market for Aerospace Workers, and Defendants are competitors in that market."). Plaintiffs cannot have their cake and eat it, too, by shifting the market at the center of this case as it suits their needs. As Plaintiffs set forth no allegations regarding the national labor market for Aerospace Workers, they have failed to show the national aerospace labor market is a plausible market in which competition could be impaired.

This leaves only the Aerospace Workers labor market in the "Hartford-East Hartford-Middletown, Connecticut metropolitan area." To support this definition of the geographic market, Plaintiffs allege that "Defendants and their affiliates comprised 44% of available job postings for Aerospace Workers in Connecticut." CAC ¶ 167. Initially, Plaintiffs have not justified why their job posting data for the entire state of Connecticut supports a geographic market limited to the Hartford-East Hartford-Middletown, Connecticut area, which is only a subset of the state. On this issue, *Madison 92nd Street*, 624 F. App'x at 29, is instructive. In *Madison 92nd Street*, the plaintiffs attempted to limit the relevant market to "labor services provided by nonmanagerial hotel employees working or seeking work in Marriott-managed hotels in New York City." *Id.* The Second Circuit held that such a specific market definition failed to take into account the interchangeability of other hotel chains in New York City with which plaintiffs were free to seek employment. *Id.* Thus, the plaintiffs' attempt to "carve up the New York City hotel labor market into an artificially small 'Marriott-only' submarket [was] sufficiently 'implausible' to render dismissal appropriate at the pleading stage." *Id.*; *see also Todd*, 275 F.3d at 200 ("Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with

potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.").

Here, Plaintiffs have failed to explain why a geographic limitation to Hartford-East Hartford-Middletown is appropriate.  Since their market share allegation relates to the entire state, and they have not provided any allegations why aerospace engineering firms outside of the Hartford-East Hartford-Middletown areas, but still within the state, would not be suitable substitute buyers, the Court construes the relevant geographic market as the state of Connecticut. This is a plausible geographic market.

Construing the market's geographic scope in this manner, the Court next turns to whether the market for Aerospace Workers constitutes an appropriate product market.  By alleging that Defendants comprise 44% of job postings in the state of Connecticut, and by extension have 44% market share for the Aerospace Workers' labor market in the state, Plaintiffs have supported a reasonable inference that Plaintiffs intended to, and have, included all possible buyers in Connecticut, not only Defendants.[7]  As the proper focus in a labor market conspiracy of this nature is "the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers," *Todd*, 275 F.3d at 202, the inclusion of all buyers of the labor of Aerospace Workers in the state of Connecticut renders Plaintiffs' proposed market "plausible" while bearing a "rational relation to the methodology courts prescribe to define a market for antitrust purposes."  *Id.* at 203.

---

[7] The Court questions whether job postings are an appropriate way to determine percentage of a labor market allocated to a particular Defendant.  Plaintiffs themselves admit that neither Agilis nor Parametric Solutions had any job postings for two years, *id.* at 44 n.30, so, under Plaintiffs' logic, neither of those companies would have *any* market share. Nevertheless, for purposes of Defendants' motions to dismiss, the Court accepts all well pleaded facts as true and will assume that Plaintiffs' allegation is an adequate approximation of Defendants' share of the Connecticut market, to the extent Plaintiffs must make a threshold showing of market share in order to proceed.  *See Todd,* 275 F.3d. at 206 ("In this Circuit, a threshold showing of market share is not a prerequisite for bringing a § 1 claim.").

Further, Plaintiffs have alleged that they could not easily transition to work outside of aerospace engineering firms, given the specialized training they have obtained by working on Pratt & Whitney projects, and that relocation is difficult and undesirable. CAC ¶¶ 62, 63, 168–170. Thus, the Court finds it reasonable, at least for purposes of a motion to dismiss, for Plaintiffs to limit the proposed market to the aerospace industry and to exclude other potential positions for people with Plaintiffs' qualifications. *See Todd,* 275 F.3d at 203.

Certainly, alleging a market in which Defendants comprise less than 50% of the market may make it more difficult for Plaintiffs to ultimately demonstrate that the alleged restraint's anticompetitive effect outweighed its procompetitive effect. But that is a question for another day, after the development of a full factual record. For now, Plaintiffs have adequately alleged a plausible market.

### 2. *Adverse Effect on Competition in the Identified Market*

Having concluded that Plaintiffs have adequately alleged a market, the Court next examines whether they have pleaded an adverse effect on competition in that market. In the Second Circuit, "if a plaintiff can show an actual adverse effect on competition," there is no need to demonstrate further "market power." *Todd*, 275 F.3d at 207. Here, Plaintiffs have alleged facts that, if proven, meet this standard.

