## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TARAH KYE BOROZNY, ANTHONY DeGENNARO, RYAN GLOGOWSKI, ELLEN McISAAC, SCOTT PRENTISS, ALEX SCALES, AUSTIN WAID-JONES, NICHOLAS WILSON, and STEVEN ZAPPULLA, individually and on behalf of all others similarly situated, <br> *Plaintiffs*, <br><br> v. <br><br> RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION; AGILIS ENGINEERING, INC.; BELCAN ENGINEERING GROUP, LLC; CYIENT, INC.; PARAMETRIC SOLUTIONS, INC.; and QUEST GLOBAL SERVICES-NA, INC., <br> *Defendants*. | 3:21-CV-1657 (SVN) <br><br><br><br><br> October 26, 2023 |

## RULING AND ORDER ON PLAINTIFFS' MOTION TO AMEND

Sarala V. Nagala, United States District Judge.

In this antitrust putative class action, Plaintiffs have alleged that Defendants violated Section 1 of the Sherman Act by conspiring to restrict competition in the recruitment and hiring of aerospace engineers and other skilled workers in the jet propulsion systems industry. The Court previously denied Defendants' motions to dismiss their consolidated amended complaint, and then denied Plaintiffs' motion for reconsideration of a portion of its ruling relating to alleging a market definition. ECF No. 647. Presently before the Court is Plaintiffs' motion for leave to amend their operative complaint in two respects: first, to expand the scope of the geographic market of the alleged conspiracy, and second, to include certain admissions made by Defendant Agilis Engineering, Inc. in its answer.

For the reasons below, the Court finds that Plaintiffs' request to amend is neither dilatory nor overly prejudicial to Defendants. Additionally, it is not futile. Plaintiffs' request to amend is therefore GRANTED, and Defendants' motion to seal limited portions of the amended complaint is GRANTED.

## I. FACTUAL BACKGROUND

The facts of this case are discussed at length in this Court's order on Defendants' motions to dismiss. For purposes of Plaintiffs' motion for leave to amend, the Court will recall only those facts relevant to re-establish familiarity. In essence, Plaintiffs accuse Defendants of running a years-long conspiracy to control the aerospace labor market. Defendants allegedly accomplished this agreement by not hiring employees from any other Defendant. Because Plaintiffs could not move among Defendants for better pay or benefits, Plaintiffs claim Defendants effectively allocated the market for aerospace employee labor. To the extent any further facts are relevant to the determination of this motion, they are discussed below.

## II. PROCEDURAL HISTORY

This action has a lengthy procedural history, which the Court will not recount in full. Relevant to the present motion, in July of 2022, Defendants moved to dismiss Plaintiffs' Consolidated Amended Complaint ("CAC"), arguing that Plaintiffs failed to plead both a *per se* violation of the Sherman Act and a rule of reason claim. The Court disagreed, holding that Plaintiffs had plausibly alleged both a *per se* violation and a rule of reason claim. ECF No. 582. The Court found that Plaintiffs adequately identified the relevant "product" market (skilled aerospace labor), *id.* at 22–26, and that Plaintiffs adequately alleged an adverse effect on competition in that market (suppression of salaries), *id.* at 26–27. Crucially, the Court limited the

geographic market to the state of Connecticut because Plaintiffs had not plausibly alleged Defendants controlled any substantial share of the market in any other area. *Id.* at 23–25.

After the Court's ruling, Plaintiffs filed a motion for reconsideration of the Court's order on Defendants' motions to dismiss. ECF No. 584-1. Plaintiffs sought reconsideration of footnote 6, which stated that "it is an element of a *per se* case to describe the relevant market in which we may presume the anticompetitive effect would occur." ECF No. 582 at 20 n.6 (quoting *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999)). Plaintiffs argued that they did not need to allege a relevant market to proceed with a *per se* claim. The Court denied Plaintiffs' motion, finding that Second Circuit precedent requires the pleading of the relevant market even for a *per se* claim, and affirming that Plaintiffs' rule of reason and *per se* violation claims were limited in geographic scope to the state of Connecticut, based on the allegations in the operative complaint. ECF No. 647.

