# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TARAH KYE BOROZNY, ANTHONY DeGENNARO, RYAN GLOGOWSKI, ELLEN McISAAC, SCOTT PRENTISS, ALEX SCALES, AUSTIN WAID-JONES, NICHOLAS WILSON, and STEVEN ZAPPULLA, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

RTX CORPORATION, PRATT & WHITNEY DIVISION; AGILIS ENGINEERING, INC.; BELCAN ENGINEERING GROUP, LLC; CYIENT, INC.; PARAMETRIC SOLUTIONS, INC.; and QUEST GLOBAL SERVICES-NA, INC.,

Defendants.

Case No.: 3:21-cv-1657 (SVN)

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**November 2, 2023**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

JURISDICTION AND VENUE .................................................................................................7

THE PARTIES.............................................................................................................................7

    A.    Plaintiffs..................................................................................................................7

    B.    Defendants ...........................................................................................................10

I.    FACTUAL ALLEGATIONS .......................................................................................12

    A.    The Aerospace Industry ......................................................................................12

    B.    Defendants' Conspiracy to Restrict Hiring, Recruiting, and Compensation Among Aerospace Workers...................................................................................22

    C.    The Conspiracy to Further Restrict Hiring and Recruiting Between Pratt & Whitney and Outsourcing Defendants .................................................................29

        1.    Pratt & Whitney and QuEST ..................................................................29

        2.    Pratt & Whitney and the Other Outsourcing Defendants .........................33

    D.    The Effects of the No-Poach Conspiracy.............................................................33

II.    EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT ......................37

III.    GEOGRAPHIC MARKET ALLEGATIONS ...............................................................41

IV.    CLASS ACTION ALLEGATIONS ..............................................................................54

FIRST CLAIM FOR RELIEF ................................................................................................57

SECOND CLAIM FOR RELIEF ...........................................................................................59

PRAYER FOR RELIEF ..........................................................................................................61

DEMAND FOR JURY TRIAL ...............................................................................................62

Plaintiffs Tarah Kye Borozny, Anthony DeGennaro, Ryan Glogowski, Ellen McIsaac, Scott Prentiss, Alex Scales, Austin Waid-Jones, Nicholas Wilson, and Steven Zappulla bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all engineers and other skilled workers employed by horizontal competitors Agilis Engineering, Inc. ("Agilis"); Belcan Engineering Group, LLC ("Belcan"); Cyient, Inc. ("Cyient"); Parametric Solutions, Inc. ("Parametric Solutions"); QuEST Global Services-NA, Inc. ("QuEST") (collectively, the "Outsourcing Defendants"); and RTX Corporation, Pratt & Whitney Division ("Pratt & Whitney") (together with the Outsourcing Defendants, the "Defendants").

## INTRODUCTION

1.      This antitrust action concerns the rights of employees to free and fair labor markets.  "[W]orkers, like consumers, are entitled to the benefits of a competitive market."[1]  But for more than a decade, Defendants—among the largest aerospace engineering firms based in the United States that design, manufacture, and service aerospace products for civil and military applications—conspired to refrain from competition when it came to hiring each other's employees.

2.      Specifically, Defendants secretly agreed to restrict their competition in the recruitment and hiring of aerospace engineers and other skilled workers in the jet propulsion systems industry ("Aerospace Workers").  Defendants entered into this agreement for one clear and overarching reason—so they could pay these highly-skilled employees *less* than they would be paid in a competitive market.

---

[1]  U.S. Dep't of Just., *Division Update Spring 2018* (Apr. 10, 2018), https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements.

3.     Defendants' conspiracy deprived Aerospace Workers of the benefits of competition: by agreeing not to recruit and hire each other's employees, Defendants were able to pay their Aerospace Workers lower wages than would have prevailed in a competitive market and deprived such workers of job opportunities and the many other benefits that accompany professional mobility.

4.     Pratt & Whitney is one of the largest aerospace engineering firms in the world. Pratt & Whitney employs its own Aerospace Workers and also contracts with outsourcing firms—such as the Outsourcing Defendants—to complete projects using the outsourcing firm's own resources and employees, including their own Aerospace Workers. When this occurs, the outsourcing firm pays the salary and benefits for workers assigned to the project and Pratt & Whitney pays the outsourcing firm once work is completed. The outsourcing firm benefits from the spread: the difference between the wage rate it pays its employees and the rate at which it then bills Pratt & Whitney for their labor. Pratt & Whitney benefits by having access to an on-demand labor force.

5.     Defendants all draw from, and compete for, the same pool of talent when hiring and staffing their aerospace engineering projects. Despite the outsourcing relationship between Pratt & Whitney and the Outsourcing Defendants, all Defendants compete directly with each other to hire Aerospace Workers.

6.     Success in this industry dependents critically on attracting, hiring, and retaining skilled Aerospace Workers. The work done on these projects is highly specialized and technical; employees must complete extensive education and training to do their jobs well. Because national defense projects are an important source of business for Defendants, many of their

employees must obtain government security clearances.  Many aerospace engineering firms—including Defendants—actively recruit armed-services veterans for this reason.

7.     Demanding requirements and high barriers to entry mean that qualified candidates for employment with Defendants are scarce.  In a competitive market, the combination of a low supply of candidates and high demand for their skills would lead to higher compensation and better benefits as firms compete to lure top workers away from competitors and convince their own workers to reject offers from other firms.

8.     Defendants, however, conspired to avoid having to compete with each other to pay their employees a competitive wage.  By 2011, if not earlier, Defendants explicitly agreed not to hire or recruit each other's Aerospace Workers.  The purpose and result of this unlawful agreement was so that Defendants could artificially depress their own labor costs, thereby depriving workers of the compensation they would otherwise earn in a competitive marketplace.  Defendants expressly discussed this shared objective with each other, and each of them knew that this was the conspiracy's overarching goal.

9.     The U.S. Department of Justice ("DOJ") exposed Defendants' conspiracy on December 21, 2021, when it unsealed a criminal antitrust action against Mahesh Patel, the former Director of Global Engineering Sourcing at Pratt & Whitney.  *See* Aff. in Supp. of Criminal Compl. and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-1189 (D. Conn. Dec. 9, 2021), ECF No. 15.  A week later, the DOJ announced the indictment of Patel and five senior executives from the Outsourcing Defendants, including Steven Houghtaling of Belcan, Tom Edwards of Cyient, Gary Prus of Parametric Solutions, and Robert Harvey and Harpreet Wasan of QuEST.

10.     The DOJ indicted these senior executives for entering into and carrying out, along with other unnamed executives, an unlawful agreement to restrict competition for each other's employees. *United States v. Patel, et al.*, No. 3:21-cr-220-VAB, ECF No. 20 (D. Conn. Dec. 16, 2021) (the "Indictment").  As stated by Assistant Attorney General Jonathan Kanter in announcing the Indictment, the DOJ's "investigation revealed a prolonged and widespread scheme to deprive aerospace workers of the ability to plan their own careers and earn competitive pay."[2]

11.     Defendant Agilis has applied for a marker under the Department of Justice's Corporate Leniency Program.  Under the Corporate Leniency Program, to receive immunity from criminal prosecution, an applicant must admit to its participation in a criminal violation of the antitrust laws.  *See, e.g.,* DOJ Corporate Leniency Policy, at 1-2 (Aug. 10, 1993); DOJ Antitrust Division Leniency Policy & Procedures 7-3.310 (Apr. 4, 2022).  In this litigation, Agilis has admitted "that it voluntarily participated in an agreement to allocate employees constituting a criminal violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by restricting the hiring and recruitment of engineers and other skilled labor employees among outsource engineering services companies."  Agilis Answer, ECF No. 631, at 1-2 (internal quotation marks omitted).

12.     As a result of the DOJ's investigation, this is the rare antitrust case where direct, "smoking gun" evidence of the conspiracy exists at the pleading stage.  Numerous examples of this direct evidence are discussed herein.

_____

[2]  U.S. Attorney's Office District of Connecticut, *Six Aerospace Executives and Managers Indicted for Leading Roles in Labor Market Conspiracy that Limited Workers' Mobility and Career Prospects* (Dec. 16, 2021), https://www.justice.gov/usao-ct/pr/six-aerospace-executives-and-managers-indicted-leading-roles-labor-market-conspiracy-1.

13.     Defendants implemented and enforced their conspiracy by a system of monitoring and reporting.  Pratt & Whitney's Patel served as the leader and primary enforcer of the conspiratorial agreement and the intermediary for communications between co-conspirators.  When members of the conspiracy learned that a co-conspirator was trying to compete for an already-claimed worker, they would complain to Patel who would take steps to stop the competition for the worker.  For example, in November 2016, Patel reminded the other conspirators that "[w]e must not poach each other [sic] partners [sic] employee," a message he communicated numerous times throughout the conspiracy.  In other cases, Patel directed that Pratt "not extend" offers to candidates working for Outsourcing Defendants.  Other conspirators documented discussions with Patel about "new policy/guidelines" to establish minimum "tenure requirements" before conspirators could consider a worker from one another for employment.

14.     Time after time, Defendants would fall in line.  Defendants' mutual refusal to recruit or hire each other's employees had the purpose and effect of allocating the market for skilled Aerospace Worker labor among Defendants.

15.     Defendants' agreement "pre[v]ent[ed] poaching and price war[s]" over qualified candidates, which they feared would "drive the price structure up" for Defendants.  In other words, their clear objective was to pay Aerospace Workers less than the free market would dictate.  Defendants repeatedly discussed with each other their mutual desire to use the conspiracy to "contain labor cost increases in our joint 'ecosystem' over time."  The "ecosystem" to which Defendants referred was not limited to a single geographic area, but  encompassed all of Defendants' plants and other locations.  In their discussions of the no-poach agreement, never did any Defendant cabin the geographic scope of their conspiracy to a single state or area.

16.     Defendants boasted to each other about the money they saved through their unlawful agreement at the expense of their workers.  Defendants knew that their conspiracy harmed their employees, and they knew it was illegal and had to be concealed.  Again, this knowledge is demonstrated by direct evidence that is unambiguous and unmistakable.

17.     In January 2016, for example, one of the conspirators scheduled a meeting with Patel that included the agenda item: "Informal poaching agreement between outsource suppliers. *Recent Apple lawsuit because these agreements are illegal*."  The following year, a Human Resources Director employed by one of Defendants raised concerns that "*[t]here is an anti-trust issue by us turning people away solely based on their previous employer*."  After speaking with Patel, the Human Resources Director reported that Patel "understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [] competitors."

18.     Because they knew their agreement was illegal, Defendants took pains to keep their conspiracy secret and to hide it from their victims.  In one email, for example, a Defendant conspirator advised that "[f]ollowing Mahesh's [Patel's] previous counsel, I am not going into detail in writing on this subject."

19.     Defendants' unlawful actions harmed their employees in ways that will persist for years to come.  The conspiracy depressed these workers' wages and compensation for the better part of a decade, and future employers may use these artificially low salary histories when deciding compensation.  It also interfered with the ability of workers to plan their careers and to find employment that best suited their skills and interests.  Defendants' conspiracy has already cost employees many millions of dollars they lost the opportunity to earn, and that damage is likely to compound as their careers continue.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

21.     This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22; Federal Rule of Civil Procedure 4(h)(1)(A); and the Connecticut long-arm statute because each Defendant resides in or has its principal place of business in Connecticut, employed individuals in Connecticut during the Class Period, and/or has had substantial contacts with Connecticut in furtherance of the conspiracy.

22.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### A.     Plaintiffs

23.     Plaintiff Tarah-Kye Borozny is a citizen and resident of the State of Texas.  Ms. Borozny was employed as an engineer by QuEST from September 2014 until March 2017, working out of East Hartford, Connecticut.  As part of her employment at QuEST, Ms. Borozny exclusively worked on projects for Pratt & Whitney.  Ms. Borozny was also employed as an engineer by Pratt & Whitney from March 2017 until October 2018, working out of East Hartford, Connecticut.  As a result of Defendants' agreement, Ms. Borozny earned less than she would have absent the alleged agreement.  Further, because of Defendants' unlawful agreement, she was also denied access to better, higher-paying job opportunities and her ability to change employment was restricted.