Specifically, Plaintiffs have alleged that Defendants entered a conspiracy that had the effect of actually reducing the compensation paid to Plaintiffs. CAC ¶ 173. According to Plaintiffs, the agreement not to hire each other's employees allowed Defendants to keep wages artificially low, due to the decreased competition in the market for Aerospace Workers. *Id.* ¶ 66. Crucially for Plaintiffs, the allegations set forth that the scheme was successful and that many Plaintiffs were actually paid wages below those they would have otherwise achieved. *Id.* ¶¶ 68, 173.

These allegations of adverse effects on competition are strikingly similar to the ones in *Todd*. There, the Second Circuit held that allegations that competitors in the petrochemical and oil market were able to artificially depress salaries through information sharing and reduced competitive incentives adequately stated an effect on competition. *Todd*, 275 F.3d at 214. The Second Circuit noted that whether such actions actually took place, and actually had the effect the plaintiffs alleged, were questions of fact that the plaintiffs would be required to prove at a later time. *Id.* The same is true here; for purposes of a motion to dismiss, Plaintiffs have adequately stated an effect on the market.

Thus, Plaintiffs have adequately, although inartfully, pleaded an antitrust claim under the rule of reason.[8]

### E. Sufficiency of Conspiracy Claims

The Outsourcing Defendants' next argument is that the CAC does not adequately allege a conspiracy and must be dismissed on that ground. In a case brought under Section 1 of the Sherman Act, "the crucial question" is "whether the challenged conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Starr v. Sony BMG Music Ent*., 592 F.3d 314, 321 (2d Cir. 2010). In other words, the challenged conduct must constitute a conspiracy. The ultimate existence of an "agreement," or conspiracy, is "a legal conclusion, not a factual allegation." *Mayor & City Council of Balt., Md. v. Citigroup, Inc*., 709 F.3d 129, 136 (2d Cir. 2013). At the pleading stage, a plaintiff must allege "enough facts to support the inference that a conspiracy actually existed." *Id.* This can be done in two ways: first, through asserting direct evidence of an agreement, and second, through "circumstantial facts supporting the inference that

---

[8] The parties also contest whether Plaintiffs adequately pleaded a claim under the "quick look" analysis. "'Quick look' is essentially an abbreviated form of rule of reason analysis." *Madison Square Garden, L.P. v. Nat'l Hockey League*, 270 F. App'x 56, 58 (2d Cir. 2008) (summary order). Having already found that the CAC adequately states a rule of reason claim, the Court need not independently address the quick look framework at this time.

a conspiracy existed." *Id.*  Here, Defendants assert that Plaintiffs have not offered adequate allegations under either of these categories, while Plaintiffs argue they have satisfied their obligations under both.  The Court addresses each in turn.

### 1.  Direct Evidence

"Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" to state a claim under the antitrust laws.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010).  Thus, if Plaintiffs have adequately alleged direct evidence of an agreement, they need not also plead "plus factors" or other parallel conduct.  *Id.*  Such direct evidence could be, for example, "a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Mayor & City Council of Balt., Md.*, 709 F.3d at 136.

While Defendants claim Plaintiffs have made only general allegations that Defendants entered into a conspiracy, this grossly understates the facts presented in the CAC.  In reality, the CAC repeatedly quotes emails where Defendants actively discussed the alleged conspiracy.  *See, e.g.*, CAC ¶¶ 70 (email from Patel to owner of Parametric Solutions), 73 (email from QuEST to Patel discussing Cyient), 79 (email from Belcan to Patel regarding actions of Parametric Solutions).  These paragraphs each contain specific allegations, regarding specific employees, of specific Defendants, discussing the specific agreement alleged to have violated the antitrust laws. The Court need not recite each example from the CAC, as it contains numerous detailed conspiracy allegations.  Plaintiffs have successfully pleaded direct evidence of a conspiracy.

### 2.  Circumstantial Evidence

Even if the CAC did not contain adequate direct evidence standing on its own, it contains sufficient circumstantial evidence of a conspiracy to survive a motion to dismiss.  In the context of an antitrust complaint, circumstantial evidence consists of allegations detailing defendants'

parallel conduct, as well as certain other "plus factors." *Mayor & City Council of Balt., Md.*, 709 F.3d at 136.  Initially, contrary to Defendants' assertions, the CAC clearly and consistently alleges plausible parallel conduct amongst Defendants that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by any advance understanding among the parties." *Twombly*, 550 U.S. at 556, n.4.  Specifically, the CAC alleges throughout that each of the Defendants did not hire or recruit employees from the other Defendants.  *See, e.g.*, CAC ¶ 8.  Further, it is fair inference from Plaintiffs' allegations that this parallel conduct was the result of an illegal agreement, as opposed to chance, coincidence, or other non-coordinated action.