After the Court denied the motion for reconsideration, and after resolution of a discovery dispute by U.S. Magistrate Judge Spector that required Defendants to produce to Plaintiffs employment and other data for employees residing outside of Connecticut, ECF Nos. 673, 705, Plaintiffs filed the pending motion for leave to amend the CAC, in order to expand the geographic scope of their claims to all states in which Defendants employ skilled aerospace workers. As part of their proposed amendments, Plaintiffs also seek to include admissions made by Defendant Agilis in its answer to Plaintiffs' operative complaint. Defendants oppose the motion, arguing that Plaintiffs' amendments are futile under Federal Rule of Civil Procedure 15(a)(2), and, even if the amendments were not futile, that the proposed amendments are barred under Federal Rule of Civil Procedure Rule 16(b) as unduly delayed and prejudicial to Defendants.

### III. LEGAL STANDARD

At the outset of litigation, "a plaintiff may freely amend [his] [or] her pleadings pursuant to Rule 15(a)(1) as of right without court permission." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022). After this period ends—either by operation of a scheduling order set by the Court or upon "expiration of the default period set forth in Rule 15(a)(1)(A)," *id.*—a plaintiff may seek to amend "with the opposing party's written consent or the court's leave," Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) is a lenient standard, and the Court is to "freely give leave when justice so requires." *See Sacerdote*, 9 F.4th at 115 (referring to the Rule 15 standard as "liberal" and "permissive").

If a district court set a date in the scheduling order after which no amendment would be permitted and a plaintiff seeks leave to amend his or her complaint after this deadline, the court must also amend its scheduling order, if it is to grant the motion for leave to amend. Modifications to a scheduling order are permitted upon a showing of "good cause." Fed. R. Civ. P. 16(b)(4). Therefore, Rule 15(a) governs whether the Court should grant the motion for leave to amend, while Rule 16(b) governs whether there is good cause for the Court to amend its scheduling order.

There is an "obvious tension" between the standards applied by Rule 15(a) and Rule 16(b). *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 175 (S.D.N.Y. 2014) (explaining different courts' approaches to these rules). Rule 15(a)'s "lenient standard . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause." *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009) (cleaned up); *see also Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (citing older versions of Rules 15 and 16). Accordingly, the Court will apply and balance

both Rule 15(a)'s lenient standard for granting leave to amend with Rule 16(b)'s stricter standard governing amendments after the Court's scheduling order deadline.

Under Rule 15(a)(2), "the only 'grounds on which denial of leave to amend has long been held proper' are upon a showing of 'undue delay, bad faith, dilatory motive, [or] futility.'" *Sacerdote*, 9 F.4th at 115 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015)) (alterations in original). Relevant here, "[a] proposed amendment to a complaint is futile when it 'could not withstand a motion to dismiss.'" *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164–65 (2d Cir. 2015) (quoting *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)). That is, "a proposed claim is futile if, accepting the facts alleged by the party seeking amendment as true and construing them in the light most favorable to that party, it does not 'plausibly give rise to an entitlement to relief.'" *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2018 WL 1274238, at *1 (S.D.N.Y. Mar. 9, 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). If, however, "the underlying facts or circumstances relied upon by a plaintiff *may* be a proper subject of relief," the plaintiff "ought to be afforded an opportunity to test his claim on the merits." *United States v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 889 F.2d 1248, 1254 (2d Cir. 1989) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (emphasis added). Therefore, the Court "should dismiss claims for futility 'only where it is beyond doubt that the plaintiff can prove no set of facts in support of his amended claims.'" *Richard Mfg. Co. v. Richard*, 513 F. Supp. 3d 261, 290 (D. Conn. 2021) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 70–71 (2d Cir. 1999)). "The party opposing a motion to amend bears the burden of establishing that amendment would be futile." *Brach Fam. Found., Inc.*, 2018 WL 1274238, at *1.

Rule 16(b) governs whether a plaintiff should be permitted to assert an amended complaint after a scheduling order's deadline for doing so. The "good cause" standard in Rule 16(b)(4) applies where a district court has issued "a scheduling order setting a date after which no amendment will be permitted" and the plaintiff requests to amend the complaint after that date. Whether good cause exists generally "depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000), *overruled on other grounds as recognized in Natofsky v. City of New York*, 921 F.3d 337, 347 (2d Cir. 2019). The Court can also consider whether allowing amendment of the complaint at a particular stage of litigation would prejudice the defendant. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).

**IV.     DISCUSSION**

As noted above, Plaintiffs seek to expand the geographic scope of their claims to every state in which skilled aerospace workers were located and worked on projects for Pratt & Whitney (now known as Defendant RTX), and to add admissions made by Defendant Agilis in its answer. Defendants oppose Plaintiffs' motion to amend on two grounds. First, Defendants argue that Plaintiffs' amendments are futile under Federal Rule of Civil Procedure 15(a)(2) because Plaintiffs' proposed amended consolidated complaint fails to address the deficiencies in geographic scope identified by the Court in its orders on Defendants' motions to dismiss and Plaintiffs' motion for reconsideration. Second, Defendants argue that even if the amendments were not futile, that the proposed amendments are barred under Federal Rule of Civil Procedure Rule 16(b) as unduly delayed and prejudicial to Defendants. *Id.*

The Court holds that Plaintiffs' proposed amendments are permissible, and addresses Defendants' arguments in turn.

### A. Rule 15(a)(2):  Futility

For the reasons stated below, the Court finds that Plaintiffs have alleged sufficient facts with respect to the relevant geographic market encompassing the states where Defendants employ aerospace workers.  The Court also holds that the proposed amendments related to Defendant Agilis are not futile.

#### *1. Market Definition*

First, Defendants argue that the proposed amended complaint fails to plausibly plead a relevant market beyond Connecticut.  Initially, they contend that Plaintiffs fail to allege a "buyer-side" market, focusing instead on "where sellers—here, Aerospace Workers—'sell' their labor." ECF No. 703 at 12 (citing Proposed Am. Compl. ("PAC") at ¶¶ 151–52).  According to Defendants, Plaintiffs must "identify any other buyers of Aerospace Workers' labor other than the Defendants themselves, or why those other buyers would not be reasonable substitutes for Defendants."  *Id.* at 13.  Because Plaintiffs' proposed amendment has not addressed this fundamental flaw, Defendants argue, the Court should deny Plaintiffs' motion to amend.

The Second Circuit explained in *Concord Associates, L.P. v. Entertainment Properties Trust*:

> For antitrust purposes, the concept of a market has two components:  a product market and a geographic market.  A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.  By contrast, the geographic market analysis seeks to identify the precise geographic boundaries of effective competition in order to reach a more informed conclusion on potential harm to the market.  Courts generally measure a market's geographic scope, the area of effective competition, by determining the areas *in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product*.
>
> Taken together, the product and geographic components illuminate the relevant market analysis, which is essential for assessing the potential harm to competition from the defendants' alleged misconduct.

> Although market definition is a deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage, there is no absolute rule against dismissal where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way. Thus, in order to survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiffs' complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market.

817 F.3d 46, 52–53 (2d Cir. 2016) (emphasis added) (cleaned up).

Here, as the Court explained in its ruling on Defendants' motions to dismiss, the conspiracy Plaintiffs allege is a buyer-side conspiracy, with the market comprised of companies, including Defendants, as the buyers of labor, and aerospace workers, the putative class members, as its sellers. ECF No. 582 at 23 (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 201–02 (2d Cir. 2001)). As *Todd* recognized, "[a]n alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd*, 275 F.3d at 199 (cleaned up). In a buyer-side conspiracy, the focus must be on the commonality and interchangeability of the employer-buyers, and "greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question." *Todd*, 275 F.3d at 202. To analyze interchangeability, then, the Court must examine whether, from the perspective of the employee selling her labor, a job opportunity with another company in the aerospace industry or a company in another industry is a reasonably good substitute for a job opportunity with an aerospace engineering firm like Defendants. *See id.*

The Court notes that Plaintiffs have not fundamentally changed the product market that formed the basis of their claim when Defendants filed their motions to dismiss. Nonetheless, Defendants' buyer-side conspiracy argument continues to focus on apparent deficiencies in Plaintiffs' alleged product market. In its prior ruling, the Court recognized that market definition

8

is a "deeply fact-intensive inquiry" not typically well-suited to a motion to dismiss, and found it reasonable "at least for purposes of a motion to dismiss, for Plaintiffs to limit the proposed market to the aerospace industry . . . ." ECF No. 582 at 22 (quoting *Todd*, 275 F.3d at 199), 26.  In other words, the Court's prior ruling approved Plaintiffs' product market for pleading purposes with respect to a limited geographic market, while pointing to deficiencies in Plaintiffs' geographic market allegations, insofar as they sought to allege as to a nationwide conspiracy.  Now Plaintiffs move to cure those deficiencies in their geographic market allegations, and yet Defendants remain focused on Plaintiffs' product market allegations.  Because the Court has already found Plaintiffs' product market allegations adequate, and Plaintiffs' proposed allegations cure the deficiencies the Court identified with respect to Plaintiffs' geographic market allegations (as discussed below), the Court finds unpersuasive Defendants' renewed arguments as to the product market.

In particular, Defendants urge the Court to require that Plaintiffs identify other specific potential buyers of their labor and explain why those other buyers would not be reasonable substitutes for Defendants.  The Court itself has questioned Plaintiffs at two oral arguments about why members of the putative class could not simply switch to *other* aerospace engineering companies besides Defendants, thus rendering those firms adequate substitutes for Defendants; indeed, Plaintiffs themselves state that there are 60,000 aerospace engineers in the United States as of 2020, *see* PAC ¶ 45, and the number of engineers in Defendants' employ appears to be only a small fraction of that amount, *see id.* ¶ 149.  Plaintiffs respond that they have received training specific to Pratt & Whitney projects, which makes their skills at least somewhat specific to Defendants (Pratt & Whitney and companies that perform projects for it).  They further allege that members of the putative class must "complete extensive education and training to do their jobs well" because the work is "highly specialized." *Id.* ¶ 6.  Critically, because the aerospace workers

at issue worked almost exclusively on Pratt & Whitney projects, Plaintiffs allege they "would experience significant barriers to transitioning to another employer outside of Pratt & Whitney and its engineering and skilled labor suppliers." *Id.* ¶ 68. They also allege that, "[h]ad competing opportunities existed for Defendants' employees to earn higher compensation at other aerospace engineering firms, they could have ceased their employment with Defendants and pursued those more lucrative opportunities," resulting in the "collapse[]" of the alleged conspiracy. *Id.* ¶ 161. Because the conspiracy operated for many years, Plaintiffs believe such competing opportunities did not exist. From these allegations, it is a plausible inference that there are few available substitutes for positions at Defendants' companies. The Court therefore holds, once again, that Plaintiffs have stated a plausible product market, for pleading purposes.[1]

Turning to the geographic market, the Court finds *Concord Associates*' description of a geographic market instructive: "Courts generally measure a market's geographic scope, the area of effective competition, by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." 817 F.3d at 52 (cleaned up). Translating this statement to a buyer-side labor market conspiracy, the market's geographic scope for the present case is the areas in which the *buyers* operate and where *sellers* can turn for *sale* of their labor. Using this formulation, the geographic scope of the market here includes all states where Defendants employ aerospace workers—i.e., where putative class

---

[1] As *Todd* makes clear, Plaintiffs also cannot avoid the question of whether they could switch to industries outside of aerospace engineering. Plaintiffs have plausibly alleged, however, that there are few available substitutes for working in an aerospace engineering firm given their highly specialized knowledge and training—thus demonstrating a relevant product market for pleading purposes. *See Todd*, 275 F.3d at 203 (noting that the accumulation of industry-specific knowledge can support an inference that jobs outside of that industry would be inadequate substitutes, and thus should not be part of the relevant product market).

10

members, as skilled aerospace workers with training specific for Pratt & Whitney projects, would turn for sale of their labor—alleged to be thirty states.[2]

It is true that the relevant geographic market "is not defined by the market in which the defendant conducts its business." *Ragner Tech. Corp. v. Berardi*, 324 F. Supp. 3d 491, 510 (D.N.J. 2018). Defendants argue that this Court has already rejected as insufficient allegations that do no more than allege that Defendants employ some number of people in various states and do business in those states. Defendants contend the PAC is simply another variation on this same theme, albeit with more detailed employment figures. But Plaintiffs have done more than simply allege where Defendants do business; they have plausibly alleged that putative class members would "rationally look" to these locations for the jobs they seek. *See id.* Based on "Defendants' own data," Plaintiffs have incorporated into their PAC detailed information regarding the percentage of Defendants' workforce comprised of employees in these thirty states. PAC ¶¶ 52–55. When Plaintiffs lay out the expanded geographic scope of the alleged conspiracy in their PAC, they not only allege the number of employees each Defendant employed, but also information regarding the states in which the majority of those employees worked for Defendants. *Id.* ¶¶ 148–49. Plaintiffs would rationally look to these states for employment because, as skilled aerospace workers with training specific to Pratt & Whitney projects, Plaintiffs would aim to sell their specialized labor in geographic locations where the most likely buyers of that labor—Defendants—operate.

Defendants' Florida comparison is useful in highlighting how Plaintiffs' new allegations are not futile. In their operative complaint, Plaintiffs offered sparse allegations as to the extent of Defendants' alleged conspiracy in Florida. Plaintiffs simply alleged that Defendant Agilis was

---

[2] The thirty states are Alabama, Arkansas, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin. PAC ¶ 148.

11

"incorporated in Florida," ECF No. 385 ¶ 32, that Defendant Parametric Solutions was "incorporated in Florida," *id.* ¶ 35, that "Defendants' employees were also geographically concentrated in Connecticut and northeast South Florida," *id.* ¶ 63, and that "[t]o the extent a relevant market needs to be defined for any reason, the market restrained by Defendants' conduct" includes "Palm Beach County, Florida," *id.* ¶ 163. That these threadbare allegations could not survive a motion to dismiss is clear. *See* ECF No. 582 at 23. In their PAC, however, Plaintiffs allege more detailed geographic information based on employment data produced by Defendants. In particular, Plaintiffs now allege the number of employees Defendants employee in various states and the percentage those employees make up of the entirety of Defendants' workforce. As to Florida specifically, Plaintiffs allege that it is one of the states in which high concentrations of Defendants' employees supporting Pratt & Whitney projects work. *See* PAC ¶¶ 149(a), (c), (d), (f). It stands to reason that skilled aerospace workers would thus rationally look to Florida as a place to sell their labor. In short, Plaintiffs no longer rely on the conclusory allegations that this Court previously rejected.

Moreover, the PAC includes new allegations based on documents produced in discovery demonstrating that Defendants were able to enforce their conspiracy in several states beyond Connecticut. For example, they allege that Plaintiff Glogowski, who worked for Defendant QuEST in Michigan, was not hired for a position at Pratt & Whitney in Michigan that would have paid more, due to the conspiracy, PAC ¶ 162(a); that Defendant Parametric Solutions did not hire several candidates who were employed by Pratt & Whitney partner companies in South Carolina and Ohio due to the conspiracy, *id.* ¶ 162(b); and that Defendant Belcan did not hire a QuEST employee in Ohio due to the conspiracy, *id.* ¶ 162(c). These allegations support a geographic

market that extends beyond Connecticut, to the other places where Defendants employ significant numbers of skilled aerospace workers.

For these reasons, the Court holds that Plaintiffs have now put forward enough geographic data such that their allegations of the geographic market as encompassing the thirty states where Defendants employed aerospace workers is plausible. *See Concord Assocs.*, 817 F.3d at 52. The Court notes, however, that an expanded geographic market may be a double-edged sword for Plaintiffs. As another district court has noted:

> Because alleging an overbroad market does not create deficiencies analogous to those that plague contradictory, undefined, or implausibly narrow markets, it does not warrant dismissal at the pleading stage. It is therefore problematic to allege too narrow a geographic market, because it could create the illusion of market power where no market power exists, via the exclusion of nearby alternative employment opportunities. The same concern does not exist for a broad geographic market, because many alternative employment opportunities are included in the allegedly overbroad market, so there is no risk of creating an illusion of market power. In fact, by alleging a broad geographic market spanning the entire country, Plaintiffs are making it *harder* to prove their case, because the level of market power necessary to control wages across the entire country is much greater.

*Jien v. Perdue Farms, Inc.*, Case No. 1:19-CV-2521-SAG, 2022 WL 2818950, at *10 (D. Md. July 19, 2022) (emphasis in original) (cleaned up). The Court leaves for another day whether Plaintiffs will be able to prove the alleged antitrust violations.

### 2. *Market Share Allegations*

Defendants next take issue with Plaintiffs' market share allegations, as they relate to four states—Connecticut, Florida, Michigan, and Ohio. Defendants contend Plaintiffs' allegations of Defendants' market shares in these states are based on flawed résumé data from Lightcast, a labor market analytics firm. Having held above that Plaintiffs have plausibly alleged a geographic market beyond these four states without reference to the Lightcast market share data, the Court need not reach Defendants' argument that this data is faulty. The Court notes only that "[i]f a

13

plaintiff can show an actual adverse effect on competition," then there is no need to demonstrate further "market power." *Todd*, 275 F.3d at 206–07.  Just as when the Court ruled on Defendants' motions to dismiss, Plaintiffs allege an adverse effect on competition by virtue of Defendants' alleged "ability to suppress the wages they paid to Aerospace Workers they employed, no matter where those workers were located." PAC ¶¶ 158–59.  Plaintiffs' PAC is therefore not futile on this ground.

### 3. Agilis' Alleged Admissions

Finally, Defendants contest Plaintiffs' incorporation of Defendant Agilis' alleged admissions to "participating in a 'criminal violation' of the antitrust laws." ECF No. 703 at 19 (citing PAC ¶¶ 11, 162(d), 186).  These allegations are not futile.

First, Defendants argue that Defendant Agilis' admission of participating in a criminal scheme in violation of the Sherman Act does not and cannot support Plaintiffs' expanded geographic market.  The Court has held above that the geographic market is plausibly pleaded without reference to the additional Agilis allegations, so this argument fails.  Additionally, that Agilis has denied some of Plaintiffs' allegations, while admitting others, does not render Plaintiffs' allegations concerning Agilis' admissions of participation in the conspiracy implausible.

Judge Bolden's granting of the individual criminal defendants' motion for judgment of acquittal in the related criminal prosecution does not compel a different conclusion, as Defendants suggest.  That the *individuals* charged in the criminal case were acquitted does not negate Agilis' admissions as a corporation in this civil litigation, particularly given the higher burden of proof in the criminal case.  Defendants do not provide any authority to the contrary.

*4. Conclusion*

For these reasons, the Court finds that Plaintiffs' proposed amendments would not be futile under Rule 15.

B. Rule 16(b):  Diligence and Prejudice

The Court holds that, under Rule 16(b), there is good cause to modify the scheduling order to permit the proposed amendment.  Plaintiffs acted diligently in pursuing the amendment, and Defendants will not suffer from undue prejudice if the amendment is permitted.

*1. Diligence*

Defendants argue that Plaintiffs lacked diligence in investigating publicly available information that Plaintiffs could have (and should have) included in a more timely manner.  The Court disagrees.

First, Defendants compare Plaintiffs' motion for leave to amend with that of the plaintiff in *Conservation Law Foundation, Inc. v. Gulf Oil Limited Partnership*, No. 3:21-CV-932 (SVN), 2023 WL 4145000 (D. Conn. June 23, 2023) ("*CLF*").  In *CLF*, this Court denied the plaintiff's motion for leave to amend in part because it could have discovered the new facts alleged in the proposed amendment before the scheduling order's deadline for amendments.  *Id.* at *9.  In so holding, the Court noted that a plaintiff may still amend "under certain circumstances where a party 'learns new facts through discovery that were unavailable prior to the applicable deadline' and 'moves promptly' to amend based on such facts . . . .'" *Id.* (quoting *Port Auth. Police Benevolent Ass'n v. Port Auth. of N.Y. & N.J.*, No. 15-CV-3526 (AJN), 2016 WL 6083956, at *5 (S.D.N.Y. Oct. 17, 2016)).  Unlike the plaintiff in *CLF*, here Plaintiffs have shown that they acted diligently in moving to amend after learning new facts based on discovery produced by Defendants

15

during the course of this litigation. Plaintiffs also sought leave to amend shortly after this Court's Reconsideration Order. Plaintiffs' motion is not untimely for these reasons.

Defendants' other arguments challenging Plaintiffs' diligence fail for similar reasons. For example, Defendants argue Plaintiffs lacked diligence in their proposed amendments because they could have engaged Lightcast earlier and could have accessed publicly available job posting information before the Court's amendment deadlines. These arguments ignore important facts that provide context for the timeline on which Plaintiffs operated. First, Plaintiffs did include some publicly available job posting information in their operative complaint, but the employment data received from Defendants in discovery, which comprises the bulk of the new allegations in the PAC, could not have been known to Plaintiffs earlier. Second, as noted in Judge Spector's June 13, 2023, discovery order, Defendants delayed in providing Plaintiffs with requested material. ECF No. 705. Defendants cannot delay production of discovery and then fault Plaintiffs for acting late. Although Plaintiffs could have purchased the Lightcast data earlier, their failure to do so does not defeat a finding of diligence under these circumstances.

For these reasons, Plaintiffs' motion for leave to amend will not be denied because of a lack of diligence.

### 2. Prejudice

The Court also finds that Defendants will not be unduly prejudiced by the proposed amendments. As Defendants admit, Plaintiffs' PAC adds no new claims. Additionally, Defendants have already been required by Judge Spector's order to produce discovery concerning aerospace employees employed by them in thirty-three states, so the PAC will not greatly expand the scope of discovery. *See* ECF No. 705.

In sum, the Court finds that there is good cause to modify the scheduling order to permit Plaintiffs' proposed amendments.

## V. MOTION TO SEAL

In accordance with the Court's order regarding sealing procedures, ECF No. 714, Plaintiffs have filed a motion to seal certain limited parts of the PAC, ECF No. 683, and Defendants have supplemented the motion with their view as to what is appropriate to seal, in their own motion, ECF No. 721. Defendants originally sought to have portions of paragraphs 54, 149(a)–(f), 155, 158, and 162(a)–(b) of the PAC sealed, but later withdrew their request as paragraphs 162(a) and (b). ECF No. 734.

The Court finds that the limited sealing of paragraphs 54, 149(a)–(f), 155, and 158 proposed by Defendants is supported by the clear and compelling reason of protecting from public disclosure Defendants' competitive business information, including the number of employees who work in specific locations and certain salary information. The requested sealing is also narrowly tailored, in that Defendants have sought to seal only minimal parts of these paragraphs that would reveal their competitive business information. Therefore, Defendants' motion to seal, ECF No. 721, as modified by their notice of withdrawal in part at ECF No. 734, is GRANTED. Plaintiffs' motion to seal, ECF No. 683, is denied as moot.

## VI. CONCLUSION

For the reasons described herein, Plaintiffs' motion for leave to amend is GRANTED. By **November 2, 2023**, Plaintiffs shall docket a public, redacted version of the Amended Consolidated Class Action Complaint, with redactions consistent with this order. Plaintiffs shall also docket, as a sealed document, the unredacted Amended Consolidated Class Action Complaint in its final form.

The deadlines for class certification filings in ECF No. 713 remain operative.

**SO ORDERED** at Hartford, Connecticut, this 26th day of October, 2023.

                                           */s/ Sarala V. Nagala*
                                           SARALA V. NAGALA
                                           UNITED STATES DISTRICT JUDGE