24.     Plaintiff Anthony DeGennaro is a citizen and resident of the State of Connecticut. Mr. DeGennaro was employed as an engineer by Belcan from October 2013 until November 2017, working out of Windsor, Connecticut.  As part of his employment, Mr. DeGennaro exclusively worked on projects for Pratt & Whitney.  As a result of Defendants' agreement, Mr. DeGennaro earned less than he would have absent the alleged agreement.  Further, because of Defendants' unlawful agreement, he was also denied access to better, higher-paying job opportunities and his ability to change employment was restricted.

25.     Plaintiff Ryan Glogowski is a citizen and resident of the State of Michigan.  Mr. Glogowski was employed as an engineer by QuEST from June 2015 until January 2018, working out of East Hartford, Connecticut and Lansing, Michigan.  As part of his employment, Mr. Glogowski exclusively worked on projects for Pratt & Whitney.  As a result of Defendants' agreement, Mr. Glogowski earned less than he would have absent the alleged agreement. Further, because of Defendants' unlawful agreement, he was also denied access to better, higher-paying job opportunities and his ability to change employment was restricted.

26.     Plaintiff Ellen McIsaac is a citizen and resident of the State of California.  Ms. McIsaac was employed as an engineer by Pratt & Whitney from June 2012 until January 2015, working out of Middletown, Connecticut.  As a result of Defendants' agreement, Ms. McIsaac earned less than she would have absent the alleged agreement.  Further, because of Defendants' unlawful agreement, she was also denied access to better, higher-paying job opportunities and her ability to change employment was restricted.

27.     Plaintiff Scott Prentiss is a citizen and resident of the State of Connecticut.  Mr. Prentiss was employed as an engineer by QuEST from August 2009 until March 2014, working out of both East Hartford, Connecticut and Windsor, Connecticut.  As part of his employment,

Mr. Prentiss primarily worked on projects for Pratt & Whitney. Mr. Prentiss was also employed as an engineer by Belcan from December 2017 until December 2019, working out of Windsor, Connecticut. As a result of Defendants' agreement, Mr. Prentiss earned less than he would have absent the alleged agreement. Further, because of Defendants' unlawful agreement, he was also denied access to better, higher-paying job opportunities and his ability to change employment was restricted.

28.     Plaintiff Alex Scales is a citizen and resident of the State of Colorado. Mr. Scales was employed as a mass properties engineer by Cyient from June 2016 until May 2020, working out of East Hartford, Connecticut. As part of his employment, Mr. Scales exclusively worked on projects for Pratt & Whitney. As a result of Defendants' agreement, Mr. Scales earned less than he would have absent the alleged agreement. Further, because of Defendants' unlawful agreement, he was also denied access to better, higher-paying job opportunities and his ability to change employment was restricted.

29.     Plaintiff Austin Waid-Jones is a citizen and resident of the State of Massachusetts. Mr. Waid-Jones was employed as an engineer by QuEST from November 2015 until January 2018, working out of East Hartford, Connecticut and Windsor, Connecticut. As part of his employment, Mr. Waid-Jones primarily worked on projects for Pratt & Whitney. As a result of Defendants' agreement, Mr. Waid-Jones earned less than he would have absent the alleged agreement. Further, because of Defendants' unlawful agreement, he was also denied access to better, higher-paying job opportunities and his ability to change employment was restricted.

30.     Plaintiff Nicholas Wilson is a citizen and resident of the State of Colorado. Mr. Wilson was employed as an engineer by Cyient from September 2018 until May 2020, working out of East Hartford, Connecticut. As part of his employment, Mr. Wilson primarily worked on

projects for Pratt & Whitney. As a result of Defendants' agreement, Mr. Wilson earned less than he would have absent the alleged agreement. Further, because of Defendants' unlawful agreement, he was also denied access to better, higher-paying job opportunities and his ability to change employment was restricted.

31. Plaintiff Steven Zappulla is a citizen and resident of the State of Connecticut. Mr. Zappulla was employed as an engineer by Cyient from July 2011 until December 2021, working out of East Hartford , Connecticut and Middletown, Connecticut. As part of his employment, Mr. Zappulla primarily worked on projects for Pratt & Whitney. As a result of Defendants' agreement, Mr. Zappulla earned less than he would have absent the alleged agreement. Further, because of Defendants' unlawful agreement, he was also denied access to better, higher-paying job opportunities and his ability to change employment was restricted.

**B.** **Defendants**

32. Defendant RTX Corporation, Pratt & Whitney Division is incorporated in Delaware with its principal place of business in East Hartford, Connecticut. Pratt & Whitney is one of the largest aerospace engine design, manufacture, and service companies in the United States. During the Class Period, Pratt & Whitney and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

33. During the Class Period, Pratt & Whitney employed Mahesh Patel. Mr. Patel was the Director of the Pratt & Whitney unit that managed the relationship between Pratt & Whitney and its suppliers. He was the highest-ranking employee within that unit and managed a team of associates from his office in East Hartford, Connecticut. Mr. Patel was the main enforcer of Defendants' illegal agreement and served as an intermediary for communications between co-conspirators. Mr. Patel left Pratt & Whitney in March 2020.

34.     Agilis Engineering, Inc. ("Agilis") is incorporated in Florida with its principal place of business in Palm Beach Gardens, Florida.  During the Class Period, Agilis and/or its predecessors or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.

35.     During the Class Period, Agilis employed Frank O'Neill, who has served as Agilis's President and CEO since 1993, working primarily from an office in Palm Beach Gardens, Florida.

36.     Belcan Engineering Group, LLC ("Belcan") is incorporated in Ohio with its principal place of business in Windsor, Connecticut.  During the Class Period, Belcan and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.

37.     During the Class Period, Belcan employed Steven Houghtaling.  In 2013, Mr. Houghtaling began working for Belcan as a General Manager, and was promoted to Vice President in 2015.  Since 2019, he has served as Belcan's Senior Vice President, working principally from an office in Windsor, Connecticut.

38.     Cyient, Inc. ("Cyient") is incorporated in California with its principal place of business in East Hartford, Connecticut.  Prior to 2014, Cyient was known under a different corporate name, Infotech Enterprises, Limited.  During the Class Period, Cyient and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.

39.     During the Class Period, Cyient employed Thomas Edwards, who has been President for Cyient's North America operations since 2013. He worked principally from an office in East Hartford, Connecticut.

40.     Parametric Solutions, Inc. ("Parametric Solutions") is incorporated in Florida with its principal place of business in Jupiter, Florida.  During the Class Period, Parametric Solutions and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.

41.     During the Class Period, Parametric Solutions employed Gary Prus. Beginning at least as early as 2015, Mr. Prus was Chief Operating Officer/Executive Vice President and part owner of Parametric Solutions, and worked principally from an office in Jupiter, Florida.  Prior to his employment with Parametric Solutions, Mr. Prus worked for 18 years at Pratt & Whitney.

42.     QuEST Global Services-NA, Inc. ("QuEST") is incorporated in Ohio with its principal place of business in East Hartford, Connecticut.  During the Class Period, QuEST and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class members in the United States.

43.     During the Class Period, QuEST employed Robert (Bob) Harvey and Hapreet Wasan. Beginning in 2010, Mr. Harvey worked for QuEST as Senior Vice President, then President-Strategic Accounts, and, as of 2019, President-Global Business Head.  Mr. Harvey worked principally from an office in East Hartford, Connecticut.  From 1998 to 2000, Mr. Harvey worked for Pratt & Whitney as a Senior Vice President.  Beginning in early 2015, Mr. Wasan was Vice President/Strategic Client Partner at QuEST, and worked principally from offices in East Hartford, Connecticut and Tokyo, Japan.  He left QuEST in early 2021.  Prior to his roles at QuEST, Mr. Wasan worked at Pratt & Whitney for approximately ten years.

I.      **FACTUAL ALLEGATIONS**

        A.      **The Aerospace Industry**

44.     The U.S. aerospace industry is the largest aerospace industry in the world and continues to grow as space and defense-related sectors expand.  Despite COVID-19's impact on

commercial aviation, the United States aerospace and defense industry reported nearly $700 billion in revenue in 2020.[3]

45.     According to the United States Bureau of Labor Statistics ("BLS"), as of 2020, there were approximately 60,000 aerospace engineers in the United States earning a mean wage of more than $120,000 per year.[4]

46.     Many aerospace companies participate in projects related to national security or defense, which require their engineers to access sensitive or classified information.  As a result, engineers are often required to obtain national security clearances.  Pratt & Whitney lists the "[a]bility to obtain Security Clearance" as a basic qualification for some of its aerospace engineering positions.[5]

47.     High barriers to entry and specialized work keep the supply of qualified Aerospace Worker candidates low, despite increasing demand.  The Aerospace Industry Association's report on the aerospace workforce warned that "the industry faces impending retirements and a shortage of trained technical graduates while work and skills requirements become increasingly advanced—a challenging situation forecast to worsen in the next decade."[6] The same organization found that 39 percent of aerospace companies predict an "'extreme'

---

[3]  PricewaterhouseCoopers, *Global Aerospace and Defense: Annual Industry Performance and Outlook* at 4 (2021), *available at* https://www.pwc.com/us/en/industrial-products/publications/assets/pwc-aerospace-defense-annual-industry-performance-outlook-2021.pdf.

[4]  U.S. Bureau of Labor Statistics., *Occupational Employment and Wages Statistics, May 2020 Occupation Profiles*: 17-2011 Aerospace Engineers, https://www.bls.gov/oes/current/oes172011.htm#st (last visited June 29, 2022).

[5]  Pratt & Whitney, *Sr. Engineer, Aero/Thermal Systems (Hybrid)*, https://careers.rtx.com/global/en/job/01485454/Senior-Engineer-Adaptive-HPC-Structures-P3-Onsite (last visited June 29, 2023).

[6]  Aerospace Industries Ass'n, *The Defining Workforce Challenge in U.S. Aerospace & Defense:  STEM Education, Training, Recruitment & Retention* at 2 (2016).

impact on their business growth caused by the [Science, Technology, Engineering, and Mathematics] labor shortage" and that "talent shortages cost an estimated $14,000 per unfilled position."[7]  As with aerospace engineers, there also has been a shortage of aerospace skilled workers (*e.g.*, assemblers, machinists, tool and die makers, sheet metal workers, patter-makers, and electricians).  As of 2012, the average age of Aerospace Workers was reported to be 45 and a survey conducted by Advanced Technology Services (ATS) and ACNielsen reported that 41 percent of skilled tradespeople in the United States would retire by 2017.

48.     Basic economics prescribes that the relative scarcity of skilled Aerospace Workers and the high demand for their services increases these employees' value, and thus should also increase the compensation that employers pay to secure and retain them.  In a competitive labor market, competition between numerous employers for the small pool of eligible candidates would help "actual and potential employees through higher wages, better benefits, or other terms of employment."[8]

49.     Pratt & Whitney is a major player in the aerospace industry with significant market power, employing more than 42,000 people while generating nearly $21 billion in net sales and $1.8 billion in adjusted operating profit in 2019.[9]  Engines manufactured by Pratt & Whitney power thousands of civil and military aircraft around the world, including the U.S. military's state-of-the-art F-35 Lightning II fighter jet.[10]  Pratt & Whitney's large commercial

---

[7]   Aerospace Industries Ass'n, *What Every Candidate Should Know About the Aerospace Workforce and STEM* at 1 (2016).

[8]   U.S. Dep't of Just., *Antitrust Guidance for Human Resource Professionals* at 2 (Oct. 2016), *available at* https://www.justice.gov/atr/file/903511/download.

[9]   United Technologies, *Annual Report 2019* at 10 (2019), *available at* https://investors.rtx.com/static-files/5612ce4a-a018-4f37-adc6-a154069a68f3.

[10]   *Id.*

engines power over 25% of the world's passenger airline fleet,[11] and Pratt & Whitney claims that its military engines are used by "34 armed forces worldwide."[12]

50.     In addition to hiring its own Aerospace Workers, Pratt & Whitney used outsourcing during the Class Period as a source of labor to design, manufacture, and service its aerospace products.  In an outsource engagement, Pratt & Whitney would typically issue a "Statement of Work" for a particular project, and outsourcing firms would bid on the project. Once a bid was accepted, Pratt & Whitney and the chosen outsourcing firm would enter into an agreement for the project, and the outsourcing firm would allocate Aerospace Workers from among its own employees to work on the project, often alongside Pratt & Whitney's own employees.

51.     Defendants QuEST, Belcan, Cyient, Parametric Solutions, and Agilis were among the outsourcing firms whose employees were outsourced to Pratt & Whitney on projects during the Class Period.  The Outsourcing Defendants' employees often worked on location at Pratt & Whitney sites performing the same or similar work as Pratt & Whitney's own employees.

52.     For example, Parametric Solutions has a single location, in Palm Beach County, Florida. Pratt & Whitney operates a 97,000 square foot test engine center in Jupiter, Florida, located in the same county[13] as an engine overhaul center in West Palm Beach, Florida.[14]

---

[11]     Aerotime, *Who are the world's largest aircraft engine manufacturers?*, Aerotime Hub (Oct. 14, 2022), https://www.aerotime.aero/articles/32417-who-are-the-world-s-largest-aircraft-engine-manufacturers.

[12]     Pratt & Whitney, *Military Engines*, https://www.prattwhitney.com/en/products/military-engines (last visited June 30, 2023).

[13]     Pratt & Whitney NA2 Test Engine Center, https://hedrickbrothers.com/portfolio/pratt-whitney-engine-center (last visited June 29, 2023).

[14]     Florida, USA Details, https://www.prattwhitney.com/en/services/enginewise/maintenance/mro-map/2022/11/21/florida-usa#facility-finder (last visited June 29, 2023).

Parametric Solutions employees not only work on location at Pratt & Whitney in Jupiter, Florida; they also work in many other states.

53.     Data produced in this action by Parametric Solutions includes a list of employees who worked on Pratt & Whitney projects and the locations at which they worked. While the majority of employees working on Pratt & Whitney projects did so in Florida, a minority also worked on Pratt & Whitney projects in Connecticut and Georgia (Pratt & Whitney also operates an engine overhaul center in Columbus, GA, near the Georgia-Alabama border).[15] Other PSI employees worked remotely on unspecified, offsite locations.

54.     Likewise, QuEST employees worked on Pratt & Whitney projects around the country. The following table provides a breakdown of the states in which QuEST employees worked on Pratt & Whitney projects. While the majority were located in Connecticut, there were other employees stationed across many other states:

| Worked in State Tax Code | # Unique Employees | Percent of Employees |
|---|---|---|
| CT | | |
| IN | | |
| MI | | |
| OH | | |
| ME | | |
| GA | | |
| OK | | |
| TX | | |
| CA | | |
| NH | | |
| FL | | |
| AZ | | |
| NY | | |
| MA | | |

[15]  MRO Footprint, https://www.prattwhitney.com/en/services/enginewise/maintenance/mro-map (last visited June 29, 2023).

| Worked in State Tax Code | # Unique Employees | Percent of Employees |
|---|---|---|
| PA | | |
| NC | | |
| AL | | |
| IL | | |
| SC | | |
| N/A | | |
| NJ | | |
| VT | | |

55.     Defendants' own data thus provide ample evidence that the geographic market includes, at a minimum, all locations where Defendant employees worked on Pratt & Whitney projects.

56.     In a competitive market—i.e., a world without Defendants' collusion to suppress wages—Agilis, Belcan, Cyient, Parametric Solutions, and QuEST would have competed against one another, and against Pratt & Whitney, to recruit and hire the most talented Aerospace Workers by offering them better compensation, wages, and benefits.  And they would have competed for these workers in every geographic market in which Defendants operate.  But for Defendants' conspiracy, Aerospace Workers would have benefited from this free market by securing higher compensation.

57.     Competition for skilled aerospace labor by lateral recruitment and hiring has a significant impact on employees' mobility and compensation.  If or when aerospace employers become aware of attractive outside opportunities for their employees, the threat of losing these employees to a competitor encourages improvements in compensation so as to retain valuable labor.  If an employer does not adjust its compensation in response to competitive market forces, its Aerospace Workers would be more receptive to recruiting by a rival employer or seek out such position on their own.

58.     Once an Aerospace Worker has received an offer from a rival employer, retaining that employee may require an increase in this individual's compensation. But increasing compensation for one person has broader effects. Such an increase tends to impact salaries across a company and market, at least for those who perform comparable work. One mechanism for this widespread effect is salary discovery, in which information about competing salaries causes higher compensation even among those employees not actively looking to switch employers.

59.     Another mechanism by which an individual salary adjustment has broader impact is known as "internal equity." This phenomenon means that employers endeavor to maintain parity in pay levels across employees within the same categories, as well as maintain certain compensation relationships among employees across different job categories.

60.     Also known as "wage compression," internal equity has been widely explained and documented in the economic literature. As a recent article notes, "a long tradition in economic thought—as well as in psychology, sociology, and organizational behavior—has advanced the notion that individuals also care about their pay relative to that of their co-workers."[16] Because employees value internal equity, employers respond by implementing uniform compensation structures that pay comparable compensation for comparable work. As a

---

[16]     Emily Breza, Supreet Kaur & Yogita Shamdasani, *The Morale Effects Of Pay Inequality* (Nat'l Bureau of Economic Research, Working Paper No. 22491, Aug. 2016) at 1. *See also* Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving Classwide Impact in Wage Suppression Case*s, ANTITRUST SOURCE (Feb. 2015), https://www.antitrustinstitute.org/wp-content/uploads/2018/08/CavesSinger.pdf; GEORGE MILKOVICH, JERRY NEWMAN & BARRY GERHART, COMPENSATION 72 (11th ed. McGraw-Hill 2014) ("Internal alignment, also called *internal equity*, refers to the pay relationships among different jobs/skills/competencies within a single organization.") (emphasis in original).

result, when competition for labor leads to higher wages for some, all comparable workers tend to benefit from overall higher pay structures.

61.    One textbook explains that "[p]ay structure refers to the array of pay rates for different work or skills within a single organization,"[17] and refers to examples of pay structures at companies such as Lockheed Martin.[18]   Payroll software companies offer advice to employers on achieving internal equity:

> Internal equity is the comparison of positions within your business to ensure fair pay.  You must pay employees fairly compared to coworkers.  Employees must also perceive that they are paid fairly compared to their coworkers.  Otherwise, they might feel unvalued and leave.  It is easy for employees to find out how much other employees earn via the Internet and word of mouth.  If an employee works hard but is paid less than her coworkers who do not work as hard, she might become upset about her wages.  When you adopt a straightforward and honest payment system, your employees will believe that they are being paid fairly and with equality.  This boosts company morale and employee loyalty, bringing many benefits in the long run. . . .
>
> To create fair pay, you compare employees who do similar jobs for your company. You should consider the tasks your employees do.  *If two employees perform similar tasks, they should earn similar wages.*[19]

62.    Defendants' salary structures for their Aerospace Workers were governed by internal equity.  Defendants set pay structures to ensure that Aerospace Workers with similar backgrounds and seniority were paid at similar levels.  Indeed, this is why Defendants

---

[17]   Milkovich et al., *supra*, at 72.

[18]   *Id.* at 73.

[19]   Mike Kappel, *For Fair and Equal Pay, Get to Know Your Business's Internal Equity*, Patriot Software (Dec. 14, 2015), https://web.archive.org/web/20201126132344/https://www.patriotsoftware.com/blog/payroll/what-is-internal-equity (emphasis added).  *See also* Conrado Tapado, *Does Your Company Have Internal Equity?*, Payscale (Apr. 1, 2009) http://www.payscale.com/compensation-today/2009/03/importance-of-internal-pay-equity.

conspired—to avoid the systematic increases in salaries for all Aerospace Workers that would occur if they had to compete for talent in a free market.

63. As an illustration of internal equity among Defendants, one Defendant's employee handbook during the Class Period expressly acknowledged that it would impose "wage structures based on the market value of each position compared to similar organizations in the industry and the local business community. Wage ranges will be reviewed, periodically, to ensure the appropriateness of the structure."

64. In a market untainted by their anticompetitive conspiracy, Defendants would have had an incentive to preempt lateral departures by paying their Aerospace Workers enough that they would be less likely to seek or pursue outside opportunities. Similarly, absent collusion, Defendants would have had an incentive to increase compensation for those employees inclined to join a competitor. Such retention measures would have led to increased compensation for all similarly situated employees. That is, the positive compensation effects of hiring employees from competitors lead to higher wage structures generally and are not limited to the particular individuals who seek new employment or to the particular individuals who would have been recruited.

65. Defendants' conspiracy prevented these procompetitive dynamics from benefiting Aerospace Workers. As a result, Defendants' conspiracy suppressed competition for cross-hiring and recruitment and artificially depressed compensation for workers both within and between competitors. Defendants' conspiracy enabled them to avoid the upward wage pressure that would have been exerted by competition in a free labor market.

66. Pratt & Whitney also benefited from the Outsourcing Defendants' wage suppression by paying a lower billing rate for their employees. Had the Outsourcing Defendants

not conspired with each other and Pratt & Whitney and instead paid their employees competitive wages, they would have had to raise their billing rates to Pratt & Whitney. Otherwise, the Outsourcing Defendants would have suffered a loss in margins. Thus, by suppressing wages, Pratt & Whitney not only benefited from paying lower wages to its own employees but also paying lower billing rates for work performed by employees of the Outsourcing Defendants.

67. Instead of competing vigorously in the labor market for skilled aerospace employees, Defendants entered into an illegal agreement not to compete against each other when it came to recruiting, hiring, and compensating Aerospace Workers. This agreement was undertaken so that Defendants could pay their Aerospace Workers less money than they would otherwise have to in a free market. Defendants benefited from lower labor costs, all at the expense of their employees who were compensated at artificially low levels.

68. Defendants are horizontal competitors in the input market for the labor of Aerospace Workers. Although Defendants have some labor market competitors outside of each other, the Outsourcing Defendants performed work almost exclusively for and supplied their employees primarily to Pratt & Whitney. Thus, having worked mainly on Pratt & Whitney projects, Aerospace Workers employed by any of the Defendants would experience significant barriers to transitioning to another employer outside of Pratt & Whitney and its engineering and skilled labor suppliers. As a result, the existence of outside competitors could not discipline Defendants' anticompetitive conduct, a result evidenced by the lengthy duration of the conspiracy.

69. Although Pratt & Whitney maintains its headquarters in East Hartford, Connecticut and has major operations in that area, the company also operates locations throughout the United States. Some of Defendants' employees—in particular, those working for

Pratt & Whitney, Agilis, Cyient, and Parametric Solutions—were also geographically concentrated in Connecticut and northeast South Florida (specifically, in the neighboring towns Palm Beach Gardens and Jupiter). Other employees—such as those working for Belcan and QuEST—were located in or around Ohio. Many Aerospace Workers are reluctant to move long distances for jobs. The high transaction costs associated with having to move large distances for a new job helped Defendants make their conspiracy even more potent. In other words, Defendants exploited structural geographic barriers that helped keep employees under the thumb of their conspiracy.

**B.** **Defendants' Conspiracy to Restrict Hiring, Recruiting, and Compensation Among Aerospace Workers**

70. Beginning at least as early as 2011, Defendants conspired with each other not to hire or recruit each other's employees.[20]

71. At all times, Defendants conducted this conspiracy in secret, unbeknownst to the employees it harmed. Defendants took pains to keep it secret that they had conspired with each other to suppress labor competition. They hid the existence and terms of the agreement from view due to its illegality and (intended and actual) negative impact on Defendants' employees compensation and career options.

72. Defendants designed their conspiracy to enrich themselves by suppressing the compensation of their Aerospace Workers. This suppression was done by limiting, if not altogether eliminating, competition for these workers once they were originally hired by any Defendant. The absence of normal competition had the effect of allocating the labor market among Defendants.

---

[20] It is presently unknown whether Defendants have withdrawn from the conspiracy and, if so, when that occurred.

73.     Defendants all drew from the same labor pool.  Defendants' conspiracy enabled them to avoid bidding wars to attract and retain employees.  Indeed, far from bidding wars, the conspiracy let Defendants avoid paying fair market rates to their Aerospace Workers.

74.     To ensure the conspiracy worked, when any Defendant engaged in potential competition to hire or recruit Aerospace Workers, Pratt & Whitney's Patel and other conspirators attempted to stop it.  The conspiracy was successful:  it suppressed the wages, salaries, and benefits paid to Class members since at least 2011 to levels materially lower than they would have been in a competitive market.

75.     Pratt & Whitney explicitly told the other Defendants that they should not recruit or hire each other's employees, and each Defendant agreed to abide by this instruction.  This is not something Plaintiffs are inferring or surmising based merely on suspicious circumstances or parallel conduct.  To the contrary, direct evidence exists of Pratt & Whitney directing and policing the conspiracy—the existence of which it acknowledged along the way.

76.     For example, Patel held a dinner in December 2015 with QuEST's Wasan, another co-conspirator employee of QuEST, and Cyient's Edwards.  At that dinner, Patel directly told attendees that there should be "no poaching of each other's employees."  These competitors agreed to follow that instruction.  As another example, in an email from January 2017, Patel sent a warning to Prus, the Chief Operating Officer and part owner of Parametric Solutions, stating: "Last time we talked you assured me that you will not hire any P&W [Pratt & Whitney] partners['] employee.  This must stop, otherwise others will also start poaching your employees." Defendants understood that these restrictions applied mutually among each of them, and abided by the agreement.

77.     Throughout the conspiracy period, Defendants were in frequent contact and often assured each other of their commitment to maintaining the conspiracy. For example, Pratt & Whitney held frequent meetings among its outsourcers, chaired by Patel. At these meetings, Patel would often raise the goal of depressing labor costs.

78.     Defendants convinced each other to abide by the no-poach conspiracy by appealing to their joint interest in suppressing their labor costs in their shared market. For example, in a January 2017 email, Patel wrote Parametric Solutions and instructed: "Please do not hire any partners['] employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war." And in March 2016, while discussing Pratt & Whitney's hiring restrictions, Prus of Parametric Solutions wrote that "Mahesh [Patel] says he does not want the salaries to increase." DOJ Aff. ¶ 24. These statements are direct evidence of an anticompetitive agreement among horizontal competitors, and they lay bare the conspirators' motivation—suppressing the salaries paid to the Aerospace Workers they employed.

79.     The Outsourcing Defendants frequently used Pratt & Whitney as an intermediary to enforce the conspiracy among each other.

80.     For example, in April 2017, a conspirator employed by QuEST emailed Patel to complain that Cyient had hired a current QuEST employee, telling him: "[t]his is against our agreements with our employees and against our known expectations of Pratt & Whitney for the cooperation of the outsource companies," and warning that if the poaching did not stop, it would "drive the price structure up." Patel then sent the conspirator an invitation for a "private discussion" the next day in his office with executives of QuEST and Cyient, including Cyient's Edwards.

81.     Defendants' mutual prohibition on recruiting and hiring each other's current employees is starkly illustrated by the way Defendants would share information about former employees with their direct horizontal competitors so that these competitors understood who they could hire without violating the terms of the conspiracy.

82.     As noted, Defendants' conspiracy was intended to, and did, suppress wages by limiting competition for Defendants' employees.  Defendants did not have the same incentive to restrict their hiring practices when a potential employee had *formerly* worked for another Defendant, as they could hire such a person without needing to lure them away from a competitor with better compensation.  Agilis and Belcan, for example, shared information with each other about which Aerospace Workers were acceptable to hire (because they no longer were employed at a company).

83.     On October 15, 2019, for example, Agilis received an application from an engineer whose resume indicated they had worked for Belcan.  Frank O'Neill allowed the application to go forward only after he confirmed that the applicant was a "free agent," meaning he no longer worked for Belcan.

84.     Pratt & Whitney policed and enforced the agreement on behalf of the other Defendants in a number of ways.  When one Defendant stepped out of line, another Defendant would alert Pratt & Whitney's Patel and ask him to assist in preventing or deterring the conduct.  Patel often obliged by reprimanding the offending Defendant.  In this way, Defendants' artificial allocation of the relevant labor market were protected and maintained.

85.     For example, in May 2016, Houghtaling of Belcan was informed by a colleague that "[a]nother employee" had been hired by Parametric Solutions to work on an outsourcing project.  The colleague asked Houghtaling if he "ever discuss[ed] the last one with [Patel]."

Houghtaling told the colleague he had spoken to Patel and that Patel "said he'd talk to Parametric Solutions about it." Houghtaling then emailed Patel that Belcan was "losing another employee to [Parametric Solutions]," and named the employee.

86.    In November 2016, Prus of Parametric Solutions emailed Patel that Belcan was "actively [r]ecruiting [Parametric Solutions] employees." Patel forwarded Prus's email to Houghtaling and another Belcan manager, saying that "[w]e must not poach each other partners['] employee. Please communicate to [Belcan] HR not to interview or hire active employees working on Pratt & Whitney work."

87.    As yet another example for which there is direct evidence, in a February 2017 email, Wasan of QuEST responded to the news that Belcan had made an employment offer to a QuEST engineer by stating "Belcan is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." Wasan immediately forwarded the information about Belcan's offer to Patel, stating that "I am very concerned that Belcan believes they can hire any of our employees. . . . Could you please stop this person from being hired by [Belcan]?"

88.    Agilis had weekly standing business meetings with Pratt & Whitney, where Patel was present. Defendants' no-poach agreement was discussed in these meetings, the proceedings of which were never publicly disclosed. QuEST also had had weekly standing business meetings with Pratt & Whitney, where Patel was present. Defendants' no-poach agreement was discussed in these meetings, the proceedings of which were never shared with employees or publicly disclosed.

89.    Pratt & Whitney also enforced the conspiracy by requiring Aerospace Worker applicants to disclose whether they worked for any company that did outsourcing work for Pratt

& Whitney.  Pratt & Whitney typically refused to hire any applicant who worked for one of the Outsourcing Defendants.  This refusal, too, effectively locked an existing labor market allocation in place.

90.     Attempting to advance their careers and escape the artificially low wages at the Outsourcing Defendants, class members would spend time and energy searching and applying for positions at Pratt & Whitney or at other Outsourcing Defendants.  Class members had no idea that these applications were doomed to failure because of Defendants' conspiracy, which was designed to keep Aerospace Workers stuck in underpaying jobs so that Defendants could jointly profit at the expense of their employees.

91.     Another way Pratt & Whitney enforced the conspiracy was by refusing to staff on their projects Aerospace Workers hired away from one Outsourcing Defendant by another.  Pratt & Whitney instituted an approval process whereby outsourcers were required to submit for approval by Pratt & Whitney a list of employees who the outsourcer planned to staff on a new Pratt & Whitney project.  Patel and his second-in-command for outsourcing, Matt Lavoie, exercised complete control over the approval process.  Without this approval, Outsourcing Defendants could not staff their Aerospace Workers on Pratt & Whitney projects.

92.     Given that the Outsourcing Defendants and their employees worked principally on Pratt & Whitney projects, being blacklisted like this had a deterrent effect on competition for labor.  The Outsourcing Defendants understood that Pratt & Whitney could withhold approval for any employees who were hired from another Outsourcing Defendant or Pratt & Whitney. This allowed Pratt & Whitney to enforce the conspiracy by causing the Outsourcing Defendants to pay the salaries of employees who were working substantially reduced hours.

93.     Pratt & Whitney also threatened to cut the Outsourcing Defendants off from Pratt & Whitney's business if they violated the conspiratorial agreement.  For example, a series of internal emails from June 2018 shows that QuEST complained to Pratt & Whitney after Belcan made an offer of employment to a QuEST engineer.  Following that complaint, Pratt & Whitney "threatened to pull all POs [project orders] from Belcan" if Belcan hired the employee.  The next day, a Belcan employee emailed Patel that, "Per our conversation yesterday, this email is to confirm that *we have rescinded the offer letter*" for the engineer.

94.     Likewise, when Belcan deviated from the agreement and recruited employees from QuEST, QuEST informed Pratt & Whitney.  Pratt & Whitney then threatened to stop hiring Belcan for its projects.  Belcan then retracted the job offers that it had already extended to QuEST employees (without telling the prospective hires the real reasons for the retractions).

95.     These examples, supported by direct evidence of the agreement, confirm that Defendants are horizontal competitors, operating at the same level of the market for skilled aerospace labor, and hiring from the same pool of talent.

96.     In addition to using Patel as a conduit, the Outsourcing Defendants also discussed the no-poach agreement directly with each other.  For example, in a September 2019 email between O'Neill of Agilis and Edwards of Cyient, Edwards asked O'Neill to stop "actively recruiting" Cyient employees.  O'Neill responded by confirming to Edwards that Agilis's "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get [sic] unstable, and our margins all get hurt."  Edwards thanked O'Neill and added, to reinforce the quid-pro-quo nature of the conspiracy, that "I flat out ask our teams not to hire people from the other Pratt & Whitney suppliers."

97.    Pratt & Whitney also discussed its hires with the Outsourcing Defendants.  On March 17, 2016, for example, Pratt & Whitney asked Agilis whether it would be acceptable for Pratt & Whitney to hire a particular Agilis aerospace engineer.  O'Neill responded that the hire would "undermine the trust" between the two entities, and subsequently Pratt & Whitney did not hire the candidate.  O'Neill was referring to the no-poach agreement.

98.    As noted, Defendants were aware of the illegality of their conduct but that did not stop them.  As early as January 2016, managers and executives at Belcan discussed the fact that no-hire agreements between competitors violate antitrust laws.  A later email showed Belcan's Houghtaling planning a meeting with Patel with an agenda item, "Informal poaching agreement between outsource suppliers.  *Recent Apple lawsuit because these agreements are illegal.*"  In a separate email thread, Houghtaling expressed concern about the agreements, stating, "[Pratt & Whitney] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors . . . .  I'm not sure if this is legal, but that is what they are requesting we do."  The next day, Belcan's Human Resources Director conveyed that she and another Belcan manager "spoke with Mahesh this afternoon.  He understands our concern with antitrust compliance [sic], however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors."  Defendants nevertheless continued to conspire.

C.    **The Conspiracy to Further Restrict Hiring and Recruiting Between Pratt & Whitney and Outsourcing Defendants**

1.    *Pratt & Whitney and QuEST*

99.    As part of the overarching no-poach agreement, Pratt & Whitney and QuEST had specific arrangements that reinforced the no-poach conspiracy and further restrained competition

in the market for Aerospace Workers. These included a two-year tenure restriction and hiring freezes.

100.    The employees harmed by these agreements were never informed that these restrictive arrangements were part of an overarching no-poach conspiracy.

<div align="center">(a)    <u>Pratt & Whitney agreed not to recruit or hire QuEST employees<br>until they had worked for QuEST for at least two years</u></div>

101.    The two-year tenure agreement was formed in 2011. In September 2011, Harvey (of QuEST) and a QuEST account manager attended a dinner with Patel and a Pratt & Whitney Vice President to whom Patel directly reported. The next day, Harvey emailed the dinner group and said, "We truly appreciate and value our strategic relationship. . . . I thought I would take the lead in summarizing what we discussed last night and proposed next steps . . . ." The first item in the summary was called "Personnel Transfers," which Harvey described as the set of "new policy/guidelines" that the Pratt & Whitney Vice President had reviewed at the dinner, and which outlined a requirement for a "min. 24 months" for such "Personnel Transfers."

102.    In late 2011, Harvey and other QuEST executives and managers regularly communicated with Patel and other Pratt & Whitney employees to maintain and enforce this agreement.

103.    As an example, in October 2012, after receiving a voicemail from Patel, a person with knowledge of the conspiracy emailed him: "[Employee]'s tenure at QuEST dates to May 2011. Based on our agreement of two year minimum tenure, we would ask that [Pratt & Whitney] not pursue employment of [him] at this time."

104.    In June 2015, Patel emailed Wasan (of QuEST) and two other QuEST managers, stating that Pratt & Whitney "is interested in interviewing and hiring" two QuEST employees, "[p]lease provide your concurrence." In response, a QuEST manager told Patel that one of the

employees had worked at QuEST for four and a half years, and thus "meets requirements," but the other "only has 8 months and does not meet obligation, so QuEST cannot provide concurrence."

105.     As yet another example, in April 2017, one QuEST manager emailed another QuEST manager that he had received a notice from Pratt & Whitney that it wanted to hire a QuEST employee but the employee "wouldn't meet our requirements for two years." The same manager then emailed Patel that the employee "does not meet tenure requirements." In response, Patel told a Pratt & Whitney Human Resources employee, "QuEST will not release him. . . . He has not completed 2 [y]ears as our verbal agreements."

106.     While the two-year restriction was known to certain QuEST Aerospace Workers, their awareness of this limited restriction did not alert them to the existence of the broader no-poach conspiracy among Defendants. There was nothing about the two-year restriction that would have given a reasonable employee reason to suspect the larger agreement, the membership and terms of which extended well beyond Pratt & Whitney and QuEST.

(b)     Pratt & Whitney and QuEST agreed on hiring freezes

107.     In furtherance of the conspiracy, from approximately 2015 through 2017, Patel and QuEST representatives also agreed to periods of time—from several months to nearly an entire year (2016)—during which Pratt & Whitney would not recruit or hire *any* QuEST employees, with only very limited exceptions. The companies referred to these periods as "freezes" or "moratoria."

108.     For example, in January 2016, Patel and Wasan (of QuEST) put in place a hiring freeze for 2016. Wasan sent an internal email stating that "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I am going to tell

him that he needs to block" two QuEST engineers "from being hired until we come to an agreement on the acceptable limit to hire [from] our team."

109.     Patel enforced this agreement within Pratt & Whitney.  For example, in September 2017, Patel emailed Pratt & Whitney's Vice President of Human Resources-Engineering and told her to "direct your HR team not to hire Quest outsource resources currently deployed on [Pratt & Whitney] projects till end of this year. . . .  Quest senior leadership including CEO has repeatedly raised concerns on [Pratt & Whitney] hiring Quest employees. We will lift Quest hiring restriction from Jan 1, 2018."

110.     Just like the overall conspiracy, these hiring freezes were motivated by a shared desire among Pratt & Whitney and QuEST to suppress wages and costs.  For Pratt & Whitney, this had two benefits.  First, by suppressing wages for Aerospace Workers, Pratt & Whitney was able to pay its own employees lower wages.  Second, by agreeing to restrict hiring of QuEST's employees, Pratt & Whitney helped keep QuEST's wages—and therefore its own costs—lower than they would have been in a competitive market.  The DOJ's investigation revealed that QuEST expressly appealed to these interests in keeping labor costs artificially low.

111.     In June 2017, Harvey (of QuEST) proposed to Pratt & Whitney's parent company a "partnership approach on how we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services[.]"  In the attached presentation, Harvey asked for additional hiring restrictions between the two companies, given that "[w]e have found that customer hiring of our resources puts pressure on Quest's and our customers' [*e.g.*, Pratt & Whitney's] ability to contain labor cost increases in our joint 'ecosystem' over time."  *Id.*  This statement lays bare that the conspiracy was expressly designed to suppress wages paid by both the Outsourcing Defendants *and* Pratt & Whitney.

2. *Pratt & Whitney and the Other Outsourcing Defendants*

112.     Similar to its agreements with QuEST, Pratt & Whitney made agreements in furtherance of the broader conspiracy with each of the other Outsourcing Defendants pursuant to which Pratt & Whitney would not hire Aerospace Workers in the jet propulsion systems markets from them.  These agreements too helped Defendants suppress wages for the aerospace engineers they employed.

113.     Although there were a limited number of exceptions to these agreements granted in extraordinary situations, these rare instances only highlight the general prohibition that prevented almost any movement by Aerospace Workers from Agilis, Belcan, Cyient, and Parametric Solutions to Pratt & Whitney, despite the strong desire of the Aerospace Workers employed at these outsourcing companies to improve their compensation at Pratt & Whitney.

114.     Many employees of the Outsourcing Defendants applied to Pratt & Whitney during the Class Period hoping to escape their artificially low compensation.  Yet application after application was rejected, despite the fact that these outsourced Aerospace Workers often worked alongside Pratt & Whitney engineers and did the same tasks, had the same training, and reported to the same supervisors.

115.     The agreement that Pratt & Whitney would not freely hire from any of the other Outsourcing Defendants further limited employees' options and resulted in artificial allocation of the market for skilled aerospace employees.

**D.     The Effects of the No-Poach Conspiracy**

116.     Defendants' conspiracy suppressed the compensation (including salaries, wages, and benefits) offered and paid to their Aerospace Workers while restricting the employment opportunities available to these employees.

117.     Defendants competed for a limited supply of qualified Aerospace Workers.

118.    Absent the conspiracy, Defendants would have vigorously competed to recruit, hire, and retain top aerospace engineers and other skilled workers, including by directly soliciting competitors' employees with better offers.

119.    The United States Department of Justice has been clear that "[a]greements among competitors not to solicit or hire each other's employees harm competition in labor markets in the same way that agreements among them to allocate customers or divide product markets harms competition in those markets." *In re: Railway Industry Employee No-Poach Antitrust Litigation*, 2:18-MC-798-JFC (W.D. Pa. Feb. 8, 2019), Dkt. 158 at 4 ("DOJ Railway Statement of Interest").

120.    Indeed, the Department of Justice has criminally prosecuted many such market-allocation agreements as *per se* violations of Section 1 of the Sherman Act. *Id.* at 6.

121.    Based on long-standing Supreme Court precedent, the Department of Justice has recognized that "[j]ust as an agreement among competitors to allocate customers eliminates competition for those customers, an agreement among them to allocate employees eliminates competition for those employees." *Id.* at 7.

122.    Agreements not to compete in product and labor markets are virtually indistinguishable in terms of their competitive harms. "[J]ust as allocation agreements in product markets have almost identical anticompetitive effects to price-fixing agreements, no-poach agreements among competing employers have almost identical anticompetitive effects to wage-fixing agreements:  they enable the employers to avoid competing over wages and other terms of employment offered to the affected employees." *Id.* at 8.

123.    This dynamic is well illustrated by Defendants' conspiracy and its effects.  As it was intended to do, Defendants' agreement resulted in pervasive wage suppression among their

Aerospace Workers.  The systemic impact of Defendants' conspiracy meant that the Outsourcing Defendants paid artificially suppressed wages to their Aerospace Workers even when they supplied these Aerospace Workers to clients other than Pratt & Whitney.

124.    Defendants were only able to maintain their artificially low salaries because each of them, as horizontal competitors, agreed not to break ranks and compete with each other based on compensation.

125.    Wage suppression resulting from Defendants' conspiracy impacted Aerospace Workers employed by all Defendants.  Although the Outsourcing Defendants typically paid less than Pratt & Whitney, Defendants' conspiracy also resulted in artificially low pay at Pratt & Whitney itself.  Because the Outsourcing Defendants paid artificially low salaries, Pratt & Whitney could also pay less than it would in a competitive market when it competed against the Outsourcing Defendants to hire a new Aerospace Worker, or in the rare instance when it was allowed to hire an employee away from a Outsourcing Defendant.  In other words, because the Outsourcing Defendants were paying artificially low wages, all Pratt & Whitney had to do to win a salary war was exceed these suppressed salaries.

126.    Free market competition for labor would lead to upward pressure on compensation as firms sought to lure top talent away from their competitors while ensuring their current employees rejected any outside solicitation.  In other words, according to the Antitrust Guidance For Human Resource Professionals issued by the DOJ's Antitrust Division and the Federal Trade Commission, "competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment."[21]  Conversely, "[r]obbing

---

[21]    U.S. Dep't of Justice, *supra* note 8 at 2.

employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment."[22]

127.     Defendants conspired to harm their employees by pledging not to solicit or hire each other's workers.  Freedom from competition allowed Defendants to pay their employees less than they would have been paid in a competitive market.  No-poach agreements like these "enable [] employers to avoid competing over wages and other terms of employment offered to the affected employees" and prevent employees from "reap[ing] the benefits of competition among those employers that may result in higher wages or better terms of employment."[23]

128.     Defendants' conspiracy also cut off the free flow of information within the aerospace engineering and skilled labor market, allowing Defendants to keep costs down by obscuring or eliminating the availability of better opportunities elsewhere.  Put differently, Defendants' conspiracy greatly increased the difficulty their employees faced in searching for better job opportunities.

129.     Direct solicitation from competing employers benefits individual employees because competing employers may make offers that exceed an employee's current compensation. That employee can then secure additional compensation by either changing employers or negotiating increased compensation from her current employer.  In addition, employees often share information about offers, which can empower other employees to negotiate with their employers or seek similar or better terms from their current employers.

130.     Defendants' conspiracy also cut off the free flow of information to employers who might otherwise have increased compensation to compete in the labor market.  Firms that

---

[22]   U.S. Dep't of Justice, *supra* note 1.

[23]   Corrected Statement of Interest of the United States of America at 10, *Stigar v. Dough, Inc. et al.,* No. 2:18-cv-244-SAB (E.D. Wash. Mar. 18, 2019) (Dkt. 34).

directly solicit competitors' employees will learn whether their offered compensation is sufficient to lure its competitors' employees or not, and they are likely to increase compensation offers to ensure they remain competitive. Similarly, firms that learn that their compensation is lower than competitors may preemptively increase compensation in order to avoid losing employees to poaching.

131.    Defendants' conspiracy successfully controlled labor costs by stifling competition for skilled aerospace labor, suppressing compensation to their employees, and restricting the free movement of those employees by eliminating new employment opportunities.

132.    Defendants benefitted from their conspiracy at the expense of Class members. Defendants could have operated in the aerospace industry without their anticompetitive agreement—*i.e.*, paying competitive wages. Pratt & Whitney could have sought bids from the Outsourcing Defendants for its projects and staffed (in whole or in part) projects with Outsourcing Defendants' Aerospace Workers while competing on compensation for those Aerospace Workers. Instead, Defendants decided to pay their employees artificially low compensation so as to avoid the inconvenience of having to compete for skilled labor on the merits.

## II.    EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT

133.    Defendants actively and effectively concealed their collusion from its inception in 2011, as alleged herein, from Plaintiffs and the Class. As a result of the inherently self-concealing nature of Defendants' conspiracy, as well as Defendants' fraudulent concealment of their agreements, all applicable statutes of limitations affecting Plaintiffs' and the Class's claims have been tolled.

134.    Unlike public prices for goods, employees' salaries are often hidden from public knowledge and difficult to ascertain. This opacity makes it very difficult for one employee to

compare wages across employers. Just as a passenger on a flight may have paid more or less than their fellow passengers but has no realistic practical way of discovering this information, pay disparities between employees at competitor companies are, practically speaking, effectively hidden from view.

135. Short of applying for a job and receiving an offer—a scenario Defendants' conspiracy effectively guaranteed would almost never happen among their co-conspirator horizontal competitors—Aerospace Workers had no way to discover what peer employees at competitors were earning.[24]

136. Knowing that their anticompetitive agreements were illegal, Defendants did not commit them to writing. The employees whose wages were suppressed, and who had professional opportunities denied to them by the conspiracy, were not informed that their careers were governed by these secret agreements and had no way of discovering this crucial fact.

137. In addition to deliberately leaving no formal trace of their conspiracy (as one would a legitimate agreement), Defendants used various methods to conceal their conspiracy. These carefully-selected methods included conducting in-person meetings among the conspirators, and minimizing and concealing the written record of their discussions and agreements. For example, in December 2015, Pratt & Whitney held a dinner attended by Patel and representatives from several other Defendants, including Edwards (Cyient), and Wasan (QuEST). At the dinner Patel told the other attendees they should not poach each other's employees.

---

[24] Although outsourced employees of the Outsourcing Defendants were generally aware that Pratt & Whitney employees earned more than they did, the quantum of this disparity was also kept from Plaintiffs and Class members by Defendants.

138.     After another dinner meeting at which Defendants discussed their no-poach

agreement, Harvey (QuEST) stated that Patel had advised the attendees to minimize the written

record of their discussion, writing "Following Mahesh [Patel]'s previous counsel, I am not going

into detail in writing on this subject."

139.     While Defendants concealed their unlawful agreement, they simultaneously

misrepresented to Plaintiffs and the Class that they were abiding by antitrust and fair competition

laws.  For example, Raytheon Technologies Corporation, the parent company of Pratt &

Whitney, states in its Code of Conduct that "anti-competitive activities are always a violation of

our values."[25]

140.     Belcan's Code of Conduct "requires and expects everyone to conduct business

fairly, impartially, and *in full compliance with all laws and regulations*."[26]

141.     Cyient has a similar policy outlined in its Code of Conduct.  It states that

"CYIENT and all our associates are required to comply with the antitrust and unfair competition

laws of the many countries in which we do business. We must never rig bids, fix prices, allocate

customers or markets, or exchange competitively sensitive information (e.g., price, cost, or

---

[25]     Raytheon Tech., *Code of Conduct* at 22 (2020), *available at*
https://raytheonethicscheckline.webline.saiglobal.com/RTX-Code-of-Conduct-
English_200317.pdf.  United Technologies Corporation—Pratt & Whitney's parent corporation
prior to the formation of Raytheon Technologies Corporation through the April 2020 merger of
United Technologies Corporation and Raytheon Co.—had a similar (undated) policy in its Code
of Conduct publicly available online as of January 19, 2022 (since removed) which stated:
"[A]nti-competitive activities are always a violation of our core values.  They can also result in
severe civil or criminal penalties for companies and individuals.  We compete vigorously and
legally, not only because it's good for our business and reputation, but because it's the right thing
to do."  United Tech., *United by Values* at 27 (on file with Plaintiffs) (last viewed May 6, 2022).

[26]     Belcan, *Code of Conduct* (2019), https://www.belcan.com/about/corporate-beliefs/
(emphasis added).

output data) with competitors. Pricing, wage and hiring decision should be made unilaterally by Cyient and not discussed with competitors."[27]

142.    Similarly, in its Code of Conduct, QuEST states that "anti-competitive activity will not be tolerated."[28]

143.    It was reasonable for Plaintiffs and the Class to believe that Defendants were enforcing and abiding by these codes of conduct and the policies stated therein.

144.    Defendants' active concealment of their conspiracy did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that Defendants conspired to restrict competition for Class members' services through anti-solicitation agreements.  Given Defendants' concealment and misrepresentations, Plaintiffs and the Class could not have discovered the conspiracy until December 2021, when the Justice Department's complaint was made public.

145.    Prior to December 2021, Plaintiffs and the Class reasonably considered the aerospace engineering industry to be competitive, and no reasonable person under the circumstances would have had reason to begin to investigate the legitimacy of wages, salaries, or benefits paid by Defendants to engineers in the United States (at least until the Department of Justice began interviewing engineers as part of its investigation).[29]

---

[27]    Cyient, *Code of Conduct* at 7 (Feb. 22, 2022), *available at* https://www.cyient.com/hubfs/Statutory_information/Code_of_Conduct.pdf.

[28]    QuEST Global Inc., *QuEST Code of Conduct* at 59 (Jan. 2022), *available at* https://3fee7a1sld751eqrjr3a035t-wpengine.netdna-ssl.com/wp-content/uploads/2021/08/Code-of-Conduct-Brochure-v4-Sep-2020.pdf.

[29]    Although certain former employees of Defendants were interviewed by the Department of Justice prior to December 2021, which indicated that there was some potential unlawful conduct being investigated, even these individuals were not told the nature or scope of the federal criminal investigation.

146.     The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Class because they related to potential employment opportunities and increases in compensation.

147.     Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class have been tolled during the period of concealment.

## III.     GEOGRAPHIC MARKET ALLEGATIONS

148.     To the extent a relevant market needs to be defined for any reason, the market restrained by Defendants' conduct is the market for labor services of skilled Aerospace Workers in each of the states where Defendants employ skilled Aerospace Workers.  This geographic market includes Alabama, Arkansas, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.  At a minimum, Defendants' conduct restrained the market for labor services of skilled Aerospace Workers in Connecticut, Florida, Michigan, and Ohio.

149.     Defendants employed Aerospace Workers in locations across the United States working on Pratt & Whitney aerospace projects.  By way of example:

(a)     As of December 2018, Belcan employed nearly 500 engineers and another 165 non-engineers supporting Pratt & Whitney located in Arizona, California, Connecticut, Florida, Kentucky, Maine, Maryland, Nevada, Ohio, South Carolina, Texas, and Utah.  Over ███ of these employees were located in Connecticut, Florida, Maine and Kentucky.

(b)     As of 2019, QuEST employed over 250 engineers and another 368 non-engineers supporting Pratt & Whitney located in California, Connecticut, Florida, Georgia,

Indiana, Maine, Michigan, Ohio, Oklahoma, and elsewhere in the United States. Over ███ of these employees were located in Connecticut, Indiana, Maine, Michigan, and Ohio.

(c)     As of 2020, Cyient had over 320 employees supporting Pratt & Whitney located in Connecticut, Florida, Georgia, Maine, and elsewhere in the United States. Over ███ of these employees are located in Connecticut, Florida, and Georgia.

(d)     As of 2020, Agilis employed over 127 engineers supporting Pratt & Whitney located in Florida, California, Oklahoma, and South Carolina. Over ███ of those employees were located in Florida, California, and South Carolina.

(e)     Parametric Solutions, between 2011 and 2019, had approximately 330 employees supporting Pratt & Whitney located in Alabama, Arizona, California, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Maryland, North Carolina, New Hampshire, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington. Over ███ of those employees were located in Connecticut and Florida.

(f)     Pratt & Whitney itself had over 3,500 employees with "Engineering" as their "Organization Description Code." These employees were located in Alabama, Arkansas, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin. Over ███ of these employees were located in Connecticut and Florida.

150.     Thus, even these preliminary data show that Defendants competed for the services of Aerospace Workers in states other than Connecticut.

151.     The 2010 Horizontal Merger Guidelines (the "Guidelines") explain the

framework that the DOJ and the Federal Trade Commission use to define product and

geographic markets.  As this case deals with labor input providers, Defendants act as purchasers

and workers as suppliers.  The Guidelines explain:

> The arena of competition affected by the merger may be geographically bounded if
> geography limits some customers' willingness or ability to substitute to some
> products, or some suppliers' willingness or ability to serve some customers. Both
> supplier and customer locations can affect this.
>
> Geographic markets based on the locations of suppliers encompass the region from
> which sales are made. Geographic markets of this type often apply when customers
> receive goods or services at suppliers' locations. Competitors in the market are
> firms with relevant production, sales, or service facilities in that region. Some
> customers who buy from these firms may be located outside the boundaries of the
> geographic market.[30]

152.     Consistent with these Guidelines, the relevant geographic markets in this case

encompass all locations where Defendants employed  Aerospace Workers.  As noted above, PSI

had over 300 employees supporting Pratt & Whitney in 23 states; Belcan had over 500

employees supporting Pratt & Whitney in at least 12 states; QuEST had over 600 employees

supporting Pratt & Whitney in at least nine states; Agilis had over 100 employees supporting

Pratt & Whitney in four states; and Cyient had over 300 employees supporting Pratt & Whitney

in at least four states.  Pratt & Whitney itself had over 3,500 employees in at least 30 states.

These facts demonstrate that Defendants operated in each of those states where Defendants'

Aerospace Workers were supporting Pratt & Whitney.

153.     Using the DOJ Horizontal Merger Guidelines, the relevant question is whether a

hypothetical monopsonist in a geographic market such as the Hartford, Connecticut area could

---

[30]   U.S. Dep't of Just. & Fed. Trade Comm'n, Horizontal Merger Guidelines at 14
(2010), *available at* https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-
2010.pdf.

profitably impose a small but significant non-transitory decrease in wages. Such a monopsonist could do so if outside options could not discipline its ability to suppress wages below competitive levels. The evidence in this matter overwhelmingly supports the conclusion that Defendants had monopsony power over workers in the locations where Defendants had operations (e.g., Connecticut, Florida, Michigan, Ohio, and other states).

154. First, the mere fact the no-poach conspiracy lasted more than 8 years is compelling testament to the notion that Defendants did indeed have pricing power over wages and benefits in the geographic areas in which Pratt & Whitney operated.

155. Second, employees in this sector face substantial search frictions and transaction costs, the corollary to transportation costs that the Merger Guidelines contemplate with respect to output markets. The average wage for an SNR aerospace worker at Pratt & Whitney was approximately ██████ in 2019. If that wage resulted from the imposition of a five percent decrease in wages—meaning the competitive wage should have been approximately ██████— the question, for purposes of market definition, is whether an employee would incur the costs of moving to a different location, potentially selling and purchasing a new home, uprooting one's family, and a host of other costs and burdens for a $6,000 pay raise.

156. Data and economic reasoning strongly suggest the answer is "no." CareerBuilder's Supply and Demand data indicate that over 70 percent of aerospace employees who listed a Defendant on their resumes would *not* relocate for a new position, as shown in the following table.

| | All Resumes | | Resumes with at Least Bachelor Degree | |
|---|---|---|---|---|
| | Resumes | % Unwilling to Relocate | Resumes | % Unwilling to Relocate |
| Pratt & Whitney | 3,356 | 77% | 2,309 | 75% |
| Belcan | 1,354 | 78% | 869 | 78% |
| QuEST | 1,095 | 79% | 704 | 78% |
| Cyient | 236 | 73% | 172 | 71% |

157.    Employees' reluctance to do so is based on economic logic; the costs required to effectuate such a transition would surpass the benefits of doing so in the form of higher wages. Such transaction costs do not even take into consideration the search costs that an employee must incur to obtain an offer. It was this lack of employee mobility that gave Defendants power to reduce wages and benefits without losing workers, even if theoretically these employees had outside options.

158.    The evidence also shows that Defendants' conspiracy directly impacted Aerospace Workers across various states, forcing them to accept lower-than-market wages. For example, a comparison of the wages that Pratt & Whitney paid its SNR employees (the highest wage category) against the average wages for aerospace engineers in the United States, as reported in the Bureau of Labor Statistics' Occupational Employment and Wage Statistics ("OEWS"), shows that Pratt & Whitney systematically underpaid its employees throughout the relevant period.[31] Moreover, the data evince spillover effects into the post-conspiracy period, a

---

[31]   The data detailed in the wage comparison table reflect only wages and salaries. The OEWS data do not include any benefits. To enable an apples-to-apples comparison, the Pratt & Whitney data only reflect the annual base salary wages. *See* Bureau of Labor Statistics, *Occupational Employment and Wage Statistics*, https://www.bls.gov/oes/oes_ques.htm (last viewed June 29, 2023) ("Do the OEWS wage estimates include benefits? No. OEWS wage estimates represent wages and salaries only, and do not include nonproduction bonuses or employer costs of nonwage benefits, such as health insurance or employer contributions to retirement plans.")

phenomenon documented in the economic literature, which notes that the effects of a collusive

agreement may extend after the breakup of the conspiracy.[32]

| | Average Annual Wage | | | | |
|---|---|---|---|---|---|
| Year | SOC: 17-2011 (Aerospace Engineers) | SOC: 17-3021 (Aerospace Engineering and Operations Technologists & Technicians) | Employee - Weighted Avg. Wage | Pratt & Whitney SNR Employee Avg. Salaries | Annual Wage Underpayment Per Employee |
| 2012 | $104,810 | $61,980 | $100,179 | | |
| 2013 | $105,450 | $62,540 | $99,937 | | |
| 2014 | $107,700 | $64,310 | $101,633 | | |
| 2015 | $110,570 | $68,620 | $103,800 | | |
| 2016 | $112,010 | $71,070 | $105,921 | | |
| 2017 | $115,300 | $71,340 | $108,655 | | |
| 2018 | $117,100 | $68,970 | $110,531 | | |
| 2019 | $119,220 | $68,340 | $111,364 | | |
| 2020 | $121,110 | $70,680 | $112,836 | | |
| 2021 | $122,970 | $73,510 | $114,988 | | |

159. Defendants' conspiracy had the ability to suppress the wages they paid to

Aerospace Workers they employed, no matter where those workers were located. Defendants'

market power can be demonstrated through both direct and indirect evidence.[33] In the output

market, direct evidence of market power is shown by the ability to control prices and output or

---

[32] *See, e.g.*, H. Peter Boswijk, Maurice J. G. Bun and Maarten Pieter Schinkel, *Cartel Dating*, 34 J. OF APPL ECON. 26, 26 (2019) ("The formal cartel dates need not coincide with the point(s) in time at which the anticompetitive effects produced by the cartel violation began or ended. The collusive agreements may take a while to take effect, become ineffective before its members ultimately disband, or rather have lasting effects—including unilateral incentives for former cartellists to keep post-cartel prices up in order to mask their conspiracy.").

[33] *See Todd v. Exxon Corp.*, 275 F.3d 191, 206-07 (2d Cir. 2001) (direct or indirect evidence can be used to show market power).

exclude competitors.[34]  The existence of market power may also be inferred though indirect evidence such as market shares, "in conjunction with other market characteristics including the strength of competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand."[35]

160.    As in the output market, both direct and indirect evidence can illuminate the existence of market power over input providers, including labor.  The ability to restrain wages below those that would prevail under competitive conditions is commonly known as monopsony power, the analogue to monopoly power in output markets.  Here, Defendants' monopsony power is demonstrated directly by the very existence of their multi-year conspiracy to fix, maintain, and suppress compensation for Plaintiffs and other members of the Class.

161.    As Defendants own documents reflect, the stated purpose of the conspiracy aimed to "prevent poaching and price war[s]" that would "drive the price structure up."  Defendants did not distinguish among the Aerospace Workers subject to the conspiracy based on where they were located.  Had competing opportunities existed for Defendants' employees to earn higher compensation at other aerospace engineering firms, they could have ceased their employment with Defendants and pursued those more lucrative opportunities. Had these conditions existed, Defendants' conspiracy to suppress compensation would not have been economically viable and would have collapsed. The fact that outside competition did not discipline Defendants' ability to

---

[34]    *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (market power "may be proven directly by evidence of the control of prices . . . ."); *Todd*, 275 F.3d at 206 (market power may be proven if "a defendant's conduct exerted an actual adverse effect on competition," meaning that if plaintiffs can show that defendants' exchange of salary information "did in fact have an anticompetitive effect on the market for MPT labor in the oil and petrochemical industry, we would not deny relief on the basis of market share figures").

[35]    *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 501 (2d Cir. 2004) (internal citation and quotation marks omitted).

sustain their long-standing conspiracy over the period from 2011 to 2019 directly evinces their monopsony power. And the fact that Defendants did not limit their conspiracy to certain geographies shows that their monopsony power was not limited to certain geographies.

162. There was no express or implied geographic limitation to Defendants' conspiracy; Defendants imposed the same restraints wherever a Defendant's Aerospace Workers were located. For example:

(a) Plaintiff Ryan Glogowski, who worked for Defendant QuEST in Michigan, sought to leave his position at QuEST for a new position at Pratt & Whitney. A May 2016 internal email from Pratt & Whitney's human resources personnel to Mahesh Patel requested authorization to hire Mr. Glogowski for Pratt & Whitney's "AutoAir" operation in Lansing, Michigan. Pratt & Whitney was prepared to offer Mr. Glogowski an annual salary of between $72,000 and $75,000, which reflected a *$10,000+* increase over his gross pay at QuEST. Mr. Patel, however, blocked the transfer because "P&W has agreed with Quest not to hire *any of their employees* in 2016. Please do not extend the hiring offer."

(b) In January 2017, Mahesh Patel prevented Parametric Solutions from hiring several candidates who were currently employed by Pratt & Whitney "partner companies" on projects in Greenville, South Carolina and Cincinnati, Ohio. Parametric Solutions COO Gary Prus stated the following in a January 31, 2017 email to Ben Reinert of Pratt & Whitney: "We are in a hiring mode and recruiting across the country. I have a lot of PW partner companies (mainly Belcan, Quest, Cyient) personnel that are working GE projects in Greenville and Cincinnati applying for jobs. We recently spoke to Mahesh and he has told us that we cannot hire any of these individuals since they work for partner companies." Prus noted that the employees "are leaving since they have limited work, or do not want to live in the area or want to

do something else" and that "[i]f PSI is not allowed to hire from any company that does work with PW, it will GREATLY reduce our opportunities to hire experienced personnel."

(c)     When Belcan made an offer in July of 2013 to hire Debera Schroeder, a QuEST employee working out of Cincinnati, QuEST intervened directly to prevent the hiring. In a July 19, 2013, email to Belcan General Counsel Craig Hopewell, John Reinard of QuEST stated that: "QuEST has a policy to not interview or hire any person who currently works for Belcan. We continue to honor this. We believe that poaching from each other will have a negative impact on our companies, and that it will generally increase the cost of engineering services to our customers. We request that Belcan also observe this practice." After speaking to Hopewell on the phone, Reinard sent an email to his colleague Phillip Monin stating that: "based on my conversation with Craig, it would not surprise me if Belcan rescinds the job offer." Ms. Schroeder was not hired by Belcan.

(d)     Agilis, which employs people outside of Connecticut, including in Florida, California, Oklahoma, and South Carolina, admitted "that it voluntarily participated in an agreement to allocate employees constituting a criminal violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by restricting the hiring and recruiting restrictions of engineers and other skilled labor employees among outsource engineering services companies." Agilis Answer, ECF No. 631, at 1-2 (internal quotation marks omitted).

163.    Defendants control a substantial portion of the available skilled aerospace jobs in a number of states, including Connecticut, Florida, Michigan, and Ohio. Defendants' power is amplified in these states due to search frictions that complicate workers' ability to avail themselves of potentially more lucrative opportunities elsewhere.

49

164.     Plaintiffs obtained additional data from Lightcast (formerly known as Emsi/Burning Glass), a leading labor market analytics firm.  The data obtained included employee profiles and experience data, including information reflected on employee resumes such as job title, company, skills, and education information.  While the Lightcast database currently contains profiles for over a hundred million distinct individuals,"[36] Plaintiffs obtained data only related to aerospace employees.  The data specifically contains a state code reflecting where the employment occurred.

165.     The Lightcast dataset includes a total of 1,598 resumes, of which 347 reflected positions across the United States.  Using these data, Plaintiffs sought to answer two questions: (1) what percentage of these employees were employed by Defendants; and (2) to what extent aerospace engineers took positions in various states.

166.     Plaintiffs analyzed the Lightcast production with respect to the "Experience" file, which includes employment histories, limiting the data to include only job positions that referenced the terms "engineer," "manager," or "technician."  In addition to including only these job positions, Plaintiffs further confined the scope of the data to include only companies in industries identical or similar to the ones in which Defendants operated.[37]

167.     Plaintiffs' analysis proceeded along a five-step process.  First, Plaintiffs identified instances where any Defendant (or their related corporate entities)[38] appeared as an employer

---

[36] Emsi, *Emsi Burning Glass Data Basic Overview*, https://kb.emsidata.com/methodology/emsi-data-basic-overview (last visited June 29, 2023).

[37] This step reflected the fact that the data production from Lightcast included positions and industries that do not serve as substitutes for aerospace engineers working for Defendants.  For example, the Lightcast data included industries such as Hospitals and Oil & Gas Extraction.

[38] For example, prior to 2014, Cyient was known as Infotech Enterprises.  In addition, in December 2017, Belcan acquired CDI Corporation's Aerospace & Industrial Equipment business unit.  *See* Press Release, Acquires CDI's Aerospace & Industrial Equipment Business Unit and Certain Related Aerospace Staffing Contracts (Dec. 12, 2017),

name on a resume.  Second, Plaintiffs totaled the number of times Defendants (or their related

corporate entities) appeared as an employer on resumes for aerospace engineers in each U.S.

state.  Third, Plaintiffs identified the total number of aerospace engineering positions, across all

aerospace employers, listed in the resumes, as explained in paragraph 10 above.  Fourth,

Plaintiffs totaled the number of aerospace engineering positions, regardless of employer, in each

U.S. state.  Finally, for each U.S. state, Plaintiffs calculated the percentage of total aerospace

engineering positions attributable to Defendants (or their related corporate entities) relative to the

total number of aerospace engineering positions attributable to any aerospace employer.

168.    Over the period covered by the Lightcast data, Plaintiffs' analysis shows that

Defendants held a significant share of total aerospace engineering positions in each of the

following states: Connecticut (between 50%-75%), Florida (between 20%-30%), Michigan

(between 40%-50%), and Ohio (between 30%-40%).[39]

169.    Further entrenching Defendants' control over the skilled aerospace labor market is

the lack of employee mobility.  Defendants' employees were largely unwilling, or unable, to

move large distances for other employment opportunities.  This limited their options and allowed

Defendants to lower wages without losing skilled workers.  Evidence of this is found in data

from CareerBuilder, which show that over 70% of aerospace engineers whose resumes are

included in the CareerBuilder data indicated that they are  unwilling to relocate.  Such data

illustrate the limited outside employment options available to Class Members, and Defendants'

ability to exercise market power over them to restrain their wages.

---

https://www.belcan.com/2017/12/12/belcan-acquires-cdis-aerospace-industrial-equipment-business-unit-certain-related-aerospace-staffing-contracts/.

[39]    The Emsi Burning Glass profiles dataset did not include resumes reflecting aerospace engineers for Agilis and Parametric.  Accordingly, these percentages likely undercount Defendants' total share in one or more of these specific geographic submarkets.

170.     Even though outside options may exist *in theory*, numerous search frictions limit the geographic scope of the labor market, allowing buyers such as Defendants to place downward pressure on wages even where Defendants do not have an especially high market share.[40]  A recent 2021 study found that search frictions and switching costs may grant monopsony power to incumbent employers (such as Defendants) by reducing workers' outside options.[41]  This study also found that "moving costs are substantial and that labor market frictions primarily inhibit the employed.  Reducing these frictions would result in a higher wage elasticity and lower employer monopsony power."[42]  A 2018 *Harvard Law Review* article further explains that:  "Because a worker's existing employer knows that the worker's search cost is high, the employer can reduce compensation—including wages, benefits, and workplace amenities—or fail to increase compensation despite the worker's contributions because the employer knows that the worker can find an alternative job only with difficulty."[43]

171.     Defendants' employees also obtain specialized training on projects specific to Pratt & Whitney.  These project-specific skills limit their mobility to aerospace engineering firm outside of Defendants.

---

[40]     Adib Ahmad, *What can search frictions tell us about the labor market?*, U.S. BUREAU OF LABOR STATISTICS MONTHLY LABOR REVIEW (Oct. 2020), https://www.bls.gov/opub/mlr/2020/book-review/what-can-search-frictions-tell-us-about-the-labor-market.htm.

[41]     Tyler Ransom, *Labor Market Frictions and Moving Costs of the Employed and Unemployed*, 57(S) J. HUMAN RES. 137, 137 (2021).

[42]     *Id.* at 138 ("… lower levels of migration may indicate a less competitive labor market—when workers are unable or unwilling to move, their outside options are diminished, and employers can compensate them below their market value…Moving costs depend on employment status, and frictions depend on both employment status and local labor market conditions").

[43]     Suresh Naidu, Eric A. Posner & Glen Weyl, *Antitrust Remedies for Labor Market Power*, 132 HARV. L. REV. 536, 553 (2018).

172.    Economic literature demonstrates that buyers can exercise monopsony power—particularly in labor markets—while holding substantially lower market shares than those necessary to exercise monopoly power in output markets.  For example, the higher education market consists of approximately four thousand degree-granting institutions in the United States (an average of eighty per state).  Nonetheless, a 2019 paper authored by Austan Goolsbee, former Chairman of the Council of Economic Advisers, and Chad Syverson, editor of the Journal of Political Economy, found that institutions of post-secondary education have significant monopsony power over their tenure-track faculty.  The authors also found that "[t]he degree of a college's monopsony power is therefore related to its size, but not any measure of local market share."[44]  Another paper shows that a significant degree of labor market power is "frictional"—that is, lacking any artificial barriers to entry or employment concentration—and that "even labor markets unaffected by the traditional markers of anticompetitive markets are rife with monopsony."[45]  Surveying several models of employment, the authors also explain that "while concentration in labor markets is significant, the models surveyed earlier suggest that considerable monopsony power can persist even in large, non-concentrated labor markets with many employers."[46]

---

[44] Austan Goolsbee & Chad Syverson, *Monopsony Power in Higher Education: A Tale of Two Tracks* 15 (Nat'l Bureau of Economic Research, Working Paper No. 26070, 2019).

[45] Suresh Naidu & Eric A. Posner, *Labor Monopsony and the Limits of the Law*, 57 S J. HUMAN RES. 284, 285 (2021).  *See also id.* at 289 ("While concentration is a clear empirical determinant of labor market monopsony, it has not been the traditional focus of labor economists interested in monopsony. Instead, labor economists have focused on models of imperfect competition that have many firms and many workers, yet still deliver upward-sloping labor supply curves to each firm.").

[46] *Id.* at 295-96.

173.     Accordingly, whether viewed under the lens of direct or indirect evidence, Defendants' conspiracy operated without restriction across the United States and had the greatest effects within Connecticut, Florida, Michigan, and Ohio.

## IV.     CLASS ACTION ALLEGATIONS

174.     Plaintiffs, on behalf of themselves and those similarly situated, seek damages against Defendants based on the allegations contained herein.

175.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  The Class is defined as:

> All persons employed by Pratt & Whitney, Agilis, Belcan, Cyient, Parametric Solutions, QuEST, or their wholly-owned subsidiaries as Aerospace Workers at any time from January 1, 2011 through the present (the "Class Period"). Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, senior officers and directors, and human resources personnel of Defendants and the United States government.

176.     *Numerosity*.  Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class, but believe that there are thousands of Class members geographically dispersed throughout the United States.  Moreover, given the costs of complex antitrust litigation, it would be uneconomical for many plaintiffs to bring individual claims and join them together.  The Class is readily identifiable.

177.     *Typicality*.  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

178.     Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.

Accordingly, by proving their own claims, Plaintiffs will prove other Class members' claims as well.

179.   ***Adequacy of Representation***.   Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and in the representation of individual employees and groups of employees.   Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

180.   ***Commonality***.   There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)   Whether Defendants entered into a no-poach agreement to restrict competition in the labor market in which Plaintiffs and the other Class members sold their services;

(b)   the identity of the participants in the conspiracy;

(c)   the duration of the conspiracy;

(d)   the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)   whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Class;

(f)   whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Class;

(g)    whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

(h)    the appropriate injunctive and equitable relief for the Class.

181.    ***Predominance***.  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

182.    ***Superiority***.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in managing this class action.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

183.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

# FIRST CLAIM FOR RELIEF

## (Conspiracy to Restrain Trade in Violation of §1 of the Sherman Act, 15 U.S.C. § 1)
### (*Per Se* Violation)

184.    Plaintiffs incorporate the preceding paragraphs by reference, including all geographic market allegations in Paragraphs 148 through 173.

185.    Defendants knowingly, intentionally, and cooperatively engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Specifically, Defendants agreed to restrict competition for Class members' services through a no-poach agreement, as detailed herein, with the purpose and effect of suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

186.    Defendant Agilis has admitted "that it voluntarily participated in an agreement to 'allocate employees constituting a criminal violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by restricting the hiring and recruiting restrictions of engineers and other skilled labor employees among outsource engineering services companies."  Agilis Answer, ECF No. 631, at 1-2.  Agilis also applied for a marker under the DOJ's Corporate Leniency Program, which requires that any party seeking immunity from criminal sanctions fully disclose and admit its participation in a criminal violation of the antitrust laws.

187.    Defendants are horizontal competitors who operate at the same level of the aerospace market when it comes to hiring skilled Aerospace Workers.  Defendants compete for skilled labor in this market.  Class members would apply for positions across Defendants, as they employed the same or similarly skilled labor.

188.    Defendants' agreement to eliminate competition for skilled aerospace labor allocated the employment market among themselves, and had no lawful or legitimate procompetitive business purpose.

189.    Defendants' no-poach agreement is a *per se* violation of Section 1 of the Sherman Act.

190.    The U.S. Department of Justice has made clear that no-poach agreements among competing employers are a type of allocation agreement affecting a labor market and that, like other allocation agreements, they are *per se* unlawful.

191.    Defendants' agreements are naked restraints of trade that serve no purpose except for stifling competition, to the detriment of the market for employee labor and the employees comprising that market.  Defendants' conspiracy was not reasonably necessary to further any separate, legitimate business transaction or collaboration.

192.    Naked no-poach agreements of the kind entered into by Defendants "are *per se* illegal because they eliminate competition in the same irredeemable way as agreements to allocate customers or markets."  DOJ Railway Statement of Interest at 9.

193.    Defendants' conduct injured Plaintiffs and other Class members by depriving them of free and fair competition in the market for their services.

194.    Because Defendants' conspiracy is *per se* illegal under the federal antitrust laws, Plaintiffs need not define a relevant product or geographic market.

195.    To the extent a relevant market needs to be defined for any reason, the market restrained by Defendants' conduct is the market for labor services of skilled Aerospace Workers in each of the states where Defendants employ skilled Aerospace Workers.  This geographic market includes Alabama, Arkansas, California, Connecticut, Florida, Georgia, Hawaii, Illinois,

Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.  At a minimum, Defendants' conduct restrained the market for labor services of skilled Aerospace Workers in Connecticut, Florida, Michigan, and Ohio.

196.    As alleged above in Paragraphs 148 through 173, Defendants employed Aerospace Workers in locations across the United States working on Pratt & Whitney aerospace projects, with particularly high concentrations in Connecticut, Florida, Michigan, and Ohio.

197.    As a direct and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and the Class have received compensation that is less than they would have received had the market for their services been free of anticompetitive restraint.

## SECOND CLAIM FOR RELIEF

**(Conspiracy to Restrain Trade in Violation of §1 of the Sherman Act, 15 U.S.C. § 1) (Rule of Reason)**

198.    Plaintiffs incorporate the preceding paragraphs by reference, including all geographic market allegations in Paragraphs 148-173.

199.    Defendants knowingly, intentionally, and cooperatively engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Specifically, Defendants agreed to restrict competition for Class members' services through a no-poach agreement, as detailed herein, with the purpose and effect of suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

200.    Defendants are horizontal competitors who operate at the same level of the aerospace market when it comes to hiring skilled Aerospace Workers.  Defendants compete for

skilled labor in this market. Class members would apply for positions across Defendants, as they employed the same or similarly skilled labor.

201. Defendants' agreement to eliminate competition for skilled aerospace labor allocated the employment market among themselves, and had no lawful or legitimate procompetitive business purpose.

202. In addition to being a *per se* violation of Section 1 of the Sherman Act, Defendants conduct is also unlawful under the quick look and rule of reason standards, as there is no cognizable legitimate procompetitive justification for the restraint. To the extent there are any legitimate procompetitive benefits, those benefits can be achieved through less restrictive means.

203. Defendants' no-poach agreement is a violation of Section 1 of the Sherman Act to the extent any "quick look" analysis is employed. Defendants are competing firms that agreed not to compete for employees. Under basic economic theory, when competitors agree not to hire each other's employees, compensation stagnates.

204. Defendants' conduct injured Plaintiffs and other Class members by depriving them of free and fair competition in the market for their services.

205. As alleged above, the market restrained by Defendants' conduct is the market for labor services of skilled Aerospace Workers in each of the states where Defendants' employ skilled Aerospace Workers. This geographic market includes Alabama, Arkansas, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West

Virginia, and Wisconsin. At a minimum, Defendants' conduct restrained the market for in labor services of skilled Aerospace Workers in Connecticut, Florida, Michigan, and Ohio.

206. As alleged above in Paragraphs 148 through 173, whether viewed under the lens of direct or indirect evidence, Defendants' conspiracy operated without restriction across the United States and had the greatest effects within Connecticut, Florida, Michigan, and Ohio.

207. As a direct and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and the Class have received compensation that is less than they would have received had the market for their services been free of anticompetitive restraint.

## **PRAYER FOR RELIEF**

208. WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

(a) Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and/or (b)(3); direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class; declare Plaintiffs as the representatives of the Class; and designate undersigned counsel as counsel for the Class.

(b) Adjudge and decree that the unlawful conduct alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c) Permanently enjoin and restrain Defendants from continuing and maintaining the conspiracy alleged in the Complaint under Section 16 of the Clayton Act, 15 U.S.C. § 26;

(d) Award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15, plus interest;

(e)     Award reasonable attorneys' fees and costs;

(f)     Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action; and

(g)     Direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.


DATED:   Milford, Connecticut
         November 2, 2023

By:

**QUINN EMANUEL URQUHART &**          **DICELLO LEVITT LLP**
**  SULLIVAN, LLP**

 */s/ Daniel L. Brockett*                */s/ Gregory S. Asciolla*
Daniel L. Brockett (phv20450)          Gregory S. Asciolla (phv02599)
Manisha M. Sheth (phv01061)            Robin A. van der Meulen (phv09139)
Steig D. Olson (phv06391)              Matthew J. Perez (phv06870)
Thomas Lepri (phv20453)                485 Lexington Avenue, Suite 1001
Daniel F. Loud (phv206704)             New York, New York 10017
51 Madison Avenue, 22nd Floor          Telephone: (646) 933-1000
New York, New York 10010               gasciolla@dicellolevitt.com
Telephone:  (212) 849-7000             rvandermeulen@dicellolevitt.com
danbrockett@quinnemanuel.com           mperez@dicellolevitt.com
manishasheth@quinnemanuel.com
steigolson@quinnemanuel.com
thomaslepri@quinnemanuel.com
danielloud@quinnemanuel.com

Justin Reinheimer (phv20572)
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:  (415) 875-6600
justinreinheimer@quinnemanuel.com

*Interim Co-Lead Counsel*

**GARRISON, LEVIN-EPSTEIN,**
**FITZGERALD & PIRROTTI, P.C.**

Joseph D. Garrison (ct04132)
Stephen J. Fitzgerald (ct22939)
Joshua R. Goodbaum (ct28834)
Amanda M. DeMatteis (ct29413)
405 Orange Street
New Haven, Connecticut 06511
Telephone:  (203) 777-4425
jgarrison@garrisonlaw.com
sfitzgerald@garrisonlaw.com
jgoodbaum@garrisonlaw.com
adematteis@garrisonlaw.com

**HURWITZ SAGARIN SLOSSBERG &**
**KNUFF, LLC**

David A. Slossberg (ct13116)
Erica Oates Nolan (ct31097)
Timothy C. Cowan (ct30786)
135 Broad Street
Milford, Connecticut 06460
Telephone:  (203) 877-8000
DSlossberg@hssklaw.com
ENolan@hssklaw.com
TCowan@hssklaw.com

*Local Connecticut Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 2, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

<div style="margin-left: 50%;">

*/s/ Erica O. Nolan*
Erica O. Nolan

</div>