Turning to the plus factors, these may consist of, but are not limited to, "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Mayor & City Council of Balt., Md.*, 709 F.3d at 136.  Here, the CAC alleges each of these plus factors.  First, Defendants had a motive to conspire because it would keep the wages of Aerospace Workers artificially low.  CAC ¶¶ 72 (Patel noting the only way to prevent a price war is to not hire partners' employees), 73 (QuEST employee complaining that failure to abide by the agreement would drive wages up).  The CAC also contains allegations tending to show that the actions of Defendants were against their own economic self-interest.  Specifically, Plaintiffs allege that there is a shortage of qualified Aerospace Workers in the country and companies are struggling with labor shortages as a result; in a normal economy, free of collusion, these labor shortages would require Defendants to raise salaries in order to make sure they are able to hire qualified employees to fill their positions.  *Id.* ¶¶ 46–47, 51–52.  From these allegations, it is reasonable to infer that it would be against Defendants' own economic self-interest not to

increase salaries to entice applicants, unless Defendants knew that their arrangement would provide applicants with little ability to move amongst the various Defendants. Therefore, the CAC alleges "behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals." *Starr*, 592 F.3d at 327.

Finally, as laid out in the Court's discussion of Plaintiffs' direct evidence, the CAC contains myriad allegations regarding communications between Defendants throughout the conspiracy. Ultimately, while it is clear Defendants do not agree with Plaintiffs' allegations in the CAC, "to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action." *Anderson News, L.L.C.*, 680 F.3d at 184. Instead, the CAC "must plead enough factual matter (taken as true) to suggest that an agreement was made, *i.e.*, it must provide some factual context suggesting [that the parties reached an] agreement." *Id.* (alteration in original). It is clear that the CAC contains more than enough evidence, whether direct or circumstantial, to state a claim for relief at this stage of the proceeding.

### F. Sufficiency of Pleadings Related to Cyient and Parametric Solutions

Finally, the Outsourcing Defendants contend that, even if the evidence is sufficient to establish a conspiracy amongst some or even most of the Defendants, there are insufficient allegations against Cyient and Parametric Solutions. The Court is unpersuaded.

Initially, "once a conspiracy is shown, only slight evidence is needed to link another defendant with it." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257 (2d Cir. 1987). Further, "a conspirator may join a conspiracy at any time that it is ongoing; there is no requirement that a conspirator join in a conspiracy from its inception." *In re Elec. Books Antitrust Litig.*, 859 F. Supp.

2d 671, 689 (S.D.N.Y. 2012). Here, it is clear that there are sufficient allegations against Cyient and Parametric Solutions.

In their motion to dismiss, the Outsourcing Defendants admit that there are several allegations levied specifically at Cyient. ECF No. 466-1 at 43. These include allegations regarding an email where a Cyient employee requested another Outsourcing Defendant "stop actively recruiting" Cyient employees. *Id.*; CAC ¶ 89. If this were not enough, however, the CAC also alleges that QuEST specifically complained about Cyient violating "our agreements" not to hire other Defendants' employees. CAC ¶ 73. This communication led to Patel inviting executives of both Cyient and QuEST to a private conversation the next day. *Id.* These allegations provide the "slight evidence" required to implicate Cyient. *See Apex Oil Co.*, 822 F.2d at 257.

The CAC also contains sufficient factual allegations against Parametric Solutions. Specifically, it quotes several emails detailing Parametric Solutions' agreement not to hire employees from other Outsourcing Defendants. CAC ¶¶ 70 (Patel email to Parametric Solutions stating "last time we talked you assured me that you will not hire any [Pratt & Whitney] partners['] employee"), 79 (email from Parametric Solutions to Patel complaining that Belcan was actively recruiting their employees). Once again, it is clear that such allegations adequately connect Parametric Solutions to the conspiracy for purposes of surviving the Outsourcing Defendants' motion to dismiss.

Ultimately, while Cyient and Parametric Solutions may believe there is an innocent explanation to all of these actions, the allegations of the CAC plausibly demonstrate that they participated in the conspiracy at issue in this case. Thus, Plaintiffs have alleged sufficient factual material to implicate Cyient and Parametric Solutions. *See Anderson News, L.L.C.*, 680 F.3d at 184.

## V.      CONCLUSION

For the reasons discussed herein, Defendants' motions to dismiss are DENIED in their entirety.

**SO ORDERED** at Hartford, Connecticut, this 20th day of January, 2023.

   */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE